CIV-COHN

04-60196

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MAGISTRATE JUDGE
SNOW

-----------------------------------------------------------------------

The Pension Committee of the University of Montreal Pension Plan; The Altar
Fund; Aberdeen Investments, Ltd.; Aries Trading Ltd.; The Arrowsmith Fund,
Ltd.; AXA Alternative Advisors, Inc.; Banco Nominees (I.O.M.) Ltd; Bank of
Bermuda (Luxembourg) S.A.; Banque Privee Edmond de Rothschild Europe;
Banque Privee Edmond de Rothschild Europe/Isofin; John G. Barrie, Jr. IRA;
Base Force, Ltd.; Bombardier Trust (Canada); The Bombardier Trust (U.K.); The
Bombardier Trust (U.S.);  Commerzbank Capital Markets Corp.; Cedar Fund;
Clearwater Commercial Enterprises, Inc.; Commonfund Global Hedged
Partners, LLC; Condor Alternative Fund; The Corbett Family Charitable
Foundation, Inc.; The International Active Fund of Funds; Fortis Global Custody
Management and Trustee Services (Ireland) Ltd; Dirmica Investment, Ltd.;
Diversified Capital Management Ltd; Dominion Resources Inc. Master Trust;
Alain Dunand; Fondation Lucie et Andre Chagnon; 9091-2601 Quebec Inc.,
Assignee of Sojecci Ltee.; Claude Chagnon; Andre Chagnon; Fondation J.
Armand Bombardier; Fondation Lilla; Ethos Investments, Ltd; First Trust Corp.;
Goulam Investments Inc.; GT Alpha; Christa Gunter; Hermes Trading Ltd.;
HSBC Private Bank (Suisse) SA; HSBC Republic (USA) Inc.; Hunnicutt & Co.,
Inc.; IRA fbo Wiliam Hunnicut; Kredietbank Luxembourg; Kuwait and Middle East
Financial Investment Company; La Compagnie Financiere Edmond de
Rothschild Banque; Cecile Lescoat; LGT Bank in Liechtenstein, Ltd.; L.H.
Logarithm Holdings SA; Madison Textiles Ltd.; Maestro Trading, Inc.; Mirelis
InvesTrust SA; Vittorio Mosca; The Morton Meyerson Family Foundation; The
1999 Meyerson Charitable Remainder Trust; Multivalor Invest Inc.; National
Bank of Canada; Nemrod Leveraged Holdings Ltd; Nobilis S.A.; Suzanne Fontan
S.C.A; Halivest Sarl; Octogone Gestion SA; Okabena Marketable Alternatives
Fund LLC; Pictet & Cie Banquiers; The Pension Committee of Régime des
rentes du Mouvement Desjardins; Anne-Chantal Pigelet; The Trustees of RCA
in Trust; The Pension Committee of the pension plan for Regime de ratraite de la
Corporation de l'Ecole Polytechnique;  Rothschild Gestion; Satnam Investments
Ltd; Seven Seas Portfolio A Ltd; Signet Multi-Manager Inc; SIL Nominees
Limited; Sperry Complete Manager Fund Ltd.; SPGP (Societe Privee de Gestion
de Patrimoine); St. George's Trust Company Limited; Jo-Ann St. Germain; The
Stafford Fund Ltd; StarVest Funds Ltd.; The Taurus Trust; Team Haas USA, Ltd;
Trendtrust SA; UEB Geneva; James Vaughan; Venere Investments Limited;
Vidacos Nominees Ltd.; WestWind Foundation Holdings Ltd.; 169642 Canada,
Inc.; 171212 Canada, Inc.,

No.

**Complaint**

**Jury Trial
Demanded**

Plaintiffs

-against-

Banc of America Securities, LLC ; Citco Fund Services (Curacao) N.V.; The
Citco Group Limited; International Fund Services (Ireland) Limited;
PricewaterhouseCoopers (Netherlands Antilles ); John W. Bendall, Jr.; Richard
Geist;  Anthony Stocks; Kieran Conroy; and Declan Quilligan,

Defendants

-----------------------------------------------------------------------



1

Plaintiffs, by their attorneys, Brown Rudnick Berlack Israels LLP, for their complaint against the above-named defendants, respectfully allege as follows:

## INTRODUCTION

1.       The plaintiffs in this action collectively invested over $460 million in two hedge funds, Lancer Offshore, Inc. ("Lancer Offshore") and The OmniFund Ltd. ("OmniFund")[1] (collectively referred to herein as the "Funds").  The Funds were managed by Michael Lauer ("Lauer") through Lancer Management Group, LLC ("Lancer Management"), the management company he owned and controlled.  The Funds are now in the process of being liquidated and it has become increasingly and distressingly clear that most of the capital invested in the Funds has been lost.  The investors seek through this action to redress their direct losses.

2.       This case involves egregious misconduct and recklessness.  Lauer repeatedly and falsely told plaintiffs that the Funds' assets were appreciating when, in fact, the Funds had lost virtually all of plaintiffs' money.  Plaintiffs reasonably relied on these misrepresentations when making investment decisions.  Each of the Investors was induced to invest in the Fund, and to pay inflated prices for shares in the Fund, by the persistently overstated valuations of the Funds' portfolios.  Thereafter, Lauer and other defendants intentionally caused plaintiffs to maintain their investments in the Funds by continuing to lie about the performance of the Funds' investments.

3.       At least in recent years, the Funds' holdings (the particular identity of which were often kept secret from the investors) consisted mainly of small or micro-cap stocks which were unlisted and only thinly traded on the over-the-counter market

---

[1] References to OmniFund are intended, unless specifically noted to the contrary, to include the Orbiter and Viator Funds, predecessor funds merged into OmniFund in or about April 2002.

and pink sheets.  The Funds would initially acquire large, often controlling, stakes in these companies for a small investment.  Then, shortly before month end, Lauer would cause the Funds to purchase a small number of shares at a price significantly higher than the original acquisition price.  The Funds would then calculate their entire holding in the company at the now-inflated price reflected by the last "market" purchase.  Lauer used these inflated prices to report positive performance results to investors.

4.     By "marking the close" in this manner, and employing other fraudulent devices, Lauer was able to make it appear as though the value of the Funds' portfolio was continually rising, even in a down market.  This continually inflated performance induced Plaintiffs to invest and remain invested in the Funds, thereby increasing the management fees being earned by Lancer Management and others. Plaintiffs were not told that the Funds were valued using this fraudulent technique.

5.     The Funds' directors included Anthony J. Stocks, Kieran Conroy and Declan Quilligan, employees of the Funds' Administrator, Citco Fund Services (Curacao) N.V. (collectively the "Citco Directors") as well as John W. Bendall, Jr. and Richard Geist (collectively, all referred to as the "Director Defendants").  The Director Defendants are also responsible for the plaintiffs' losses because they breached their obligations to ensure that the Funds' portfolio were properly valued and reported to Plaintiffs.

6.     Lauer and the Director Defendants did not act – and, indeed could not have acted – alone in perpetrating this fraudulent scheme.  The fraud would not have succeeded without the reckless and negligent conduct of the Funds' service providers, including their administrators, auditor and prime broker/custodian.

3

7.      Citco Fund Services (Curacao) N.V. ("Citco NV"), a division of The Citco Group and the administrator for the Funds, distributed materially false monthly NAV statements to plaintiffs. Instead of conducting an independent valuation, as it was obligated to do, Citco NV simply used Lauer's fraudulent valuations in preparing the NAV statements. Lauer provided Citco NV with, among other things, documents purporting to be position reports issued by the Bank's custodian and prime broker, Bank of America Securities, LLC ("B of A"). These reports were generated by Lauer from B of A's computer system and were based on inputs directly made by Lauer or by B of A employees at Lauer's direction. Citco NV knew or should have known of the fraud because, among other things, three of its employees were also members of the Funds' Board of Directors.

8.      The Funds' auditors, PricewaterhouseCoopers (Netherlands Antilles) ("PWC NA"), recklessly and negligently ratified and confirmed the false valuations in annual audit reports disseminated directly to the plaintiffs. PWC NA realized, or was reckless in failing to realize, that the Funds' financial statements, which it was auditing and certifying as accurate, fraudulently and dramatically overstated the Funds' assets, net worth and earnings along with concealing massive losses sustained by the Funds. In the 2000 and 2001 audits, PWC NA represented that it had audited the Funds' financial statements in accordance with international standards on auditing, including representations that the audits had been planned and performed in order to obtain reasonable assurance, on the part of PWC NA, that the financial statements were free of material misstatements. PWC NA failed to disclose that, in fact, it was

4

simply rubber-stamping the information received from Lauer, thus facilitating the fraud being perpetrated upon the investors.

9.     In addition to committing a direct fraud upon the plaintiffs and negligently performing their duties, Citco NV and PWC NA each materially assisted Lauer's effort to induce plaintiffs to purchase securities in the Funds at inflated prices and/or to forego their rights to withdraw their investments therein. By creating and/or confirming false valuations of the Funds' assets, Citco NV and PWC NA each knowingly (or recklessly) and materially assisted Lauer and the Director Defendant's continuing fraud upon plaintiffs, and breach of fiduciary duty.

10.     B of A also substantially assisted Lauer and the Director Defendant's fraud and breach of duty.  B of A provided Lauer with access to its computer network, thereby allowing Lauer to generate position statements purporting to depict the Funds' holdings and the value of such holdings.  These reports, which were provided to Citco NV and PWC NA, appeared to be valuations undertaken by, or at least approved by B of A (the "B of A Position Reports").

11.     Upon information and belief, the valuations set forth in the B of A Position Reports, as well as other valuation information provided by Lauer, were used by the auditor and the administrators to create fraudulent NAV statements and audit reports. Moreover, certain investors, including The Pension Committee of the University of Montreal and Fondation Chagnon, periodically received these B of A Positions Reports and relied upon them when making investment and retention decisions.  The fraud could not have occurred if B of A had denied Lauer access to its computer system or if B of A had ensured that the position reports were accurate.

5

12.     In September 2002, Citco NV resigned and was replaced by defendant International Fund Services (Ireland) Limited ("IFS").   IFS also negligently disseminated false, misleading and fraudulent NAV statements to investors based upon Lauer's false valuations and did not independently value the portfolios.

## THE PARTIES

### The Plaintiffs

13.     The plaintiffs are shareholders in the Funds.   It is the intent of the plaintiffs to pursue through this action only such claims as they own directly.

14.     Specifically, the plaintiffs are as follows:

a)     The Altar Fund, an exempted limited company incorporated under the laws of the Cayman Islands having a registered office c/oCitco Fund Services (Cayman Islands) Limited, Corporate Centre, West Bay Road, P.O. Box 31106 SMB, Grand Cayman, Cayman Islands, B.W.I., which invested $1,000,000 in Lancer Offshore on or about October 1, 2000, $500,000 in Lance Offshore on or about May 1, 2001, $100,000 in Lancer Offshore on or about August 1, 2002, $350,000 in Viator on or about October 1, 2000, $300,000 in Viator on or about December 1, 2000, $500,000 in Viator on or about February 1, 2001, $500,000 in Viator on or about March 1, 2001 and $500,000 in Viator on or about May 1, 2001;

b)     Aberdeen Investments Ltd., having an administration address at PO Box 300, 8034 Zurich, Switzerland, which invested $517,534.28 in Lancer Offshore between February 1998 and February 2002;

c)     Aries Trading, Ltd., having an address of Aktis 119, Faros Kavouri, Vouligameni 166-71, Greece which invested $105,000  in Lancer Offshore on or about April 1, 1997;

d)     The Arrowsmith Fund Ltd., having an address at Dockendale House, West Bay Street, P.O. Box N-4836, Nassau, Bahamas, which invested $1,976,433.10 in Lancer Offshore in or about June 2001, $887,640.80 in Lancer Offshore in or about May 2002 and $96,940.00 in Lancer Offshore in or about May 2002;

e)     AXA Alternative Advisors, Inc. in its capacity as investment manager and agent for AXA Alternatve Strategies Fund Ltd., AXA New Horizon Fund Select Dollar, AXA New Horizon Fund Select Euro and AXA New Horizon Fund Select Plus Euro and as subadvisor and agent for CIC Alternaif, having an address at 1370 Avenue of the Americas, 22nd Floor, New York,

New York 10019, which invested $15,000,000 in Lancer Offshore in or about June 2002;

f)   Banco Nominees (I.O.M.) Limited, having an address at P.O. Box 34, 12/13 Hill Street, Douglas, Isle of Man, IM99 IBW, British Isles, which invested $200,000 in Lancer Offshore on or about April 25, 2001, $200,000 in Lancer Offshore on or about August 10, 2001, $200,000 in Lancer Offshore on or about April 11, 2002 and $300,000 in Lancer Offshore on or about August 13, 2002;

g)   Bank of Bermuda (Luxembourg), S.A. with an address at P.O. Box 413, 13 Rue Goethe, 2014 Luxembourg, which invested on behalf of Liberty Ermitage North American Absolute Fund Ltd, $1,000,000 in Lancer Offshore on or about June 1, 2002 and $1,000,000 in Lancer Offshore on or about August 1, 2002;

h)   Banque Privee Edmond de Rothschild Europe, having an address at Societe anonyme, 20 boulevard Emmanuel Servais, L-2535 Luxembourg, which invested $1,640,463.96 in Lancer Offshore;

i)   Banque Privee Edmond de Rothschild Europe/Isofin having an address at 20 boulevard Emmanuel Servais, L-2535, Luxembourg, which invested $3,000,000 in Lancer Offshore ;

j)   John G. Barrie, Jr. IRA, an Individual Retirement Account ("IRA") held on behalf of John G. Barrie, Jr., who resides at 2331 Castleford Terrace, Midlothian, Virginia 23113, which invested $250,000 in Lancer Offshore on or about November 1, 2000;

k)   Base Force, Ltd., having an address in c/o Bruce Campbell & Co., P.O. Box 834, Bank of Nova Scotia Building, Grand Cayman, Cayman Islands, which invested $1,100,000 in Lancer Offshore;

l)    Bombardier Trust (Canada), as agent of the administrators of the pension funds of Bombardier Inc. whose assets are collectively invested in the Bombardier Trust (Canada) (Foreign Assets) Fund, a trust restated under and governed by the laws of the Province of Quebec (Canada), with an address in c/o Bombardier Inc., Corporate Office, 800 Rene-Levesque Blvd. West, Montreal, Quebec, Canada H3B 1Y8, which invested $20,000,000.00 in Lancer Offshore on or about January 1, 2000, $6,960,608.60 in Lancer Offshore on or about March 1, 2000 and $6,900,000.00 in Lancer Offshore on or about April 1, 2000;

m)   The Bombardier Trust (UK), a trust established under and governed by the laws of Northern Ireland, with an address in c/o Bombardier Inc., Corporate Office, 800 Rene-Levesque Blvd. West, Montreal, Quebec, Canada H3B 1Y8, which invested $6,000,000.00 in Lancer Offshore on or about March 1, 2000, $8,328,000.00 in Lancer Offshore on or about April 1, 2000, $7,750,000.00 in Lancer Offshore on or about March 1, 2002 and $3,000,000.00 in Lancer Offshore on or about June 1, 2002;

n)   The Bombardier Trust (U.S.) Master Trust, a trust established under and governed by ERISA and the laws of the State of Ohio, with an address in c/o Bombardier Inc., Corporate Office, 800 Rene-Levesque Blvd. West, Montreal, Quebec, Canada H3B 1Y8, which invested $8,459,000.00 in Lancer Offshore on or about October 1, 1999 and $1,025,940.01 in Lancer Offshore on or about December 1, 1999;

o)   Commerzbank Capital Markets Corporation in its capacity as investment manager for AIS Holdings Series Trust II and Commerzbank Global Alternative Limited and as subadvisor for Commerzbank Alternative Strategies, having an address at 1251 Avenue of the Americas, New York, NY 10020-1104, which invested $3,000,000 in Lancer Offshore on or about May 1, 2002;

p)   Cedar Fund, having an address in c/o Commerzbank Capital Markets Corporation, 1251 Avenue of the Americas, New York, NY 10020-1104, which invested $2,000,000 in Lancer Offshore;

q)   Clearwater Commercial Enterprises, Inc., having an address care of Bermuda Trust Company Limited, which invested $110,437.71 in Lancer Offshore and $203,165.65 in OmniFund;

r)   Commonfund Global Hedged Partners, LLC, having an address in care of Commonfund Asset Management Company, Inc., 15 Old Danbury Road, P.O. Box 812, Wilton, Connecticut 06897-0812, which invested $1,500,000 in Lancer Offshore on or about April 1, 2000, $1,500,000 in Lancer Offshore on or about June 1, 2000, $1,500,000 in Lancer Offshore on or about July 1, 2000 and $6,000,000 in Lancer Offshore on or about January 1, 2001;

s)   Condor Alternative Fund, having an address in c/o SV Alterinvest, 42 Avenue Montaigne, 75008, Paris, France, which invested $700,000 in Lancer Offshore in or about October 2000, $400,000 in Lancer Offshore in or about December, 2001, $400,000 in OmniFund in or about October 2000 and $500,000 in OmniFund in or about June 2001;

t)   The Corbett Family Charitable Foundation Inc., having an address of 2202 N. West Shore Blvd., Suite 110, Tampa, Florida 33607, which invested $2,000,000 in Lancer Offshore on or about September 29, 2000 and redeemed $400,000 from Lancer Offshore in or about June 2002;

u)   The International Active Fund of Funds, having an address in c/o Coronation Management Company Limited, which invested $20,750,000 in Lancer Offshore;

v)   Fortis Global Custody Management and Trustee Services (Ireland) Limited as trustee for Coronation Universal Fund, having an address in c/o Fortis Global Custody Management & Trustee Services (Ireland) Limited, which invested $8,000,000 in Lancer Offshore;

w)    Dirmica Investment Ltd having an address in c/o Mirabaud & Cie, Boulevard du Theatre, CH-1211, Geneve 11 Switzerland, which invested $3,899,675.54 in Lancer Offshore and $2,077,814.85 in OmniFund;

x)    Diversified Capital Management LTD, an International Business Company incorporated in the British Virgin Islands, having an address of Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, BVI, which invested $3,000,000 in Lancer Offshore on or about May 1, 2002 and $3,000,000 in Lancer Offshore on or about June 1, 2002;

y)    Dominion Resources Inc. Master Trust, having an address in c/o Dominion Resources Inc., 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222, which invested $40,000,000 in Lancer Offshore between July 1999 and July 2002;

z)    Alain Dunand, an individual residing at 15 Rue de l'Eglise, 1270 Trelex, Switzerland, invested $250,000 in Lancer Offshore on or about November 2, 1998 and $200,000 in Lancer Offshore on or about February 1, 2000;

aa)   Ethos Investments Ltd, having an address in c/o S&A Papadimitrious & Co., 241, Syngrou Ave. & 2, Aikarnassou Str., Athens, Greece 171-22, which invested $200,000 in Viator on or about October 1, 2000;

bb)   First Trust Corp., as trustee f/b/o Paul J. Simon, as trustee f/b/o/ Shirley A. Simon and as trustee f/b/o Joseph Cueter, having an address in c/o US Group, 20580 Hoover Road, Detroit, Michigan, 48206 which purchased $1,465,000 in Lancer Offshore on or about January 30, 2001, $185,000 in Lancer Offshore on or about January 31, 2001, $290,000 in Lancer Offshore on or about January 30, 2001, $109,984.28 in Lancer Offshore in June of 2001 and $6,168.95 in Lancer Offshore in June 2001;

cc)   Fondation Lucie et Andre Chagnon, a Canadian charitable foundation with a principal place of business at 1010 de la Gauchetiere West, Suite 600, Montreal, Quebec, Canada H3B 2N2, which invested $50,000,000 in Lancer Offshore on or about March 1, 2001 and $50,000,000 in Lancer Offshore on or about December 1, 2001;

dd)   Claude Chagnon, an individual residing in Canada, who invested $5,000,000 in the Lancer Offshore on or about May 1, 2002;

ee)   Andre Chagnon, an individual residing at 521 De L'Anse, Vaudreuil, QC, J7V 8P3, Canada, who invested $2,000,000 in Lancer Offshore on or about June 1, 1998;

ff)   9091-2601 Quebec Inc., Assignee of Sojecci Ltee., having an address at 1010 de la Gauchetiere West, Suite 600, Montreal, Quebec, Canada H3B 2N2, which invested $6,000,000 in Lancer Offshore on or about October 1, 1999, $10,000,000 in Lancer Offshore on or about February 29, 2000 and $10,000,000 in Lancer Offshore on or about April 30, 2002 and which invested $2,000,000 in Orbiter on or about March 1, 2000, $2,000,000 in Viator on or about March 1, 2000;

gg)  Fondation J. Armand Bombardier, having an address at Edifice Sun Life, 1155 rue Metcalfe, 21e etage, Montreal, Quebec H3B 2V6, Canada, which purchased $2,700,000 in Lancer Offshore on or about November 30, 1999, $3,500,000 in Lancer Offshore on or about January 31, 2000 and $2,200,000 in Lancer Offshore on or about May 1, 2001;

hh)  Fondation Lilla, having an address c/o Mirabaud & Cie, Boulevard de Theatre, CH – 1211, Geneva, Switzerland, which invested $150,225.14 in Lancer Offshore;

ii)  Goulam Investments Inc., having an address in c/o Goulam Investment Ltd., 6111, du Boise, #4A, Montreal, Quebec H3S 2V8, which invested $500,000 in Lancer Offshore on or about November 30, 2001;

jj)  GT Alpha, having an address in care of GT Finance, Societe de Gestion 16, place de la Madeleine, which invested $900,000 in Lancer Offshore on or about January 1, 2002 and $300,000 in Lancer Offshore on or about July 1, 2002;

kk)  Christa Gunter, an individual who invested $100,0000 in Lancer Offshore;

ll)  Hermes Trading Ltd., having an address of Aktis 119, Faros Kavouri, Vouliagmeni 166-71, Greece, which invested $150,000 in Viator on or about October 1, 2000;

mm)  HSBC Private Bank (Suisse) SA (f/k/a HSBC Republic (Suisse) SA, having an address of 2 Quai General-Guisan, P.O. Box 3580, 1211 Geneva 3, Switzerland, invested $7,380,000 in Lancer Offshore and $255,000 in OmniFund between May 1997 and July 2002;

nn)  HSBC Republic (USA) Inc., having an address c/o HSBC Brokerage (USA) Inc., 1 West 39th Street, 11th Floor, New York, New York 10018, which invested $1,000,000 in Lancer Offshore;

oo)  Hunnicutt & Co., Inc. (Defined Benefit Plan), having an address in c/o Hunnicut & Co., Inc., 110 East 59th Street, Suite 3200, New York, New York 10022, which invested $580,361.10 in Lancer Offshore;

pp)  IRA f/b/o William Hunnicut VFTC as Custodian, having an address in c/o Hunnicut & Co., Inc., 110 East 59th Street, Suite 3200, New York, New York 10022, which invested $1,652,254.63;

qq)  Kredeitbank Luxembourg, A/C Special Opportunities Fund, having an address at 43 Boulevard Royal, L-2955 Luxembourg, which invested $1,300,000 in Lancer Offshore on or about July 1, 1998, $500,000 in Lancer Offshore on or about September 1, 1998, $1,400,000 in Lancer Offshore on or about December 1, 1999, $600,000 in Lancer Offshore on or about January 1, 2000, $226,207.62 in Lancer Offshore in or about 2001, $46,531.20 in Lancer Offshore on or about June 6, 2002 and $2,000,000 in Lancer Offshore on or about August 1, 2002 and which redeemed ($100,000) from Lancer Offshore on or about October 1, 1999,

($2,400,000) from Lancer Offshore on or about April 1, 2000 and ($2,000,000) from Lancer Offshore on or about October 1, 2000;

rr)    Kuwait and Middle East Financial Investment Company, a company having an address in care of Kuwait and Middle East Financial Investment Company, PO Box 819 Safat 13009 Kuwait, which invested $1,000,000 in Lancer Offshore on or about November 1, 1997, $1,000,000 in Lancer Offshore on or about January 1, 1998,$10,000,000 in Lancer Offshore on or about May 1, 1998, $10,000,000 in Lancer Offshore on or about January 1, 2000, $1,500,000 in Lancer Offshore on or about March 1, 2000, $800,000 in Lancer Offshore on or about June 1, 2000, $750,000 in Lancer Offshore on or about June 1, 2000 and $250,000 in Lancer Offshore on or about June 1, 2002 and which redeemed ($181,755) from Lancer Offshore;

ss)    La Compagnie Financiere Edmond de Rothschild Banque, an entity having an address c/o LCF Rothschild Multi Management 47, rue du Faubourg Saint-Honore, 75401 Paris Cedex 08, France, which invested $9,406,282.50 in Lancer Offshore between October 1997 and May 2002;

tt)    Cecile Lescoat, an individual residing in France who invested $55,825.62 in Lancer Offshore;

uu)    LGT Bank in Liechtenstein AG, an entity having an address c/o LGT Bank in Lichtenstein Ltd., Herrengasse 12, FL-9490 Vaduz, Furstentum, Lichtenstein, which purchased $834,701.43 in Lancer Offshore in or about October 1999;

vv)    L.H. Logarithm Holdings SA, having an address in c/o Rene Merkt Associes 15, rue General-Dufour, Case Postale 5556, CH-1211 Geneve 11 Switzerland, which invested $193366 in OmniFund on or about August 2, 2001 and $49,999.66 in OmniFund on or about November 30, 1999;

ww)    Madison Textiles, LTD, a company limited by shares incorporated in Guernsey, the Channel Islands on August 24, 1990 with a registered office in Havelet Howe, South Esplanade 181, St. Peter Port, Guernsey, which invested $500,000in Lancer Offshore in March 1997, $500,000 in Lancer Offshore in August 1997, $1,000,000 in Lancer Offshore in November 1997 and $1,500,000 in Lancer Offshore in June 1998 and which redeemed ($500,000) from Lancer Offshore in January 2001 and ($2,000,000) from Lancer Offshore in April 2002 and which invested $500,000 in Orbiter on or about March 1, 1999, $552,718 in Orbiter on or about July 1, 1999, $1,000,000 in Viator on or about October 15, 1999, $250,000 in Orbiter on or about January 1, 2001, $250,000 in Viator on or about January 1, 2001 and $2,000,000 in OmniFund on or about April 1, 2002;

xx)    Maestro Trading, Inc., having an address in c/o Vergotis, 13-15 Dimitros Street, P. Faliron, Athens 17562, Greece, which invested $100,000 in Lancer Offshore in or about June 1998;

yy)   Mirelis InvesTrust SA, having an address of 12, rue de la Corraterie, 12 Geneva 11, Switzerland, which invested $3,500,000 in Lancer Offshore;

zz)   Vittorio Mosca, an individual residing in Italy, who invested $500,000 in Lancer Offshore;

aaa)  The Morton Meyerson Family Foundation, a foundation and Texas non-profit corporation, having an address of 7800 Northaven Road, Dallas, Texas 75230, which invested $3,000,000 in Lancer Offshore between March and April, 2002;

bbb)  The 1999 Meyerson Charitable Remainder Trust, having an address of 3401 Armstrong Avenue, Dallas, Texas 75205, which invested $4,000,000 in Lancer Offshore in March 2002;

ccc)  Multivalor Invest Inc., a Panamanian corporation, having a registered office at Chase Manhattan Bank Building, via Espana 120, 2nd Floor, Panama, Republic of Panama, which invested $252,033.40 in Lancer Offshore on or about January 31, 1997;

ddd)  National Bank of Canada, having an address at 1155 Metcalfe, Ground Floor, Montreal, Quebec H3B 5G2, which invested $10,000,000 in Lancer Offshore;

eee)  Nemrod Leveraged Holdings Ltd., having an address in c/o Rothschild & Cie Gestion, 42 Rue d'Anjou, 75008, Paris, France, which invested $700,000 in Lancer Offshore on or about February 1, 1999, $500,000 in Lancer Offshore on or about March 1, 2000, $500,000 in Lancer Offshore on or about October 1, 2000, $300,000 in Lancer Offshore on or about August 1, 2001, $1,000,000 in Lancer Offshore on or about November 1, 2001, $1,000,000 in Lancer Offshore on or about April 1, 2002, $1,000,000 in Lancer Offshore on or about May 1, 2002, $1,000,000 in Lancer Offshore on or about July 1, 2002, and $1,000,000 in Lancer Offshore on or about August 1, 2002;

fff)  Nobilis S.A., Suzanne Fontan S.C.A. Halinvest Sarl, (collectively the "Nobilis Group"), entities having an address in c/o Nobilis, S.A., 29 Rue Bonaparte, 75006 Paris, France, which invested $500,000 in Lancer Offshore on or about March 1, 2000 and $1,500,000 in Lancer Offshore on or about August 1, 2002 on behalf of Nobilis S.A., $500,000 in Lancer Offshore on or about March 6, 2000, $500,000 in Lancer Offshore on or about August 1, 2002 on behalf of Suzanne Fontan S.C.A. and $425,000 in Lancer Offshore on or about August 1, 2002 on behalf of Halinvest Sarl;

ggg)  Octogone Gestion SA, an entity located at 26, rue de Candolle, CH-1205 Geneva Switzerland, which invested $200,000 in Lancer Offshore in or about March 2001, $100,000 in Lancer Offshore in or about April 2001, $100,000 in Lancer Offshore in or about June 2001, $200,000 in Lancer Offshore in or about June 2001, $500,000 in Lancer Offshore in or about April 2002, $120,000 in Lancer Offshore in or about March 2002, $190,000 in Lance Offshore in or about March 2002, $290,000 in Lancer

Offshore in or about March 2002, $125,000 in Lancer Offshore in or about May 2002, $25,000 in Lancer Offshore in or about June 2001, $50,000 in Lancer Offshore in or about December 2001, $25,000 in Lancer Offshore in or about April 2002, $45,000 in Lancer Offshore in or about June 2001, $30,000 in Lancer Offshore in or about April 2002, $40,000 in Lancer Offshore in or about April 2002, $50,000 in Lancer Offshore in or about July 2001, $70,000 in Lancer Offshore in or about December 2001, $100,000 in Lancer Offshore in or about June 2001, $100,000 in Lancer Offshore in or about April 2002, $25,270 in Lancer Offshore in or about April 2002, $16,837 in Lancer Offshore in or about June 1998, $37,910 in Lancer Offshore in or about January 2002, $12,090 in Lancer Offshore in or about January 2002, $20, 712 in Lancer Offshore in or about June 1998, $240,000 in Lancer Offshore in or about June 2001 and $350,000 in Lancer Offshore in or about November 2001;

hhh)   Okabena Marketable Alternatives Fund, LLC, a limited liability corporation, having an address in c/o Okabena Investment Services Inc., 5410 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota, 55402-4139, which invested $2,000,000 in Lancer Offshore on or about January 4, 1999, $1,000,000 in Lancer Offshore on or about February 1, 1999, $1,500,000 in Lancer Offshore on or about March 1, 1999, $1,000,000 in Lancer Offshore on or about April 1, 1999, $1,500,000 in Lancer Offshore on or about October 1, 1999, $2,500,000 in Lancer Offshore on or about April 3, 2000 and $1,300,000 in Lancer Offshore on or about January 2, 2001 and which redeemed ($3,000,000) from Lancer Offshore on or about January 3, 2002;

iii)   The Pension Committee of the University of Montreal, in its capacity as administrator and agent for the University of Montreal Pension Plan, having an address in c/o University of Montreal, Investment Management, Pension Fund, Building 3744 Jean-Brillant suite 108, Montreal Quebec H3T 1P1, Canada, which invested, through its custodian Fiducie Desjardins, $17,000,000 in Lancer Offshore on or about July 1, 1998, $15,000,000 in Lancer Offshore on or about October 1, 1999, $14,000,000 in Lance Offshore in or about October 1999, $6,000,000 in Lancer Offshore on or about April 1, 2000 and $15,000,000 in Lancer Offshore on or about May 1, 2000;

jjj)   The Pension Committee of Régime des rentes du Mouvement Desjardins, with an address at 100 avenue des commandeurs, Lévis, Province of Quebec, Canada, QC G6V 7N5, which invested through its custodian Fiducie Desjardins $10,000,000 in Lancer Offshore;

kkk)   Anne-Chantal Pigelet, an individual residing at 344 rue Chenal, 74700 Sallanches, Paris, France, who invested $349,994.33 in Lancer Offshore and $30,494.00 in OmniFund;

lll)    Pictet & Cie Banquiers, having an address of Boulevard Georges-Favon 29, Case Postale 5130, CH-1211 Geneva, Switzerland, which invested $5,277,076.30 in Lancer Offshore;

mmm) Irving Teitelbaum, Stephen Gross and Laurence Lewin in their capacity as the Trustees of RCA in Trust, having an address at 1604 St. Regis Blvd., Dorval, Quebec, Canada H9P 1H6, which invested $140,000 in Lancer Offshore on or about May 1, 2002;

nnn)    The Pension Committee of the Pension Plan for the Régime de retraite de la Corporation de l'Ecole Polytechnique, having an address in c/o Ecole Polytechnique Montreal, C.P. 6079, succ. Centre-ville, Montreal, Quebec Canada H3C 3A7, which invested $6,813,844.77 in Lancer Offshore on or about April 1, 2000, $3,186,155.23 in Lancer Offshore on or about April 1, 2000, $6,230,500 in Lancer Offshore on or about June 1, 2000 and $650,480 in Lancer Offshore on or about July 1, 2000;

ooo)    Rothschild Gestion, having an address in c/o Rothschild & Cie Gestion, 42 Rue d'Anjou, 75008, Paris, France, which invested $500,000 in Lancer Offshore;

ppp)    Satnam Investments Ltd., having an address in c/o EFG Financial Advisory Pte Ltd., 1 Raffles Place, #42-00, OUB Centre, Singapore 048616, which invested $1,000,000 in Lancer Offshore on or about May 1, 1999;

qqq)    Seven Seas Portfolio A Limited, an entity incorporated under the laws of Bermuda having an address at 6 Front Street, Hamilton HM 11, P.O. Box HM 1020, Hamilton HM DX, Bermuda, which invested $1,000,000 in Lancer Offshore;

rrr)    Signet Multi-Manager Inc. and UEB (United European Bank) Geneva (Switzerland), having addresses in care of Signet Management Limited 9 Columbus Centre, Pelican Drive, Road Town, Tortola, British Virgin Islands, which invested, collectively, $500,000 in Lancer Offshore on or about March 1, 1997, $200,000 in Lancer Offshore on or about March 1, 1997, $300,000 in Lancer Offshore on or about March 1, 1997, $250,000 in Lancer Offshore on or about January 1, 1998, $250,000 in Lancer Offshore on or about April 1, 1998, $400,000 in Lancer Offshore on or about July 1, 1998, $200,000 in Lancer Offshore on or about June 30, 1999, $700,000 in Lancer Offshore on or about June 1, 2000 and $780,866.74 in Lancer Offshore on or about June 1, 2000 and which redeemed ($300,000) from Lancer Offshore on or about January 1, 1999, ($300,000) from Lancer Offshore on or about January 1, 1999, ($250,000) from Lancer Offshore on or about August 1, 1999, ($200,000) from Lancer Offshore on or about September 1, 1999, ($300,000) from Lancer Offshore on or about February 1, 2000, ($250,000) from Lancer Offshore on or about February 1, 2000, ($300,000) from Lancer Offshore on or about March 1, 2000, ($600,000) from Lancer Offshore on or about February 1, 2001, ($200,00) from Lancer Offshore on or about April 1,

2001 and ($200,000) from Lancer Offshore on or about June 1, 2001), for a total of $680,866.74 in unredeemed investment;

sss) SIL Nominees Limited, a Cayman Islands entity having an administrative office at 2 Jane Street, Suite 501, Toronto, Ontario M6S 4W3 Canada, which invested $250,000 in Lancer Offshore in or about June 1997, $500,000 in Lancer Offshore in or about December 1997, $170,000 in Lancer Offshore in or about March 1998 and $500,000 in Lancer Offshore in or about December 2000;

ttt) Sperry Complete Manager Fund Ltd., having a registered office c/o Citco, Bahamas, which invested $350,000 in Lancer Offshore on or about July 1, 1996, $200,000 in Lancer Offshore on or about December 2, 1996, $501,314.64 in Lancer Offshore on or about November 1, 1999, $98,683.98 in Lancer Offshore on or about December 1, 1999, $68,120.83 in Lancer Offshore on or about January 1, 2000 and $26,301 in Lancer Offshore on or abour November 1, 2000;

uuu) SPGP (Societe Privee de Gestion de Patrimoine), having an address 17 avenue Matignon, 75008 Paris, France, which invested $1,000,000 in Lancer Offshore;

vvv) St. George's Trust Company Limited, having an address of 27 Reid Street, 1st Floor, P.O. Box HM 3051, Hamilton, HM 11, Bermuda, which invested $500,000 in Lancer Offshore on or about February 3, 1997;

www) Jo-Ann St Germain, an individual residing at 940 Lake Shore Road, Dorval QC H9S 2C5, Canada, who invested $258,500 in Lancer Offshore;

xxx) The Stafford Fund Ltd., successor to Stafford Opportunity Fund, Ltd., a BVI entity having an address of in c/o Fairway Investment Partners AG, Nueschelerstrasse 35, 8001 Zurich, which invested $600,000 in Lancer Offshore on or about May 29, 1998 and $500,000 in Lancer Offshore on or about February 1, 2000;

yyy) StarVest Funds Ltd., having an address  in c/o Bank of Bermuda Limited, 6 Front Street, Hamilton HM 11, Bermuda, which invested $6,000,000 in Lancer Offshore on or about January 1, 2002 and $500,000 in Lancer Offshore on or about June 1, 2002;

zzz) The Taurus Trust, a Pennsylvania irrevocable trust, having an address in care of Duane Morris LLP, One Liberty Plaza, Philadelphia, PA, 19103-7396 and successor-in-interest to Turkos Seventeen Limited, which invested $100,000.46 in Lancer Offshore on or about February 27, 1998;

aaaa) Team Haas USA, Ltd., a Cayman Islands corporation, having an address of 15 Rue Du Jeu-De-L'arc, Case Postale 6259, CH 1211 Geneve, Switzerland, which invested $1,500,000 in Lancer Offshore in April 2001;

bbbb) Trendtrust SA, having an address at Rue du Mont-Blanc 3, CH-1201 Geneve Switzerland, which invested $1,000,000 in Lancer Offshore;

cccc) James Vaughan, who through his retirement account invested $660,000 in Lancer Offshore;

dddd) Venere Investments Limited, having an address in c/o Fiduciare Tucker, Route de Denges 28G, 1027 Lonay, Switzerland, which invested $690,000 in Lancer Offshore;

eeee) Vidacos Nominees Limited, having an address in c/o Liberty Ermitage, 1st Floor, 47 The Esplanade, St. Helier, Jersey, Channel Islands, JE1 9LB, which is the custodian for shares representing $1,500,000 invested in Lancer Offshore on or about January 1, 2002;

ffff) WestWind Foundation Holdings Ltd., having an address of WestWind Foundation Holdings, Ltd, PO Box 26 GT, Grand Cayman, Cayman Islands, B.W.I., which invested $1,400,000 in Lancer Offshore on or about July 1, 1999, $500,000 in Lancer Offshore on or about January 1, 2000 and $2,000,000 in Lancer Offshore on or about April 1, 2000;

gggg) 169642 Canada, Inc., having an address c/o Len-Jay, Inc., 5640 Thimens, St-Laurent, Quebec, H4R 2K9, which invested $100,000 in OmniFund;

hhhh) 171212 Canada, Inc., having an address at 12436 Notre Dame East, Montreal, QC H1B 2Z1, which invested $1,000,000 in Lancer Offshore on or about February 1, 2000.

**The Defendants**

15.    Upon information and belief, Michael Lauer resides at 7 Dwight Lane, Greenwich, Connecticut 06831.  At all relevant times, Lauer was the founder, manager and principal owner of Lancer Management, which acted as the Investment Manager for the Funds and which had its principal office in New York City.  Pursuant to the Case Management Order entered in the case of *Securities and Exchange Commission v. Lauer, et al.*, No. 03-80612 on January 8, 2004 (the "CMO"), plaintiffs are at this time prohibited from bringing any claims against, *inter alia*, Lauer and Lancer Management without first obtaining court approval.

16.    Upon information and belief, defendant John W. Bendall, Jr. conducts an investment business in New York, New York under the name of Hermitage Capital Corporation and has been a director of both Lancer Offshore and OmniFund since early 2002.

17.     Upon information and belief, defendant Richard Geist resides in Massachusetts and has been a director of both Lancer Offshore and OmniFund since early 2002.

18.     Upon information and belief, defendant Anthony Stocks ("Stocks") was a director of Lancer Offshore from 1995 until his resignation in or around July 2001 and resides in London, England.  Stocks was also a Director of the International Fund Services division of The Citco Group Limited during this time period.

19.     Upon information and belief, defendant Kieran Conroy ("Conroy") was a director of Lancer Offshore from 1998 until early 2002 and resides in Dublin, Ireland.  Conroy was also a Managing Director of Citco NV during this time period.

20.     Upon information and belief, defendant Declan Quilligan ("Quilligan") was a director of Lancer Offshore from 2001 until early 2002 and resides in Curacao, Netherlands Antilles.  Quilligan was also General Manager and Managing Director of Citco NV.

21.     Upon information and belief, The Citco Group Limited ("The Citco Group") is an independent financial services organization with approximately 46 offices in 27 countries around the world, including offices in New York and has its principal place of business at Corporate Centre, West Bay Road, Grand Cayman, Cayman Islands-British West Indies.  One of its regional offices is defendant Citco Fund Services (Curacao), N.V.  The Citco Group represents that it is the world's top provider of hedge fund administration services and administers more than 1200 funds with more than $110 billion in assets.  The Citco Group also represents that by administering funds in offices throughout the world it is able to provide a "consistent service platform" and that

17

it is a "global fund administrator". Further, The Citco Group states that its "mission is to provide superior performance in the area of asset protection, delivered through our high level of responsibility, continuity, accuracy, and responsiveness." The Citco Group allows its personnel "the ability to transfer between offices and divisions" in order to maintain consistent levels of excellence.

22.     Upon information and belief, Citco NV is a business entity organized and existing under the laws of the Netherlands Antilles, having places of business at Kaya Flamboyan 9, P.O. Box 812, Curacao, Netherlands Antilles and Citco Building, Wickams Cay, Road Town, Tortola, British Virgin Islands. Citco NV is a division and wholly-owned and controlled subsidiary of The Citco Group.

23.     Upon information and belief, PWC NA is a Netherlands Antilles civil partnership formed by limited liability companies under Netherlands Antilles law and is a member of PricewaterhouseCoopers International Limited, a company limited by guaranty registered in England and Wales. PWC NA has a place of business at P.O. Box 360, Julianaplein 38, Willemstad – Curacao, Netherlands, Antilles. PWC NA, through its client and professional relationships, derives substantial revenue from activities throughout the United States.

24.     Upon information and belief, B of A is a limited liability corporation organized and existing under the laws of the State of New York, having its principal place of business therein at 9 West 57th Street, 17th Floor, New York, New York 10019. B of A, through its business activities and relationships, derives substantial revenues from the United States, including New York.

25.     Upon information and belief, International Fund Services (Ireland) Limited is a business entity organized and existing under the laws of Ireland, having a place of business at Third Floor, Bishop's Square, Redmond's Hill, Dublin 2, Ireland. IFS, through its business activities and relationships, derives substantial revenues from the United States.

## JURISDICTION AND VENUE

26.     This Court has original and/or supplemental subject matter jurisdiction over all claims at issue in this action pursuant to, inter alia, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1367.  The defendants conducted substantial activities in the United States, and their conduct here directly caused the plaintiffs' losses.  Among other things, defendants interacted on a regular basis with Lauer and Lancer Management, both of whom conducted their business affairs from the United States.  Many of the false and fraudulent statements were created in the United States and sent from there to the administrators for ultimate distribution to the investors.  Regular investor conference calls were initiated by Lauer from within the United States. Many of the securities purchases made on behalf of the Funds were executed on national stock exchanges in the United States and involved companies based in Florida.  Lauer and Lancer Management had regular contact with individuals in Florida relating to these investments.  Moreover, defendants committed acts outside of the United States which caused injury within the United States.  Finally, all of the claims asserted herein are so related, and derive from the same set of operative facts, as to constitute a single case or controversy.

27.     Moreover, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§ 754 and the CMO, which mandates that this action must be commenced in this Court.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial amount of the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also proper in this District pursuant to the CMO.

29.     This Court has personal jurisdiction over Bendall and Geist because both of them are residents of the United States. In addition, the Court has personal jurisdiction over all of the Director Defendants because they performed substantial business activities for the Funds which were managed by Lauer and Lancer Management in the United States. Furthermore, the Director Defendants knew, or reasonably should have known, that many investors in the Funds were located in the United States and that information relating to the Funds, including offering materials specifically identifying the Director Defendants was sent to those investors located in the United States. Moreover, each of the Citco Directors participated in the fund administration activities engaged in by Citco NV and, thus, the activities of Citco NV which were directed to the United States and Florida must be imputed to the Citco Directors.

30.     This Court has personal jurisdiction over Citco NV because it performs fund administration services for hundreds of companies throughout the world, including many based in, and/or having investors located in, the United States. As a result of such regular, systematic and continuous business activities, Citco NV derives

substantial revenue from the United States, including Florida.  Moreover, Citco NV had specific and regular communications with the investors in the Funds, many of whom were located in the United States.

31.     This Court has personal jurisdiction over The Citco Group because it is a worldwide company with offices located throughout the world, including at least two in Florida itself, through which it conducts regular, systematic and continuous business activities resulting in the derivation of substantial revenues from the United States and Florida.

32.     This Court has personal jurisdiction over PWC NA because it provides auditing and accounting services to hundreds of companies throughout the world, including many based in, and/or having substantial contacts with, the United States.  As a result of such regular, systematic and continuous business activities, PWC NA derives substantial revenue from the United States, including Florida.  Moreover, PWC NA specifically addressed its audits to investors in the Funds, many of whom were located in the United States.

33.     This Court has personal jurisdiction over IFS because it also performs fund administration services for hundreds of companies throughout the world, including many based in, and/or having investors located in, the United States.  As a result of such regular, systematic and continuous business activities, IFS derives substantial revenue from the United States, including Florida.  Moreover, IFS had specific and regular communications with the investors in the Funds, many of whom were located in the United States.

34.     This Court has personal jurisdiction over B of A because it performs brokerage services for hundreds of companies throughout the world States, including many based in, and/or having investors located in, the United States.  As a result of such regular, systematic and continuous business activities, B of A derives substantial revenue from the United States, including Florida.

35.     Moreover, pursuant to 28 U.S.C. § 1692, this Court has personal jurisdiction over those defendants residing in, or otherwise present in, the United States.

## FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

### The Funds and Lancer Management's Role

36.     Lancer Offshore was incorporated as an International Business Company, or IBC, in the British Virgin Islands ("BVI") on September 27, 1995.  At the time of its incorporation, its registered offices were at Citco Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands.  In December 1998 Lancer Offshore gained recognition as a professional mutual fund.

37.     OmniFund was formed on or about April 2, 2002 through the merger of two existing funds: The Orbiter Fund, Ltd. ("Orbiter") and The Viator Fund ("Viator").  Orbiter had originally been incorporated as an IBC in the BVI on January 29, 1999 and was recognized as a professional mutual fund in February 1999.  Viator had originally been incorporated as an IBC in the BVI on September 30, 1999 and was later also recognized as a professional mutual fund.  Like Lancer Offshore, at the time of their incorporation, both Orbitor and Viator listed their registered offices at Citco Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands (references to "OmniFund" herein shall, unless indicated specifically to the contrary, intend to refer to Orbiter, Viator and the OmniFund).

38.     Lancer Management was formed to manage the Funds in exchange for receiving certain fees, based on the Funds' performance.   Lancer Management's advisory fee for managing Lancer Offshore was approximately 1% per year, and was calculated by multiplying the Funds' NAV at the beginning of each fiscal quarter by 0.25%.  Lancer Management also received an "incentive fee" equal to 20% of the net profits of the Lancer Offshore, as calculated on the last day of the Funds' fiscal year.   Lancer Management's advisory fee for managing Orbiter was 1.5% per year, while its incentive fee was 50%.   Lancer Management's advisory fee for managing Viator was 1%, while its incentive fee was 25%.   Lancer Management's advisory fee for managing OmniFund was 2% while its incentive fee was 25%.

39.     Investors were solicited through letters, mailings, meetings, marketing materials and private placement memoranda ("PPMs").   Upon information and belief, the PPMs for Lancer Offshore and OmniFund were substantially similar.

**The Valuation Fraud**

40.     The Funds' investment strategy was one purportedly "concentrated" on investments in small and mid cap companies that were "investment community pariahs."

41.     Over the last three years, the Funds have relied on a few purportedly highly valued small cap issuers to comprise a substantial portion of their portfolios.  Contrary to what had been represented in the PPMs, a majority of the stocks in which the Funds have been heavily invested were unlisted and traded on the OTCBB and pink sheets.  These stocks were thinly traded and illiquid.  Despite the fact that most of the issuers in which the Funds were heavily invested had virtually no operations

or earnings, Defendants assigned values to them in the hundreds of millions of dollars.

For example:

- As of December 31, 2000, 2001, 2002 and April 30, 2003, Lancer Offshore held shares and warrants in Fidelity First Financial Corporation ("Fidelity First") valuing them at approximately $22.55 million, $6.89 million, $46.34 million and $64.19 million, respectively. OmniFund valued the shares and warrants it held on those year-end dates at $9.27 million, $1.2 million and $2.09 million. In 2000, Fidelity First exited the mortgage business and since that time has essentially been a non-operating, shell corporation. Fidelity First, which has traded on the pink sheets since November 1999, had no revenues for 2001 and 2002, lost millions of dollars since 2000 and had total assets of a mere $25,101 as of December 31, 2002.

- As of December 31, 2001 and 2002, and April 30, 2003, Lancer Offshore held shares in Biometrics Security Technology, Inc. (f/k/a Aug Corp.) ("Biometrics"), valuing them at approximately $61.2 million, $162.55 million and $75.76 million, respectively. OmniFund valued the shares and warrants it held on those year-end dates at $11.56 million and $15.81 million. Biometrics' common stock had been quoted on the OTCBB from December 2001 through May 23, 2003. On May 23, 2003, Biometrics was delisted from the OTCBB and it currently trades on the Pink Sheets. In 2001, Biometrics had no revenues, negative cash flow from operations of $385,593, and an accumulated deficit of $22,371,214. Biometrics' current results for all of 2002 are unknown because Biometrics' last public filing containing financial information was a Form 10-QSB for the period ended September 30, 2002, at which time Biometrics reported total revenues for the nine months of just $68,936.

- As of December 31, 2000 and 2001, Lancer Offshore held shares and warrants in SMX Corp. ("SMX"), valuing them at approximately $152.98 million and $133.42 million, respectively. OmniFund valued the shares and warrants it held on those year-end dates at $8.5 million and $15.11 million. SMX has traded on the pink sheets since December 2000. In fiscal 2000, SMX had no revenues and a net loss of $415,356. By December 31, 2001, SMX had revenues of $99,441, assets of a mere $1.28 million and its losses had increased to $4.31 million.

- As of December 31, 2000, 2001, 2002 and April 30, 2003, Lancer Offshore held shares and warrants in XtraCard Corp. (f/k/a Nu-D-Zine, Inc.) ("XtraCard"), valuing them at approximately $22.16 million, $84.12 million, $102.98 million and $58.86 million, respectively. OmniFund valued the shares and warrants it held on December 31, 2002 at $6.0 million. XtraCard has traded on the pink sheets since February 2000. XtraCard earned no revenue in 2000 and 2001; in 2002 it showed revenues of only $152,407. On December 31, 2002, XtraCard had assets of less than $2 million.

- As of December 31, 2001, 2002 and April 30, 2003, Lancer Offshore held shares in Total Film Group, Inc. ("Total Film"), valuing them at approximately $36.46

million, $37.7 million and $44.06 million, respectively. OmniFund valued the shares and warrants it held on those year-end dates at $12.1 million and $5.0 million. Total Film traded on the OTCBB from May 2001 until April 2002 at which point it began trading exclusively on the pink sheets. In 2000-2001 Total Film had revenues of $1.8 million and a loss of $8.95 million in the nine months (ending March 31, 2001) before it stopped filing with the SEC.

42.     The values assigned to the Funds were directly tied to the closing prices of the securities in which the Funds were invested. The Funds' PPM provided that the Funds' NAV would be calculated as follows:

> [listed or quoted securities are to] be valued at their last sales prices on the date of determination, or if no sales occurred on such date at the mean between "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value reasonably assigned to such securities and instruments by the Board of Directors.

> [If securities are not listed, they] shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value reasonably assigned to such securities by the Board of Directors.."

43.     The PPMs also contained a caveat that in the event the Board of Directors determined that the listed valuation method did not represent its market value the Board of Directors would value the securities as it reasonably determined.

44.     As described in detail below, from at least March 2000, the NAVs were intentionally, and fraudulently, inflated by manipulating the month end closing prices of certain securities in which the Funds were heavily invested.

45.     According to the SEC, Lauer and/or Lancer Management purchased for the Funds substantial, sometimes controlling blocks of these thinly traded stock in off-market trades. Subsequently, on or near monthly valuation dates, Lauer

and/or Lancer Management purchased a small number of additional shares at prices that were significantly higher than the Funds' initial acquisition price. Following the purchase, Lauer and/or Lancer Management would calculate the value of the Funds' entire holding of that security based on the artificial price achieved through the recent limited value transaction at the increased price. These purchases were made with the intent to raise the closing market price of certain stocks in the Funds' portfolios.

46.     These rigged closing prices were then used in valuing the Fund's securities and in calculating the Funds' performances and NAVs which were disseminated to investors each month and to potential investors. The inflated valuation of these positions was provided to Citco NV and PWC NA which used the inflated values to prepare monthly NAV statements and annual audit reports respectively. The fraudulent performance reports induced plaintiffs to invest in the Funds and remain invested in the Funds.

47.     The purpose of such activity was to allow Lauer and Lancer Management to "earn" millions of dollars in management and incentive fees. Lancer Offshore's financial statements reveal that "Management fees" of $1,524,406 were paid in 2000 and $1,607,928 in 2001. The unaudited financial statements reveal an additional $2,117,200 in Management fees as of June 30, 2002. Moreover, the audited financial statements reveal that $15,915,593 and $13,548,193 in "Incentive Fees" were payable in 2000 and 2001 respectively. These same statements reveal an additional $44,006,726 (for 2000) and $48,264,309 (or 2001) as deferred incentive fees payable. The unaudited financial statements reveal $8,937,540 in "Incentive Fees" payable and $61,113,468 in deferred incentive fees payable as of June 30, 2002.

48.    This fraudulent manipulation was used for many of the securities in which the Funds were invested, including for example, Lighthouse Fast Ferry, Inc. ("Lighthouse"), the manipulation of which is illustrative of Lauer's fraudulent scheme. On October 31, 2001, Lancer Management purchased 40,000 shares of Lighthouse at the end of the trading day, representing the largest single day volume in the month of October.    Lancer Management thereby controlled and dominated the market for Lighthouse's common stock and its manipulative trading caused Lighthouse's stock price to rise dramatically on October 31, 2001 to $2.15 per share from the previous day's closing price of $1.60 per share (a 34% increase over the previous day).    The Funds' complete holdings in Lighthouse were then valued at the materially overstated value of $2.15 per share.    Utilizing this technique of "Marking the Close," Lauer successfully manipulated the closing price of Lighthouse's stock on April 30, 2001, June 29, 2001, July 31, 2001, August 31, 2001, September 28, 2001, November 30, 2001, December 26, 2001, December 28, 2001 and December 31, 2001.

49.    Similar trading patterns were employed in relation to other holdings, including Biometrics Security Technology, Inc., Fidelity First Financial Corp., SMX Corp., XtraCard Corp., Continental Southern Resources and Total Film Group. Lauer's fraudulent scheme succeeded in significantly overstating the values assigned to Lancer Offshore Fund's stock portfolio.  While the book (cost) value of Lancer Offshore Fund's portfolio as of December 31, 2002 was $259,307,486, the reported value was $824,523,879.  This unrealized increase in value was not based on any actual increase in value but was the result of Lauer's manipulation of the NAV.

50.    Lancer Offshore Fund's annual report for 2000, which was audited by PWC NA, stated that the Fund's NAV for the month ending December 31, 2000 was $840.22 per share.   Upon information and belief, at the time, this valuation was materially false and grossly overstated the actual NAV.

51.    In 2002, Lauer and Lancer Management reported that Lancer Offshore Fund's NAV for the month ending December 31, 2001 was $915.43 per share. Upon information and belief, at the time, this valuation, again audited and certified by PWC NA, was materially false and grossly overstated the actual NAV.

52.    In 2003, Lauer and Lancer Management reported that Lancer Offshore Fund's NAV for the month ending December 31, 2002 was $768.46 per share. Upon information and belief, this valuation was materially false and grossly overstated the actual NAV.

**Additional Material Misrepresentations and Omissions**

53.    In addition, Lauer made other materially false and misleading statements in various offering materials and newsletters about the Funds' holdings, performances, values and management backgrounds.

54.    For example, the Funds' PPMs misrepresented the type of investments the Funds would make.   Specifically, the PPMs represented that most investments made by the Funds would trade on "listed exchanges."  In truth, a majority of the Fund's investments were and are on unlisted exchanges such as the OTCBB or pink sheets. The PPM also stated, under a section titled "Investment Restrictions," that the Fund would not allow any one investment to comprise more than 20% of its total assets and that the "Fund may not take or seek to take legal or management control of

the issuer of any of its underlying investments." In direct contravention of these restrictions, the Funds at various times allowed more than 20% of their assets to be invested in a single company (often the same ones whose "value" was being fraudulently manipulated) and repeatedly acquired controlling stakes in several of the companies in which they were invested, whose "valuation" they later grossly inflated.

55.    Monthly newsletters and other marketing materials sent by Citco NV and Lauer to investors were also replete with falsehoods about the Funds' holdings and performance.

**Participation of the Director Defendants**

56.    The PPMs represented that the Funds' Board of Directors would review the values assigned to the securities held by the Fund and, if the valuations did not fairly present those values, the Board would value the securities reasonably and set forth the valuations in writing.   The audited financial statements for 2001 (and the restated audited financial statements for 2000) state that "in accordance and in conformity with the Fund's Placement Memorandum, the Board of Directors in conjunction with the investment manager determine at what value the investment securities are reported for the determination of the net asset value of the Fund."

57.    The audited financial statements for 2001 (and the restated audited financial statements for 2000) state that the Board of Directors of the Offshore Fund determined the value of 100% of the Fund's securities.

58.    On information and belief, the Director Defendants failed to exercise independent judgment and appropriate care and attention with respect to the

determination of the Funds' NAV.  They likewise knew or were reckless in not knowing that the Funds' holdings were overvalued and their NAV grossly inflated.

59.   The Director Defendants owed a fiduciary duty to the Funds and their shareholders to examine the valuation methodologies applied by Lauer in determining the NAV.  The Director Defendants further owed a fiduciary duty to the Funds and their shareholders to reasonably determine substitute methodologies in the event that they determined that the valuation methodologies applied by Lauer did not result in reasonable and accurate market values.  The Director Defendants failed to satisfy these fiduciary duties by allowing the materially false and misleading statements of the Funds' NAV to be disseminated to investors, including plaintiffs.

## Citco NV's Wrongful Conduct

60.   At all relevant times until September 2002, Citco NV served as administrator to the Funds.

61.   Citco NV was to provide various administrative services to the Funds, including, inter alia: (a) preparing and maintaining all customary financial and accounting books and records; (b) disseminating the Funds' NAV information; (c) preparing, or causing to be prepared, and disseminating the annual financial statements of the Funds, as well as quarterly reports regarding the NAV of the Funds; and (d) performing all other accounting and clerical services necessary in connection with the administration of the Funds.

62.   According to Citco NV's marketing materials, Citco NV maintains "the accounting records of a fund on an independent basis" and prices the fund's portfolio "using recognized data vendors".

63.     Materials prepared by Citco NV and provided to certain investors in the Funds specifically stated that Citco NV has policies, procedures and safeguards in place to ensure that valuations would be done accurately and fairly. These materials also stated that Citco NV "ensure[s] that we rely on third-party information on trades, portfolios and prices, and reconcile them to manager reports to ensure the independence of the valuation produced" and that Citco NV itself prepares monthly NAV calculations for the Funds.

64.     During the relevant time period Citco NV assigned at least three of its officers, defendants Conroy, Stocks and Quilligan, to serve as Directors of the Funds. Upon information and belief, the Citco Directors undertook the assignment in furtherance of their duties on behalf of Citco NV and to help Citco NV retain the Funds as clients.

65.     John M.S. Verhooren, a former director of Lancer Offshore and a Citco NV employee, writing for an industry publication in May 2003, stated that one of the guiding principles of a hedge fund administrator is to provide an honest interface between the investor and the fund. According to Verhooren, an administrator's "raison d'etre" is to serve the interests of the investors by providing them with the independent, accurate and timely information they need to make informed decisions about their investments. He went on to note that 'pricing' is central to the role of a fund administrator and that "a good administrator will always have insisted on independent pricing, and will terminate a contract with a hedge fund if they cannot agree with its primary methodology."

31

66.     Similarly, Declan Quilligan, identified at the time as General Manager and Managing Director of Citco NV was quoted in a 2001 article on the role Citco NV provides as follows: "Independence combined with an accurate, timely and professional service is how we can 'add value' to the finished product and to our clients.... The shareholders are our ultimate client... and they rely on our experience and time in the industry – which is since the very beginning – and take confidence from our subsequent position as a market leader. Our involvement means they don't have to entirely rely on the investment manager." The article goes on to note that Citco NV's centralized funds department allows Citco NV's 30 staff personnel to provide shareholder services to Citco NV funds whether they are administered in Curacao, the United States or elsewhere. Quilligan cites such integration as important in providing client services.

67.     Each month, Citco NV distributed to each shareholder of the Funds a statement setting forth the NAVs of the Funds. Plaintiffs reasonably expected that Citco NV would accurately report the Funds' NAV. As described above, each of these statements was materially false. Citco NV failed to independently value the portfolios and instead slavishly adhered to the valuations provided by Lauer.

68.     Citco NV also sent to investors and shareholders periodic reports prepared by Lauer and/or Lancer Management, all of which contained materially false information about the Funds' NAVs, their holdings, and the performance of their portfolio companies.

69.     Through the intimate involvement of the Citco Directors in the affairs of the Funds, they (and Citco NV through them) had access to non-public

information concerning the Funds' financial affairs and business practices, including periodic internal reports detailing revenues, holdings and other financial information.

70.    Thus, the Citco Directors knew, or should have known, that the Funds' NAV's were materially inflated. This knowledge must be imputed to Citco NV.

71.    Citco NV knew or was reckless in not knowing that the Funds' holdings were overvalued and that their performance and NAV's were grossly overinflated. Citco NV likewise knew or was reckless in not knowing that the statements and information it provided to investors concerning the Funds' performance and NAVs were materially false and misleading.

72.    Citco NV resigned as administrator of the Offshore Fund in September 2002. Upon information and belief, it knew, at that time, of significant irregularities in the conduct of the Funds, but failed to disclose those irregularities to shareholders and prospective investors, including plaintiffs.

**PWC NA's Wrongful Conduct**

73.    PWC NA knew that, at least beginning in October 1999, the Funds' PPMs identified "Pricewaterhouse Coopers" as the auditors and "Chartered Accountants" of the Funds.

74.    PWC NA audited Lancer Offshore's financial statements for the years ended December 31, 1997, 1998, 1999, 2000 and 2001. Upon information and belief, PWC NA also audited Viator's financial statements for the fiscal year ended September 30, 2000 and the Orbiter's financial statements for the year(s) ended December 31, 1999 and/or 2000.

75.    PWC NA's opinion letters stated that it had conducted its audits in accordance with international auditing standards. This refers to standards established

33

by the International Auditing and Assurance Standards Board, which functions as an independent standard setting body under the auspices of the International Federation of Accountants ("IFAC"). IFAC issues International Standards on Auditing ("ISA"), which are similar to those issued by the American Institute of Certified Public Accountants and the Public Company Accounting Oversight Board.

      76.    Each year, PWC NA issued a "clean" unqualified report attesting to the accuracy of Lancer Offshore's financial statements. These audit reports were specifically addressed to the investors in the Funds and distributed to the investors through Citco NV.

      77.    PWC NA's audit opinions for Lancer Offshore each year included the following statement for the year under examination (with the audit opinions for the year ended December 31, 2000 also representing that PWC NA had confirmed the securities owned by correspondence with the custodian):

> We have audited the accompanying statement of assets and liabilities of [the Fund] as of December 31, .... and the related statement of operations, changes in shareholders' equity and cash flows for the year ended December 31, .... These financial statements are the responsibility of the Fund's management. Our responsibility is to express an opinion on these financial statements based on our audit.
>
> We conducted our audit in accordance with international standards on auditing. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

78.    The audit opinions went on to state that: "In our opinion the financial statements referred to above present fairly, in all material respects, the financial positions of [the Funds],   as of December 31, ... and the results of its operations, changes in shareholders' equity and cash flows for the year ended December 31, ... in conformity with international accounting standards."

79.    PWC NA's audit opinions for at least the years ended December 31, 2000 and December 31, 2001 falsely stated that the firm's audits of the Offshore Fund had been conducted in accordance with international standards on auditing.  Its representations were false because, upon information and belief, PWC NA did not plan and perform its audits to obtain reasonable assurances that the Funds' financial statements were free of material misstatements, and did not examine evidence supporting the valuation amounts and disclosures in the financial statements.  PWC NA's audits therefore did not "provide a reasonable basis for [its] opinion" and, by stating to the contrary, the opinions were entirely false.

80.    Upon information and belief, similar statements were contained in PWC NA's audit reports for the Viator and Orbiter Funds as well.

81.    PWC NA willfully, recklessly and/or grossly failed in its stated "responsibility to express an opinion on [the Funds'] financial statements based on our audit."  PWC NA misrepresented in its opinions that the Funds' financial statements were presented in accordance with international accounting standards, and that its audits were performed in accordance with international standards on auditing.

82.    ISA 200 requires an auditor to plan and perform an audit with an attitude of professional skepticism, which is necessary for the auditor to identify and

properly evaluate matters that increase the risk of material misstatements resulting from fraud or error (for example, management's characteristics and influence over the internal control environment, industry conditions, and operating characteristics and financial stability). Thus, representations by management would ordinarily be expected to be supported by other evidence and would not be assumed to be necessarily correct.

83. The Funds' claims of steadily increasing NAV's, in a declining market and when its portfolio consisted of small companies whose securities were thinly traded, should have met with skepticism on the part of PWC NA, but did not. After the end of 1999, the global equity markets declined significantly and investors generally suffered negative returns for 2000, 2001 and 2002, but Lancer Offshore, according to Lauer and Lancer Management, earned approximately $100 million in each of 2000 and 2001. PWC NA, which (unlike most of the Funds' investors) knew the companies in which the Funds were invested, should have been skeptical of these performance claims and should have employed procedures to verify those claims, but did not.

84. Additionally, PWC NA should have recognized a variety of "red flags" raised by the information it was receiving including, but not limited to: (a) many of the companies whose shares were held by the Funds shared a common address in Boca Raton, Florida; (b) personnel associated with the Funds and/or Lancer Management had previously been barred by governmental agencies from working with public companies and brokers; and (c) Lauer himself reportedly poured millions of dollars into films being produced by Total Film, a company in which the Funds held large positions.

85.    PWC NA knew that the valuation of the Funds' portfolios were subject to a high degree of uncertainty.  The 2001 notes to the financial statements of Lancer Offshore, noted that:

> Due to the characteristics of certain investment securities of the Fund combined with limited trading volumes of such securities, the Board of Directors in conjunction with the investment manager estimated the fair values of such securities based on a methodology developed by the investment manager.  The total value of investment securities of the Fund' which were subjected to such valuation procedures at year-end amounted to USD 827,020,243 which represents 100% of investment securities of the Fund.

86.    Knowing that the valuations of the Funds were dependent on judgments made by management and the Board of Directors, PWC NA was required to engage in such auditing procedures as were necessary to afford a reasonable opinion regarding the fairness of those valuations.   Had PWC NA conducted an audit appropriate for these circumstances, it would not have been able to issue an unqualified opinion on the Funds' financial statements.

87.    PWC NA should have added an explanatory paragraph to its standard reports to emphasize the uncertainty of the valuation of the market prices of the Funds' investments.  PWC NA also should have expressly stated that a large portion of the Funds' portfolio was subject to good faith valuation estimates by the Funds' Board of Directors in view of the absence of readily ascertainable market values.

88.    Because PWC NA accepted valuations for the Funds' portfolio companies that the SEC has subsequently described as "outlandish", PWC NA's audits of Lancer Offshore for at least 2000 (NAV of $840.22 per share) and 2001 (NAV of $915.43 per share) were materially false and misleading.

89.    On information and belief, the appraisals prepared for the Funds' holdings, which PWC NA accepted in rendering its opinion, closely approximated the values assigned to the Funds' holdings based on the manipulated closing prices at month end.  These appraisals were, however, fatally flawed and did not reflect the true values of the Funds' holdings under the generally accepted Uniform Standards of Professional Appraisal Practice or the American Society of Appraisers Business Valuation Standards.  In particular, the valuations were improperly based on unreliable market prices of thinly traded securities; unjustified prices of private transactions in thinly traded securities; unfounded, baseless and unrealistic projections; hypotheticals; and/or an averaging of various factors.  Indeed, under accepted standards of valuing businesses, certain of the Funds' holdings were and/or are essentially worthless.

90.    That PWC NA's audits of the value of the Funds' investments were fraudulent or recklessly negligent is illustrated by the facts relating to Lancer Offshore's investment in Biometrics (formerly AUG).  Upon information and belief, at some point in December 2001 Lancer Offshore acquired 18,000,000 shares of Biometrics for approximately $500,000, or less than 3 cents a share.  These shares were then valued at $61.2 million as of December 31, 2001, based on the fact that a mere 1,800 shares of Biometrics traded at $3.40 per share on December 31, 2001.  This $61.2 million valuation is almost 100 times the underlying value of the assets of Biometrics as disclosed by Biometrics' auditors as of December 31, 2002.

91.    On information and belief, Lancer Offshore delivered an appraisal of Biometrics to PWC NA to support the valuation that the Board of Directors assigned to the investment which did not comport with the generally accepted Uniform Standards

of Professional Appraisal Practice or the American Society of Appraisers Business Valuation Standards.

92.    Biometrics had no revenue for 2000 or 2001, had a negative cash flow from operations for the year ended December 31, 2001 of $281,593 and had total stockholder equity as of December 31, 2001 of $629,000, entirely in cash.    The company's financial statements as of September 30, 2001 indicated the the company had accumulated net losses from operations of $22,175,121 and that the company's ability to continue as a going concern was dependent on the ability to raise additional capital and implement its business plan.

93.    Notwithstanding the fact that Biometrics had no revenues, and that Biometrics had stated that it faced bankruptcy if it did not receive additional financing, its operating plan forecast revenues of tens of millions of dollars.

94.    PWC NA signed off on a "gain" of $60.7 million on Biometrics in the month of December 2001, notwithstanding (i) its knowledge of the pennies per share paid by Lancer Offshore for Biometrics earlier that month; (ii) the short interval between the acquisition of the bulk of the shares by Lancer Offshore versus the trade date utilized for valuation; (iii) the dramatic discrepancy between the price paid by Lancer Offshore for the bulk of its shares versus the price at which it "bought" at month end on the OTC market; and (iv) the patent lack of reliability of the appraisal, which disregarded Biometrics' own balance sheet that showed no asset value, and also disregarded Biometrics' auditor's qualified opinion questioning whether Biometrics would be able to continue as a going concern.

95.    Other companies in the Funds' portfolios were the subject of equally shoddy and useless valuations, which PWC NA, on even a rudimentary review, should have concluded were insufficient to support the valuations on which PWC NA was asked to sign off.

96.    The facts known at the time of PWC NA's audits of the Funds' investments should have heightened PWC NA's skepticism.  PWC NA knew that the bulk of the Funds' investments were purchased by the Fund for pennies per share in off-market transactions.  These penny stocks were written up by tens of millions of dollars just days or months later based on a "marking the close" scheme and were reflected in the financial statements as hundreds of millions of dollars of "unrealized gains."  The "unrealized gains" number was of particular significance in PWC NA's performance of the audit because those gains were a factor in determining both the Funds' NAV and Lancer Management's fee of 20% of the Funds' gains.

97.    Even a cursory examination by PWC NA of the portfolio company valuations that were provided to PWC NA would have revealed that the claimed values were totally unsupported by the facts, and the valuations were worthless.

98.    As PWC NA's opinion letters highlight, a central function of its audit was to "assess the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation."  This is precisely what PWC NA failed to do.

99.    Under ISA 24, transactions between entities that are "related parties" must be disclosed in the financial statements of the reporting entity.  PWC NA failed to cause the Funds to disclose the extensive related party transactions into which