UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------------------x
                                                         :

THE PENSION COMMITTEE OF THE UNIVERSITY OF MONTREAL    :
PENSION PLAN; THE ALTAR FUND; ABERDEEN INVESTMENTS LTD.;   :
ARIES TRADING, LTD.; THE ARROWSMITH FUND LTD.; AVISON     :  1:05-CV-09016
COMPANY SA; BANCO NOMINEES (I.O.M.) LIMITED; BANK OF       :  (SAS) (FM)
BERMUDA (LUXEMBOURG), S.A. NOW CALLED HSBC SECURITIES    :
SERVICES (LUXEMBOURG) S.A., ON BEHALF OF LIBERTY ERMITAGE  :  **SECOND**
NORTH AMERICAN ABSOLUTE FUND LTD.; BANQUE PRIVEE          :  **AMENDED**
EDMOND DE ROTHSCHILD EUROPE; CACEIS BANK LUXEMBOURG     :  **COMPLAINT**
(F/K/A CREDIT AGRICOLE INVESTOR SERVICES BANK              :
LUXEMBOURG), AS ASSIGNEE OF BANQUE PRIVEE EDMOND DE     :  **Jury Trial**
ROTHSCHILD EUROPE/ISOFIN; JOHN G. BARRIE, JR. IRA, AN       :  **Demanded**
INDIVIDUAL RETIREMENT ACCOUNT ("IRA") HELD ON BEHALF OF  :
JOHN G. BARRIE, JR.; BASE FORCE, LTD.; BOMBARDIER TRUST    :
(CANADA), AS AGENT OF THE ADMINISTRATORS OF THE PENSION   :
FUNDS OF BOMBARDIER INC. WHOSE ASSETS ARE COLLECTIVELY  :
INVESTED IN THE BOMBARDIER TRUST (CANADA) (FOREIGN        :
ASSETS) FUND; THE BOMBARDIER TRUST (UK); THE BOMBARDIER   :
TRUST (U.S.) MASTER TRUST; CEDAR FUND; CLEARWATER        :
COMMERCIAL ENTERPRISES, INC.; COMMONFUND GLOBAL HEDGED :
PARTNERS, LLC; CONDOR ALTERNATIVE FUND; THE CORBETT     :
FAMILY CHARITABLE FOUNDATION INC.; THE CORONATION      :
INTERNATIONAL ACTIVE FUND OF FUNDS; FORTIS GLOBAL       :
CUSTODY MANAGEMENT AND TRUSTEE SERVICES (IRELAND)     :
LIMITED AS TRUSTEE FOR CORONATION UNIVERSAL FUND; THE   :
DEVON TRUST; DIRMICA INVESTMENT LTD; DIVERSIFIED CAPITAL  :
MANAGEMENT LTD; MELLON BANK, N.A., AS TRUSTEE FOR THE   :
DOMINION RESOURCES INC. MASTER TRUST; ALAIN DUNAND;    :
ETHOS INVESTMENTS LTD.; FIRST TRUST CORP., AS TRUSTEE F/B/O  :
EACH OF PAUL J. SIMON, SHIRLEY A. SIMON AND JOSEPH CUETER;  :
FONDATION LUCIE ET ANDRE CHAGNON; ANDRE CHAGNON;     :
SOJECCI II LTEE.; FONDATION LILLA; GOULAM INVESTMENTS INC.;  :
GT ALPHA; CHRISTA GUNTER; HERMES TRADING LTD.; HSBC     :
PRIVATE BANK (SUISSE) SA (F/K/A HSBC REPUBLIC (SUISSE) SA;   :
HSBC REPUBLIC (USA) INC.; DEFINED BENEFIT PLAN FOR      :
HUNNICUTT & CO., INC.; IRA F/B/O WILLIAM HUNNICUT VFTC AS  :
CUSTODIAN; THE ISRAEL HENRY BEREN CHARITABLE TRUST;    :
JOYCE SINCLAIR SPOUSAL TRUST; KREDEITBANK LUXEMBOURG,  :
A/C SPECIAL OPPORTUNITIES FUND; KUWAIT AND MIDDLE EAST  :
FINANCIAL INVESTMENT COMPANY; LA COMPAGNIE FINANCIERE  :
EDMOND DE ROTHSCHILD BANQUE; CECILE LESCOAT; LGT BANK IN :
LIECHTENSTEIN AG; L.H. LOGARITHM HOLDINGS SA;           :  (caption continued on
LIVSFORSLKRINGSSELSKAPET NORDEA LIV NORGE AS; MADISON  :  following page)

(caption continued on following page)

TEXTILES, LTD; MAESTRO TRADING, INC.; MIRELIS INVESTRUST SA; : (caption continued
VITTORIO MOSCA; THE MORTON MEYERSON FAMILY FOUNDATION; : from previous page)
THE 1999 MEYERSON CHARITABLE REMAINDER TRUST; :
MULTIVALOR INVEST INC.; NATIONAL BANK OF CANADA; NEMROD :
LEVERAGED HOLDINGS LTD.; NOBILIS S.A.; SUZANNE FONTAN :
S.C.A.; HALINVEST SARL; DELPHI GLOBAL LIMITED; JOAKIM :
LEHMKUHL; ISCANDAR INTERNATIONAL S.A. (F/K/A SIMISA :
INTERNATIONAL S.A.); LABISCOUTI TRUST; KIKOUSU TRUST; :
OKABENA MARKETABLE ALTERNATIVES FUND, LLC; THE PENSION :
COMMITTEE OF RÉGIME DES RENTES DU MOUVEMENT DESJARDINS;:
ANNE-CHANTAL PIGELET; PICTET & CIE BANQUIERS; IRVING :
TEITELBAUM, STEPHEN GROSS AND LAURENCE LEWIN IN THEIR :
CAPACITY AS THE TRUSTEES OF RCA IN TRUST; THE PENSION :
COMMITTEE OF THE PENSION PLAN FOR THE RÉGIME DE RETRAITE :
DE LA CORPORATION DE L'ECOLE POLYTECHNIQUE; ROTHSCHILD :
GESTION; SATNAM INVESTMENTS LTD.; SEVEN SEAS PORTFOLIO A :
LIMITED; SIGNET MULTI-MANAGER INC. AND UEB (UNITED :
EUROPEAN BANK) GENEVA (SWITZERLAND); SIL NOMINEES :
LIMITED; SPGP (SOCIETE PRIVEE DE GESTION DE PATRIMOINE); JO- :
ANN ST. GERMAIN; THE STAFFORD FUND LTD., SUCCESSOR TO :
STAFFORD OPPORTUNITY FUND, LTD.; STARVEST FUNDS LTD.; THE :
TAURUS TRUST, SUCCESSOR-IN-INTEREST TO TURKOS SEVENTEEN :
LIMITED; TEAM HAAS USA, LTD.; TRENDTRUST SA; JAMES :
VAUGHAN; VENERE INVESTMENTS LIMITED; VIDACOS NOMINEES :
LIMITED; WESTWIND FOUNDATION HOLDINGS LTD.; WYATT :
INCORPORATED EMPLOYEES PROFIT SHARING PLAN; 171212 :
CANADA, INC.; AIS HOLDING SERIES TRUST II; COMMERZBANK :
GLOBAL ALTERNATIVE LIMITED; COMMERZBANK ALTERNATIVE :
STRATEGIES – GLOBAL HEDGE; VESTA FORSIKRING AS; FUND :
NOMINEES LTD.; and ORAN LIMITED, :
:
                        Plaintiffs, :
:
                - against - :
:
BANC OF AMERICA SECURITIES, LLC; CITCO FUND SERVICES :
(CURACAO) N.V.; THE CITCO GROUP LIMITED; INTERNATIONAL :
FUND SERVICES (IRELAND) LIMITED; PRICEWATERHOUSECOOPERS :
(NETHERLANDS ANTILLES); JOHN W. BENDALL, JR.; RICHARD GEIST;:
ANTHONY STOCKS; KIERAN CONROY; DECLAN QUILLIGAN; and :
INTER CARIBBEAN SERVICES LIMITED, :
:
                       Defendants. :
:
:
-------------------------------------------------------------------------------------------x

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

THE PARTIES....................................................................................................................6

The Plaintiffs....................................................................................................................6

Capacity and Authority of Certain Plaintiffs to Sue ......................................................22

    Plaintiff Nobilis Group ............................................................................22

    Plaintiff The Pension Committee of the University of Montreal Pension Plan.................23

    Plaintiff Liberty Ermitage North American Absolute Fund Limited................................24

Non-Parties Michael Lauer and Lancer Management ....................................................25

The Defendants ................................................................................................................25

    Defendant Citco NV ...............................................................................25

    Defendant Citco Group ...........................................................................26

    The Citco Directors.................................................................................26

    The Non-Citco Directors.........................................................................28

    Defendant PWC NA ...............................................................................28

    Defendant BofA .....................................................................................28

    Defendant IFS ........................................................................................29

JURISDICTION AND VENUE .........................................................................................29

Subject Matter Jurisdiction .............................................................................................29

Venue ...............................................................................................................................30

Personal Jurisdiction Over Defendant Citco NV ............................................................30

Personal Jurisdiction Over Defendant Citco Group........................................................34

Personal Jurisdiction Over the Citco Directors...............................................................37

Personal Jurisdiction Over the Non-Citco Directors ......................................................38

Personal Jurisdiction Over Defendant PWC NA ............................................................38

Personal Jurisdiction Over Defendant BofA.................................................................39

Personal Jurisdiction Over Defendant IFS.................................................................39

FACTS RELEVANT TO ALL CLAIMS FOR RELIEF ...........................................43

The Funds and Lancer Management's Role ...............................................................43

The Funds' Purported Strategy .................................................................................45

The Valuation Fraud ..................................................................................................46

    Lauer and Lancer Management Falsify the Values of the Funds' Holdings
    Through a Scheme with Bruce Cowen and Others to "Mark the Close"..........................49

    BofA's Newman, Pennecke and Krawciw Help Lauer and
    Lancer Management Falsify the Values of the Funds' Holdings ....................................55

        BofA's Knowledge and Substantial Assistance
        of Lauer and Lancer Management's Fraud ...........................................................61

        BofA Knowingly and Substantially Assisted Lauer and Lancer
        Management in Falsifying the Value of Unregistered Warrants .........................62

        BofA Knowingly and Substantially Assisted Lauer and
        Lancer Management in Falsifying the Value of Publicly Traded
        Stock and Privately Held Stock (Which BofA Misrepresented
        on the Position Reports to Be Publicly Traded Stock) .........................................64

        BofA Knowingly and Substantially Assisted Lauer and Lancer Management
        in Defrauding Plaintiffs by Falsifying the Value of Unregistered Shares ............68

Citco NV's Role in Portfolio Valuation and NAV Calculation....................................71

    Citco NV's Obligations Under the Administrative Services Agreements........................71

    Citco NV's Obligations Under the Funds' PPMs..........................................................72

    Citco NV's Public Representations ...............................................................................72

    Industry Standards for a Hedge Fund Administrator's Valuation Activities...................79

The Director Defendants' Role in Portfolio Valuation and NAV Calculation.............82

    The Obligations and Role of the Director
    Defendants Under the Funds' Articles of Association ...................................................83

    The Obligations and Role of the Director Defendants Under the Funds' PPMs..............83

The Director Defendants' Role in Valuation
According to the Audits of Lancer Offshore ...................................................84

The Citco Directors' Fees ...................................................................................84

The Misrepresentations by Citco NV and the Citco Directors .......................85

The Scienter of Citco NV and the Citco Directors .........................................85

Citco NV and the Citco Directors Knowingly Accepted and
Approved Absurd Valuations by Lauer and Lancer Management ...................86

The Citco Directors Had the Motive and Opportunity to Inflate the
Funds' NAVs, and Their Knowledge Must Be Imputed to Citco NV ............105

The "Red Flags" ...............................................................................................106

Red Flag #1:  The Funds' NAVs Were Increasing Substantially
at a Time When Global Equity Markets Were Performing Poorly....................106

Red Flag #2:  The Substantial Increase in the Concentration
of the Funds' Holdings in the Target Companies .................................................107

Red Flag #3:  The Substantial Increase in the
Valuations of the Funds' Holdings in the Target Companies..............................107

Red Flag #4:  The Dramatic Increase in the Values Ascribed to
Large Blocks of Restricted Stock Purchased at Much Lower Prices...................108

Red Flag #5:  The Small, End-of-Period Trades in the Target
Companies' Stock Which Served No Legitimate Investment Purpose ...............108

Red Flag #6:  The End-of-Period Purchases, and the Corresponding
Increases in Valuation of the Target Companies, Coincided with the
Calculation of the NAVs and Lancer Management's Fees.................................109

PWC NA's Wrongful Conduct ........................................................................110

IFS's Wrongful Conduct...................................................................................117

Plaintiffs' Reliance............................................................................................119

The Funds' Collapse and Resulting Litigation ...............................................119

FIRST CLAIM FOR RELIEF:
Against Citco NV, Stocks, Quilligan and Conroy for Violations of Section 10(b)
of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder............................121

SECOND CLAIM FOR RELIEF:
Against Citco Group for Violations of
Section 20(a) of the Securities Exchange Act of 1934 ............................................122

THIRD CLAIM FOR RELIEF:
Against Citco NV and the Citco Directors for Common Law Fraud .........................125

FOURTH CLAIM FOR RELIEF:
Against Citco NV and the Citco Directors for
Aiding and Abetting Common Law Fraud .................................................................126

FIFTH CLAIM FOR RELIEF:
Against Citco NV, Stocks, Quilligan and Conroy for
Aiding and Abetting Breach of Fiduciary Duty.........................................................128

SIXTH CLAIM FOR RELIEF:
Against Citco NV, Stocks, Quilligan and Conroy for
Negligence, Negligent Misrepresentation and Professional Malpractice ...................129

SEVENTH CLAIM FOR RELIEF:
Against IFS for Negligence and Professional Malpractice ........................................131

EIGHTH CLAIM FOR RELIEF:
Against Citco NV and IFS for Breach of Fiduciary Duty ..........................................132

NINTH CLAIM FOR RELIEF:
Against PWC NA for Violations of Section 10(b) of
the Securities Exchange Act of 1934 and Rule 10b-5 thereunder ..............................134

TENTH CLAIM FOR RELIEF:
Against PWC NA for Common Law Fraud..................................................................136

ELEVENTH CLAIM FOR RELIEF:
Against PWC NA for Aiding and Abetting Common Law Fraud................................138

TWELFTH CLAIM FOR RELIEF:
Against PWC NA for Aiding and Abetting Breach of Fiduciary Duty ......................139

THIRTEENTH CLAIM FOR RELIEF:
Against PWC NA for Negligence, Negligent Misrepresentation
and Professional Malpractice .....................................................................................140

FOURTEENTH CLAIM FOR RELIEF:
Against BofA for Aiding and Abetting Common Law Fraud .....................................141

FIFTEENTH CLAIM FOR RELIEF:
Against BofA for Aiding and Abetting Breach of Fiduciary Duty.............................143

SIXTEENTH CLAIM FOR RELIEF:
Against the Director Defendants for Breach of Fiduciary Duty ..................................................145

CONCLUSION....................................................................................................................147

JURY DEMAND ................................................................................................................147

Plaintiffs, by their attorneys Friedman Kaplan Seiler & Adelman LLP, for their second amended complaint against the defendants named herein, respectfully allege as follows:

## INTRODUCTION

1. Plaintiffs in this action collectively invested over $550 million in two hedge funds, Lancer Offshore, Inc. ("Lancer Offshore") and The OmniFund Ltd. ("OmniFund")[1] (collectively referred to herein as the "Funds"). The Funds were managed by Michael Lauer ("Lauer") through Lancer Management Group, LLC ("Lancer Management"), the management company he owned and controlled. The Funds are now in the process of being liquidated by a court-appointed receiver (the "Receiver"), and virtually all of the capital invested in the Funds has been lost. The investors seek through this action to redress their direct losses.

2. Commencing in at least March 2000, the Funds began losing money on a colossal scale. This development was hidden from the Funds' investors – through fraud. Lauer and Lancer Management repeatedly and falsely told plaintiffs that the Funds' assets were appreciating when, in fact, the Funds were losing money. To conceal these losses, Lauer and Lancer Management concocted a scheme to fraudulently falsify the values of the Funds' positions.

3. Under this scheme, the Funds initially would acquire a large stake in a tiny public company that was a mere shell with few, if any, operations and no reasonable prospect of profitability. This stake – which, in many instances, was so large that it amounted to control of the company – was purchased for pennies per share, or sometimes nothing at all. Subsequently, just prior to month-end (the "close"), when the Funds' net asset values ("NAVs") were due to be

---

[1] References to OmniFund are intended, unless specifically noted to the contrary, to include the Orbiter and Viator Funds, predecessor funds that were merged into OmniFund in or about April 2002.

calculated, Lauer and Lancer Management would cause the Funds to purchase a small number of additional publicly traded shares in the company, this time at a price significantly higher than the acquisition price of the large block of unregistered, privately placed shares. Lauer and Lancer Management would then arrange to value the Funds' entire holdings in the company – both the tiny quantity of free-trading shares and the large block of unregistered, privately placed shares – at the inflated price reflected by this last supposedly "open market" transaction. Lauer and Lancer Management used these inflated valuations, which were the product of illegal market manipulation by Lauer and Lancer Management, to manufacture fake profits and report positive performance results to investors and prospective investors.

        4.     Lauer and Lancer Management worked closely with the Funds' prime broker/custodian, defendant Banc of America Securities, LLC ("BofA") to facilitate this scheme. At the request of Lauer and Lancer Management, the Funds' BofA account representatives personally falsified valuations of securities that appeared on "position reports," which BofA posted on a password-protected website. On the website, Lauer, Lancer Management and the Funds' administrators and auditor could view these fraudulent "position reports," which bore BofA's name and purported to give accurate information about the Funds' portfolios, including the identities, quantities and, most importantly, the valuations of the securities in the portfolios. BofA knew that Lauer and Lancer Management provided these false "position reports" (hereinafter, "Position Reports") to defendants Citco Fund Services (Curacao) N.V. ("Citco NV"), International Fund Services (Ireland) Limited ("IFS") and PricewaterhouseCoopers (Netherlands Antilles) ("PWC NA"). Indeed, defendant BofA itself gave these service providers logins and passwords so that they could access the reports on the website directly. BofA also knew that these service providers, in turn, used the false Position Reports (albeit in violation of

their own duties) to create monthly NAV statements and audit reports for the Funds. BofA also knew that those NAV statements and audit reports ultimately were intended to, and would, be disseminated to, and relied upon by, investors and prospective investors in the Funds.

5.      Through these fraudulent methods, Lauer and Lancer Management made it appear as though the values of the Funds' portfolios were continually rising, even in a falling market. This induced plaintiffs to invest and remain invested in the Funds, and also increased the fees earned by Lancer Management and Citco NV. Plaintiffs were never told that the Funds' portfolios were valued using these fraudulent techniques.

6.      Lauer and Lancer Management did not act – indeed, they could not have acted – alone in perpetrating this fraudulent scheme. The fraud would not have succeeded without the assistance not only of defendant BofA as already noted, but also of the Funds' directors and their other service providers, including their administrators, directors and auditor.

7.      Defendant Citco NV, an indirect, wholly owned subsidiary of defendant The Citco Group Limited ("Citco Group"), was the administrator for the Funds. Throughout the relevant time period, Citco NV prepared and sent materially false monthly NAV statements to plaintiffs. Instead of conducting an independent valuation of the Funds' portfolios, as it was obligated to do, Citco NV simply used the fraudulent valuations prepared and provided by Lauer, Lancer Management and BofA to prepare NAV statements. These NAV statements were prepared and distributed on Citco NV letterhead and were sent to the Funds' investors and prospective investors.

8.      Citco NV knew of the fraud. Three of its officers – defendants Stocks, Quilligan and Conroy – and one of Citco Group's subsidiaries – defendant ICSL – were also the Funds' directors (defendants Stocks, Quilligan, Conroy and ICSL, collectively, the "Citco

Directors"). The Citco Directors were personally and actively involved in defendant Citco NV's valuation of the Funds' portfolios, and the distribution of false and misleading NAV statements to plaintiffs. As detailed herein, defendants Stocks, Quilligan and Conroy knew, as did numerous other personnel throughout the Citco organization – up to and including the CEO and President of Citco NV's parent, defendant Citco Group – that the portfolio valuations they received from Lauer, Lancer Management and defendant BofA were – in defendant Quilligan's own words – "absurd" and indefensible. Indeed, Citco NV and the Citco Directors had ample information that contradicted the valuations they were receiving from Lauer, Lancer Management and defendant BofA. Citco NV and the Citco Directors nevertheless disseminated NAV statements that relied on these absurd valuations, in blatant disregard of the losses they would inevitably cause to investors, including plaintiffs.

9.     Defendant Citco Group controlled Citco NV. Not only was Citco Group the corporate parent of defendant Citco NV, but Citco Group also was involved in Citco NV's knowing decision to distribute false and misleading NAV statements. In fact, on at least one occasion, it was Citco Group that instructed Citco NV to disseminate those false and misleading NAV statements to investors. Citco Group also was involved in Citco NV's decision to resign as the Funds' administrator without disclosing the misconduct by Lauer and Lancer Management of which Citco Group, Citco NV and the Citco Directors were indisputably aware.

10.     In early 2002, Lauer substituted two of his cronies, defendants John W. Bendall, Jr. and Richard Geist (the "Non-Citco Directors," and, together with the Citco Directors, the "Director Defendants") as directors of the Funds.

11.     The Funds' auditor, defendant PWC NA, recklessly and negligently ratified and confirmed the false valuations in annual audit reports disseminated directly to

plaintiffs. PWC NA realized, or was reckless in failing to realize, that the Funds' financial statements, which it was auditing and certifying as accurate, fraudulently and dramatically overstated the Funds' assets, net worth and earnings along with concealing massive losses sustained by the Funds. In the 2000 and 2001 audits, defendant PWC NA represented that it had audited the Funds' financial statements in accordance with international standards on auditing, including representations that the audits had been planned and performed in order to obtain reasonable assurance, on the part of PWC NA, that the financial statements were free of material misstatements. PWC NA failed to disclose that, in fact, it was simply rubber-stamping the information received from Lauer and Lancer Management, thus facilitating the fraud being perpetrated upon the investors.

12.     In addition to their own direct misrepresentations to plaintiffs, defendants Citco NV and PWC NA each negligently performed their duties and also materially and substantially assisted Lauer's and Lancer Management's efforts to induce plaintiffs to invest in the Funds at inflated prices and/or to forego their rights to withdraw their investments. By creating and/or confirming false valuations of the Funds' assets, Citco NV and PWC NA each knowingly and materially assisted the continuing fraud and breaches of fiduciary duty by Lauer and Lancer Management.

13.     In September 2002, Citco NV resigned and was replaced as the Funds' administrator by defendant IFS. IFS also failed to independently and properly value the Funds' portfolios, and negligently disseminated false, misleading and fraudulent NAV statements to investors based upon the fraudulent valuations generated by Lauer and Lancer Management with defendant BofA's substantial assistance. Like Citco NV, IFS recognized that there were problems with the valuations generated by Lauer and Lancer Management, and had access to

information contradicting those valuations, but nonetheless sent out NAV statements that, like those sent out by Citco NV, misrepresented the true state of the Funds' NAVs.

**THE PARTIES**

**The Plaintiffs**

14.     Plaintiffs are shareholders in the Funds.  It is plaintiffs' intent to pursue through this action only such claims as they own directly.

15.     Specifically, the plaintiffs in this action are as follows:

(a)     The Altar Fund, an exempted limited company incorporated under the laws of the Cayman Islands having a registered office in c/o Quin & Hampson, 3rd Floor Harbour Centre, North Church Street, P.O. Box 1348 GT, Grand Cayman, Cayman Islands., which invested $1,000,000 in Lancer Offshore on or about October 1, 2000, $500,000 in Lancer Offshore on or about May 1, 2001, $100,000 in Lancer Offshore on or about August 1, 2002, $350,000 in Viator on or about October 1, 2000, $300,000 in Viator on or about December 1, 2000, $500,000 in Viator on or about February 1, 2001, $500,000 in Viator on or about March 1, 2001 and $500,000 in Viator on or about May 1, 2001, for a total of $3,750,000 in net invested capital, $1,600,000 of which was invested in Lancer Offshore, and $2,150,000 of which was invested in OmniFund;

(b)     Aberdeen Investments Ltd., having an administration address at PO Box 300, 8034 Zurich, Switzerland, which invested $1,000,000 in Lancer Offshore in or about February 1998 and $250,000 in Lancer Offshore in or about January 2002, and which redeemed $546,723.22 from Lancer Offshore in or about April 1999 and $500,003.12 in or about January 2001, for a total of $203,273.66 in net invested capital;

(c)     Aries Trading, Ltd., having an address of Aktis 119, Faros Kavouri, Vouligameni 166-71, Greece which invested $105,000 in Lancer Offshore on or about April 1, 1997;

(d)     The Arrowsmith Fund Ltd., having an address at Dockendale House, West Bay Street, P.O. Box N-4836, Nassau, Bahamas, which invested $900,000 in Lancer Offshore;

(e)     Avison Company SA, having an address at the Vanterpool Plaza Building, Wickhams Cay I, Road Town, Tortola, British Virgin Islands, which invested $499,998.97 in Lancer Offshore on or about February 25, 2000;

6

(f)     Banco Nominees (I.O.M.) Limited, having an address at P.O. Box 34, 12/13 Hill Street, Douglas, Isle of Man, IM99 IBW, British Isles, which invested $199,999.99 in Lancer Offshore on or about April 1, 2001, $200,000 in Lancer Offshore on or about July 29, 2001, $200,000 in Lancer Offshore on or about April 1, 2002, and $300,000 in Lancer Offshore on or about August 13, 2002, for a total of $899,999.99 in net invested capital;

(g)     Bank of Bermuda (Luxembourg), S.A. now called HSBC Securities Services (Luxembourg) S.A., with an address at P.O. Box 413, 13 Rue Goethe, 2014 Luxembourg, which invested on behalf of Liberty Ermitage North American Absolute Fund Ltd., $1,000,000 in Lancer Offshore on or about June 1, 2002 and $1,000,000 in Lancer Offshore on or about August 1, 2002, for a total of $2,000,000 in net invested capital;

(h)     Banque Privee Edmond de Rothschild Europe, having an address at Societe anonyme, 20 boulevard Emmanuel Servais, L-2535 Luxembourg, which invested $1,000,000 in Lancer Offshore on or about January 4, 1999 and $100,000 in Lancer Offshore on or about September 1, 1999, for a total of $1,100,000 in net invested capital;

(i)     Caceis Bank Luxembourg (f/k/a Credit Agricole Investor Services Bank Luxembourg), as assignee of Banque Privee Edmond de Rothschild Europe/Isofin, having an address at 5 allee Scheffer, L-2520, Luxembourg, which invested $3,000,000 in Lancer Offshore on or about September 23, 2002;

(j)     John G. Barrie, Jr. IRA, an Individual Retirement Account ("IRA") held on behalf of John G. Barrie, Jr., who resides at 2331 Castleford Terrace, Midlothian, Virginia 23113, which invested $250,000 in Lancer Offshore on or about November 1, 2000;

(k)     Base Force, Ltd., having an address in c/o Bruce Campbell & Co., P.O. Box 834, Bank of Nova Scotia Building, Grand Cayman, Cayman Islands, which invested $500,000 in Lancer Offshore on or about May 1, 1998, $300,000 in Lancer Offshore on or about October 1, 1998, and $300,000 in Lancer Offshore on or about January 1, 2000, for a total of $1,100,000 in net invested capital;

(l)     Bombardier Trust (Canada), as agent of the administrators of the pension funds of Bombardier Inc. whose assets are collectively invested in the Bombardier Trust (Canada) (Foreign Assets) Fund, a trust restated under and governed by the laws of the Province of Quebec (Canada), with an address in c/o Bombardier Inc., Corporate Office, 800 Rene-Levesque Blvd. West, Montreal, Quebec, Canada H3B 1Y8, which invested $20,000,000.00 in Lancer Offshore on or about January 1, 2000, $6,960,608.60 in Lancer Offshore on or about March 1, 2000 and

$6,900,000.00 in Lancer Offshore on or about April 1, 2000, for a total of $33,860,608.60 in net invested capital;

(m)    The Bombardier Trust (UK), a trust established under and governed by the laws of Northern Ireland, with an address in c/o Bombardier Inc., Corporate Office, 800 Rene-Levesque Blvd. West, Montreal, Quebec, Canada H3B 1Y8, which invested $6,000,000 in Lancer Offshore on or about March 1, 2000, $8,328,000 in Lancer Offshore on or about April 1, 2000, $7,750,000 in Lancer Offshore on or about March 1, 2002 and $3,000,000 in Lancer Offshore on or about June 1, 2002, for a total of $25,078,000 in net invested capital;

(n)    The Bombardier Trust (U.S.) Master Trust, a trust established under and governed by ERISA and the laws of the State of Ohio, with an address in c/o Bombardier Inc., Corporate Office, 800 Rene-Levesque Blvd. West, Montreal, Quebec, Canada H3B 1Y8, which invested $8,459,000.00 in Lancer Offshore on or about October 1, 1999 and $1,025,940.01 in Lancer Offshore on or about December 1, 1999, for a total of $9,484,940.01 in net invested capital;

(o)    Cedar Fund, having an address in c/o Bank of Bermuda Member, HSBC Security Services, 6 Front Street, Hamilton HM 1, Bermuda, which invested $2,000,000 in Lancer Offshore;

(p)    Clearwater Commercial Enterprises, Inc., having an address care of Bermuda Trust Company Limited, which invested $200,030.00 in Lancer Offshore on or about October 31, 1997, $100,030.00 in Lancer Offshore on or about November 25, 1998, and which redeemed $218,290.50 from Lancer Offshore on or about May 20, 1998, and which invested $200,030.00 in OmniFund on or about March 31, 1999, for a total of $281,799.50 in net invested capital, $81,769.50 of which was invested in Lancer Offshore, and $200,030.00 of which was invested in OmniFund;

(q)    Commonfund Global Hedged Partners, LLC, having an address in care of Commonfund Asset Management Company, Inc., 15 Old Danbury Road, P.O. Box 812, Wilton, Connecticut 06897-0812, which invested $1,500,000 in Lancer Offshore on or about April 1, 2000, $1,500,000 in Lancer Offshore on or about June 1, 2000, $1,500,000 in Lancer Offshore on or about July 1, 2000 and $6,000,000 in Lancer Offshore on or about January 1, 2001, for a total of $10,500,000 in net invested capital;

(r)    Condor Alternative Fund, having an address in c/o SV Alterinvest, 42 Avenue Montaigne, 75008, Paris, France, which invested $700,000 in Lancer Offshore in or about October 2000, $400,000 in Lancer Offshore in or about December, 2001, $400,000 in OmniFund in or about October 2000 and $500,000 in OmniFund in or about June 2001, for a total of

$2,000,000 in net invested capital, $1,100,000 of which was invested in Lancer Offshore, and $900,000 of which was invested in OmniFund;

(s)     The Corbett Family Charitable Foundation Inc., having an address of 2202 N. West Shore Blvd., Suite 110, Tampa, Florida 33607, which invested $2,000,000 in Lancer Offshore on or about September 29, 2000 and redeemed $400,000 from Lancer Offshore in or about June 2002, for a total of $1,600,000 in net invested capital;

(t)     The Coronation International Active Fund of Funds, having an address in c/o ABSA Investor Services, 6th Floor, ABSA Towers North, 180 Commissioner Street, Johannesburg, South Africa, which invested $3,582,000 in Lancer Offshore on or about April 1, 1998, $906,662 in Lancer Offshore on or about June 1, 1998, $636,200 in Lancer Offshore on or about August 3, 1998, $7,605,767 in Lancer Offshore on or about October 1, 1998, $10,000,000 in Lancer Offshore on or about November 2, 1998, and $4,000,000 in Lancer Offshore on or about December 1, 1998, and which redeemed $3,000,000 from Lancer Offshore on or about December 14, 2000, for a total of $23,730,629 in net invested capital;

(u)     Fortis Global Custody Management and Trustee Services (Ireland) Limited as trustee for Coronation Universal Fund, having an address in c/o Fortis Global Custody Management & Trustee Services (Ireland) Limited, 5th Floor, Plaza 2, Custom House Plaza, IFSC, Dublin 1, Ireland, which invested $12,000,000.00 in Lancer Offshore on or about April 1, 1998, $6,000,000.00 in Lancer Offshore on or about October 1, 1998, and $5,000,000.00 in Lancer Offshore on or about November 2, 1998, and which redeemed $2,999,999.28 from Lancer Offshore on or about December 1, 2000, $7,000,000.00 from Lancer Offshore on or about March 1, 2001, and $5,000,004.31 from Lancer Offshore on or about July 1, 2001, for a total of $7,999,996.41 in net invested capital;

(v)     The Devon Trust, a trust which, through Mirabuad & Cie, Boulevard du Theatre, CH-1211, Geneve 11 Switzerland, invested $50,544.29 in Lancer Offshore on or about September 30, 1999, $547,961.15 in Lancer Offshore on or about November 30, 1999, and $833,673.96 in Lancer Offshore on or about August 31, 2000, for a total of $1,432,179.40 in net invested capital;

(w)     Dirmica Investment Ltd having an address in c/o Mirabaud & Cie, Boulevard du Theatre, CH-1211, Geneve 11 Switzerland, which invested $1,415,547.61 in Lancer Offshore on or about July 31, 1998, $2,021,043.49 in Lancer Offshore on or about November 30, 1998, $60,411.79 in Lancer Offshore on or about May 31, 2000, $402,672.65 in Lancer Offshore on or about July 31, 2000, $251,60.69 in Viator on or about October 29, 1999, $754,890.78 in Viator on or about November 29, 1999, $32,950.29 in Viator on or about April 17, 2001, $6,361.64 in

Viator on or about July 31, 2001, $762,438.43 in Orbiter on or about January 1, 2000, and $269,533.02 in Orbiter on or about August 14, 2002, for a total of $5,977,490.39 in net invested capital, $3,899,675.54 of which was invested in Lancer Offshore, and $2,077,814.85 of which was invested in OmniFund;

(x)     Diversified Capital Management LTD, an International Business Company incorporated in the British Virgin Islands, having an address of Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, BVI, which invested $3,000,000 in Lancer Offshore on or about May 1, 2002 and $3,000,000 in Lancer Offshore on or about June 1, 2002, for a total of $6,000,000 in net invested capital;

(y)     Mellon Bank, N.A., as Trustee for the Dominion Resources Inc. Master Trust, having an address in c/o Dominion Resources Inc., 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222, which invested $15,000,000 in Lancer Offshore on or about July 1, 1999, $10,000,000 in Lancer Offshore on or about April 1, 2002, and $15,000,000 in Lancer Offshore on or about July 1, 2002, for a total of $40,000,000 in net invested capital;

(z)     Alain Dunand, an individual residing at 15 Rue de l'Eglise, 1270 Trelex, Switzerland, who invested $250,000 in Lancer Offshore on or about November 2, 1998 and $200,000 in Lancer Offshore on or about February 1, 2000, for a total of $450,000 in net invested capital;

(aa)    Ethos Investments Ltd., having an address in c/o S&A Papadimitrious & Co., 241, Syngrou Ave. & 2, Aikarnassou Str., Athens, Greece 171-22, which invested $200,000 in Viator on or about October 1, 2000;

(bb)    First Trust Corp., as trustee f/b/o each of Paul J. Simon, Shirley A. Simon and Joseph Cueter, having an address c/o U.S. Equipment Company, 20580 Hoover Road, Detroit, Michigan, 48206, which invested $1,465,000.00 in Lancer Offshore on or about January 30, 2001 and $109,984.28 in Lancer Offshore in or about June 2001 for the benefit of Shirley Simon, and which invested $185,000.00 in Lancer Offshore on or about January 31, 2001 and $6,168.95 in Lancer Offshore in or about June 2001 for the benefit of Paul Simon, and which invested $290,000.00 in Lancer Offshore on or about January 30, 2001 for the benefit of Joseph Cueter, for a total of $2,056,153.23 in net invested capital;

(cc)    Fondation Lucie et Andre Chagnon, a Canadian charitable foundation with its principal place of business at 2001 McGill College Avenue, Suite 1000, Montreal, Quebec, Canada H3A 1G1, which invested $50,000,000 in Lancer Offshore on or about March 1, 2001 and $50,000,000 in Lancer Offshore on or about December 1, 2001, for a total of $100,000,000 in net invested capital;

(dd)     Andre Chagnon, an individual residing at 521 De L'Anse, Vaudreuil, QC, J7V 8P3, Canada, who invested $2,000,000 in Lancer Offshore on or about June 1, 1998;

(ee)     Sojecci II Ltée, (formerly known as 9091-2601 Quebec Inc.) with its principal place of business at 2001 McGill College Avenue, Suite 1000, Montreal, Quebec, Canada H3A 1G1, as assignee of (i) Sojecci Ltée., which invested $6,000,000 in Lancer Offshore on or about October 1, 1999, $10,000,000 in Lancer Offshore on or about February 29, 2000 and $10,000,000 in Lancer Offshore on or about April 30, 2002 and which invested $2,000,000 in Orbiter on or about March 1, 2000 and $2,000,000 in Viator on or about March 1, 2000, and (ii) Claude Chagnon, who invested $5,000,000 in Lancer Offshore on or about May 1, 2002, for a total of $35,000,000 in net invested capital, $31,000,000 of which was invested in Lancer Offshore, and $4,000,000 of which was invested in OmniFund;

(ff)     Fondation J. Armand Bombardier, having an address at Edifice Sun Life, 1155 rue Metcalfe, 21e etage, Montreal, Quebec H3B 2V6, Canada, which invested $2,700,000 in Lancer Offshore on or about November 30, 1999, $3,500,000 in Lancer Offshore on or about January 31, 2000, and $2,200,000 in Lancer Offshore on or about May 1, 2001, for a total of $8,400,000 in net invested capital;

(gg)     Fondation Lilla, having an address c/o Mirabaud & Cie, Boulevard de Theatre, CH – 1211, Geneva, Switzerland, which invested $100,149.99 in Lancer Offshore on or about June 30, 1999 and $50,075.15 in Lancer Offshore on or about September 30, 1999, for a total of $150,224.14 in net invested capital.

(hh)     Goulam Investments Inc., having an address in c/o Goulam Investment Ltd., 6111, du Boise, #4A, Montreal, Quebec H3S 2V8, which invested $500,000 in Lancer Offshore on or about November 30, 2001;

(ii)     GT Alpha, having an address in care of GT Finance, Societe de Gestion 16, place de la Madeleine, which invested $900,000 in Lancer Offshore on or about January 1, 2002 and $200,000 in Lancer Offshore on or about July 1, 2002, for a total of in net invested capital;

(jj)     Christa Gunter, an individual residing at Les Terrasses du Leman, CH-1272 Genolier, Switzerland, who invested $100,000 in Lancer Offshore on or about June 1, 1998;

(kk)     Hermes Trading Ltd., having an address of Aktis 119, Faros Kavouri, Vouliagmeni 166-71, Greece, which invested $150,000 in Viator on or about October 1, 2000;

(ll)    HSBC Private Bank (Suisse) SA (f/k/a HSBC Republic (Suisse) SA, having an address of 2 Quai General-Guisan, P.O. Box 3580, 1211 Geneva 3, Switzerland, as the record holder of Lancer Offshore shares, (1) for confidential client No. 1, who invested $299,997.69 in Lancer Offshore on our about May 31, 2002; (2) for confidential client No. 2, who invested $99,999.39 in Lancer Offshore on or about June 28, 2002; (3) for confidential client No. 3, who invested $125,003.95 in Lancer Offshore on or about May 31, 2002; (4) for confidential client No. 4, who invested $199,700.92 in Lancer Offshore on or about October 2, 1997; (5) for confidential client No. 5, who invested $100,002.07 in Lancer Offshore on or about May 29, 1998; (6) for confidential client No. 6, who invested $100,004.46 in Lancer Offshore on or about July 31, 1997; (7) for confidential client No. 7, who invested $100,000.46 in Lancer Offshore on or about February 27, 1998; (8) for confidential client No. 8, who invested $150,001.95 in Lancer Offshore on or about January 2, 1998; (9) for confidential client No. 9, who invested $99,997.83 in Lancer Offshore on or about February 28, 2002; (10) for confidential client No. 10, who invested $200,002.25 in Lancer Offshore on or about January 31, 2002; (11) for confidential client No. 11, who invested $100,650.00 in Lancer Offshore on or about November 30, 1999 and redeemed $38,832.04 from Lancer Offshore on or about January 11, 2002; (12) for confidential client No. 12, who invested $199,998.15 in Lancer Offshore and redeemed from Lancer Offshore $132,759.43 on or about January 11, 2002; (13) for confidential client No. 13, who invested $100,646.61 in Lancer Offshore on or about February 10, 2000; (14) for confidential client No. 14, who invested $100,651.59 in Lancer Offshore on or about November 10, 1999 and redeemed $46,055.13 from Lancer Offshore on or about January 11, 2002; (15) for confidential client No. 15, who invested $100,651.59 in Lancer Offshore and redeemed $46,055.13 from Lancer Offshore on or about January 11, 2002; (16) for confidential client No. 18, who invested $99,999.50 in Lancer Offshore on or about May 31, 2001 and $99,999.50 in Lancer Offshore on or about November 21, 2002; (17) for confidential client No. 19, who invested $100,001.57 in Lancer Offshore; (18) for confidential client No. 20, who invested $99,997.83 in Lancer Offshore; (19) for confidential client No. 21, who invested $100,003.98 in Lancer Offshore on or about May 3, 2002; (20) for confidential client No. 22, who invested $138,011.02 in Lancer Offshore; (21) for confidential client No. 23, who invested $200,001.42 in Lancer Offshore on or about January 30, 1998; (22) for confidential client No. 24, who invested $1,000,000.84 in Lancer Offshore on or about May 3, 2002; (23) for confidential client No. 25, who invested $1,999,991.95 in Lancer Offshore on or about May 3, 2002; (24) for confidential client No. 28, who invested $142,733.70 in Lancer Offshore on or about June 30, 2000; (25) for confidential client No. 29, who invested $53,283.42 in Lancer Offshore; (26) for confidential client No. 30, who invested $250,000.28 in Lancer Offshore; and (27) for

confidential client No. 31, who invested $67,152.59 in Lancer Offshore, for a total of $6,146,784.78 in net invested capital;

(mm) HSBC Republic (USA) Inc., having an address c/o HSBC Brokerage (USA) Inc., 1 West 39th Street, 11th Floor, New York, New York 10018, which invested $8,074.85 in Lancer Offshore on or about March 30, 2000, $800,000 in Lancer Offshore on or about March 31, 2000, $798,369.60 in Lancer Offshore on or about February 28, 2001, and $17,613.37 in Lancer Offshore on or about January 1, 2002, for a total of $1,624,057.82 in net invested capital;

(nn) Defined Benefit Plan for Hunnicutt & Co., Inc., having an address in c/o Hunnicut & Co., Inc., 110 East 59th Street, Suite 3200, New York, New York 10022, which invested $265,478.09 in Lancer Offshore on or about November 1, 1999, $35,000.00 in Lancer Offshore on or about March 1, 2000, $84,980.00 in Lancer Offshore on or about July 1, 2000, $15,678.01 in Lancer Offshore on or about February 1, 2000, $91,000.00 in Lancer Offshore on or about June 1, 2001, and $88,225.00 in Lancer Offshore on or about March 1, 2002, for a total of $580,361.10 in net invested capital;

(oo) IRA f/b/o William Hunnicut VFTC as Custodian, having an address in c/o Hunnicut & Co., Inc., 110 East 59th Street, Suite 3200, New York, New York 10022, which invested $1,577,845.22 in Lancer Offshore on or about November 1, 1999 and $74,409.41 in Lancer Offshore on or about February 1, 2001, for a total of $1,652,254.63 in net invested capital;

(pp) The Israel Henry Beren Charitable Trust, a charitable trust having an address of P.O. Box 20380, Wichita, Kansas 67208, which invested $5,000,000 in Lancer Offshore on or about January 1, 2001;

(qq) Joyce Sinclair Spousal Trust, a trust with an address in c/o Heenan Blaikie, 1250 Rene-Levesque W. #2500, Montreal, Québec, Canada, which through Mirabaud Canada Inc., invested $100,963.85 in Lancer Offshore on or about September 1, 1998;

(rr) Kredeitbank Luxembourg, A/C Special Opportunities Fund, having an address at 43 Boulevard Royal, L-2955 Luxembourg, which invested $1,300,000.00 in Lancer Offshore on or about July 1, 1998, $500,000.00 in Lancer Offshore on or about September 1, 1998, $1,400,000.00 in Lancer Offshore on or about December 1, 1999, $600,000.00 in Lancer Offshore on or about January 1, 2000, $226,207.62 in Lancer Offshore in or about 2001, $46,531.20 in Lancer Offshore on or about June 6, 2002, and $2,000,000.00 in Lancer Offshore on or about August 1, 2002 and which redeemed $100,000.00 from Lancer Offshore on or about October 1, 1999, $2,400,000.00 from Lancer Offshore on or about April 1, 2000 and $2,000,000.00 from Lancer Offshore on or about October 1, 2000, for a total of $1,572,738.82 in net invested capital;

(ss)     Kuwait and Middle East Financial Investment Company, a company having an address in care of Kuwait and Middle East Financial Investment Company, PO Box 819 Safat 13009 Kuwait, which invested $1,000,000 in Lancer Offshore on or about November 1, 1997, $1,000,000 in Lancer Offshore on or about January 1, 1998, $10,000,000 in Lancer Offshore on or about May 1, 1998, $10,000,000 in Lancer Offshore on or about January 1, 2000, $1,500,000 in Lancer Offshore on or about March 1, 2000, $800,000 in Lancer Offshore on or about June 1, 2000, $750,000 in Lancer Offshore on or about June 1, 2000 and $250,000 in Lancer Offshore on or about June 1, 2002, and which redeemed $181,755 from Lancer Offshore, for a total of $25,118,245 in net invested capital;

(tt)     La Compagnie Financiere Edmond de Rothschild Banque, an entity having an address at 47, rue du Faubourg Saint-Honore, 75401 Paris Cedex 08, France, which invested $500,000.00 in Lancer Offshore on or about October 31, 1997, $400,000.00 in Lancer Offshore on or about October 31, 1997, $100,000.00 in Lancer Offshore on or about December 31, 1997, $200,000.00 in Lancer Offshore on or about January 31, 1998, $640,000.00 in Lancer Offshore on or about February 3, 2000, $100,000.00 in Lancer Offshore on or about September 4, 2001 and $4,500,000.00 in Lancer Offshore on or about May 31, 2002, and which redeemed $52,109.87 from Lancer Offshore on or about April 30, 1998, $46,860.40 from Lancer Offshore on or about October 30, 1998 and $48,504.49 from Lancer Offshore on or about May 31, 2000, for a total of $6,292,525.24 in net invested capital;

(uu)     Cecile Lescoat, an individual residing in France with an address c/o Financiere Atlas, 4, place Vendome, 75001 Paris, France, who invested $10,000 in Lancer Offshore on or about March 26, 1997 and $10,000 in Lancer Offshore on or about May 30, 1997, for a total of $20,000 in net invested capital;

(vv)     LGT Bank in Liechtenstein AG, an entity having an address c/o LGT Bank in Liechtenstein Ltd., Herrengasse 12, FL-9490 Vaduz, Furstentum, Liechtenstein, which (1) for the benefit of Decton Limited, invested $399,998.49 in Lancer Offshore on or about April 29, 1997, redeemed $252,397.08 from Lancer Offshore on or about October 12, 2001, and which transferred Lancer Offshore shares representing net invested capital of $16,606.34 to Combe Securities Ltd. on or about June 26, 2002; (2) for the benefit of Combe Securities Ltd., invested $49,999.97 in Lancer Offshore on or about April 29, 1997, purchased shares of Lancer Offshore representing net invested capital of $31,577.00 from an entity not a party to this complaint on or about October 6, 1999, and purchased shares of Lancer Offshore representing net invested capital of $16,606.34 from Decton Limited on or about June 26, 2002; (3) for the benefit of Masureh Stiftung Vaduz, invested $100,000.00 in Lancer Offshore on or about May 29, 1998; and (4) for the benefit of Emil Frick Schaan, invested

14

$49,978.74 in Lancer Offshore on or about June 30, 1998, for a total of $379,157.12 in net invested capital;

(ww)  L.H. Logarithm Holdings SA, having an address in c/o Rene Merkt Associes 15, rue General-Dufour, Case Postale 5556, CH-1211 Geneve 11 Switzerland, which invested $50,824.66 in Viator on or about November 30, 1999, $15,247.50 in Viator on or about March 1, 2000, $50,825.71 in Viator on or about May 9, 2000, $50,824.91 in Viator on or about July 31, 2000, and $25,288.39 in OmniFund on or about August 30, 2002, for a total of $193,011.17 in net invested capital;

(xx)  Livsforslkringsselskapet Nordea Liv Norge AS, having an address of P.O. Box 7078, NO-5020, Bergen, Norway, which invested $4,500,000 in Lancer Offshore in the name of Vesta Liv AS on or about April 1, 2002.

(yy)  Madison Textiles, LTD, a company limited by shares incorporated in Guernsey, the Channel Islands on August 24, 1990 with a registered office in Havelet Howe, South Esplanade 181, St. Peter Port, Guernsey, which invested $500,000 in Lancer Offshore in or about March 1997, $500,000 in Lancer Offshore in or about August 1997, $1,000,000 in Lancer Offshore in or about November 1997 and $1,500,000 in Lancer Offshore in or about June 1998, and which redeemed $500,000 from Lancer Offshore in or about January 2001 and $2,000,000 from Lancer Offshore in or about April 2002, and which invested $500,000 in Orbiter on or about March 1, 1999, $552,718 in Orbiter on or about July 1, 1999, $1,000,000 in Viator on or about October 15, 1999, $250,000 in Orbiter on or about January 1, 2001, $250,000 in Viator on or about January 1, 2001 and $2,000,000 in OmniFund on or about April 1, 2002, for a total of $5,552,718 in net invested capital, $1,000,000 of which was invested in Lancer Offshore, and $4,552,718 of which was invested in OmniFund;

(zz)  Maestro Trading, Inc., having an address in c/o Vergotis, 13-15 Dimitros Street, P. Faliron, Athens 17562, Greece, which invested $100,000 in Lancer Offshore in or about June 1998;

(aaa)  Mirelis InvesTrust SA, having an address of 12, rue de la Corraterie, 12 Geneva 11, Switzerland, which invested $3,500,000 in Lancer Offshore;

(bbb)  Vittorio Mosca, an individual residing in Italy, who through Murdoch & Company A/C 0088997 invested $500,000 in Lancer Offshore on or about July 12, 1999;

(ccc)  The Morton Meyerson Family Foundation, a foundation and Texas non-profit corporation, having an address of 7800 Northaven Road, Dallas, Texas 75230, which invested $2,000,000 in Lancer Offshore on or about March 1, 2002 and $1,000,000 in Lancer Offshore on or about April 1, 2002, for a total of $3,000,000 in net invested capital;

(ddd)　The 1999 Meyerson Charitable Remainder Trust, having an address of 3401 Armstrong Avenue, Dallas, Texas 75205, which invested $4,000,000 in Lancer Offshore on or about March 1, 2002;

(eee)　Multivalor Invest Inc., a Panamanian corporation, having a registered office at Chase Manhattan Bank Building, via Espana 120, 2nd Floor, Panama, Republic of Panama, which invested $250,000 in Lancer Offshore on or about January 31, 1997;

(fff)　National Bank of Canada, having an address at 1155 Metcalfe, Ground Floor, Montreal, Quebec H3B 5G2, which invested $10,000,000 in Lancer Offshore on or about February 1, 2002;

(ggg)　Nemrod Leveraged Holdings Ltd., having an address in c/o State Street Trustees (Guernsey), Sarnia House Le Truchot, St. Peter Port Guernsey GY1 1 GR, Channel Islands, which invested $700,000 in Lancer Offshore on or about February 1, 1999, $500,000 in Lancer Offshore on or about March 1, 2000, $500,000 in Lancer Offshore on or about October 1, 2000, $300,000 in Lancer Offshore on or about August 1, 2001, $1,000,000 in Lancer Offshore on or about November 1, 2001, $1,000,000 in Lancer Offshore on or about April 1, 2002, $1,000,000 in Lancer Offshore on or about May 1, 2002, $1,000,000 in Lancer Offshore on or about July 1, 2002, and $1,000,000 in Lancer Offshore on or about August 1, 2002, for a total of $13,300,000 in net invested capital;

(hhh)　Nobilis S.A., Suzanne Fontan S.C.A., Halinvest Sarl, (collectively the "Nobilis Group"), entities having an address in c/o Nobilis, S.A., 29 Rue Bonaparte, 75006 Paris, France, which invested $500,000 in Lancer Offshore on or about March 1, 2000 and $1,500,000 in Lancer Offshore on or about August 1, 2002 on behalf of Nobilis S.A., $500,000 in Lancer Offshore on or about March 6, 2000 and $500,000 in Lancer Offshore on or about August 1, 2002 on behalf of Suzanne Fontan S.C.A., and $425,000 in Lancer Offshore on or about August 1, 2002 on behalf of Halinvest Sarl, for a total of $3,425,000 in net invested capital;

(iii)　Delphi Global Limited, having an address in c/o Octogone Gestion SA, 26, rue de Candolle, CH-1205 Geneva Switzerland, which invested $200,000 in Lancer Offshore on or about March 2, 2001, $100,000 in Lancer Offshore on or about April 1, 2001, $100,000 in Lancer Offshore on or about June 1, 2001, $200,000 in Lancer Offshore on or about August 20, 2001, and $500,000 in Lancer Offshore on or about April 16, 2002, for a total of $1,100,000 in net invested capital;

(jjj)　Joakim Lehmkuhl, an individual having an address in c/o Octogone Gestion SA, 26, rue de Candolle, CH-1205 Geneva Switzerland, who invested $351,724.61 in Lancer Offshore on or about November 23, 2001;

(kkk)  Iscandar International S.A. (f/k/a Simisa International S.A.), having an address of in c/o Octogone Gestion SA, 26, rue de Candolle, CH-1205 Geneva Switzerland, which invested $240,000 in Lancer Offshore on or about June 29, 2001;

(lll)  Labiscouti Trust, having an address in c/o Octogone Gestion SA, 26, rue de Candolle, CH-1205 Geneva Switzerland, which invested $37,909.23 in Lancer Offshore on or about January 31, 2002;

(mmm) Kikousu Trust, having an address in c/o Octogone Gestion SA, 26, rue de Candolle, CH-1205 Geneva Switzerland, which invested $12,090.77 in Lancer Offshore on or about January 31, 2002;

(nnn)  Okabena Marketable Alternatives Fund, LLC, a limited liability corporation, having an address in c/o Okabena Investment Services Inc., 1800 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota, 55402-4523, which invested $2,000,000 in Lancer Offshore on or about January 4, 1999, $1,000,000 in Lancer Offshore on or about February 1, 1999, $1,500,000 in Lancer Offshore on or about March 1, 1999, $1,000,000 in Lancer Offshore on or about April 1, 1999, $1,500,000 in Lancer Offshore on or about October 1, 1999, $2,500,000 in Lancer Offshore on or about April 3, 2000 and $1,300,000 in Lancer Offshore on or about January 2, 2001 and which redeemed $3,000,000 from Lancer Offshore on or about January 3, 2002, for a total of $7,800,000 in net invested capital;

(ooo)  The Pension Committee of the University of Montreal, in its capacity as administrator and agent for the University of Montreal Pension Plan, having an address in c/o University of Montreal, Investment Management, Pension Fund, Building 3744 Jean-Brillant suite 108, Montreal Quebec H3T 1P1, Canada, which, through its custodian Fiducie Desjardins, invested $17,000,000 in Lancer Offshore on or about July 1, 1998, $15,000,000 in Lancer Offshore on or about October 1, 1998, $14,000,000 in Lancer Offshore on or about October 1, 1999, $6,000,000 in Lancer Offshore on or about April 1, 2000 and $15,000,000 in Lancer Offshore on or about May 1, 2000, for a total of $67,000,000 in net invested capital;

(ppp)  The Pension Committee of Régime des rentes du Mouvement Desjardins, with an address at 100 avenue des commandeurs, Lévis, Province of Quebec, Canada, QC G6V 7N5, which invested through its custodian Fiducie Desjardins $10,000,000 in Lancer Offshore on or about July 1, 2002;

(qqq)  Anne-Chantal Pigelet, an individual residing at 344 rue Chenal, 74700 Sallanches, Paris, France, who invested $352,852.51 in Lancer Offshore on or about February 29, 2000 and $50,575.87 in Orbiter on or about February 29, 2000, for a total of $403,428.38 in net invested capital;

(rrr)    Pictet & Cie Banquiers, having an address of Boulevard Georges-Favon 29, Case Postale 5130, CH-1211 Geneva, Switzerland, which (1) for the benefit of NorgesInvestor Value AS, invested $750,000.00 in Lancer Offshore on or about October 31, 2000, $250,000.00 in Lancer Offshore on or about January 31, 2001, $500,000.00 in Lancer Offshore on or about July 31, 2001, and $1,500,000.00 in Lancer Offshore on or about March, 28, 2002; (2) for the benefit of NorgesInvestor Long Short AS, invested $500,000.00 in Lancer Offshore on or about August 31, 2001, $400,000.00 in Lancer Offshore on or about September 28, 2001, $300,000.00 in Lancer Offshore on or about October 31, 2001, $150,000.00 in Lancer Offshore on or about November 30, 2001, and $150,000.00 in Lancer Offshore on or about March 28, 2002; (3) for the benefit of Claude Demole, invested $200,000.00 in Lancer Offshore on or about December 30, 1997; (4) for the benefit of confidential client No. 1, invested $25,000.00 in Lancer Offshore on our about June 29, 2001; (5) for the benefit of confidential client No. 2, invested $25,000.00 in Lancer Offshore on or about April 30, 2002; (6) for the benefit of confidential client No. 3, invested $100,000.00 in Lancer Offshore on or about April 30, 2002; (7) for the benefit of confidential client No. 4, invested $50,000.00 in Lancer Offshore on or about December 28, 2001; (8) for the benefit of confidential client No. 5, invested $50,000.00 in Lancer Offshore on or about July 31, 2001 and $70,000.00 in Lancer Offshore on or about December 28, 2001; (9) for the benefit of confidential client No. 6, invested $100,000.00 in Lancer Offshore on or about June 29, 2001; (10) for the benefit of confidential client No. 7, invested $120,000.00 in Lancer Offshore on or about March 28, 2002; (11) for the benefit of confidential client No. 8, invested $290,000.00 in Lancer Offshore on or about March 28, 2002; (12) for the benefit of confidential client No. 9, invested $125,000.00 in Lancer Offshore on or about May 31, 2002; (13) for the benefit of confidential client No. 10, invested $45,000.00 in Lancer Offshore on or about June 29, 2001 and $25,000.00 in Lancer Offshore on or about April 30, 2002; (14) for the benefit of confidential client No. 11, invested $190,000.00 in Lancer Offshore on or about March 28, 2002; (15) for the benefit of confidential client No. 12, invested $30,000.00 in Lancer Offshore on or about April 30, 2002; (16) for the benefit of confidential client No. 13, invested $40,000.00 in Lancer Offshore on or about April 30, 2002; (17) for the benefit of confidential client No. 14, invested $651,188.58 in Viator on or about November 1, 1999; and (18) for the benefit of confidential client No. 15, invested $250,000.00 in OmniFund on or about July 1, 2002, for a total of $6,886,188.58 in net invested capital, $5,985,000.00 of which was invested in Lancer Offshore, and $901,188.58 of which was invested in OmniFund;

(sss)    Irving Teitelbaum, Stephen Gross and Laurence Lewin in their capacity as the Trustees of RCA in Trust, having an address at 1604 St. Regis Blvd.,

Dorval, Quebec, Canada H9P 1H6, which invested $140,000 in Lancer Offshore on or about April 30, 2002;

(ttt)    The Pension Committee of the Pension Plan for the Régime de retraite de la Corporation de l'Ecole Polytechnique, having an address in c/o Ecole Polytechnique Montreal, C.P. 6079, succ. Centre-ville, Montreal, Quebec Canada H3C 3A7, which invested $6,813,844.77 in Lancer Offshore on or about April 1, 2000, $3,186,155.23 in Lancer Offshore on or about April 1, 2000, $6,230,500.00 in Lancer Offshore on or about June 1, 2000 and $650,480.00 in Lancer Offshore on or about July 1, 2000, for a total of $16,880,980 in net invested capital;

(uuu)   Rothschild Gestion, having an address in c/o Rothschild & Cie Gestion, 42 Rue d'Anjou, 75008, Paris, France, which invested $500,000 in Lancer Offshore on or about June 1, 2002;

(vvv)   Satnam Investments Ltd., having an address in c/o EFG Financial Advisory Pte Ltd., 1 Raffles Place, #42-00, OUB Centre, Singapore 048616, which invested $1,000,000 in Lancer Offshore on or about May 1, 1999;

(www)  Seven Seas Portfolio A Limited, an entity incorporated under the laws of Bermuda having an address at 6 Front Street, Hamilton HM 11, P.O. Box HM 1020, Hamilton HM DX, Bermuda, which invested $1,000,000 in Lancer Offshore on or about April 1, 2002;

(xxx)   Signet Multi-Manager Inc. and UEB (United European Bank) Geneva (Switzerland), having addresses in care of Signet Management Limited 9 Columbus Centre, Pelican Drive, Road Town, Tortola, British Virgin Islands, which invested $1,000,000.00 in Lancer Offshore on or about March 1, 1997, $250,000.00 in Lancer Offshore on or about January 1, 1998, $250,000.00 in Lancer Offshore on or about April 1, 1998, $400,000.00 in Lancer Offshore on or about July 1, 1998, and $1,480,866.74 in Lancer Offshore on or about June 1, 2000, and which redeemed $600,000.00 from Lancer Offshore on or about January 1, 1999, $250,000.00 from Lancer Offshore on or about August 1, 1999, $200,000.00 from Lancer Offshore on or about September 1, 1999, $550,000.00 from Lancer Offshore on or about February 1, 2000, $300,000.00 from Lancer Offshore on or about March 1, 2000, $600,000.00 from Lancer Offshore on or about February 1, 2001, $200,000.00 from Lancer Offshore on or about April 1, 2001 and $200,000.00 from Lancer Offshore on or about June 1, 2001, for a total of $480,866.74 in net invested capital;

(yyy)   SIL Nominees Limited, a Cayman Islands entity having an administrative office at 2 Jane Street, Suite 501, Toronto, Ontario M6S 4W3 Canada, which invested $250,000 in Lancer Offshore in or about June 1997,

$500,000 in Lancer Offshore in or about December 1997, $170,000 in Lancer Offshore in or about March 1998 and $500,000 in Lancer Offshore in or about December 2000, for a total of $1,420,000 in net invested capital;

(zzz)  SPGP (Societe Privee de Gestion de Patrimoine), having an address of 17 avenue Matignon, 75008 Paris, France, which invested $906,992.37 in Lancer Offshore;

(aaaa) Jo-Ann St. Germain, an individual residing at 940 Lake Shore Road, Dorval QC H9S 2C5, Canada, who invested $258,500 in Lancer Offshore on or about August 31, 2001;

(bbbb) The Stafford Fund Ltd., successor to Stafford Opportunity Fund, Ltd., a BVI entity having an address of in c/o Fairway Investment Partners AG, Nueschelerstrasse 35, 8001 Zurich, which invested $600,000 in Lancer Offshore on or about May 29, 1998 and $500,000 in Lancer Offshore on or about February 1, 2000, for a total of $1,100,000 in net invested capital;

(cccc) StarVest Funds Ltd., having an address in c/o Bank of Bermuda Limited, 6 Front Street, Hamilton HM 11, Bermuda, which invested $6,000,000 in Lancer Offshore on or about January 1, 2002 and $500,000 in Lancer Offshore on or about June 1, 2002, for a total of $6,500,000 in net invested capital;

(dddd) The Taurus Trust, a Pennsylvania irrevocable trust, having an address in care of Duane Morris LLP, One Liberty Plaza, Philadelphia, PA, 19103-7396 and successor-in-interest to Turkos Seventeen Limited, which invested $100,000.46 in Lancer Offshore on or about February 27, 1998;

(eeee) Team Haas USA, Ltd., a Cayman Islands corporation, having an address of 15 Rue Du Jeu-De-L'arc, Case Postale 6259, CH 1211 Geneve, Switzerland, which invested $1,500,000 in Lancer Offshore in or about April 2001;

(ffff)  Trendtrust SA, having an address at Rue du Mont-Blanc 3, CH-1201 Geneve Switzerland, as assignee of an entity that invested $1,000,000 in Lancer Offshore on or about May 31, 1997;

(gggg) James Vaughan, an individual residing at 50 Foster Ave., Elmira, New York and 155 Brackenwood Road, Palm Beach Gardens, Florida, who through his retirement account invested $660,511.27 in Lancer Offshore on or about October 1, 2000 and $1,702.23 in Lancer Offshore on or about February 1, 2001, for a total of $662,213.50 in net invested capital;

(hhhh) Venere Investments Limited, having an address in c/o Fiduciare Tucker, Route de Denges 28G, 1027 Lonay, Switzerland, which invested $250,000 in Lancer Offshore on or about July 29, 1997;

(iiii)   Vidacos Nominees Limited, having an address in c/o Liberty Ermitage, 1st Floor, 47 The Esplanade, St. Helier, Jersey, Channel Islands, JE1 9LB, which is the custodian for shares representing $1,500,000 invested in Lancer Offshore on or about January 1, 2002;

(jjjj)   WestWind Foundation Holdings Ltd., having an address in c/o Cox Hallett Wilkinson, Milner House, 18 Parliament Street, Hamilton HM12, Bermuda, which invested $1,400,000 in Lancer Offshore on or about July 1, 1999, $500,000 in Lancer Offshore on or about January 1, 2000 and $2,000,000 in Lancer Offshore on or about April 1, 2000, for a total of $3,900,000 in net invested capital;

(kkkk)  Wyatt Incorporated Employees Profit Sharing Plan, having an address of Wyatt Incorporated, 4545 Campbells Run Road, Pittsburgh, Pennsylvania 15205, which invested $1,030,000.00 in Lancer Offshore on or about September 26, 1997, $1,800,000.00 on or about March 5, 1999, and which redeemed $499,999.44 on or about February 1, 2001, for a total of $2,330,000.56 in net invested capital;

(llll)   171212 Canada, Inc., having an address at 333 Sherbrooke East, App. 1001, Montreal, Quebec H2X 4E3, Canada, which invested $1,000,000 in Lancer Offshore on or about February 1, 2000;

(mmmm) AIS Holding Series Trust II, having an address in c/o Commerzbank Corporates and Markets, 2 World Financial Center, 31st Floor, New York, New York 10281, which, through its nominee Nautical Nominees Limited, invested $1,000,000 in Lancer Offshore on or about May 1, 2002;

(nnnn)  Commerzbank Global Alternative Limited, having an address in c/o Commerzbank Corporates and Markets, 2 World Financial Center, 31st Floor, New York, New York 10281, which invested $1,000,000 in Lancer Offshore on or about May 1, 2002;

(oooo)  Commerzbank Alternative Strategies – Global Hedge, having an address in c/o Commerzbank Corporates and Markets, 2 World Financial Center, 31st Floor, New York, New York 10281, which invested $1,000,000 in Lancer Offshore on or about May 1, 2002;

(pppp)  Vesta Forsikring AS, having an administrative address at Postbox 7070, N-5020 Bergen, Norway, which invested $1,500,000 in Lancer Offshore on or about April 1, 2002;

(qqqq)  Fund Nominees Ltd., having an address in c/o Collins Stewart Asset Management Ltd., PO Box 45, Hirzel House, Smith Street, Guernsey GY1 4AX, which invested $481,654.79 in Lancer Offshore; and

(rrrr)  Oran Limited, a Cayman Islands special purpose vehicle having an address of PO Box 1984, Elizabethan Square, George Town Grand Cayman, Cayman Islands, (i) as assignee of St. George's Trust Company Limited, which, through the Wilbur Boat Trust, invested $500,000 in Lancer Offshore on or about February 3, 1997; (ii) as assignee of AXA Alternative Strategies Fund Ltd., which, through Fortis Fund Services (Cayman) Limited, invested $6,000,000 in Lancer Offshore on or about July 1, 2002; (iii) as assignee of AXA New Horizons Fund PLL, Ltd., an Irish company organized under the Irish Companies Act of 1963-2003 which, through Fortis Global Custody Management & Trustee Services (Ireland) Limited A/C 301, invested $500,000 in Lancer Offshore on or about June 28, 2002 and $500,000 in Lancer Offshore on or about July 1, 2002; (iv) as assignee of AXA New Horizons Fund PLL, Ltd., an Irish company organized under the Irish Companies Act of 1963-2003 which, through Fortis Global Custody Management & Trustee Services (Ireland) Limited A/C 276, invested $3,000,000 in Lancer Offshore on or about June 1, 2002 and $2,000,000 in Lancer Offshore on or about June 28, 2002; (v) as assignee of AXA New Horizons Fund, Ltd., an Irish company organized under the Irish Companies Act of 1963-2003 which, through Fortis Global Custody Management & Trustee Services (Ireland) Limited A/C 393, invested $2,800,000 in Lancer Offshore on or about June 1, 2002; and (vi) as assignee of CIC Alternatif, which invested $450,000 in Lancer Offshore on or about July 1, 2002.

**Capacity and Authority of Certain Plaintiffs to Sue**

16.     Each of the persons and/or entities set forth above has the capacity and authority to sue, and has authorized suit against, the defendants in this case.  For the avoidance of doubt, the capacity and authority of certain plaintiffs is set forth below.[2]

*Plaintiff Nobilis Group*

17.     Each of the entities in the Nobilis Group asserts its claims in this action separately and on its own behalf.  Denis Halard is managing agent of each of the entities in the Nobilis Group with authority to commence lawsuits, including this one.

---

[2] The Court has already found that plaintiffs have properly alleged the capacity and/or authority of these plaintiffs to sue.  However, in an abundance of caution and for the avoidance of doubt, the facts upon which that ruling was premised are set forth herein.

18.     The University of Montreal Pension Plan (the "Plan") is a defined benefits pension plan that became effective on June 1, 1956.  The Plan is registered with the Canada Customs and Revenue Agency and with the Régie des rentes du Québec which is the provincial pension supervisor authority in the Province of Quebec.  The Plan is governed by and registered under the Supplemental Pension Plans Act, Revised Statutes of Quebec, chapter R-15.1 (the "SPPA"), as amended from time to time, and the Income Tax Act (Canada), Revised Statutes of Canada, Chapter 1 (5th supplement) (the "ITA").

19.     All pension plans which cover employees residing in the Province of Quebec must comply with the SPPA.  The SPPA requires that a pension plan be administered by a pension committee composed of at least one active plan member and at least one person representing the retired members and plan beneficiaries.

20.     The pension committee administering the Plan (the "Pension Committee") is composed of nineteen (19) persons and complies with the SPPA.  The Pension Committee administers the Plan.

21.     The SPPA provides that a pension plan is a contract and that its pension fund is a trust patrimony (the "Pension Fund").  The Pension Fund as a trust patrimony under the Civil Code of Quebec is autonomous and distinct from the property of its settlor, its trustee or any beneficiary and none of the settlor, trustee or beneficiary has any right in such trust patrimony.

22.     The SPPA provides that a pension committee acts in the capacity of a trustee.  The Pension Committee is the trustee of the Pension Fund.

23.     The Civil Code of Quebec provides that a trustee has the control and the exclusive administration of the trust property, has the exercise of all the rights pertaining to the patrimony and may take any proper measure to secure its appropriation.  The Pension Committee as trustee of the Plan and its Pension Fund acts as administrator of the property of others.

24.     The Code of Civil Procedure (Quebec) provides that administrators of the property of others in respect of anything connected with their administration make and file claims and plead in court in their own name in their respective capacities.  The Pension Committee has authority to sue on behalf of the Plan in the above-captioned action, and is exercising its authority to do so in this action on behalf of the Plan and its Pension Fund, which is the owner of the claims upon which the Plan is suing.

25.     The assets of the Plan, which constitute the Pension Fund, are held under a custody agreement by its custodian Fiducie Desjardins Inc., a trust corporation duly incorporated under Quebec legislation.

26.     Between July 1, 1998 and May 1, 2000, the Plan and its Pension Fund invested $67 million in Lancer Offshore through its custodian.

27.     The SPPA provides that the investment of the assets of a pension plan must be made in the name of the pension fund or for its account.  The investment in Lancer Offshore by Fiducie Desjardins Inc. was made for the account of the Plan and its Pension Fund.

### Plaintiff Liberty Ermitage North American Absolute Fund Limited

28.     Plaintiff Liberty Ermitage North American Absolute Fund Limited ("Liberty Fund") invested $2,000,000.00 in Lancer Offshore.

29.     Liberty Fund's investments in Lancer Offshore were made in the name of "Bank of Bermuda (Luxembourg), SA re Liberty Ermitage North American Absolute Fund,"

because Bank of Bermuda (Luxembourg), SA ("Bank of Bermuda/Lux") acts as Custodian to Liberty Fund.

30. Bank of Bermuda/Lux has authority to sue on behalf of Liberty Fund in the above-captioned action, and is exercising its authority to do so in this action on behalf of Liberty Fund, which is the beneficial holder of the claims upon which Bank of Bermuda/Lux is suing.

## Non-Parties Michael Lauer and Lancer Management

31. Upon information and belief, Michael Lauer is an individual who resides at 7 Dwight Lane, Greenwich, Connecticut 06831.

32. At all relevant times, Lauer was the founder, manager and principal owner of Lancer Management, which acted as the investment manager for the Funds and had its principal office in New York City.

33. Pursuant to the Case Management Order ("CMO") entered on January 8, 2004 in *SEC v. Lauer, et al.*, No. 03-80612 (S.D. Fla.) (the "Receivership Case"), plaintiffs are at this time prohibited from bringing any claims against, *inter alia*, Lauer and Lancer Management without first obtaining Court approval.

## The Defendants

### *Defendant Citco NV*

34. Upon information and belief, Citco NV is a business entity organized and existing under the laws of the Netherlands Antilles, having places of business at Kaya Flamboyan 9, P.O. Box 812, Curacao, Netherlands Antilles and Citco Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands ("BVI"). Citco NV is a wholly-owned and controlled subsidiary of another Citco entity that is itself a wholly-owned and controlled

subsidiary of defendant Citco Group.  As detailed herein, defendant Citco Group controls defendant Citco NV.

### Defendant Citco Group

35.     Upon information and belief, defendant Citco Group is an independent financial services organization with approximately 46 offices in 27 countries around the world, including in New York.  Citco Group is an integrated financial services holding company that operates through numerous subsidiaries, including defendant Citco NV.  Citco Group has its principal place of business at Corporate Centre, West Bay Road, Grand Cayman, Cayman Islands-British West Indies.

### The Citco Directors

36.     Defendant Stocks is an individual who, upon information and belief, currently resides in London, England.  Stocks served as a director of Lancer Offshore from at least 1998 until his resignation in or around July 2001, during which time he played an active role in preparing and disseminating NAV statements for the Funds.  From 1985 to 2001 Stocks was employed by defendant Citco NV, where he served as Global Head of Citco Fund Services, having been "charged with building Citco Fund Services."  Under Stocks' leadership, defendant Citco NV increased its assets under administration from $1 billion to $110 billion, becoming the world's largest hedge fund administrator.  Stocks was responsible for opening nine operational offices for Citco Group around the world, including one in New York.  He also was responsible for establishing initiatives throughout defendant Citco Group to implement secondary market trading, training and education, web-based reporting, captive insurance, capital introduction, dedicated legal services, internal audit, and quality reviews.  Stocks was also a Director of the International Fund Services division of Citco Group during this time period and sat on the boards

of a number of major hedge funds in addition to the Funds at issue here, including Soros, Jaguar, Moore, Tudor, Chilton, and Haussmann. Stocks is currently a partner in Tennyson Capital Advisors in London.

37. Defendant Conroy is an individual who, upon information and belief, currently resides in Dublin, Ireland and is employed as a Managing Director of Citco Fund Services (Dublin). From 1994 until 2001, when he moved to Dublin, Conroy was employed by defendant Citco NV. Conroy was promoted to managing director of Citco NV in 1998. From 1998 until early 2002, Conroy served as a director of Lancer Offshore, during which time he played an active role in preparing and disseminating NAV statements for the Funds. Prior to joining Citco, Conroy was employed by KPMG in Dublin as an Irish Chartered Accountant.

38. Defendant Quilligan is an individual who, upon information and belief, resides in Dublin, Ireland and is employed as a Managing Director of Citco Fund Services (Dublin). Until at least approximately 2004, Quilligan was General Manager and a Managing Director of defendant Citco NV and resided in Curacao, Netherlands Antilles. He became a director of Lancer Offshore in 2001 upon defendant Stocks' resignation, and continued in that role until early 2002. Quilligan played an active role in preparing and disseminating NAV statements for the Funds – including traveling to New York to meet with Lauer and Lancer Management regarding portfolio valuation, among other things.

39. Defendant ICSL is a corporation organized under the laws of the BVI and a subsidiary of defendant Citco Group. It served as sole director for OmniFund. ICSL represents that it "principally functions as a corporate director for offshore funds." ICSL's business addresses are CITCO Building, Wickhams Cay, P.O. Box 662, Road Town, Tortola,

BVI and also c/o CITCO, Kaya Flamboyan 9, Curacao, Netherlands Antilles – the same as Citco NV.

### *The Non-Citco Directors*

40.     Defendant Bendall is an individual who, upon information and belief, resides in New York and conducts an investment business in New York City under the trade name of Hermitage Capital Corporation.  Bendall became a director of Lancer Offshore and OmniFund beginning in early 2002.  From 1968 to 1977, Bendall was barred by the NASD from associating with any securities broker or dealer.  From 1968 to 1997, Bendall was barred by the SEC from being associated with a broker-dealer.  Hermitage Capital played an instrumental role in the valuation fraud carried out by Lauer and Lancer Management.

41.     Defendant Geist is an individual who, upon information and belief, resides in Massachusetts.  Geist became a director of Lancer Offshore and OmniFund in early 2002.

### *Defendant PWC NA*

42.     Upon information and belief, defendant PWC NA is a Netherlands Antilles civil partnership formed by limited liability companies under Netherlands Antilles law and is a member of PricewaterhouseCoopers International Limited, a company limited by guaranty registered in England and Wales.  PWC NA has a place of business at P.O. Box 360, Julianaplein 38, Willemstad, Curacao, Netherlands Antilles.

### *Defendant BofA*

43.     Upon information and belief, BofA is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at 9 West 57th Street, New York, New York 10019.

*Defendant IFS*

44.     Upon information and belief, defendant IFS is a business entity organized and existing under the laws of Ireland, having a place of business at Third Floor, Bishop's Square, Redmond's Hill, Dublin 2, Ireland.

## JURISDICTION AND VENUE

**Subject Matter Jurisdiction**

45.     This Court has original and/or supplemental subject matter jurisdiction over all claims at issue in this action pursuant to the CMO entered on January 8, 2004 in the Receivership Case, which states that any "proceedings, suits or actions" that involve "causes of action that … may belong to the Receiver, any investors, or any class or group of investors … against the Receivership Entities' former … professionals or other third parties … must be brought in the form of a proceeding ancillary to this Proceeding pursuant to this Order." Pursuant to this channeling injunction, this action was originally filed in the United States District Court for the Southern District of Florida as a proceeding ancillary to the Receivership Case.  Pursuant to the September 30, 2005 order of Judge Kenneth Marra, this action was transferred to this Court.

46.     This Court also has original and/or supplemental subject matter jurisdiction over all claims at issue in this action pursuant to, *inter alia*, 15 U.S.C. § 78aa and 28 U.S.C. §§ 754, 1331, 1367 and/or 1692.  The defendants conducted substantial activities in the United States, and their conduct here directly caused plaintiffs' losses.  Among other things, defendants interacted on a regular basis with Lauer and Lancer Management, both of which conducted their business affairs from the United States.  Many of the false and fraudulent statements were created in the United States and sent from there to the administrators for ultimate distribution to the investors.  Regular investor conference calls were initiated by Lauer

29

and Lancer Management from within the United States. Many of the securities purchases made on behalf of the Funds were executed on national stock exchanges in the United States and involved companies based in New York. Lauer and Lancer Management had regular contact with individuals in New York relating to these investments. Moreover, defendants committed acts outside of the United States which caused injury within the United States. Finally, all of the claims asserted herein are so related, and derive from the same set of operative facts, as to constitute a single case or controversy.

**Venue**

47.      Venue is proper pursuant to 15 U.S.C. § 78aa, because one or more acts or transactions constituting violations of the federal securities laws occurred in this District.

**Personal Jurisdiction Over Defendant Citco NV**

48.      This Court has personal jurisdiction over defendant Citco NV with respect to plaintiffs' federal securities law claims pursuant to 15 U.S.C. § 78aa, because Citco NV has constitutionally sufficient minimum contacts with the United States and the exercise of personal jurisdiction over Citco NV in this Court is consistent with traditional notions of fair play and substantial justice.

49.      Defendant Citco NV also is subject to personal jurisdiction in New York with respect to plaintiffs' common law claims pursuant to CPLR 302(a)(1) because it transacted business in New York.[3]

---

[3] Citco NV has not contested the exercise of jurisdiction over it with respect to plaintiffs' federal securities law claims. The Court has already found that plaintiffs have properly alleged a basis for the exercise of jurisdiction over defendant Citco NV with respect to plaintiffs' state common law claims. However, in an abundance of caution and for the avoidance of doubt, the facts upon which the Court's ruling was premised are set forth herein.

50.     Among other things, Citco NV received falsified portfolio statements from Lauer, Lancer Management and BofA, all located in New York.  Citco NV took directions from and constantly communicated with Lauer and Lancer Management in New York.  In addition, the Funds' investors were instructed to wire investments to a Citco NV bank account located in New York.  The Funds here invested in securities traded on New York exchanges and held such securities in a BofA account in New York.  Citco NV sent fraudulent NAV statements to at least five investors in New York.

51.     Plaintiffs' claims against Citco NV as alleged herein resulted from, and occurred in the course of, Citco NV's daily interactions with the Funds' management and prime broker in New York, through which Citco NV was supposed to verify and reconcile the Funds' portfolio holdings, value the portfolios and prepare and distribute NAV statements that were accurate.

52.     Citco NV also is subject to jurisdiction in New York pursuant to CPLR 302(a)(1), because it contracted to provide services in New York.

53.     Upon information and belief, when Lauer executed the Funds' agreements with Citco NV, he did so in New York.  In those New York-executed agreements, Citco NV contracted to, among other things, prepare and send reports on a monthly basis to Lauer and Lancer Management in New York (based on information received from New York).  Citco NV also contracted to provide monthly NAV statements to the Funds' investors, including those located in New York.  This was not a one-shot arrangement; it was contemplated that Citco NV was to provide these and other services to the Funds' manager on an ongoing, indefinite basis – and it did.

54.     Again, plaintiffs' claims against Citco NV arise directly from the services it agreed to provide to the Funds in New York. Citco NV's failures to carefully, properly and accurately value the Funds' portfolios and provide the investors with accurate NAV statements came about in the course of performance under agreements to provide services to the Funds and their management in New York.

55.     Citco NV also is subject to jurisdiction in New York pursuant to CPLR 302(a)(3), because it committed tortious acts outside New York causing injuries in New York.

56.     The Funds had at least five New York-based investors. Each month during the relevant time period, Citco NV distributed materially false NAV statements to all investors, including at least five located in New York. By disseminating misrepresentations to investors located in New York, Citco NV committed tortious acts outside New York that caused injuries to persons in New York.

57.     Citco NV should reasonably have expected its misrepresentations to have consequences in New York.

58.     Citco NV derives substantial revenue from international commerce. Since it administers hedge funds all over the world, its business is obviously international. Specific information regarding the finances of Citco NV is not readily available because it is privately held. However, Citco NV practices under the umbrella of defendant Citco Group, whose "diverse client base" includes "[m]ultinational banks, Global 1000 companies, investment management firms, international real estate investors and high net worth individuals."

59.     Upon information and belief, Citco NV performs fund administration services for hundreds of hedge funds throughout the world, including many that are managed in the United States, including New York. Through this regular, systematic and continuous

business activity, Citco NV receives substantial revenue from the United States, including New York.

60.     Upon information and belief, Citco NV performed extensive fund administration and/or management services for the Funds while they were operated and managed by Lauer and Lancer Management from offices located in New York and Connecticut. These services included, without limitation, the following:

(a)     Citco NV collected thousands of wire transfers from the Funds' investors – both new investors and existing investors making additional investments – through one or more bank accounts located in New York that were held by Citco Group entities, including Citco NV.

(b)     Citco NV provided the Funds with a bank account with Citco Banking Corporation, N.V., located in New York.

(c)     Citco NV continuously and systematically sent NAV statements for the Funds to investors based in the United States, including at least five investors located in New York.

(d)     Citco NV continuously and systematically sent NAV statements for the Funds and invoices to Lancer Management in New York. Citco NV's wire instructions to Lancer Management directed that payment of Citco NV's fees be sent to a Citco Banking Corporation account in Curacao, a Citibank bank account in New York, or a Citibank lockbox in Pennsylvania.

(e)     Citco NV communicated continuously and systematically with Lancer Management in New York and Connecticut and defendant BofA in New York regarding administration of the Funds, governance of the Funds, investor subscriptions and redemptions and valuation of the Funds' portfolios.

(f)     Citco NV communicated continuously and systematically with investors in the United States – including at least five investors located in New York – to convey information from Lauer and Lancer Management, including without limitation correspondence and newsletters, information regarding investor subscriptions and redemptions, investor account statements, and responses to investor inquiries.

(g)     Citco NV communicated continuously and systematically with Citco Group subsidiaries and/or affiliates in the United States that provided

valuation services and technology infrastructure to Citco NV in support of its work for the Funds.

(h)     Citco NV provided its own officers – defendants Stocks, Conroy and Quilligan – and a Citco Group subsidiary – defendant ICSL – to serve as directors of the Funds.

61.     Citco NV has historically been Citco Group's largest office worldwide, and the base from which Citco Group's global network has grown.  Upon information and belief, Citco NV is the largest Citco entity in the Citco Fund Services group within Citco Group.  Upon information and belief, Citco NV employs over one hundred people and provides full-service administration to funds that have over $100 billion in assets under management.

**Personal Jurisdiction Over Defendant Citco Group**

62.     This Court has personal jurisdiction over defendant Citco Group.[4]

63.     Citco Group is a worldwide company with offices located throughout the world, including at least one in New York itself, through which it conducts regular, systematic and continuous business activities resulting in the derivation of substantial revenues from the United States and New York.

64.     Not only does Citco Group itself maintain profitable direct contacts with the United States, but defendant Citco NV, as the agent and/or alter ego of Citco Group, also has substantial, direct, continuous and systematic contacts with the United States.

65.     Citco Group maintains offices throughout the United States, with offices located in California, Florida, New York and Pennsylvania.  Citco Group and its subsidiaries conduct extensive business, administrative and marketing operations within the United States.

---

[4] Defendant Citco Group previously moved to dismiss the complaint based on lack of personal jurisdiction.  The Court denied the motion, and granted plaintiffs the right to conduct jurisdictional discovery, while granting Citco Group leave to renew its motion upon completion of such discovery.  Citco Group ultimately chose not to renew the motion.

66. In a 2003 interview, Citco Group's William Keunen described various examples of "significant new business" in the United States and mentioned Citco Group's "clients in the US."

67. Citco Group represents that it is the world's top provider of hedge fund administration services and administers more than 1,200 funds worldwide with more than $250 billion in assets. Citco Group represents that the services it offers include corporate and fiduciary services, fund administration and shareholder services, custody and banking services, fund advisory and brokerage services, and international pension services.

68. Citco Group has no independent revenues of its own; all of its revenues are derived from its subsidiaries, including defendants Citco NV and ICSL.

69. Defendant Citco NV holds itself out as an office of Citco Group. On the Internet website for Citco Group, defendant Citco NV is listed as an office of the Citco Group network. All of Citco Group's subsidiaries, divisions and offices are referred to on the website as "Citco." Similarly, all of Citco Group's subsidiaries use the same "Citco" logo on their letterhead and list the locations of the Citco Group's offices – again emphasizing the global, integrated nature of Citco Group.

70. Citco NV specifically touts Citco Group's integrated corporate structure when soliciting clients. Likewise, Citco Group represents that its operating subsidiaries together constitute a "global fund administrator" and that the subsidiaries' ability to administer funds in offices throughout the world makes it possible for the combined enterprise to provide a "consistent service platform." Citco Group also represents that its operating subsidiaries allow their personnel "the ability to transfer between offices and divisions" to maintain consistent levels of performance worldwide.

71.     A brochure located on the Citco Group website provides further laudatory statements regarding Citco Group's worldwide capabilities and oversight functions. It states:

> The Citco Group is an integrated company. Citco has substantial hedge fund experience. Citco is prepared to take advantage of the growth of the hedge fund industry. Its offices in Curacao and in other venues "typically work with our North American clients."

72.     Substantially all information regarding all of the funds administered by Citco Group's offices is maintained in a centralized database that can be accessed by the managers of the funds that those offices administer. Citco Group's website represents that "This online reporting service is available to Fund Managers of Funds administered by any of the Citco Fund Services offices."

73.     Citco Group's website contains a brochure that describes its computer system that contains all client information, which is located in Fort Lauderdale, Florida and operated by Citco Technology Management, Inc.:

> Citco's dedicated Information Technology Group, based in Fort Lauderdale, Florida is responsible for maintaining and monitoring all software and hardware configurations, and network support. The group also maintains Citco's exclusive database of security information (CDS Citco Data Source), providing prices and corporate actions for US and non-US securities, with integrated cross-reference identification codes, using multiple vendors such as Interactive Data Corporation (IDC), Reuters, Bloomberg and Telekurs. Each office is set up with a dedicated team of on-site IT staff to monitor daily operations and tailor the needs of our clients.

74.     The managing director of each Citco Group office that provides fund administration services – including defendant Citco NV – reports to Keunen, who has served as Global Director of Fund Services for Citco Group since 2001. Keunen lives in Miami, Florida, and works in the Miami office of Citco Fund Services (USA) Inc. ("Citco USA"). The managing director of each office of Citco Group that provides fund administration services – including

defendant Citco NV – reports to Keunen, who, in turn, reports to the four-person executive committee of Citco Group.

75.     In his role with Citco Group, and operating from Citco USA's offices in the United States, Keunen was personally involved in the issues in this case.  Keunen personally received and responded to e-mail inquiries regarding the Funds both from within Citco Group (including from defendants Citco NV, Quilligan and Conroy) and from third parties.  Keunen also engaged in correspondence regarding the Funds, and participated in meetings and telephone conversations concerning the Funds with various personnel from Citco NV, Citco Group and other Citco entities, as well as BofA and Lancer Management personnel.  Keunen also initiated discussions with defendant PWC NA concerning the Funds' portfolio valuations and NAV calculations.

76.     Citco Group's Keunen also personally directed Citco NV to disseminate NAV statements for the Funds, despite knowing them to be false and misleading.

77.     In May 2002, Keunen reported to all Citco Group directors regarding issues raised by Citco Group's internal audit department regarding portfolio valuation and NAV calculations for the Funds.

**Personal Jurisdiction Over the Citco Directors**

78.     The Court has personal jurisdiction over the Citco Directors because they performed substantial business activities for the Funds which were managed by Lauer and Lancer Management in the United States.  Furthermore, the Citco Directors knew, or reasonably should have known, that many investors in the Funds were located in the United States and that information relating to the Funds, including offering materials specifically identifying the Citco Directors was sent to those investors located in the United States.

79. Moreover, each of the Citco Directors participated in the fund administration activities engaged in by Citco NV and, thus, the activities of Citco NV which were directed to the United States and New York must be imputed to the Citco Directors.

**Personal Jurisdiction Over the Non-Citco Directors**

80. This Court has personal jurisdiction over defendants Bendall and Geist because both of them are residents of the United States, and Bendall is a resident of New York.

81. In addition, the Court has personal jurisdiction over defendants Bendall and Geist because they performed substantial business activities for the Funds which were managed by Lauer and Lancer Management in New York.

82. Furthermore, defendants Bendall and Geist knew, or reasonably should have known, that many investors in the Funds were located in New York and that information relating to the Funds, including offering materials specifically identifying defendants Bendall and Geist was sent to those investors located in New York.

**Personal Jurisdiction Over Defendant PWC NA**

83. This Court has personal jurisdiction over defendant PWC NA because it provides auditing and accounting services to hundreds of companies throughout the world, including many based in, and/or having substantial contacts with, the United States. As a result of such regular, systematic and continuous business activities, PWC NA derives substantial revenue from the United States, including New York. Moreover, PWC NA specifically addressed its audits to investors in the Funds, many of which were located in the United States.

84. PWC NA, through its client and professional relationships, derives substantial revenue from activities throughout the United States.

**Personal Jurisdiction Over Defendant BofA**

85.     This Court has personal jurisdiction over defendant BofA because its principal place of business is located in New York.

86.     BofA, through its business activities and relationships, derives substantial revenues from the United States, including New York.

**Personal Jurisdiction Over Defendant IFS**

87.     IFS is an Irish corporation that provides administrative services to offshore hedge funds.  IFS is affiliated with International Fund Services of North America ("IFS NA"), which is based in New York.  Both defendant IFS and IFS NA are subsidiaries of State Street Corporation, a Massachusetts corporation.[5]

88.     IFS is subject to personal jurisdiction in this Court pursuant to CPLR 302(a)(1), because it transacted business with, and contracted to provide services to, the Funds in New York.

89.     IFS represented that its services would be provided from New York as well as Ireland.  For example, the Funds' files contained an IFS marketing brochure which touts its office in New York.  It also contains a diagram of the "Network Architecture" for IFS's computer systems, which indicates that its main computer servers are based in IFS's "New York Office" and that it has a major "Backup Site" in Rye, New York.  Indeed, the brochure describes the Dublin office as merely a "Backup Site."  IFS's website also represents that it provides hedge fund administration services from New York:

> IFS provides comprehensive fund accounting and administrative services
> to traders, investors, and regulatory agencies for our Hedge Funds and

---

[5] The Court has already found that plaintiffs have properly alleged a basis for the exercise of jurisdiction over defendant IFS, however, in an abundance of caution and for the avoidance of doubt, the facts upon which the Court's ruling was premised are set forth herein.

Fund of Funds clients.  These services are delivered from New York, New Jersey, London, and Dublin. The different locations enable a wider coverage of time zones as the world moves to a 24 hour trading day.  IFS has developed cutting edge mechanisms for delivering information to traders and their investors to give the personalized look and feel as dynamic as our clients trading styles allow us.

90.     The IFS website contains a section for "members" to access account information through a password-protected portal.  Although it is unclear – due to the encrypted nature of the members section – whether this portal is for hedge funds or their investors, it obviously contemplates that either type of "member" might log in and do business with IFS from New York.

91.     In May 2002, Gene Mannella of IFS made a proposal to provide services to the Funds.  Mannella resides and works in New York and is president of International Fund Services' New York-based entity.  From his office in New York, Mannella remained personally involved in IFS's provision of services to the Funds until their demise.  When the Funds blew up in 2003, Mannella sent a letter to the British Virgin Islands Financial Services Commission indicating that he was president of defendant IFS.

92.     IFS also provided services to the Funds in New York.  IFS entered into two agreements with the Funds, which were signed by Lauer (presumably at the Funds' offices in New York).  In these agreements, IFS agreed to administer the Funds, which Lauer and Lancer Management managed at offices located in New York and whose daily operations were centered in New York.  IFS's agreements with the Funds required IFS to communicate every day with the Funds' management and their New York-based prime broker, BofA.

93.     Among other tasks, IFS agreed to provide daily reconciliation and exception reports comparing the information it received from Lancer Management with the information it received from BofA as well as daily "P&L and portfolio reporting."  IFS also

agreed to "[t]ransfer cash to [the] prime brokerage account, if applicable, daily, depending on cash receipts."

94.     IFS could not have carried out these obligations without daily contact with Lauer, Lancer Management and defendant BofA – all of them located in New York.  And, IFS did in fact engage in telephone, e-mail and mail communications with Lancer personnel in New York, including Lauer and David Newman (who, as detailed below, left defendant BofA to work for Lancer Management in or about August 2000).

95.     Not surprisingly, given the centrality of New York to IFS's relationship with Lauer, Lancer Management and the Funds, IFS's agreements with the Funds contain the following provision (in relevant part):

> Consent to Jurisdiction.  The Parties hereto agree that any action or proceeding arising directly, indirectly, or otherwise in connection with, out of, related to, or from this Agreement, any breach hereof, or any transaction covered hereby, shall be resolved within New York. Accordingly, the Parties consent and submit to the jurisdiction of the courts of New York.  The Parties further agree that any such action or proceeding brought by either party to enforce any right, assert any claim, or obtain any relief whatsoever in connection with this Agreement shall be brought by such party exclusively in a competent court of New York. […]

IFS's agreements also designate New York law as the governing law.

96.     IFS also had communications with the Funds' New York-based investors. One of IFS's responsibilities was to prepare the Funds' monthly NAV statements and disseminate them to investors.  At least five of the Funds' investors were located in New York, and received and relied upon the NAV statements that IFS sent to them in New York.

97.     IFS also is subject to personal jurisdiction in this Court pursuant to CPLR 302(a)(3), because it committed tortious acts outside of New York that caused injury to persons and property within the state, it expected or should reasonably have expected those acts to have

consequences in the state, and it derives substantial revenue from interstate or international commerce.

98. The Funds had at least five New York-based investors. IFS's agreements with the Funds obligated it to distribute NAV statements to all of the Funds' investors, including those located in New York. The NAV statements that IFS disseminated were false and misleading. By disseminating these misrepresentations to investors located in New York, IFS committed tortious acts outside New York that caused injuries in New York.

99. By targeting its misrepresentations to, *inter alia*, New York-based entities, IFS should reasonably have expected those misrepresentations to have consequences in New York.

100. IFS, through its business activities and relationships, derives substantial revenues from the United States and from international commerce. IFS's business is hedge fund administration, which is, by its very nature, international. The magnitude of IFS's revenue from international commerce is, however, impossible to determine, since its finances are reported under the umbrella of its parent, State Street Company. In all events, given that State Street paid well over $200 million to acquire IFS, it can reasonably be inferred that IFS's revenues are substantial.

101. IFS has maintained minimum contacts with New York by mailing NAV statements directly to New York-based investors and by maintaining continuing communications with Lauer and Lancer Management, both of which were located in New York.

102. IFS is a large corporation, doing business international, maintaining direct contacts with New York, and selecting New York as the forum for resolution of all disputes regarding the Funds.

103.    New York has an interest in adjudicating a case in which New York residents claim to be victims of a fraud. This case, involving a large number of plaintiffs and defendants from many jurisdictions, can efficiently be heard in this Court, and this Court has considerable experience adjudicating complex cases such as this. For these reasons, the exercise of jurisdiction over IFS comports with due process.

## FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

### The Funds and Lancer Management's Role

104.    Lancer Offshore was incorporated as an international business company ("IBC") in the BVI on September 27, 1995. At the time of its incorporation, its registered office was at Citco Building, Wickhams Cay, Road Town, Tortola, BVI. In December 1998, Lancer Offshore gained recognition as a professional mutual fund. From December 1998 until April 2003, Lancer Offshore was listed on the Irish Stock Exchange.

105.    OmniFund was formed on or about April 2, 2002 through the merger of two existing funds: The Orbiter Fund, Ltd. ("Orbiter") and The Viator Fund ("Viator"). Orbiter had originally been incorporated as an IBC in the BVI on January 29, 1999 and was recognized as a professional mutual fund in February 1999. Viator had originally been incorporated as an IBC in the BVI on September 30, 1999 and was later also recognized as a professional mutual fund. Like Lancer Offshore, at the time of their incorporation, both Orbiter and Viator listed their registered offices at Citco Building, Wickhams Cay, Road Town, Tortola, BVI. (Unless specifically stated otherwise, all references to "OmniFund" herein include Orbiter, Viator and OmniFund.)

106.    The Funds were open-ended investment funds, whose defining feature is the ability of investors to purchase and redeem shares at a price based on NAV per share. Unlike an ordinary company, the price of shares in such a fund does not fluctuate as a function of the

43

supply of and demand for those shares. Rather, the share price in an open-ended investment fund is solely a function of the calculated NAV per share for the fund, which is determined by dividing the total net value of the fund's portfolio by the number of shares the fund has issued.

107.     The Funds were not registered with the SEC, were open only to certain types of investors (i.e., those with a certain net worth, and meeting certain tax criteria) and had limited redemption windows. Lauer and Lancer Management, for their part, provided little or no information to investors about the identity, quantity or value of the securities in the Funds' portfolios or the Funds' investment strategy.

108.     Lauer was the founder, manager and sole shareholder of Lancer Management, which was the Funds' investment manager. Lauer and Lancer Management were responsible for all investment decisions for the funds.

109.     Lancer Management managed the Funds in exchange for receiving certain fees, which were based on the Funds' NAVs. For managing Lancer Offshore, Lancer Management was entitled to an "advisory fee" of approximately 1% per year, calculated by multiplying the fund's NAV at the beginning of each quarter by 0.25%. Lancer Management also was entitled to an annual "incentive fee" equal to 20% of Lancer Offshore's net profits, as calculated on the last day of its fiscal year. For managing Orbiter, Lancer Management's annual advisory fee was 1.5% of the fund's NAV, and the incentive fee was 50% of the fund's profits. For managing Viator, Lancer Management's annual advisory fee was 1% of the fund's NAV, and its incentive fee was 25% of the fund's profits. For managing OmniFund, Lancer Management's annual advisory fee was 2% of the fund's NAV, and its incentive fee was 25% of the fund's profits.

110. Lancer Offshore's financial statements reveal that "Management Fees" of $1,524,406 were paid in 2000 and $1,607,928 in 2001. The unaudited financial statements reveal an additional $2,117,200 in Management Fees as of June 30, 2002. Moreover, the audited financial statements reveal that $15,915,593 and $13,548,193 in "Incentive Fees" were payable in 2000 and 2001 respectively. These same statements reveal an additional $44,006,726 (for 2000) and $48,264,309 (for 2001) as deferred incentive fees payable. The unaudited financial statements reveal $8,937,540 in "Incentive Fees" payable and $61,113,468 in deferred incentive fees payable as of June 30, 2002.

111. Lauer and Lancer Management solicited investors in the Funds through personal contacts, through third-party marketers or finders, and through letters and other mailings, marketing materials, newsletters and private placement memoranda ("PPMs"). (The PPMs for Lancer Offshore and OmniFund were substantially similar.)

**The Funds' Purported Strategy**

112. As disclosed to investors and prospective investors, the Funds' investment strategy was to "concentrate" on investments in small-cap and mid-cap companies that were, in Lauer's words, "investment community pariahs." In a 1997 *Business Week* article, Lauer was quoted as stating that the Funds' "secret" was to seek out "fallen angels" – companies in which Wall Street has little or no interest.

113. The Funds' PPMs represented that the majority of the Funds' assets would be invested in common stocks traded on the New York Stock Exchange, the American Stock Exchange or in the U.S. over-the-counter market.

114. Over the last three years of the Funds' life, Lauer and Lancer Management caused the Funds to pursue an increasingly risky investment strategy, pouring the Funds' assets into the restricted securities of a small number of micro-cap and small-cap companies. Contrary

to what had been represented to investors and prospective investors in the Funds' PPMs, a majority of the securities in which the Funds were invested were not listed on any exchange and were quoted, if at all, on the OTCBB and pink sheets. Indeed, many of these securities were not publicly traded at all, but instead consisted of restricted, private placement shares and warrants as well as non-equity investments such as loans.

115. As of December 31, 2001, approximately 74% of Lancer Offshore's purported market value was comprised of the securities of only eight companies. Similarly, as of December 31, 2002, approximately 84% of Lancer Offshore's purported market value consisted of securities of only nine companies, including Biometrics Security Technology, Inc. (f/k/a Aug Corp.) ("Biometrics"), Fidelity First Financial Corporation ("Fidelity First"), SMX Corp. ("SMX"), XtraCard Corp. (f/k/a Nu-D-Zine, Inc.) ("XtraCard"), Method Products Corp., Total Film Group, Inc. ("Total Film"), World Wireless Communications, Equitel, Inc. and Continental Southern Resources, Inc. (collectively, the "Target Companies").

116. These stocks were thinly traded and illiquid. Moreover, each of the Target Companies had little or no earnings in 2000 or thereafter, and several had no material business operations. One of the Target Companies did realize a profit in 2001, but that resulted from cancellation of a debt, not from any revenue-generating business operations.

**The Valuation Fraud**

117. Lauer's and Lancer Management's interest in the Target Companies was not motivated by an interest in any fundamental value to be derived from their businesses. Rather, Lauer and Lancer Management invested in the Target Companies to inflate the reported NAVs of the Funds and, as a result, the fees paid to Lancer Management.

118.    The Funds' PPMs provided that the NAVs of the Funds were supposed to have been determined based on the market values of the securities in which the Funds' assets were invested.  Thus, the PPMs provided that the Funds' NAVs would be calculated as follows:

> [listed or quoted securities are to] be valued at their last sales prices on the date of determination, or, if no sales occurred on such date, at the mean between the "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value reasonably assigned to such securities and instruments by the Board of Directors.
>
> [If securities are not listed, they] shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value reasonably assigned to such securities by the Board of Directors."

119.    The PPMs also contained a caveat that, in the event the directors determined that the listed valuation method did not represent its market value, the directors would value the securities.

120.    Despite these requirements, as well as the fact that most of the companies in which the Funds were heavily invested had little or no operations or earnings, Lauer and Lancer Management embarked on a fraud in which they assigned values to these companies' securities in the hundreds of millions of dollars. For example:

- Throughout the period from 2000 to the demise of the Funds in April 2003, Lancer Offshore invested in shares and warrants of Fidelity First.  In 2000, Fidelity First had exited its main business – the mortgage business – entirely and thereafter was a non-operating, shell corporation.  Even before then, beginning in November 1999, Fidelity First was quoted solely on the pink sheets.  It had no revenues at all in 2001 and 2002, had lost millions of dollars since 2000 and, as of December 31, 2002, had total assets of only $25,101.  Yet, as of December 31, 2000, 2001, 2002 and April 30, 2003, Lauer and Lancer Management valued the Funds' holdings in Fidelity First at approximately $22.55 million, $6.89 million, $46.34 million and $64.19 million, respectively.  Similarly, OmniFund valued the

Fidelity First shares and warrants held by the smaller OmniFund on those year-end dates at $9.27 million, $1.2 million and $2.09 million, respectively.

- From 2001 until the Funds' demise, they owned shares of Biometrics. Its common stock had been quoted on the OTCBB from December 2001 to May 2003, but it was thereafter delisted, and its price only quoted on the pink sheets. In 2001, the company had no revenues, had negative cash flow from operations of $385,593, and an accumulated deficit of over $22 million. For the period ended September 30, 2002, Biometrics reported total revenues for the nine months of just $68,936. Nonetheless, as of December 31, 2001 and 2002, and April 30, 2003, Lauer and Lancer Management valued Lancer Offshore's shares in Biometrics at approximately $61.2 million, $162.55 million and $75.76 million, respectively. Likewise, OmniFund valued OmniFund's Biometrics shares and warrants on those same dates at $11.56 million and $15.81 million, respectively.

- In 2000 and 2001, the Funds invested in shares and warrants of SMX, which had quoted exclusively on the pink sheets since December 2000. In fiscal 2000, the company had no revenues and posted a net loss of $415,356. By December 31, 2001, SMX had revenues of $99,441, its assets were worth a mere $1.28 million and its losses had increased to $4.31 million. As of December 31, 2000 and 2001, Lauer and Lancer Management valued Lancer Offshore's SMX shares and warrants at approximately $152.98 million and $133.42 million, respectively. Lauer and Lancer Management valued OmniFund's smaller position in SMX shares and warrants on those same dates at $8.5 million and $15.11 million, respectively.

- Beginning in 2000 and continuing until their demise, the Funds invested in shares and warrants of XtraCard. The company, however, had traded on the pink sheets since February 2000, earned no revenue in 2000 and 2001, and posted revenues of only $152,407 in 2002. By the end of 2002, its assets were worth less than $2 million. Yet, as of December 31, 2000, 2001, 2002 and April 30, 2003, Lauer and Lancer Management valued Lancer Offshore's XtraCard shares and warrants at approximately $22.16 million, $84.12 million, $102.98 million and $58.86 million, respectively. As of December 31, 2002, OmniFund's XtraCard shares and warrants were valued at $6.0 million.

- From 2001 through 2003, Lancer Offshore held shares in Total Film. Total Film traded on the OTCBB from May 2001 until April 2002, when it began trading exclusively on the pink sheets. In 2000-2001, the company had revenues of $1.8 million and a loss of $8.95 million in the nine months (ending March 31, 2001) before it stopped reported to the SEC. Yet, as of December 31, 2001, 2002 and April 30, 2003, Lauer and Lancer

management valued Lancer Offshore's position in Total Film at approximately $36.46 million, $37.7 million and $44.06 million, respectively. OmniFund's shares and warrants in Total Film were valued at $12.1 million and $5.0 million.

121.     At least as early as March 2000, the Funds began losing money on a massive scale. While the Funds' assets were draining away, Lauer and Lancer Management endeavored to keep existing investors happy and induce prospective investors to invest by reporting ever-increasing returns. To hide the Funds' losses and show increasing NAVs, Lauer and Lancer Management developed a fraudulent scheme to inflate and manipulate the values of the Funds' holdings, and, in turn, the Funds' NAVs.

122.     Under this scheme, Lauer and Lancer Management manipulated the prices of certain micro-cap securities to create fictitious and fraudulent month-end and year-end "closing prices" that they used as the basis for wildly inflated valuations of the Funds' portfolios. Lancer Management's managing director Bruce Cowen subsequently pled guilty to conspiracy to commit securities fraud in connection with his role in this scheme.

123.     As part of the scheme, Lauer and Lancer Management also worked hand-in-glove with the Funds' prime broker BofA to manufacture false and misleading Position Reports that appeared to be official BofA documents, and were riddled with false valuations.

### Lauer and Lancer Management Falsify the Values of the Funds' Holdings Through a Scheme with Bruce Cowen and Others to "Mark the Close"

124.     As detailed above, Lauer and Lancer Management purchased for the Funds substantial – sometimes controlling – blocks of shares in companies whose common shares were thinly traded on the open market. The Funds' purchases occurred not on the open market, however, but in private transactions, and involved not free-trading common stock, but restricted stock, warrants and other illiquid securities. The securities usually cost the Funds only pennies per share, and in some cases they were acquired at no cost at all.

125.     At the end of a monthly or yearly reporting period, Lauer and Lancer Management would purchase comparatively tiny amounts of the unrestricted, free-trading stock of these companies.  The purchase prices for these tiny transactions were much higher than the prices the Funds had paid in the private transactions, and in many cases higher even than the normal market price of the free-trading shares themselves.  Indeed, these purchases often would be the only public transactions in the relevant companies' shares during the entire trading day. These purchases would then appear on various OTC pricing services as the "market price" for those shares.

126.     There was no plausible business or investment purpose for such purchases. It simply made no sense for the Funds to go into the open market and buy shares in a company at an open-market price – much less an inflated one – when they already owned millions of the company's shares, that had been acquired for pennies or no cost at all.  Rather, these purchases were, and can only have been, intended to create a inflated "market price" that Lauer and Lancer Management could then use to value the Funds' holdings, creating tens of millions of dollars in paper profits – and generating massive fees for Lauer and Lancer Management.

127.     These purchases themselves were arranged through market manipulation. In August 2003, Lancer Management's former Managing Director Bruce Cowen pled guilty to one count of conspiracy to commit securities fraud, mail fraud and wire fraud in connection with his role in rigging prices of certain securities in the Funds' portfolios.

128.     Upon pleading guilty, Cowen allocuted to a detailed description of that role.  According to Cowen, from at least April 2001 to December 2001, he conspired with his co-defendant James Kelly and "members of a group of hedge funds called the Lancer Group" to fraudulently manipulate and control the stock of Lighthouse Fast Ferry, Inc. ("Lighthouse").  In

addition to his job with Lancer Management, Cowen was chairman of Capital Research, which purportedly rendered management consulting services to Lighthouse and through which stock transactions were routed to allow kickbacks to be paid to the sellers who were on the other side of the manipulative transactions described below.

129.    Kelly was a partner in Capital Research with Cowen and two other "high-ranking Lancer officials" who are not named in Cowen's plea allocution – presumably Lauer is one of them.  Kelly, an NASD-licensed securities broker also owned Shamrock Partners, a Pennsylvania brokerage firm.  As the owner of Shamrock, Kelly provided the means to execute the manipulative stock transactions.

130.    Through Shamrock, Lauer and Lancer Management would purchase Lighthouse stock on the last day of each month in order to cause its market price to increase. Lauer and Lancer Management also used defendant Bendall's brokerage firm, Hermitage Capital, for the same types of transactions and the same purpose.

131.    At least from April to December 2001, the Funds were the sole significant purchasers of Lighthouse stock on the last few days of each month (with one apparent exception), buying almost all of the Lighthouse stock that was purchased during that period.  The vast majority of these Lighthouse shares were purchased by the Funds through Shamrock and Hermitage.  For example, on October 31, 2001, Lancer Management purchased 40,000 Lighthouse shares at the end of the trading day, which represented the largest single day volume for transactions in Lighthouse shares during the entire month of October 2001.

132.    Lauer and Lancer Management thereby controlled and dominated the market for Lighthouse's common stock, and their manipulative trading caused Lighthouse's

stock price to rise dramatically on October 31, 2001 to $2.15 per share from the previous day's closing price of $1.60 per share (a 34% increase over the previous day).

133.    Utilizing this technique of "marking the close," Lauer and Lancer Management successfully manipulated the closing price of Lighthouse's stock on April 30, 2001, June 29, 2001, July 31, 2001, August 31, 2001, September 28, 2001, November 30, 2001, December 26, 2001, December 28, 2001 and December 31, 2001.  Cowen's plea allocution details the specifics of the agreements and arrangements surrounding the July 2001 transactions.

134.    Lauer and Lancer Management then used the manipulated "last trade" prices for free-trading shares as the values for the shares of the same issuer in the Funds' portfolios – including the large blocks of restricted shares and warrants acquired for only pennies per share (or sometimes at no cost).

135.    Lauer and Lancer Management carried out this scheme with respective to the shares of other companies whose securities the Funds held.  Similar trading patterns were employed in relation to other holdings, including Biometrics Security Technology, Inc., Fidelity First Financial Corp., SMX Corp., XtraCard Corp., Continental Southern Resources and Total Film Group.  Lauer's and Lancer Management's fraudulent scheme succeeded in significantly overstating the values assigned to Lancer Offshore's stock portfolio.

136.    Cowen also arranged a similar manipulative arrangement with respect to some of the Funds' purchases of shares of Nu-D-Zine – a company that Cowen explicitly recognized was nothing more than a "shell."  In a fax dated December 26, 2000 – just in time for the Funds' year-end NAVs – Cowen wrote to Lauer and Garvey as follows:

> Re:  Purchase of Shell (NUDZ)
>
> We signed a term sheet to purchase ~ 94.55 of NUDZ for $400,000.  I'm pushing for a closing on Wednesday or Thursday.  Terms of the transaction are as follows:

| | |
|---|---|
| Name of Company: | Nu-D-Zine Bedding & Bath, Inc. |
| Pink Sheet Symbol: | NUDZ |
| Authorized Shares: | 50 million |
| Outstanding Shares: | 11,535,898 |
| Shares to be Purchased: | 10,900,000 |
| Remaining Float: | 635,898 |
| Inside Market: | $.155 bid        $.625 ask |
| Market Makers: | Alexander<br>Paragon<br>Herzog<br>Knight<br>Hill Thompson<br>Shamrock (I had them enter today on the bid) |
| Market Analysis: | Hill is on the offer at $.625 than [sic] the stock goes $1.05 by Paragon |
| Purchase Price Per Share: | $.0367 |
| Strategy: | 1. Complete above purchase Wed/Thurs. |
| | 2. Fund the Company with $300,000 Friday and receive the following:<br><br>30 million shares @ $.01<br>20 million warrants @ $.03<br>20 million warrants @ $.05 |
| | 3. Move the offer or close year at $.625 |
| | 4. With stock closing at $.625 $700,000 investment has market value of $48,962,500 |
| | 5. For each $.01 closing over 5/8 has impact of $809,000. |

<blockquote>
6.  Also, determining if any of the<br>
remaining 635,898 remaining<br>
shares can be purchased<br>
in a block
</blockquote>

<blockquote>
Michael, I'm pushing hard to get this done this week and hope to be successful.  We will do a reverse split in January similar to SMX.
</blockquote>

<blockquote>
Regards,<br>
Bruce
</blockquote>

137.    Cowen's December 26, 2000 fax lays out the plan for Lauer and Lancer Management to use a relatively modest "$700,000 investment" to manufacture "market value of $48,962,500" in less than a week – and just in time for the Funds' year-end NAVs and audit.

138.    This and similar conduct had the effect of grossly over-inflating the values assigned to the Funds' portfolios.  For example, while the book (cost) value of Lancer Offshore's portfolio as of December 31, 2000 was $274,967,678, its reported value was $711,487,556.  Similarly, while the book (cost) value of Lancer Offshore's portfolio as of December 31, 2001 was $261,908,110, the reported market value was $830,293,002.

139.    The vast majority of these increases in "value" were not based on any actual increase in value of the Funds' portfolios, but instead were the result of the manipulation of the portfolio valuations, and the knowing and reckless failure by the Citco NV (as controlled and directed by defendant Citco Group), the Director Defendants and PWC NA to recognize the manipulation, apply the valuation principles that they were required to apply, and independently value the securities in the Funds' portfolios.  These false, inflated valuations were used in calculating the Funds' NAVs, which Citco NV and IFS disseminated to investors each month, as well as in preparing their audited financial statements.

140.    Lancer Offshore's annual report for 2000, which was audited by PWC NA, stated that the Fund's NAV for the month ending December 31, 2000 was $840.22 per

share.  In 2002, Lauer and Lancer Management reported that Lancer Offshore's NAV for the month ending December 31, 2001 was $915.43 per share.  This valuation, too, was audited and certified by PWC NA.  In 2003, Lauer and Lancer Management reported that Lancer Offshore's NAV for the month ending December 31, 2002 was $768.46 per share.  Each of these NAVs valuation was materially false in that it grossly overstated the actual NAV.

141.    These fraudulent NAV statements and audit reports were intended to and did induce plaintiffs to invest, and remain invested, in the Funds.

142.    The manipulation and inflation of the Funds' NAVs also was intended to, and did, artificially and improperly inflate the management, incentive, and administrative fees claimed by Lauer, Lancer Management and Citco NV, further draining the Funds' remaining assets.

### BofA's Newman, Pennecke and Krawciw Help Lauer and Lancer Management Falsify the Values of the Funds' Holdings

143.    Defendant BofA began serving as the Funds' prime broker in 1999, following the September 1998 merger between Bank of America and NationsBanc Montgomery Securities, which had been the Funds' prime broker since November 1997.

144.    David Newman was the Funds' BofA account representative from approximately March 1999 to August 2000.  Newman left BofA in August 2000 to work for Lancer Management – a move that was curious, at the very least.  Newman had not been a trader at BofA, and had no obvious skills to contribute to the management of the Funds.  At Lancer Management, however, Newman was given responsibility for communicating virtually all of the Funds' trade and valuation information to BofA and for otherwise interfacing with BofA.  Upon information and belief, Newman had assisted Lauer and Lancer Management in inflating the values of the Funds' holdings during his tenure at BofA, and was hired by Lauer and Lancer

Management both as a reward for his past misconduct at BofA and to ensure his continued assistance to Lauer and Lancer Management in carrying out their fraud.

145.     On July 27, 2004, Newman was deposed by the Securities and Exchange Commission in connection with its civil lawsuit against Lauer.  Newman invoked his Fifth Amendment privilege against self-incrimination in response to all of the SEC's questions concerning the Funds, Lauer and Lancer Management, including questions relating to his employment at BofA before joining Lancer Management.  Newman also invoked the Fifth Amendment in response to all questions concerning Nu-D-Zine and XtraCard securities.

146.     Andrew Pennecke is a Vice President of Prime Brokerage at BofA who became the account representative for the Funds in approximately August 2000, when Newman left BofA.  Pennecke began his career at BofA in April 1999, and obtained his NASD Series 7 license in or around March 2000.  To obtain his Series 7 license and qualify as a "general securities representative," Pennecke had to demonstrate that he possessed an adequate understanding of the securities industry by taking an exam that included, among other things, questions concerning the taking and verification of purchase and sale instructions from customers.

147.     Roman Krawciw is a Managing Director at BofA and has served as the Operations Director for Prime Brokerage Services since April 1995.  Krawciw, who holds NASD Series 7 and 24 licenses, supervised both Pennecke and Newman in their handling of the Lancer Management's accounts.  To obtain his Series 24 license and qualify as a "general securities principal," Krawciw had to demonstrate that he possessed adequate knowledge of statutory provisions applicable to the management of a broker/dealer by taking an exam that

included, among other things, questions concerning the supervision of employees and brokerage office operations.

148.    In addition to working together at Lancer Management, Newman and Lauer have collaborated as movie producers. Newman is the co-owner of a movie production company called Holedigger Films Inc., which has produced such movies as "The Secret Lives of Dentists," "The Dying Gaul," "Off the Map," and "Roger Dodger." Lauer and Newman were executive producers of "The Secret Lives of Dentists," together with Martin Garvey, another Lancer Management representative, and Bruce Cowen. Lauer and Newman also worked together as executive producers of "Roger Dodger."

149.    Upon information and belief, Pennecke also has collaborated with Newman and Lauer in their extracurricular film production business. Pennecke processed (and BofA management approved) countless requests from Lauer and Lancer Management that required use of the Funds' assets in connection with production of films rather than legitimate investing activities. From July 2002 through December 2002, for example, Pennecke processed at least fourteen requests from Lauer and Lancer Management for the transfer of a total of over $4 million from Lancer Offshore to OTM Productions LLC. OTM Productions LLC produced a movie called "Off the Map," which Garvey and Newman produced in 2003. While a handful of the OTM requests indicated that they were for the purchase of "loans," most contained no explanation of what the transfers were for and simply contained a note from Lauer that read, "Offsets to follow." Pennecke processed the requests anyway, and ultimately received "special thanks" in the credits of "Off the Map." Pennecke received "special thanks" again in the credits for "The Dying Gaul," presumably for his continued service to Lauer, Newman and Garvey in diverting the Funds' assets to its production.

150. As the Funds' prime broker, BofA cleared and settled trades, provided portfolio management services, and served as a central custodian for some of the securities held by the Funds. BofA received a commission on each of the trades it cleared and settled. Because Lancer Management executed a high volume of trades through BofA and therefore generated substantial commissions for the bank, BofA provided Lauer with substantial goods and services. In particular, BofA set up and provided Lancer Management with its entire infrastructure: it funded construction of and paid the rent on Lancer Management's Park Avenue office space, and provided Lancer Management with all of the infrastructure – including telephones, computer systems and e-mail service – that Lauer and Lancer Management needed and used to carry on their business.

151. Each month, BofA prepared monthly account statements ("Account Statements"), which purported to reflect the value of the securities held in its custody on behalf of the Funds. BofA sent the Account Statements to the Funds and also directly to defendants Citco NV, IFS and PWC NA.

152. In order to collect the valuation information needed to generate account information for its customers, BofA received an electronic data feed from one or more third-party data providers who, in turn, obtained market prices from various securities exchanges and market makers. BofA received these data feeds on at least a daily basis so that it always had access to current price information for the publicly traded securities held in its custody. The BofA computer system automatically updated prices for publicly traded securities upon receipt of these data feeds.

153. BofA also permitted fund managers, including Lauer and Lancer Management, to access reports from its computer system through a website called

www.primebroker.com (the "BofA Website").  Upon request from Lauer and Lancer Management, BofA periodically posted reports generated by BofA's computer system on the BofA Website.  Using logins and passwords provided by BofA, Lauer and Lancer Management were able to access the BofA Website on a "read-only" basis and view, download and print various reports posted by BofA, including the Position Reports, which purported to show the Funds' holdings and the values of those holdings.  In addition to the securities in BofA's custody, the Position Reports also included holdings and valuations for "away" positions, which were not in the custody of BofA and did not appear on the Account Statements.

154.    The Position Reports contained BofA's name at the top of each page.  When downloaded and printed remotely, the Position Reports contained no disclaimer or other marking to suggest that they were anything other than official documents prepared by, posted on the BofA Website by, and bearing the imprimatur of, BofA.

155.    BofA also gave the Funds' service providers access to the BofA Website so that they, too, could view, download and print Position Reports for the Funds.  Pennecke personally arranged for IFS personnel in Ireland to receive passwords and logins to the BofA Website.  Upon information and belief, BofA also arranged for Citco NV to have the same access to the BofA Website.

156.    Although BofA permitted fund managers and service providers to view, download and print Position Reports from the BofA Website, only BofA could enter the position, transaction and valuation information into the BofA computer system that generated the Position Reports and other reports which BofA generated and posted on the BofA Website.

157.    Lauer and Lancer Management used Letters of Authorization ("LOAs") both to instruct BofA to transfer money for the purchase of securities and to instruct BofA how

to input valuations and other information about the securities in the Funds' portfolios. Lauer and Lancer Management sent numerous LOAs to BofA each week, and often sent BofA multiple LOAs in a single day.

158.     During the time he acted as the Funds' account representative, Pennecke spent a significant amount of his time each day processing LOAs and other instructions received from Lauer and Lancer Management. Upon information and belief, during the time he worked at BofA, Newman also spent a significant amount of his time each day processing LOAs and other instructions received from Lauer and Lancer Management.

159.     BofA's management reviewed and approved the LOAs received by Pennecke and Newman from Lauer and Lancer Management. Krawciw, in particular, reviewed and approved the majority of the LOAs processed by Pennecke and Newman. However, BofA did not verify that the pricing or valuation information provided by Lauer and Lancer Management on the LOAs was accurate.

160.     BofA maintained in its files a complete set of the monthly Position Reports for the Funds, which BofA had generated and posted on the BofA Website. Indeed, the Position Reports were the only reports that existed anywhere that reflected all of the Funds' holdings: they were the only documents that listed and depicted the values of both the positions in BofA's custody *and* those held "away" from BofA. For this reason, defendants Citco NV, IFS and PWC NA used the Position Reports in valuing the Funds' portfolios, calculating their NAVs and preparing their year-end audits.

### BofA's Knowledge and Substantial Assistance of Lauer and Lancer Management's Fraud

161.     BofA participated and assisted directly in Lauer and Lancer Management's fraud by falsifying the values of the Funds' holdings on the Position Reports at

the request of Lauer and Lancer Management and with actual knowledge that the information being supplied by Lauer and Lancer Management was false and was being used to mislead investors about the Funds' condition and performance.

162.     The Position Reports misrepresented the values of the Funds' holdings in at least five ways: (1) they overvalued unregistered warrants at values equal to or higher than the prices of publicly traded stock; (2) they valued securities at values higher than the last quoted public price for the shares; (3) they reported exorbitant increases in the values of unregistered shares and unregistered warrants that the Funds purportedly acquired at little or no cost; (4) they depicted unregistered shares and warrants which could not be publicly traded as registered, free-trading shares; and (5) they valued unregistered shares at the last quoted public price for the registered shares.

163.     BofA's role in valuing the Funds' holdings for the Position Reports was neither passive nor ministerial.  BofA played an active, instrumental role in manipulating and falsifying the valuations of the Funds' portfolios.

164.     The examples of BofA's knowledge and substantial assistance of the fraud perpetrated by Lauer and Lancer Management that are detailed below were culled from a very limited universe of documents produced by BofA to the Receiver and the SEC.  These examples, as egregious as they are, appear to be merely the "tip of the iceberg."  In particular, plaintiffs have yet to obtain or review most of the potentially relevant e-mail, all of which (including all e-mail send to or from Lauer and Lancer Management) was maintained on BofA's servers, as well as BofA's own e-mail traffic and any notes and tape recordings of conversations between BofA's representatives and the representatives of Lauer and Lancer Management.  Based on the ample evidence of wrongdoing that exists in BofA's limited production to date, plaintiffs have good

reason to expect that complete discovery from BofA will yield still more instances of BofA's repeated, knowing and substantial assistance of Lauer and Lancer Management in their fraudulent scheme.

BofA Knowingly and Substantially Assisted Lauer and Lancer
Management in Falsifying the Value of Unregistered Warrants

165.   BofA repeatedly and knowingly assisted Lauer and Lancer Management in fraudulently inflating the value of unregistered warrants which the Funds purchased in private placements.

166.   For example, on January 8, 2003, Newman, who was by this time working for Lancer Management, sent Pennecke an e-mail with a subject heading that read, "Final 2002 Entries for Lancer Offshore."  In the e-mail, Newman asked Pennecke to "plug in" data in the Position Reports for a number of transactions, including the following:

NEW WARRANT - XTRACARD CORP - XTRDWT

BY (sic) 3,500,000 XTRDWT @ 0.00 12/16/02

PRICE @ $3.97 FOR 12/31

167.   In other words, in January 2003, Newman asked Pennecke to modify the BofA Position Report retroactively to change the value of the 3.5 million XtraCard warrants the Funds had purchased for no cost on December 16, 2002 to almost $4 per share as of December 31, 2002.

168.   Pennecke told Newman by reply e-mail that he had complied with Newman's request and changed the December 31, 2002 Position Report to inflate and falsify the value of the warrants.  Specifically, Pennecke wrote: "dec 2002 report has been redone….thanks."  Newman then expressed his thanks for Pennecke's assistance and complicity in an e-mail that stated "you da man, thanks."

169.     Various BofA reports for the month ending December 31, 2002 show that Pennecke in fact followed Newman's instructions and valued the warrants at $3.97 per share – a value he knew to be grossly inflated for warrants that could not be publicly traded and that had been acquired for free only weeks earlier.  An "Unsettled Transactions" report reflects that, on January 8, 2003, the day of the e-mail exchange between Newman and Pennecke, Pennecke recorded the purchase of 3,500,000 XtraCard warrants at zero cost.  In a "Transaction Report" for the same period, Pennecke marked the broker for the warrants as "PRVT," showing his knowledge that they had been purchased by the Funds in a private placement.  Yet, in the December 31, 2002 Position Report, Pennecke valued the 3,500,000 warrants purchased for zero dollars at $3.97 per share (just as Newman had asked), manufacturing a paper increase of $13,895,000 in just two weeks' time.

170.     The almost $14 million in gains that BofA, Lauer and Lancer Management generated by falsifying the value of the XtraCard warrants were part of Lauer and Lancer Management's fraudulent scheme to mask severe losses suffered by the Funds in 2002.  A BofA "Realized Gain & Loss Report" for the year ending December 31, 2002 reported losses of $141,500,000.  BofA had knowledge of the Funds' losses and Lauer and Lancer Management's efforts to cover them up because Pennecke was the person who was responsible for "re-doing" the December 31, 2002 Position Report at Newman's request.

171.     When questioned by investors about how BofA valued or "marked" away positions held by the Funds, including warrants, BofA expressly denied that the positions were being overvalued or misvalued.  One of the Funds' investors recorded an October 21, 2002 telephone conversation with Pennecke as follows:

> Andrew says those securities that are held away Lancer does not trade that
> often but they don't mark them up.  There is a fairly substantial warrants

position which are either marked at zero or at a gain if the strike is below the market price (confirmed by the auditor). Bridge loans are marked at cost. All securities, books and records are reviewed with the manager monthly. He went on to say that [h]e has been managing the Lancer account for years. There have never been any lawsuits against them. There have never been any issues with the Montgomery Securities Risk Management Group. There have been no red flags.

172. Pennecke's assurances were patently false, since Pennecke knew that the values Lauer and Lancer Management were giving him for away positions were inflated far above their purchase prices and market values. At the very least, by asking Pennecke to value securities that were not publicly traded at figures that resulted in tens of millions of dollars of gains for the Funds in spans of only days or weeks, Lauer and Lancer Management waved the brightest of red flags, but Pennecke simply ignored it.

BofA Knowingly and Substantially Assisted Lauer and Lancer
Management in Falsifying the Value of Publicly Traded Stock and Privately Held
Stock (Which BofA Misrepresented on the Position Reports to Be Publicly Traded Stock)

173. BofA also assisted Lauer and Lancer Management in inflating the market value of publicly traded stock held by the Funds.

174. For example, on February 5, 2003, Newman sent an e-mail to John O'Neill, another BofA account representative, with a subject heading that read, "Johnny O – please call me when you get this – thanks." The e-mail contained several instructions relating to the month-end Position Report for January 2003, including the following:

Update prices for 1/31/03

FFIRD $5

FFIR $3.50

Thanks, Dave

175. "FFIRD" is the ticker symbol for Fidelity First Financial Corp. This request was inherently suspicious because Newman was asking BofA to change the valuation of

64

a publicly traded stock whose value already should have been provided through the data feed that BofA received on a daily basis from its third-party pricing sources. Newman thus asked BofA to override and replace the market price for FFIRD that had been entered automatically in the BofA computer system with a phony, inflated value contrived by Lauer and Lancer Management to manipulate the Funds' NAV and hide the Funds' losses.

176. The documents confirm that BofA complied with Newman's request and changed the valuations of FFIRD on the BofA computer system. A February 1, 2003 report titled, "Price Shifts by Standard Deviations" ("Price Report") indicates that, on January 31, 2003, the closing market prices of FFIRD and FFIR were $3.63 per share and $3.00 per share, respectively. However, the January 31, 2003 Position Report shows that Pennecke valued FFIRD and FFIR at $5.00 per share and $3.50 per share, respectively – matching exactly the values provided by Newman in his February 5, 2003 e-mail. The Funds' January 31, 2003 "Transaction Reports" show no trades of either FFIRD or FFIR that even arguably could have supported such an increase in value and the resulting $35,218,512 in bogus gains.

177. FFIR was a private company, in which the Funds had acquired a massive position at little or no cost. The BofA Position Reports assigned a four letter symbol to the Funds' position in FFIR, indicating that FFIR was a publicly traded stock. In fact, FFIR had no CUSIP number and was *not* a publicly traded stock. As a result, whenever a price change for FFIR was needed by Lauer and Lancer Management, it was necessary for Pennecke to make a price change in BofA's computer system. The FFIR prices input by Pennecke inflated the values assigned to FFIR stock that had been acquired at little or no cost.

178. The enormous impact of BofA's falsified pricing of the Funds' FFIR holdings on the Funds' NAVs are shown below:

| Date | Quantity of FFIR Shares in Funds' Portfolio | FFIR Price Inserted by BofA | Total Value of FFIR Created by BofA | Funds' Total NAV | FFIR Value As % of Funds' Total NAV |
|---|---|---|---|---|---|
| 12/31/01 | 56,641,635 | $2.00 | $113,283,270 | $841,293,001 | 13.47% |
| 1/31/02 | 56,641,635 | $2.35 | $133,107,842 | $864,004,508 | 15.41% |
| 2/28/02 | 56,641,635 | $2.30 | $130,275,761 | $881,694,729 | 14.78% |
| 3/31/02 | 49,841,635 | $2.30 | $114,635,761 | $920,187,993 | 12.46% |
| 4/30/02 | 47,041,635 | $2.30 | $108,195,761 | $945,395,171 | 11.44% |
| 5/31/02 | 47,041,635 | $1.50 | $70,562,453 | $981,760,021 | 7.19% |
| 6/30/02 | 47,041,635 | $1.75 | $82,322,861 | $989,362,956 | 8.32% |
| 7/31/02 | 47,041,635 | $2.50 | $117,604,088 | $978,864,965 | 12.01% |
| 8/31/02 | 47,041,635 | $2.75 | $129,364,496 | $1,003,433,921 | 12.89% |
| 9/30/02 | 47,041,635 | $2.40 | $112,899,924 | $918,729,079 | 12.29% |
| 10/31/02 | 47,041,635 | $3.00 | $141,124,905 | $922,683,148 | 15.30% |
| 11/30/02 | 45,041,635 | $3.00 | $135,124,905 | $931,322,093 | 14.51% |
| 12/31/02 | 45,041,635 | $3.00 | $135,124,905 | $822,376,265 | 16.43% |
| 1/31/03 | 45,041,635 | $3.50 | $157,645,723 | $779,460,722 | 20.22% |
| 2/28/03 | 45,041,635 | $3.10 | $139,629,069 | $734,755,367 | 19.00% |
| 3/31/03 | 45,041,635 | $4.25 | $191,426,949 | $665,357,704 | 28.77% |
| 4/31/03 | 45,041,635 | $4.50 | $202,687,358 | $657,459,261 | 30.83% |
| 5/31/03 | 45,041,635 | $4.50 | $202,687,358 | $648,002,789 | 31.28% |
| 6/30/03 | 45,041,635 | $4.50 | $202,687,358 | $626,724,931 | 32.34% |

179.    BofA also knew that Lauer and Lancer Management were inflating the value of FFIR stock because Newman asked Pennecke to record a large purchase of FFIR by OmniFund (whose BofA account number was 313-12796) at no cost in February 2003.  In an e-mail dated February 13, 2003 titled, "[E]ntries to back date," Newman asked Pennecke to modify the January 31, 2003 Position Report to show the following FFIR purchase:

Hey Dude,

313-12796 1/14/2003 BY 500,000 FFIR $0 T6

313-12796 1/10/2003 BY 850,000 XTRDWT $0 T6

313-12796 1/10/2003 BY 2,000,000 MHTDW $0 T6

313-12796 1/31/2003 BY 12,800,000 XWC $0 T6

Thanks

180.     In other words, BofA knew that Lauer and Lancer Management were fraudulently inflating the value of FFIR stock because Newman directed BofA to value the stock above market at a time when BofA knew that the Funds were acquiring it for free.

181.     BofA also knew that Lauer and Lancer Management were manipulating the value of publicly traded stock because it monitored the values ascribed to the securities held by the Funds and observing substantial fluctuations in value, which, in turn, significantly affected the Funds' NAVs.

182.     Pennecke, in particular, closely watched the valuations of the Funds' holdings and ordered changes in valuations he perceived to be incorrect – especially when they adversely affected the Funds' NAVs and their ability to meet margin calls.  In an April 10, 2002 e-mail from Pennecke to Michael Mansour and Kenneth Otstot, two of Pennecke's operations colleagues at BofA, Pennecke wrote:

> Hi guys,
>
> O.K.. . . . . the merger between these two accounts was approved by Legal and Compliance. . . . . I have the LOA to move all assets from 313-13377 to 313-12796. . . . Since the name was changed yesterday on account 313-12796, they will be wiring in $2,000,000 today into the account. . . .This should take care of the call. . . . . Also, please look into the price of SMXP. . . it priced at 2. . . . it should be 9.
>
> Thank you.

183.     The $9.00 valuation to which Pennecke referred was the "current price" for SMXP that appeared on the March 31, 2002 Position Report.  Pennecke thus considered it part of his job to – and did – monitor and change the valuations that appeared on the Position Reports.

184.    BofA also repeatedly and knowingly inflated the value of restricted shares that the Funds purchased in private placements.

185.    For example, on December 27, 2000, Lauer sent Pennecke an LOA requesting that BofA send a wire transfer of $250,000 for the purchase of 6,812,500 shares of Nu-D-Zine stock – which indicates a purchase price of roughly 3.7¢ per share.  Lauer, however, directed Pennecke to value the stock at 50¢ per share with a note at the bottom of the LOA that read: "(Please price @ $0.50 tonight.)."  In other words, Lauer instructed Pennecke to depict the value of the stock as having increased more than *twelvefold* over the span of a few hours. Although he knew that there was, and could be, no possible legitimate basis for such an extreme increase, Pennecke complied.

186.    The Funds' December 2000 purchases of Nu-D-Zine also reveal another method that BofA employed to assist Lauer and Lancer Management in carrying out their fraudulent scheme:  Not only did BofA falsify the valuations of the Funds' positions that appeared on the BofA Position Reports by directly entering false valuations into the position reports, but it also entered other false information about the Funds' positions into the BofA computer system, which, in turn, also produced further false valuations on the Position Reports.

187.    Specifically, in numerous instances, when BofA entered a security for the first time into the computer system that BofA used to generate the Position Reports, it entered false information about that security.  For example, the December 31, 2000 BofA Position Report shows that the Funds owned 21,820,500 free-trading shares of Nu-D-Zine.  However, the Funds did not in fact hold that many free-trading Nu-D-Zine shares.  Rather, the Funds' holdings consisted of the following: (1) the 6,812,500 *unregistered* shares purchased on December 27,

2000 at $0.0367 per share; (2) an additional 15,000,000 *unregistered* shares purchased on December 28, 2000 at $0.01 per share; (3) 2,500 *free-trading* shares purchased on December 28 at $0.625 per share; and (4) 5,500 *free-trading* shares purchased on December 29 at $0.9872 per share.

188.     Pennecke knew that the first two blocks of shares were unregistered shares, because he entered the symbol "PRVT" in the broker field on BofA's database, which was used to indicate that no broker was involved in the transaction, because the shares were acquired in a *private* transaction.  Yet Pennecke then entered all of these shares in BofA's computer system as free-trading shares by entering the ticker symbol for free-trading Nu-D-Zine shares – "NUDZ" – for them, instead of a ticker symbol that indicated their correct status.  As a result, BofA produced a Position Report that valued *all* of these shares at $1.0156 – based on the market price for free-trading "NUDZ" shares – for a total of $22,161,445.31.  BofA thus again assisted Lauer and Lancer Management in manufacturing more than $21 million in fake profits on the Nu-D-Zine shares that the Funds had acquired over the preceding four days.  And, of course, the "market price" for NUDZ itself was produced through the "marking the close" scheme laid out by Cowen in his December 26, 2000 fax to Lauer (*see supra* ¶ 136) and carried out through the third and fourth transactions described above.

189.     Pennecke is not a mere clerk or other low-level employee who simply followed instructions from Lauer and Lancer Management and entered data without any understanding of what those instructions meant; he is a licensed securities representative who possesses a full understanding of how trades should be executed and how securities should be valued.  Thus, Pennecke was not duped by Lauer and Lancer Management into believing that there was a legitimate reason for changing the values of publicly traded shares as they requested.

Nor was he duped by Lauer and Lancer Management into believing that unregistered shares and warrants allegedly acquired for free were somehow worth millions upon millions of dollars days (and, in some cases, hours) later. Rather, Pennecke made each of the fraudulent entries requested by Lauer or Newman with actual knowledge that, in doing so, he was helping Lauer and Lancer Management carry out their fraud.

190. BofA also had actual knowledge that the Position Reports would be relied upon by the Funds' auditor and administrators in calculating and verifying the Funds' NAVs because:

(a) BofA knew that the Position Reports were the only reports reflecting the entirety of the Funds' holdings by depicting the values of the positions held both in the custody of BofA and away from BofA;

(b) BofA knew that Lauer and Lancer Management were downloading and printing the Position Reports and providing them to third parties, including PWC NA, Citco NV and IFS; and

(c) BofA itself provided IFS and, upon information and belief, also provided PWC NA and Citco NV, with direct access to the BofA computer system for the purpose of allowing them to review, download and print the Position Reports generated and posted there by BofA.

191. BofA thus had actual knowledge that investors and potential investors would receive the NAV statements and audits based on the falsified valuations and rely on them in making investment decisions. As an experienced prime broker for hedge funds, with dozens, if not hundreds of hedge funds as clients, BofA knew the importance of portfolio valuations and NAV statements, and the uses to which a fund's management, administrator, auditor and investors would put them.

**Citco NV's Role in Portfolio Valuation and NAV Calculation**

192. From the Funds' inception until September 2002, defendant Citco NV served as their administrator.

### *Citco NV's Obligations Under the Administrative Services Agreements*

193.     Pursuant to the Administrative Services Agreements between Citco NV and the Funds, Citco NV agreed, for a fee based upon the Funds' NAVs, to provide "certain financial, accounting, corporate, administrative and other services" to the Funds.  Among other things, Citco NV agreed that it "shall be responsible for performing the following administrative duties and functions:"

> (a)     "computing the monthly Net Asset Value of the [fund's]shares, as of the close of business on the last Business Day of each month, in accordance with the Explanatory Memorandum and the Articles of Association of the [fund], and reporting such to the Investment Advisor"; and

> (b)     "independently pricing the fund by reference to data supplied by Interactive Data Services International and other independent pricing sources, or as agreed by the Board of Directors pursuant to the Explanatory Memorandum."

194.     The Administrative Services Agreements also state that the Funds' relationship with Citco NV was a "Confidential Relationship."

### *Citco NV's Obligations Under the Funds' PPMs*

195.     The Funds' PPMs also assured investors and prospective investors that they could rely on Citco NV to independently value the Funds' portfolios.  For example, the PPM for Lancer Offshore states as follows:

#### <u>The Administrator</u>

CITCO Fund Services (Curacao) N.V. (the "Administrator") has been retained by the Fund to perform administrative services for the Fund. Pursuant to an Administration Agreement entered into between the Fund and the Administrator (the "Administration Agreement"), the Administrator is responsible for, among other things:  (i) maintaining the register of Shareholders of the Fund and generally performing all actions related to the issuance and transfer of Shares of the Fund and the safe-keeping of certificates therefor, if any; (ii) reviewing subscriptions for Shares and accepting payment therefor; (iii) publishing and furnishing the Net Asset value of the Fund's Shares in accordance with its Articles of Association; (iv) performing all acts related to redemption of Shares;

71

(v) keeping the accounts of the Fund and such financial books and records as are required by law or otherwise for the proper conduct of the financial affairs of the Fund and making available annual financial statements for inspection, as well as furnishing quarterly reports regarding the Fund's performance and Net Asset Value per Share, to Shareholders; and (vi) performing all other matters necessary in connection with the administration of the Fund.

### *Citco NV's Public Representations*

196.     The public representations and statements of both Citco Group and Citco NV – including through statements by their officers, such as defendants Quilligan and Stocks – demonstrate that Citco NV knew that it was a fiduciary of the Funds' investors and that valuation of the securities in the Funds' portfolios was one of its primary roles as administrator.

197.     A Citco brochure describes its "Accounting and valuation" services as follows:

> We maintain full accounting records of a fund.  ***We price the portfolio using independent, recognized pricing sources.***  We calculate fees and accruals.  We calculate the net asset value and prepare financial statements.  We coordinate the audit process and meet stock exchange reporting requirements.  We specialize in alternative investment instruments and products and we are experts in unique concepts such as equalization, hot issues and complex fund structures.

(emphasis added).

198.     Defendant Stocks wrote a lengthy article titled "Added Value in Offshore Fund Administration," which was printed in a publication called *Capital Guide 1998*.  On the role of the administrator in valuation, Stocks wrote as follows:

> ***The offshore investors require independent valuation by the administrator. These investors look upon the administrator as fiduciary of their assets: not only of the shares they own in a fund, but in the assets of the fund itself.***  The administrator providing independent valuations as an important source of added value became most apparent in 1994, the year that most hedge funds lost money and at least two lost all of their assets. In both these cases the investment manager had valued the portfolio himself, and subsequently those valuations were undermined by the market. Each fund lost over $500,000,000. Most systems today are

72

interfaced with pricing and corporate action feeds for listed securities, which will update portfolios in real time, and price when necessary. The difficulties arise when unquoted securities need valuing. Should mathematical models be used to price synthetic options, or should the counterparty provide its current price: brokers are usually the counter party, and determine the margin calls. The administrator when pricing can be relied upon to use the broker valuation. For synthetic derivatives where the administrator cannot get broker valuations, he will have the models checked by independent auditors quarterly. Otherwise, in the absence of a market price for a security, it is the fair value that is applied, and it is normally approved by the Board of Directors of the fund. The Board will often delegate the determination of fair value to the Administrator.

After 1994, there arose an industry of due diligence by both the Swiss private banks and the family offices from which the hedge funds derive much of their assets. This due diligence was focused on the investment manager, the brokers, and the administrator. The tour of back offices began with the office of ***the administrator, who was relied upon to provide the services detailed in the offering memorandum as a guarantee of independence, not as lip-service to an American fiscal requirement.*** The administrator is also a single entity on which due diligence of back office procedures may be performed by the offshore investor - instead of traveling to diverse points in the United States and examining various back offices, the quality of a single administrator's back office provides the comfort necessary to invest in a variety of offshore funds.

\*\*\*

The administrator has available to him knowledge of every development in legal, accounting, fiscal and technical matters which have been applied to funds, and can share those with clients, current and prospective. Typically he has been at the forefront of most of these developments. This is the role of consultant (and archivist), and is most importantly applied when acting as conduit between a largely European investor pool, and a quintessentially American success story. ***Finally as internal auditor the administrator adds the seal of approval to the net asset value estimates produced by the manager, by performing the calculation that the auditors will check and certify, and ensuring consistency in methods of accounting and reporting.***

Conclusion

In summary then, ***the administrator's core competence is asset protection, and it is in this fiduciary role that he is regarded by the investors in offshore funds. He is relied upon for independent verification and valuation of the assets managed,*** acts as arbiter when

disputes arise on perceptions of various roles, and is the trusted
intermediary when a manager wishes to launch his fund on the world.

(emphasis added).

199.    Similarly, defendant Quilligan, identified at the time as General Manager
and Managing Director of Citco NV, was quoted in a 2001 article as follows:

Independence combined with an accurate, timely and professional service
is how we can 'add value' to the finished product and to our clients….
The shareholders are our ultimate client… and they rely on our experience
and time in the industry – which is since the very beginning – and take
confidence from our subsequent position as a market leader.  Our
involvement means they don't have to entirely rely on the investment
manager.

The article goes on to note that Citco NV's centralized funds department allows its 30 staff

personnel to provide shareholder services to Citco NV-administered funds whether they are

administered in Curacao, the United States or elsewhere.  Quilligan cites such integration as

important in providing client services.

200.    In a 2001 book chapter titled "The Continued Evolution of Fund
Administration," Citco Group's Keunen wrote in relevant part as follows:

First is the notion that the fund administrator must be independent to be
taken seriously. The definition of independence in the context of
traditional fund administration includes some of the following parameters:

Accounting services and net asset value calculations

• The trade activities of a fund are received from the prime brokers via a
secure encrypted electronic feed, which is processed via straight through
processing. Automated reconciliations are prevalent.

• Securities are linked to conformed securities identifiers (CUSIP,
Telekurs, SEDOL, ISIN) within a uniform securities database, to facilitate
recognition of prices and corporate actions that are market-oriented.

• Fund activities are tied out and reconciled to counterparty confirms and
statements and then reconciled to the investment manager's records.

> • All bank, broker and custody balances are agreed, and ***the portfolio is priced independently***. Administrators use independent pricing services and analyse variances.
>
> \*\*\*
>
> • The net asset value per share is calculated based on the recognition of the fund's capital activity. Financial statements are produced and disseminated.

(emphasis added).

201.    In addition, with respect to the purpose of NAV reports to investors, Keunen wrote that, "At each reporting interval, reports are sent to all investors confirming the price of the fund, its performance and the investor's holding. Thus, investors are kept informed of the welfare of their positions from an independent source."

202.    In conclusion, Keunen wrote, "But ***the administrator's primary responsibility is as a fiduciary agent to a fund's investors***.  In addition, the administrator should be relied upon for an independent verification role that is efficient and accurate."  (emphasis added).

203.    In an article in *Alternate Investment Quarterly* titled "Second Quarter 2002: The Role of Fund Administration and Technology in a Maturing Alternative Investment Market," Keunen recognized problems in the hedge fund industry that fund administrators must address, stating, "To begin with, it is paramount that events such as the Manhattan Investment Fund fraud of 1999 are not repeated.  Hedge Funds are burdened with the task of convincing the entire investment community that they can run their operations properly and responsibly."

204.    In a chapter of *The Capital Guide to Hedge Funds* titled "A Year of Turmoil: Impact on Hedge Fund Operations," written in Fall 2002, Citco Group's Keunen recognized the importance and the risks of both portfolio pricing and thinly traded securities:

The growing interest in hedge fund investing, together with a profile that generates daily media exposure, has made measuring and managing risk a hot topic within the sector.

***

Investors indicate that their main concerns are liquidity and market risk. The majority have experienced a negative surprise regarding a hedge fund manager; the result being that the demand for transparency takes on added urgency.

***

Risk generally relates to performance, and poor performance can result from two major areas - market risk and operational risk. While market risk can be caused either by the performance of the market as a whole or by a specific position in a portfolio, operational risk is typically considered to be non-market related. This is the area that is affected most by the quality of a fund's counterparties, the prime brokers and the administrator.

***

For example, pricing the portfolio can be problematic, especially in the case of illiquid securities or for portfolios with complex derivatives. Pricing models may be invalid and even listed securities are often thinly traded. In reality, the only time a price can truly be verified is when it is traded.

***

So, how can the administrator help? The independence of the administrator is of critical importance. The fund's prospectus discloses its pricing policy, and scrutiny of the administration agreement provides insight into the administrator's role in the pricing process.

***

Probing the administrator to verify their approach reinforces the overall perception as to whether the administrator is genuinely adding value to risk measurement. After all, the administrator could just be taking the prices form the fund manager.

***

Finally, if the administrator is able to satisfy the investor's need for transparency, then they should be in a position to supply information about the fund's activities, if not about individual positions. This could include

sector exposure, attribution and the proportion that big bets represent to the overall portfolio.

205.    In a 2002 article in a publication title "Risk & Reward," Citco Group's Keunen reiterated that the administrator is a fiduciary for investors: "The trend is towards an administrator being selected by the board of directors, and we, at the end of the day, have a fiduciary duty towards the board and investors."

206.    With respect to valuation, Keunen said as follows:

Our position remains that we aim to price independently using the various sources that are available to us, such as third party price feeds, the use of Reuters and Bloomberg, counterparties or other sources. We aim to get comfortable with the prices we apply and we use a variety of techniques that enable us to achieve the required level of comfort. This often means utilising various forms of analysis. We will also consult with the investment manager, the auditors and if need be the board of directors.

207.    In May 2003, John M.S. Verhooren, a former director of Lancer Offshore and a Citco NV officer, told the publication *Hedge Funds Review* that two of the most important duties of Citco Group's subsidiaries in administering a hedge fund are determining and verifying the fund's NAV and fulfilling the administrator's "risk monitoring" responsibilities.  He stated in relevant part as follows:

For example, ***pricing is an area at the heart of the administrator's business*** in which much technical discussion is taking place and new standards are developing.  However, ***a good administrator will always have insisted on independent pricing,*** and will terminate a contract with a hedge fund if they cannot agree with its pricing methodology.

***

A study of 100 hedge fund failures … concluded that operational risks are the main single cause of hedge fund failure.

***

It found that in those cases where the finger can be pointed at fraud and misrepresentation, water-tight operational standards can either reduce the size of losses or enable them to be uncovered at a much earlier stage."

***

The operational arena is the one most affected by the quality of a fund's counterparties, in particular its prime brokers and administrators. Institutional investors want an institutional quality administrator with experienced and appropriately qualified staff, independent pricing and valuation procedures, and the technology to support its enhanced role.

(emphasis added).

208.    Citco NV's Verhooren, writing again for an industry publication in May 2003, stated that one of the guiding principles of a hedge fund administrator is to provide an honest interface between the investor and the fund.  According to Verhooren, an administrator's "raison d'etre"  is to serve the interests of the investors by providing them with the independent, accurate and timely information they need to make informed decisions about their investments. He went on to note that "pricing" is central to the role of a fund administrator and that "a good administrator will always have insisted on independent pricing, and will terminate a contract with a hedge fund if they cannot agree with its primary methodology."

209.    In a November 28, 2003 interview in *Hedgeweek,* Citco Group's Keunen again acknowledged the administrator's vital role.  First, because the U.S. does not regulate hedge funds, the "valuation process becomes a crucial part of the NAV calculation."  Second, the administrator is "the ideal independent counter party that is the sole counter party able to aggregate the information in a way that represents added value to both investors and managers."

210.    In a 2005 panel discussion on fund servicing published in *Investor Services Journal*, Ruth Murphy of Citco Fund Services (London) stated that "Administrators are in a unique position insofar as they are charged with being a conduit between the manager, prime broker and investors yet operating independently and autonomously."

211.    Materials prepared by Citco NV and provided to certain investors in the Funds also specifically stated that Citco NV has policies, procedures and safeguards in place to

ensure that valuations would be done accurately and fairly.  These materials stated that Citco NV "ensure[s] that we rely on third-party information on trades, portfolios and prices, and reconcile them to manager reports to ensure the independence of the valuation produced" and that Citco NV itself conducts the monthly NAV calculations for the funds it administers.

212.    According to the Citco Fund Services marketing materials, it maintains "the accounting records of a fund on an independent basis" and prices the fund's portfolio "using recognized data vendors."

213.    The Citco Fund Services website also boasts that, "By providing fully independent services, we act as a reliable fiduciary to safeguard the interests of investors. We train our staff to provide specialist accounting and valuation support, investor relations, corporate services and day to day management."

### *Industry Standards for a Hedge Fund Administrator's Valuation Activities*

214.    The President's Working Group on Financial Markets, comprised of representatives of the Secretary of the Treasury and the chairs of the Board of Governors of the Federal Reserve System, the SEC and the CFTC, established minimum standards of care for persons involved in managing hedge funds.  Defendants Citco Group and Citco NV participated as part of a working group formed to create similar standards of care for European hedge funds. Collectively, these standards hereinafter are referred to as the "Sound Practices Manual". Relevant portions of the Sound Practices Manual are set forth below:

> In general, the administrator should have experience in accounting for and valuing the products traded by the hedge fund.  ***The hedge fund managers, directors, and administrators should conduct themselves with prudence and honesty, discharging their duties to the investment fund with the care, skill, prudence and diligence*** under the prevailing circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

[…]

Valuation Policies and Procedures

A hedge fund's valuation methods should be fair, consistent and *verifiable*.

For NAV purposes, a hedge fund's managers, directors and administrator should value investments according to GAAP.

The following is a summary of certain pertinent sections of GAAP which govern security valuations that hedge fund managers, directors, and administrators routinely apply in calculating NAV's:

a.      The fair value of an investment is the amount at which the investment could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

b.      Management's best estimate in good faith of fair value should be based on the consistent application of a variety of factors with the objective being to determine the amount at which the investment could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

c.      *Situations may arise when quoted market prices are not readily available or when market quotations are available but it is questionable whether they represent fair value. Examples include instances when - market quotations and transactions are infrequent and the most recent quotations and transactions occurred substantially prior to the valuation date, and when the market for the security is "thin" (that is, there are few transactions or market-makers in the security, the spread between the bid and asked prices is large, and price quotations vary substantially either over time or among individual marketmakers).*

d.      In estimating in good faith the fair value of a particular financial instrument, the board or its designee (the valuation committee) should, to the extent necessary, take into consideration all indications of fair value that are available. The following is a list of some factors to be considered:

i.      Financial standing of issuer;

ii.      Business and financial plan of the issuer and comparison of actual results to plan;

iii.      Cost at date of purchase;

iv.      Size of position held and liquidity of the market;

v.      Contractual restrictions on disposition;

vi.      Pending public offering with respect to the financial instrument;

vii.      Pending reorganization activity affecting the financial instrument (such as merger proposals, tender offers, debt restructurings, and conversions);

viii.      Reported prices and the extent of public trading in similar financial instruments of the issuer or comparable companies;

ix.      Ability of the issuer to obtain needed financing;

x.      Changes in the economic condition affecting the issuer;

xi.      A recent purchase or sale of a security of the company;

xii.      Pricing by other dealers in similar securities; and

xiii.      Financial statements of portfolio companies.

e.      No single method exists for estimating fair value in good faith because fair value depends on the facts and circumstances of each individual case.  Valuation methods may be based on a multiple of earnings, or a discount or premium from market of a similar freely traded security of the same issuer; on a yield to maturity with respect to debt issues; or on a combination of these or other methods.  The board of directors should be satisfied, however, that the method used to estimate fair value in good faith is reasonable and appropriate and that the resulting valuation is representative of fair value.

f.      The information considered and the basis for the valuation decision should be documented, and the supporting data should be retained.  The board may appoint individuals to assist in the estimation process and to make the necessary calculations.  The rationale for the use of a good-faith estimate of fair value different from market quotations or pricing service valuations should be documented.  If considered material, the circumstances surrounding the substitution of good-faith estimates of fair value for market quotations or pricing service valuations should be disclosed in the notes to the financial statements.  That disclosure should include the circumstances surrounding the use of a blockage factor for an unrestricted investment that has a quoted market price in an active market.

g.      ***For certain investments, such as securities that do not trade regularly, the board of directors and fund administrators should consider obtaining estimates of fair value from broker-dealers or other third-party sources.  In some situations, the board of directors or fund administrator may determine that it is necessary to obtain an estimate of***

*fair value from more than one pricing source. For example, this may be appropriate if a pricing source has a relationship with an entity that might impair its objectivity.*

Other General Fiduciary Duties

In addition to the standards above, **hedge fund managers, directors and administrators have certain general fiduciary duties**.

Care should be taken to ensure that inducements and fees do not create unacceptable conflicts of interest or influence the hedge fund manager, director or administrator against acting in the best interest of the fund or its investors.

Hedge funds are controlled by directors either of the hedge fund itself, if organized as a company, or of the hedge fund's corporate general partner, if organized as a limited partnership. **The directors should have relevant standing and experience to allow them to discharge their fiduciary and other duties. Hedge fund managers, directors, and administrators must act, solely in the interest of the Fund and its investors.**

(emphasis added).

**The Director Defendants' Role in Portfolio Valuation and NAV Calculation**

215.     From the Funds' inception until early 2002, Citco NV assigned at least three of its officers – defendants Conroy, Stocks and Quilligan – to serve as directors of Lancer Offshore.  In addition, Citco Group's subsidiary, defendant Inter Caribbean Services Limited ("ICSL"), served as director for OmniFund during this period.

216.     Upon information and belief, the Citco Directors undertook these assignments in furtherance of their duties on behalf of Citco NV and to help Citco NV retain the Funds as clients.

217.     From early 2002 until the Funds' collapse, defendants Bendall and Geist served as directors of the Funds.

*The Obligations and Role of the Director Defendants*
*Under the Funds' Articles of Association*

218. The Funds' Articles of Association required the Director Defendants to determine the Funds' NAVs on a monthly basis and also assigned the Director Defendants an integral role in valuation of the individual positions in the Funds' portfolios. The Director Defendants were required to consider whether the valuation of any position in the portfolios did not fairly represent its market value. If the Director Defendants concluded that it did not, they were required to use another valuation method that better reflected the security's fair value, "after consultation with and as advised by the Manager," and to "set forth the basis of such valuation in writing in the Company's records."

219. The Articles of Association also provided that the "business and affairs" of the Funds "shall be managed by the Directors."

*The Obligations and Role of the Director Defendants Under the Funds' PPMs*

220. Each of the PPMs for the Funds stated substantially as follows:

The Board of Directors of the Fund, in consultation with the Investment Manager, will value the securities held by the Fund in accordance with the Fund's Articles of Association. When no market exists for an investment or when the Board of Directors, in consultation with the Investment Manager, determines that the market price does not fairly represent the value of the investment, the Board of Directors of the Fund, in consultation with the Investment Manager, will value such investment as it reasonably determines.

[…]

If the Board of Directors determines, in its sole discretion, that the valuation of any security or instrument pursuant to the foregoing does not fairly represent its market value, the Board of Directors shall value such security or instrument as it reasonably determines and shall set forth the basis of such valuation in writing in the Fund's records. The value of any investment, security or instrument as aforesaid or other property for which no price quotations are available as above provided shall be determined in such manner as the Board of Directors, in its sole discretion, reasonably

determines and the basis of such valuation shall be set forth in writing in the Fund's records.

221. Of course, the only way for the Director Defendants to make the threshold determinations these provisions required was for them to examine the valuation of each security or instrument in the Funds' portfolios. They did not do this.

### The Director Defendants' Role in Valuation
### According to the Audits of Lancer Offshore

222. The 1998 and 1999 audited financial statements for Lancer Offshore represent that the fund's directors approved its policy for valuation of "[s]ecurities which have no public market value."

223. The audited financial statements for 2001 (and the restated audited financial statements for 2000) state that "in accordance and in conformity with the Fund's Placement Memorandum, the Board of Directors in conjunction with the investment manager determine at what value the investment securities are reported for the determination of the net asset value of the Fund."

224. The 2001 audited financial statements for Lancer Offshore (and the restated audited financial statements for 2000) state that the Board of Directors determined the value of 100% of Lancer Offshore's securities.

## The Citco Directors' Fees

225. None of the Citco Directors received direct compensation for service as directors of the Funds. Defendants Stocks, Conroy and Quilligan served in this capacity as part of their job as officers of defendant Citco NV and in order to maintain the Funds as Citco NV's clients. Citco NV, however, *was* compensated for the service of the Citco Directors (including defendant ICSL).

226. The 1998 and 1999 audited financial statements for Lancer Offshore disclose these fee payments as "Related party transactions," expressly citing the Citco Directors' service as directors of the fund and the payment of fees to Citco NV as such a transaction.

227. Beginning in 2000, Citco NV began charging the Funds "a separate annual fee … for each Director provided the Administrator" in the amount of $4,000.

**The Misrepresentations by Citco NV and the Citco Directors**

228. Each month from at least March 2000 through September 2002, defendant Citco NV distributed to each shareholder of the Funds a statement setting forth the NAVs of the Funds. These NAV statements were prepared by Citco NV and the Citco Directors and printed on Citco NV's letterhead and, therefore, are directly attributable to Citco NV.

229. Plaintiffs reasonably expected that Citco NV and the Citco Directors would accurately report the Funds' NAVs. As described above, each of these NAV statements was materially false. Citco NV and the Citco Directors failed to independently value the portfolios and instead slavishly adhered to the false and misleading valuations provided by Lauer and Lancer Management, simply confirming those false valuations in the NAV statements despite actual knowledge of their falsity.

**The Scienter of Citco NV and the Citco Directors**

230. Citco NV and the Citco Directors had actual knowledge that the valuations they received from Lauer, Lancer Management and BofA were "absurd" and indefensible. Despite this knowledge, Citco NV and the Citco Directors continued to prepare and distribute NAV statements that were based on these absurd, indefensible valuations, that and that they knew would mislead and cause damage to the Funds' investors and potential investors. Citco NV and the Citco Directors had a motive to commit fraud, because Citco NV's fees depended directly on the Funds' NAVs. And, Citco NV's and the Citco Directors' role as administrator

85

and their duty to value the Funds' portfolios and prepare the Funds' NAV statements gave them

the opportunity to commit fraud.  Citco NV and the Citco Directors also were confronted with

numerous "red flags" indicating the strong possibility of fraudulent conduct by Lauer and Lancer

Management.

>  ***Citco NV and the Citco Directors Knowingly Accepted and***
>  ***Approved Absurd Valuations by Lauer and Lancer Management***

231.    Citco and the Citco Directors knew that the valuations ascribed to many of

the Funds' holdings by Lauer, Lancer Management and BofA were, in their own words,

"absurd."  Yet Citco and the Citco Directors performed no independent valuation of these

holdings, and simply regurgitated the "absurd" valuations in their own NAV statements,

knowing them to be false and misleading.

232.    As early as October 1996 (if not earlier), the Citco NV and the Citco

Directors understood the very valuation problems that ultimately brought about the collapse of

the Funds and plaintiffs' losses.  This is reflected in a October 31, 1996 memo from one of Citco

NV's internal auditors, Ger Jan Meijer, to defendant Quilligan, among others, and copied to,

defendant Stocks, among others (the "October 1996 Memo"), which states in relevant part as

follows:

> Subject:        Review NAV statements of Lancer Offshore, Inc. as of
> September 30, 1996
>
> Herewith you receive some comments re the [sic] of Lancer Offshore Inc.,
> as per September 30, 1996.
>
> 1. General
>
> Lancer Offshore, Inc. (the "Fund") is a British Virgin Islands corporation.
> The Fund started operations in November 1995.  Since November 1995
> the net asset value per share increased from USD 100 to USD 189.72.
>
> […]

Administration fee:          8 b.p. (minimum USD 750 per month for NAV up to USD 5 million, USD 1,250 for 5 till USD 10 million and USD 1,750 for 10 till USD 20 million.

DRAFT FOR DISCUSSION PURPOSES ONLY

Net assets on September 30, 1996          USD 10,803,551

1.     Reg S deals

One of the investments activities of the Fund is Regulation S ("Reg S") deals. Under Reg S companies can sell unregistered securities to foreign investors without first registering the deal with the SEC. The foreign investors must hold the securities for at least 40 days, at which point (62%) of the increase of net assets resulting from operations (total USD 4,478,415) for 1996 can be allocated to Reg S dealing in EPL Technologies Inc. Shares of this company (with 40 days restriction) were purchased for USD 2.50 on the moment the market value was USD 6.25.

***CITCO values the restricted securities immediately as common shares, which results in most of the cases directly in a high unrealized gain on the deal.***

***I do not agree with to value restricted shares as common shares***, because of:

-      its against the prudence concept;

-      the value of the restricted shares are lower, because of the restriction;

-      the market price can get a drop as soon as restricted securities are offered to the market.

       The offering of large quantities of shares resulting from Reg S will have a negative influence on the market value (watering).

In my opinion the accounting principles re restricted securities have to be amended. I propose a method with a daily appreciation from purchase price to expected market value. In this case the expected market value is the market value minus a discount percentage for watering. The discount percentage should depend from the quantity of restricted shares to be offered and the normal sales volumes on the market.

I propose to ask the external auditors for a confirmation for the method to use.

Furthermore I recommend to discuss with Kevin Meehan the disclosure requirements for the Fund for situations that a material (5 or more) percentage of interests in a company is held by the Fund.

(emphasis added).

233.    As the October 1996 Memo illustrates, Citco NV and the Citco Directors recognized very early in their engagement by the Funds the importance of discounting the value of restricted shares as well as holdings in which the Funds held a 5% or larger stake.  Yet Citco NV and the Citco Directors knowingly, consciously and recklessly failed to comply with their own recognized valuation standards and principles.

234.    In mid-September 2001, the Funds sustained losses that would have reduced their NAVs by over $100 million.  After discussions involving Lancer Management's Cowen, Garvey and Newman, as well as defendant Quilligan, Lancer Management made various "adjustments" to its portfolio valuations to avoid showing the Funds' investors and prospective investors these enormous losses.

235.    Only days later, defendant Quilligan sent an e-mail in which he acknowledged to defendant Conroy that the valuations of Lauer and Lancer Management were "absurd."  In that same e-mail, Quilligan also recognized that Lauer and Lancer Management were manipulating portfolio valuations and NAVs for the purpose of hiding investment losses:

> From:          Quilligan, Declan CUR
>
> Sent:          Friday, September 21, 2001 5:20 AM
>
> To:            Conroy, Kieran DUB
>
> Subject:       FW: Lancer NA V

I took a detailed look at the pf following notification by Serge of what valuation Lancer wanted to put on a prfd stock just recently bought. As far as ***I am concerned 75% of the portfolio is very illiquid with absurd valuations*** relative to the cost which is on average a fraction of the market value. ***Warrants are grossly overvalued*** and have been since start of year

88

as the broker statement prices for wts have merely been accepted. Lancer accept this and agreed to write down such wts before end of year. PWC signed off on the latest financial statements to be released tomorrow but I am quite concerned. ***It appears to me that they have put absurd valuations on illiquid stocks since the start of the year in particular in order to compensate for serious losses from some of their P/E or reg D deals.***

(emphasis added).

236.     In later communications, Citco NV and the Citco Directors showed that they knew that these investments could not support the valuations placed on them by Lauer, Lancer Management and BofA, yet Citco NV and the Citco Directors failed to report these problems to anyone outside the Citco organization or take any action to protect the Funds' investors.

237.     For example, in February 2002, Citco NV recognized that the valuation placed by Lauer and Lancer Management on Total Film was unrealistic at best.  Citco NV's Ger-Jan Meyer wrote an e-mail to defendant Quilligan on February 4, 2002, identifying this issue:

> From:   Meyer, Ger-Jan CUR
>
> Sent:    Monday, February 4, 2002, 5:30 PM
>
> To:      Quilligan, Declan CUR
>
> Subject: Lancer
>
> Importance: High
>
> Bram Gedopt came to me and told me that he does not feel comfortable with the valuation with the Total Film Group. He has background information that the company has serious trouble, but Lancer is still showing a very high unrealized gain (cost USD8 mio market 35 mio) He has to issue the January 31, 2002 financials in this week. I think there is a serious risk that PWC want to adjust the valuation per December 31, 2001.

238.     Shortly thereafter and on February 6, 2002, defendant Quilligan and Citco NV's Edward Heidema traveled to New York to meet with Lancer Management personnel, including Lauer, Cowen, Garvey and Newman.  Defendant Quilligan sent the following e-mail

recap of this meeting to Citco Group's Keunen in Miami and defendant Conroy, who was now in

Dublin:

From:  Quilligan, Declan CUR

Sent:  Wednesday, February 06, 2002 11 :52 PM

To:     Keunen, William MIA; Heidema, Edward CUR

Cc:     Fenlon, Greg CUR; Conroy, Kieran DUB

Subject:  RE: Lancer problems

William,

The meeting with Lancer this afternoon was unpleasant. Michael Lauer, Bruce Cowen, Marty Garvey and Dave Newman all attended and Edward was with me. They think their valuations of the portfolio is reasonable and are very much of the view that the market priced all the dot.coms [sic] and the Yahoo's etc of this world because of perception and nobody raised valuation issues for Funds that held these. We got off to a bad start when it turned out that an investigation into Fidelity First Financial Corp actually had no relevance to Lancer as the company they are invested in is First Fidelity Financial Corp which they say is a totally unrelated company. We stressed the risk awareness approach we are taking and that the Fund had been, identified as one requiring extra scrutiny. They want time to put what we have asked for together and do not feel that the NAV should be delayed pending them acculating [sic] this information. They invited us to meet representatives from all these companies and if we wished to attend some of their meetings etc. Did any of this make me feel more comfortable, not really. Although they take haircuts on two positions they are hugely aggressive in valuing thinly traded stocks and Note they did say that all their investors know exactly what they are doing, that they speak to them regularly etc. They said they had replacement directors in line, one of which is an investor in the Fund and the other who is well known in the financial world (Eddie can you remember the name). Also Michael mentioned that if we were concerned that hey we could just walk away if we wished and Marty made a point of bringing up any mistake that we ever made. At this stage although there is subscription activity of $14m should we give them that time frame to collate everything we need and then on the basis of that make an informed decision of what we want to do. Note the below is a brief description of some of the large positions in the portfolio which I got sent to me from Curacao. Eddie can you add anything to the above? Is the next email that I will send in a minute a suitable one to send to Michael Lauer or should we add more or make it sound better. I am travelling [sic] for four hours between 8 and 12

tomorrow morn but will be in touch soon thereafter. Kieran do you have anything to add. PWC are also concerned.

Rgds

Declan

AUG Corp.

AUGC suspended ongoing operations in 1/1/1999 and is currently seeking buyers or strategic partners for further development of its existing technology, as well as merger opportunities. For the 9 months ended 09/30/01, the company reports no revenue. Net loss before extraordinary item fell 69% to $48,000. Results reflect the suspension of revenue generating activities. Lower loss reflects the absence of $90,000 in interest expenses and $108,000 in other income.

NU-D-ZINE

No ready information available on this one, which is a concern in itself I would say.

SMX Corp - valued at over $130m

Issue: April 23, 2001

LAKE MARY, Fla., April 23 /PRNewswire Interactive News Release/ -- FARO Technologies Inc. (Nasdaq: FARO), a leading provider of computer-aided manufacturing measurement (CAM2) solutions, today announced that it has entered into an agreement with SMX Corp. of Kennett Square, P A to provide SMX up to $3.0 million in new financing. As part of this financing arrangement, FARO and SMX have executed a letter of intent for an option to acquire SMX.

SMX Corp. is a leading manufacturer and worldwide supplier of laser tracers and targets as well as metrology software and contract inspection services. Laser trackers are highly accurate, portable, coordinate measurement machines used to make three-dimensional measurements of tooling, fixtures, large parts and other large objects in a wide variety of industrial, scientific and commercial applications.

"Our financing and intended option to acquire SMX provides FARO an excellent opportunity to expand our product line with a complementary measurement technology to better serve our worldwide customer base," said Simon Raab, FARO's President and CEO.

Total Film Group

As part of the ongoing effort to restructure Total Film Group (the "Company") to profitability in the future, the Company reduced its workforce by approximately 75% at its Beverly Hills headquarters. The announced layoffs were due to the underperformance of the Company's two most recent motion pictures released through Paramount Classics: My First Mr. and Bride of the Wind.

The Company, which has incurred ongoing losses from operations recently divested itself of all non-core business segments.

Current market conditions have and are significantly affecting the Company's operating results and liquidity. In the near future, the Company will be forced to make difficult decisions regarding its plan of operation and capital structure. Currently, there is no assurance that the Company will be able to continue to fund its operations through the sale of equity or by issuance of debt instruments.

239.     Despite this litany of problems, Citco Group's Keunen responded to defendant Quilligan's e-mail by directing Citco N.V. to "send out the NAV for Jan" the next day.

240.     As demonstrated by the above e-mail excerpts, Citco NV and the Citco Directors could have easily obtained independent information to ascertain the true value of the Funds' holdings throughout their administration of the Funds.

241.     It was not until March 2002, however, Citco Group, Citco NV and the Citco Directors apparently decided that the valuation problems had reached a crisis point.  An e-mail exchange between defendant Quilligan, Lauer and Cowen in March and April 2002 reflects the fact that Citco Group, Citco NV and the Citco Directors fully understood, but ignored, the risks that the Funds and their investors were exposed to:

From:  Quilligan, Declan CUR [Dquilligan @citco.com]

Sent:   Wednesday, March 27, 2002 9:55 PM

To:       Bcowen@thelancergroup.com; Michael Lauer

Subject: RE: Memo Valuation Dec 31, 2001 and 2002

Bruce, Michael,

If you cannot get us the full detail re backup to the portfolio valuations that you already committed to give to us by March 31 please let me know what you can provide. We committed to our internal audit and compliance dept on the basis of your commitment to me to have detailed back up to valuation issues by this month end. Senior management of Citco are aware of the valuation issues and are keenly awaiting the data you promised. What can we get prior to March 31?

Pls let me know so we can move forward

Thanks

Declan

\*          \*          \*

From:   Quilligan, Declan CUR [mailto: DQuilligan @citco.com]

Sent:   Monday, April 08, 2002 10:53 PM

To:      bcowen@thelancergroup.com

Cc:      mlauer@thelancergroup.com

Subject: Our discussion today

Bruce,

Just to confirm our discussion today. Citco needs to receive the full documentation, financial analyses, future plans etc that will justify the valuations that Lancer Management consistently say are fair and reasonable for the major positions in the portfolio. We were to receive such by March 31 but you have stated that due to a number of circumstances you were unable to collate the material in that timeframe. In order to properly evaluate such material prior to the next month end Citco requires such documentation by Tuesday April 23. If Citco has not received the requested documentation at that juncture Citco will have to consider its position carefully in the context of our internal risk management policies and other considerations.

Best regards,

Declan

\*          \*          \*

From:   Bruce Cowen [mailto:bcowen@thelancergroup.com]

Sent:   Tuesday, April 09, 2002 8:30 AM

To:     Quilligan, Declan CUR

Subject: RE: Our discussion today

\*       \*       \*

Our first requirement is to continue to manage the Fund to ensure that we are performing our fiduciary responsibility to our investors, which we will continue to do. Secondly, we are preparing the necessary information for the audit and have engaged a firm to perform valuation services on certain positions as we feel this will be most beneficial to PriceWaterhouseCoopers in rendering an opinion on our financial statements.

\*       \*       \*

In the meantime, I will prepare a memorandum, in some detail, on our major positions and present it to you by your deadline of April 23rd.

\*       \*       \*

From:   Quilligan, Declan CUR [DQuilligan@citco.com]

Sent:   Thursday, April 11, 20024:55 PM

To:     Bruce Cowen; mlauer@thelancergroup.com

Subject: RE: Our discussion today

Bruce, Michael,

Let me again reiterate that we are looking for comfort as regards valuation issues in the context of a risk management approach that is part of Citco's policies and procedures. We had an understanding that we would get information from Lancer Management by March 31 and not receiving that did cause us some difficulty. You are correct as regards what you say as regards small staff etc and I fully understand that point and the fact that you have a fiduciary responsibility to shareholders. You are also correct in saying that Citco and Lancer have always had a very good relationship and I very much hope that any tension that may have arisen over our requests for backup documentation will dissipate once we receive and are comfortable with the documentation provided.  I regard the fact that you have engaged a valuation firm to perform valuation services as extremely positive and I much look forward to receiving the detailed memorandum on or before April 23 which will give us the time we need to go through it before month end.

Please see attached the administration agreement. As part of computing the NAV we need to gain comfort about the valuation of the portfolio. With 6 thinly traded securities making up a very significant portion of the portfolio and net assets we feel it is appropriate to gain as much comfort as we can about these positions and on a regular basis and not just at audit time. You and Lancer Management do have an integral role in providing that comfort required to ourselves and of course PWC.

Thank you and best regards.

Declan

242.    By the time defendant Quilligan demanded this information, however, Citco Group, Citco NV and the Citco Directors had turned to finding a way to extricate themselves from their entanglement with the Funds.  By this point, they were pinning their hope on the possibility that defendant PWC NA, the Funds' auditor, would approve the Funds' financial statements.

243.    Nevertheless, Citco NV personnel internally admitted that the management of the Funds by Citco Group, Citco NV and the Citco Directors had been a complete and utter failure.  Citco NV internal auditor Ger-Jan Meyer prepared a memorandum for dissemination throughout Citco Group which detailed problems in Lancer Offshore's portfolio.  This memorandum states in relevant part as follows:

> To:      Declan Quilligan
>          Greg Fenlon
>          Claudio Cecchini
>          Bram Gedopt
> From:  Ger Jan Meijer
> C.c.:    William Keunen
>          Dennis Dambruck
>          Edward Heidema
>          Jos Leppers
>          Albert van Nijen
>
> Date:   May 13, 2002
>
> Subject: Valuation of the portfolio of Lancer Offshore Inc.

1. Introduction

CFS has concern about the possible aggressive valuation of the portfolio of Lancer Offshore Inc. and has requested the investment manager for additional background information about the valuation. We received this background information on May 8 and performed a review on it. Our findings are summarized in this memo.

\*      \*      \*

3. Conclusions

\*      \*      \*

3.2    Bloomberg

Most of the investments have a quotation in Bloomberg. These are obtained from the Bloomberg OTC Bulletin Board. ***It is doubtful if we can rely on these prices, because they look easy to manipulate by interested parties.***

***There are serious indications that Lancer is/was manipulating the prices*** for:

AUG Corp;

Method Prod;

Fidelity First Financial

World Wireless

***Manipulation of market prices might be seen as a criminal action. We have jurisprudence about the Rockies funds (much smaller fund) where the directors had to pay a fine for manipulating the market price.***

\*      \*      \*

4. Aug Corp.

\*      \*      \*

4.2    Comments on the Lancer valuation

In my opinion the valuation by Lancer is too aggressive and not based on the prudent concept:

-      According to Bloomberg the trade volume is 0 to 5,000 shares per week. Several weeks have no even [sic] any trading activity at all. It is

doubtful that this market is a sound basis [for] determining valuation of a position of 18,000,000 shares;

- ***There is a risk that Lancer has influence/control over the market prices by Bloomberg. There are even serious indications that Lancer is manipulating the market price.;***

- The market price of AUG is subject to high volatility and that could be an indication that the market price is not a sound source for valuation: (Nov 28, 2001: 6.00/ Dec 31, 2001: 3.50/ Jan 31, 2002: 5.00/ Feb 28, 2002: 5.00).

\*        \*        \*

- It is my experience that most other investment managers would value this position for not more than cost.

5.      Manhattan Scientifics Inc.

\*        \*        \*

5.2      Comments on Lancer Valuation

- According to Bloomberg the total number of shares is 120,900,000 per May 12, 2002;

- Total equity per March 31, 2002 is USD 1,240,000 (unaudited financials). Intrensic [sic] value per share is thus more or less USD 0.01. Market price is 20 to 30 times the intrinsic value;

\*        \*        \*

5.3 Conclusion

It is my experience that a haircut of such huge positions (compared to the market volumes) should be taken. Also there will be dilution of the value per share when the warrants would be issued.  I propose a haircut of 20% on the total market value of shares and warrants - 20% x (8,001,455 + 3,200,000) = 2,240,291

6.      Method Prods Corp New common shares and warrants

\*        \*        \*

6.2      Comments on Lancer valuation

Shares

-        According to Bloomberg low quantities are traded. Several weeks have no even [sic] any trading activity at all. It is doubtful that this market is a sound basis [for] determining valuation of a position of 2,451,059 shares;

-        ***There is a risk that Lancer has influence/control over the market prices by Bloomberg. There are even serious indications that Lancer is manipulating the market price.*** By the end of March the only trades were 500 shares for 5.00 on March 27 and 500 for 5.85 shares [sic] on March 28. Lancer was purchasing these quantities. Also for other months Lancer is always purchasing just before month end;

-        The market price of Method Prod is subject to high volatility and that could be an indication that the market price is not a sound source for valuation: (April 25, 2002: 3.25 / April 30, 2002: 6.05)

*        *        *

-        It is my experience that most other investment managers would value this position for not more than cost.

7.        Nu-D-Zine Bedding and Bath Inc

Pending: waiting for background information. No information found in Bloomberg.

8.        SMX

*        *        *

8.2        Comments on Lancer valuation

-        The trade volume according to Bloomberg is very thin if compared with the holdings by the fund;

-        It is normal practice to take a haircut on the market price when having such huge positions;

-        ***There is a risk that Lancer has influence/control over the market prices*** by Bloomberg;

-        The market price is subject to high volatility and that could be an indication that the market price is not a sound source for valuation.

*        *        *

9.        World Wireless Communication

*        *        *

9.2      Comments on Lancer valuation

-      The trade volume according to Bloomberg is thin if compared with the holdings by the fund;

-      It is normal practice to take a haircut (15-20%) on the market price when having such huge positions;

-      ***There is a risk that Lancer has influence/control over the market prices by Bloomberg. Why [sic] Lancer purchasing little quantities while they obtain large quantities of shares with the private placements. . .?***

-      Please note that Lancer Partners LP and Orbiter Fund LP have also positions.

\*      \*      \*

10.      Fidelity First Financial

\*      \*      \*

10.2      Comments on valuation by Lancer

There are almost not [sic] quantities traded on the market and probably the only trades are made by the Lancer group. Such trades are always made just before month end. It is my opinion the Bloomberg prices is [sic] not good basis for valuation and ***there are even serious indications that Lancer is manipulating the market prices.***

(emphasis added).

      244.      Meyer's memo was sent to Citco Group's Keunen for his review and comment. Keunen then forwarded the memo to "All Executive Directors" within Citco Group on May 22, 2002, and addressed his comments directly to Citco Group president and CEO Christopher Smeets:

From:  Keunen, William MIA

Sent:  Wednesday, May 22, 2002, 7:48 PM

To:     zz\*Citco All Executive Directors

Cc:     Quilligan, Declan CUR; Verhooren, John GEN;

        Conroy, Kieran DUB; Peller, Jay NYC

99

Subject: Lancer

Chris, as I mentioned to you yesterday, here is the story about Lancer, a fund that has been administered out of Curacao since its inception in 1995.

Recently the management team in Curacao have become concerned about the pricing policy of the Fund, in particular with respect to its less liquid positions which at their current reported value make up two thirds of the value of the portfolio. We began by discussing our concerns with the Investment Manager and then asked for back-up in the form of reports about the relevant companies. To date two of seven reports have been received and they do not make for pleasant reading. Then we had our internal audit group perform a detailed analysis of the positions. Their report is enclosed. The upshot is that there are a handful of positions which we feel the IM has at the least grossly over-valued and at worst manipulated the month end valuations by executing large buys close to month end that force the price up. The whole situation was discussed during my visit to Curacao.

Other issues to be taken into consideration:

*        The pricing policy of the Fund as stated in the Prospectus is clear - value positions at latest closing price

        - the Fund follows this policy and a strict interpretation of such indicates that it is not breaking its rules.

*         Our personal directors (Kieran and Declan) resigned earlier this year.

*        The Fund's auditors, PwC Curacao have signed each year's audit report up to 2000, but have still not signed off 2001.

Their deadline is Irish Stock Exchange imposed - June 30. They recently collected the company reports we requested from the IM. If PwC decide not to sign, our mission is clear - resign immediately. Declan is in touch with them, but they don't seem to be in any hurry and the May 31 NAV cycle looms.

*        If PwC do sign, we should still consider our exit strategy, but by doing is likely to create shock-waves that could cause significant distress, and our association will not be pretty.

We will keep you posted - comments welcome.

Rgds, William

245. Keunen followed this up with discussions with Jay Peller, chief operating officer of Citco USA in New York City. Peller agreed to check with Tudor Investments personnel to see if their people had heard of any of the companies in question.

246. Meanwhile, Citco Group, Citco NV and the Citco Directors continued plotting their exit strategy. That strategy was discussed and decided at Citco Group's highest level – a meeting of Citco Group's executive committee in New York City in May 2002. A series of pre-meeting e-mails details the complete failure of Citco Group, Citco NV and the Citco Directors to live up to their duties and obligations:

> From: Keunen, William MIA
>
> Sent: Tuesday, May 28, 2002 12:18 PM
>
> To: Peller, Jay NYC; Barten, Dre NYC; Conroy,
>
> Kieran DUB; Verhooren, John GEN
>
> Cc: Quilligan, Declan CUR
>
> Subject: RE: Pause for thought…

The other topic for the EC in NY this week will be Lancer - we need to have our strategy in place. I know that Jay was speaking to people at Tudor on that - plus did we receive any more reports Declan?

They have also requested a copy of the watch-list - Declan, could you work on that based on what we discussed last week - plus any updated information?

Thks, William

\*       \*       \*

> From: Verhooren, John GEN
>
> Sent: Wednesday, May 29, 2002 5:15 AM
>
> To: Quilligan, Declan CUR; Keunen, William MIA;
>
> Peller, Jay NYC; Barten, Dre NYC; Conroy,

Kieran DUB

Subject: RE: Pause for thought...

Declan,

any news from PWC?

I think their signing off is crucial. If they don't, all will come out and we will get the blame since it will be perceived that we never saw or reported it. This would be very bad news for us.

If they sign off, we still have time for an exit scenario. I think we should consider reporting this to whichever (US) authority could be responsible for this. At least that way it looks like we uncovered the problems. We have been following the accounting guide lines by taking the prices from official sources, but because of our internal controls and because of the good work of our internal audit and compliance department we uncovered this 'fraud.' (If we do this, obviously we should be 100% sure that it is fraud).

We probably should ask legal advice in any case as soon as possible. I don't think we need more valuation books to get more confirmation about the situation.

regards,

John

*        *        *

From:   Quilligan, Declan CUR

Sent:   Wednesday, May 29, 2002 9:19 AM

To:     Verhooren, John GEN; Keunen, William MIA; Peller,

        Jay NYC; Barten, Dre NYC; Conroy, Kieran DUB

Subject: lancer

I received this email this morn. I have also scanned the introductory page to Stenton Leigh, the valuation firm which Lancer has used (has anybody heard from them) which I took from the internet.

After we receive what is mentioned below I believe we/PWC will have valuation books for the 6 largest positions.

Now that we have the name of the valuation firm I suggest I ask Lancer can we contact them direct, if they refuse we should resign because we cannot work properly under such restrictions. If they accede then we can ascertain if the valuation books we received are fully the work of Stenton Leigh and whether they fully stand over the valuations, their name is not mentioned in the valuation books or if it is I have not seen it. If they do stand over them it's a plus, its an independent party with industry expertise certifying the valuations, if they don't the whole thing has been a non-exercise and again on that basis we should resign. I think it is clear at this stage that our view is that the positions should be haircutted. If the IM is not prepared to revalue them then because our comfort level has been reduced we should resign. We should get legal advice before we confront the IM for a face to face high level discussion on the matter of haircutting because at this meeting it would have to be a "if you don't do this we will walk" situation. I think if we go this route and have this meeting we should look for an explanation of some of the small trades at end of month that appear to make little sense to us. We should get legal advice on that too. If the explanation don't [sic] make any sense then we might have obligations. Once we resign we will need legal advice as regards our notice to shareholders.

As regards PWC we gave them the valuation books which Gino himself is examining. I spoke to Gino and he will be looking for more back up as regards what was contained in the booklets. They have some issues wrt price decreases subsequent to year end which they want answers on. This process will drag on for another few weeks I believe and I think if they don't get the responses they need they will qualify the report.

247.    Only in connection with manufacturing their exit strategy did Citco

Group, Citco NV and the Citco Directors begin to investigate the Target Companies and the

Funds' valuations and end-of-period trades:

> From:  Quilligan, Declan CUR [Dquilligan@citco.com]
>
> Sent:   Thursday, June 06, 2002 3:11 PM
>
> To:     Bruce Cowen (E-mail); Michael Lauer
>
> Subject: Conference call this morning

Michael, Bruce,

As per our conversation the positions that we are most concerned about are the positions that have little cost attached and very significant market values relative to the overall value of the portfolio.

These positions are

AUG Corp

Fidelity First Financial Corp

Method Products, both common stock and warrants

Nu-D-Zine Bedding & Bath Inc, both common stock and warrants

SMX Corp

Total Film Group

Expression Graphics

We have Stenton Leigh valuation booklets that you have sent to us. However what we would like to obtain in order to gain comfort as to the valuations is a memorandum from yourself as Investment Manager detailing to ourselves, PriceWaterhouse Coopers and the directors of the Fund, specific relevant information as to events that will propel liquidity in order that the current valuation of these investments will be realised. I would further like to have you detail your current thinking on your exit strategy from these positions.

As regards the trades that we mentioned this morning, can you please detail in written form the reasons for the small trades involving purchase of Method Products stock on March 27, 2002 and March 28, 2002 for blocks of 500 shares at a price of $5.00 and $5.85 respectively.

Furthermore, as regards warrant valuations, we had seen a valuation placed on Nu-D-Zine warrants as of November 30,2001 of $50m. In December, we see a significant portion of these warrants leaving the portfolio for no gain. Again, we would like your assessment of this situation.

I would appreciate receiving this information on an urgent basis.

Regards

Declan.

248.    The Funds' investors were never told what Citco NV uncovered in this

process.  Instead, in mid-August 2002, the Funds and Citco NV wrote to the Funds' investors "to

inform you of a mutually agreed upon change of the Fund's Administrator from Citco to International Fund Services (Ireland) Limited effective September 1, 2002."

### *The Citco Directors Had the Motive and Opportunity to Inflate the Funds' NAVs, and Their Knowledge Must Be Imputed to Citco NV*

249.    Citco NV and the Citco Directors had a motive to artificially inflate the Funds' NAVs, because the compensation paid by the Funds to Citco NV were based on the Funds' NAVs. Thus, the higher the Funds' NAVs, the more Citco NV would be paid by the Funds. And, in fact, as Lancer Offshore's NAV soared, Citco NV reaped ever greater fees, which nearly doubled over the life of the Funds.

250.    In an ordinary corporation, an insider's generalized desire to maintain or increase the corporation's share price and, in turn, the insider's own compensation is not necessarily an illicit motive for the insider to commit fraud. Such a desire could just as easily indicate a legal motive (e.g., to manage the corporation's business profitably) as an illegal one (e.g., to manipulate its earnings). Here, however, Citco NV and the Citco Directors were not ordinary corporate insiders with ambiguous motives. As service providers, rather than corporate insiders, Citco NV and the Citco Directors should have been entirely indifferent to the Funds' profitability. Their only possible motive to affect the Funds' NAVs in any way was an illicit one – to inflate the NAV-based fees paid to Citco NV.

251.    In light of their central role in valuation of the Funds' portfolios and calculation and dissemination of the Funds' NAVs, as well as their role as the last "line of defense" between the Funds and the investors, Citco NV and the Citco Directors had ample opportunity to manipulate, inflate and misstate the Funds' NAVs.

252.     In addition to Citco NV's independent scienter, the knowledge of the Citco NV officers who served – at Citco NV's behest – as the Funds' directors should be imputed to Citco NV.

253.     The Citco Directors were supposed to review all valuations of the Funds' positions in order to ensure that they accurately portrayed the positions' fair market value. They had access to the Funds' periodic internal reports detailing revenues, holdings and other financial information, as well as the BofA Account Statements and the falsified BofA Position Reports.

254.     Their knowledge must be imputed to Citco NV because they were all officers of Citco NV when they were directors. They participated in administrative activities for the Funds, and Citco NV was compensated for their services.

### The "Red Flags"

255.     Numerous "red flags" that were known to Citco NV and the Citco Directors would have put a reasonably prudent administrator or director on notice that Lauer and Lancer Management were engaged in conduct to the extreme detriment of the Funds. These glaring "red flags" would have prompted a reasonably prudent fund administrator or director to investigate, but Citco NV and the Citco Directors ignored them.

Red Flag #1:  The Funds' NAVs Were Increasing Substantially
at a Time When Global Equity Markets Were Performing Poorly

256.     At the end of 1999, the global equity markets declined significantly and investors generally suffered negative returns for 2000 and 2001. In 2000, the major equity indices either lost significant value or grew very little.

257.     Yet, the Funds' NAVs purportedly grew exponentially during both 2000 and 2001. Over this two-year period, Lancer Offshore purportedly gained 37.9% in value, while Orbiter purportedly gained 10.3% and Viator gained an astounding 105.8%.

258.    These dramatic gains, in the face of a stagnant or declining market should have – at a minimum – caused Citco NV and the Citco Directors to scrutinize the sources and bases for the gains and reevaluate how the Funds' NAVs were calculated.  But they did not.

Red Flag #2:  The Substantial Increase in the<br/>Concentration of the Funds' Holdings in the Target Companies

259.    Over the same time period that the Funds' purported performance was strikingly better than the performance of the global equity markets, there was a dramatic increase in the concentration of the Funds' portfolios in a few thinly traded stocks, including the Target Companies.

260.    For the year ended December 31, 1998, the Target Companies accounted for only 5.9% of the Funds' portfolio value.  By December 31, 2000, however, the Target Companies accounted for 53.4% of the Funds' portfolio value.  This concentration continued to soar, so that by December 31, 2002, the Target Companies accounted for 83.2% of the Funds' portfolio value.  Moreover, most of the Target Companies did not make regular filings with the SEC and provided little or no publicly available financial information.

261.    This dramatic increase in the concentration of the Funds' investments in the Target Companies should have presented a red flag sufficient to increase scrutiny of them by Citco NV and the Citco Directors.  However, in the face of this telltale sign of fraud, Citco NV and the Citco Directors said and did nothing.

Red Flag #3:  The Substantial Increase in the<br/>Valuations of the Funds' Holdings in the Target Companies

262.    At the same time as there was a substantial increase in the percentage of the Funds' holdings represented by the Target Companies, there also was a dramatic increase in the values attributed to these same holdings.  For the year ended December 31, 1998, the Target Companies accounted for only $19,300,000 of the Funds' portfolio value.  By December 31,

2000, however, the Target Companies accounted for $342,400,000 of the Funds' portfolio value – a *seventeenfold* increase. By December 31, 2002, the Target Companies accounted for $730,700,000 of the Funds' portfolio value.

263. This should have caused Citco NV and the Citco Directors to scrutinize the valuations placed on the Funds' holdings in the Target Companies and take appropriate steps to ensure that the "big bet" positions were valued properly. But again, they did nothing.

Red Flag #4: The Dramatic Increase in the Values Ascribed to
Large Blocks of Restricted Stock Purchased at Much Lower Prices

264. Between 1998 and 2002, the bulk of the Funds' investments in the Target Companies consisted of restricted securities and warrants which the Funds acquired for pennies per share (and sometimes at no cost) in private transactions.

265. The values for these securities were then written up by tens (or even hundreds) of millions of dollars just days or weeks later (and in a few cases the same day) based either on the market price for tiny open-market purchases by the Funds of unrestricted shares of the same stock or on values picked by Lauer and Lancer Management out of thin air and embedded by BofA in Position Reports to lend them false legitimacy.

266. These dramatic jumps in the purported value of restricted shares and warrants should have caused the Citco NV and the Citco Directors to scrutinize the valuations closely. Not until Citco NV and the Citco Directors were searching for a way to disassociate themselves from Lauer and Lancer Management did they ask for an explanation.

Red Flag #5: The Small, End-of-Period Trades in the Target
Companies' Stock Which Served No Legitimate Investment Purpose

267. In numerous instances, Lauer and Lancer Management valued the Funds' enormous holdings of restricted securities of the Target Companies using prices from tiny open-market purchases of unrestricted shares in the Target Companies at high prices.

268.     These purchases served no legitimate business or investment purpose other than to inflate the Funds' NAVs.  When the Funds already owned hundreds of thousands (or even millions) of shares in the Target Companies (in some cases controlling interests) which had been acquired for little or no cost, there was no possible reason for them to purchase additional, publicly traded shares at prices at or above the market price.  That the Funds repeatedly did so should have caused Citco NV and the Citco Directors to scrutinize the resulting valuations.

269.     Not until Citco NV and the Citco Directors were searching for a way to disassociate themselves from Lauer and Lancer Management did they ask for an explanation.

Red Flag #6:  The End-of-Period Purchases, and the Corresponding
Increases in Valuation of the Target Companies, Coincided
with the Calculation of the NAVs and Lancer Management's Fees

270.     Not only was there no conceivable legitimate investment or business purpose for the Funds' tiny, end-of-period trades, but their timing coincided with the dates for the calculation of the Funds' NAVs and, in turn, the management and incentive fees paid to Lancer Management (and thus to Lauer).

271.     The management and incentive fees paid to Lancer Management were calculated based on the Funds' NAVs at the end of certain quarters or the fiscal year.  Lancer Management therefore had a strong incentive to inflate the Funds' NAVs at those dates.

272.     That the Funds' end-of-period trades in the Target Companies clearly served this purpose should have been obvious to Citco NV and the Citco Directors, especially since Citco NV's fees were calculated at the same time and on the same basis.  But again, Citco NV and the Citco Directors did nothing.

**PWC NA's Wrongful Conduct**

273.     PWC NA knew that, at least beginning in October 1999, the Funds' PPMs identified "PricewaterhouseCoopers" as the auditors and "Chartered Accountants" of the Funds.

274.     PWC NA audited Lancer Offshore's financial statements for the years ended December 31, 1997, 1998, 1999, 2000 and 2001.  Upon information and belief, PWC NA also audited Viator's financial statements for the fiscal year ended September 30, 2000 and Orbiter's financial statements for the year(s) ended December 31, 1999 and/or 2000.

275.     PWC NA's opinion letters stated that it had conducted its audits in accordance with international auditing standards.  This refers to standards established by the International Auditing and Assurance Standards Board, which functions as an independent standard setting body under the auspices of the International Federation of Accountants ("IFAC").  IFAC issues International Standards on Auditing ("ISA"), which are similar to those issued by the American Institute of Certified Public Accountants and the Public Company Accounting Oversight Board.

276.     Each year, PWC NA issued a "clean" unqualified report attesting to the accuracy of Lancer Offshore's financial statements.  These audit reports were specifically addressed to the investors in the Funds and distributed to the investors through Citco NV.

277.     PWC NA's audit opinions for Lancer Offshore each year included the following statement for the year under examination (with the audit opinions for the year ended December 31, 2000 also representing that PWC NA had confirmed the securities owned by correspondence with the custodian):

> We have audited the accompanying statement of assets and liabilities of [the Fund] as of December 31, … and the related statement of operations, changes in shareholders' equity and cash flows for the year ended December 31 .... These financial statements are the responsibility of the Fund's management.  Our

110

responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with international standards on auditing. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

278. The audit opinions went on to state that: "In our opinion the financial statements referred to above present fairly, in all material respects, the financial positions of [the Funds], as of December 31, ... and the results of its operations, changes in shareholders' equity and cash flows for the year ended December 31, ... in conformity with international accounting standards."

279. PWC NA's audit opinions for at least the years ended December 31, 2000 and December 31, 2001 falsely stated that the firm's audits of Lancer Offshore had been conducted in accordance with international standards on auditing. Its representations were false because, upon information and belief, PWC NA did not plan and perform its audits to obtain reasonable assurances that the Funds' financial statements were free of material misstatements, and did not examine evidence supporting the valuation amounts and disclosures in the financial statements. PWC NA's audits therefore did not "provide a reasonable basis for [its] opinion" and, by stating to the contrary, the opinions were entirely false.

280. Upon information and belief, similar statements were contained in PWC NA's audit reports for the Viator and Orbiter Funds as well.

281. PWC NA willfully, recklessly and/or grossly failed in its stated "responsibility to express an opinion on [the Funds'] financial statements based on our audit."

111

PWC NA misrepresented in its opinions that the Funds' financial statements were presented in accordance with international accounting standards, and that its audits were performed in accordance with international standards on auditing.

282.     ISA 200 requires an auditor to plan and perform an audit with an attitude of professional skepticism, which is necessary for the auditor to identify and properly evaluate matters that increase the risk of material misstatements resulting from fraud or error (for example, management's characteristics and influence over the internal control environment, industry conditions, and operating characteristics and financial stability). Thus, representations by management would ordinarily be expected to be supported by other evidence and would not be assumed to be necessarily correct.

283.     The Funds' claims of steadily increasing NAVs, in a declining market and when its portfolio consisted of small companies whose securities were thinly traded, should have been met with skepticism on the part of PWC NA, but were not. After the end of 1999, the global equity markets declined significantly and investors generally suffered negative returns for 2000, 2001 and 2002, but Lancer Offshore, according to Lauer and Lancer Management, earned approximately $100 million in each of 2000 and 2001. PWC NA, which (unlike most of the Funds' investors) knew the companies in which the Funds were invested, should have been skeptical of these performance claims and should have employed procedures to verify those claims, but did not.

284.     Additionally, PWC NA should have recognized a variety of "red flags" raised by the information it was receiving including, but not limited to: (a) many of the companies whose shares were held by the Funds shared a common address in Boca Raton, Florida; (b) personnel associated with the Funds and/or Lancer Management had previously been

barred by governmental agencies from working with public companies and brokers; and

(c) Lauer himself reportedly poured millions of dollars into films being produced by Total Film, a company in which the Funds held large positions.

285.     PWC NA knew that the valuation of the Funds' portfolios were subject to a high degree of uncertainty.  The 2001 notes to the financial statements of Lancer Offshore, noted that:

> Due to the characteristics of certain investment securities of the Fund combined with limited trading volumes of such securities, the Board of Directors in conjunction with the investment manager estimated the fair values of such securities based on a methodology developed by the investment manager.  The total value of investment securities of the Fund which were subjected to such valuation procedures at year-end amounted to USD 827,020,243 which represents 100% of investment securities of the Fund.

286.     Knowing that the valuations of the Funds were dependent on judgments made by management and the Board of Directors, PWC NA was required to engage in such auditing procedures as were necessary to afford a reasonable opinion regarding the fairness of those valuations.  Had PWC NA conducted an audit appropriate for these circumstances, it would not have been able to issue an unqualified opinion on the Funds' financial statements.

287.     PWC NA should have added an explanatory paragraph to its standard reports to emphasize the uncertainty of the valuation of the market prices of the Funds' investments.  PWC NA also should have expressly stated that a large portion of the Funds' portfolio was subject to good faith valuation estimates by the Funds' Board of Directors in view of the absence of readily ascertainable market values.

288.     Because PWC NA accepted valuations for the Funds' portfolio companies that the SEC has subsequently described as "outlandish," PWC NA's audits of Lancer Offshore

for at least 2000 (NAV of $840.22 per share) and 2001 (NAV of $915.43 per share) were materially false and misleading.

289.   On information and belief, the appraisals prepared for the Funds' holdings, which PWC NA accepted in rendering its opinion, closely approximated the values assigned to the Funds' holdings based on the manipulated closing prices at month end.  These appraisals were, however, fatally flawed and did not reflect the true values of the Funds' holdings under the generally accepted Uniform Standards of Professional Appraisal Practice or the American Society of Appraisers Business Valuation Standards.  In particular, the valuations were improperly based on unreliable market prices of thinly traded securities; unjustified prices of private transactions in thinly traded securities; unfounded, baseless and unrealistic projections; hypotheticals; and/or an averaging of various factors.  Indeed, under accepted standards of valuing businesses, certain of the Funds' holdings were and/or are essentially worthless.

290.   That PWC NA's audits of the value of the Funds' investments were fraudulent or recklessly negligent is illustrated by the facts relating to Lancer Offshore's investment in Biometrics (formerly AUG).  Upon information and belief, at some point in December 2001, Lancer Offshore acquired 18,000,000 shares of Biometrics for approximately $500,000, or less than 3 cents a share.  These shares were then valued at $61.2 million as of December 31, 2001, based on the fact that a mere 1,800 shares of Biometrics traded at $3.40 per share on December 31, 2001.  This $61.2 million valuation is almost 100 times the underlying value of the assets of Biometrics as disclosed by Biometrics' auditors as of December 31, 2002.

291.   On information and belief, Lancer Offshore delivered an appraisal of Biometrics to PWC NA to support the valuation that the Board of Directors assigned to the investment which did not comport with the generally accepted Uniform Standards of

Professional Appraisal Practice or the American Society of Appraisers Business Valuation Standards.

292.     Biometrics had no revenue for 2000 or 2001, had a negative cash flow from operations for the year ended December 31, 2001 of $281,593 and had total stockholder equity as of December 31, 2001 of $629,000, entirely in cash.  The company's financial statements as of September 30, 2001 indicated the company had accumulated net losses from operations of $22,175,121 and that the company's ability to continue as a going concern was dependent on the ability to raise additional capital and implement its business plan.

293.     Notwithstanding the fact that Biometrics had no revenues, and that Biometrics had stated that it faced bankruptcy if it did not receive additional financing, its operating plan forecast revenues of tens of millions of dollars.

294.     PWC NA signed off on a "gain" of $60.7 million on Biometrics in the month of December 2001, notwithstanding (i) its knowledge of the pennies per share paid by Lancer Offshore for Biometrics earlier that month; (ii) the short interval between the acquisition of the bulk of the shares by Lancer Offshore versus the trade date utilized for valuation; (iii) the dramatic discrepancy between the price paid by Lancer Offshore for the bulk of its shares versus the price at which it "bought" at month end on the OTC market; and (iv) the patent lack of reliability of the appraisal, which disregarded Biometrics' own balance sheet which showed no asset value, and also disregarded Biometrics' auditor's qualified opinion questioning whether Biometrics would be able to continue as a going concern.

295.     Other companies in the Funds' portfolios were the subject of equally shoddy and useless valuations, which PWC NA, on even a rudimentary review, should have concluded were insufficient to support the valuations on which PWC NA was asked to sign off.

296. The facts known at the time of PWC NA's audits of the Funds' investments should have heightened PWC NA's skepticism. PWC NA knew that the bulk of the Funds' investments were purchased by the Fund for pennies per share in off-market transactions. These penny stocks were written up by tens of millions of dollars just days or months later based on a "marking the close" scheme and were reflected in the financial statements as hundreds of millions of dollars of "unrealized gains." The "unrealized gains" number was of particular significance in PWC NA's performance of the audit because those gains were a factor in determining both the Funds' NAVs and Lancer Management's fee of 20% of the Funds' gains.

297. Even a cursory examination by PWC NA of the portfolio company valuations that were provided to PWC NA would have revealed that the claimed values were totally unsupported by the facts, and the valuations were worthless.

298. As PWC NA's opinion letters highlight, a central function of its audit was to "assess the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation." This is precisely what PWC NA failed to do.

299. Under ISA 24, transactions between entities that are "related parties" must be disclosed in the financial statements of the reporting entity. PWC NA failed to cause the Funds to disclose the extensive related party transactions into which Lauer and Lancer Management caused the Funds to engage. Portfolio companies had common directors, Lauer and Lancer Management had relationships with those persons, and funds controlled by Lancer Management were invested in some or all of the same securities that the Funds were invested.

300.     ISA 120, Section 19 also provides that, by contributing its name to the offering documents used by the Funds to promote the sale of their shares, PWC NA was attesting to the accuracy of the information contained in those documents.

301.     PWC NA failed, *inter alia*, (i) to exercise due professional care in the performance of the audits and the preparation of the reports; (ii) to obtain a level of knowledge of the Funds' business that would enable PWC NA to plan and perform its audits in accordance with international auditing standards, including an understanding of the events, transactions, and practices that could have a significant effect on the financial statements; (iii) to properly study and evaluate the Funds' internal controls; (iv) to obtain sufficient, competent evidential material to provide it with a reasonable basis for forming an opinion in each of its audits of the Funds; and (v) to satisfy itself that the financial disclosures were adequate.

302.     PWC NA knew or should have known that its clean audit reports were material to investors' decisions to purchase shares in the Funds and to refrain from redeeming their investments.  Shares of the Funds were not publicly traded.  Hence, no independently verified third-party financial information about the Funds or their performance was available to investors or prospective investors in the Funds other than PWC NA's audit report and the audited financial statements.

**IFS's Wrongful Conduct**

303.     In or about September 2002, IFS replaced Citco NV as the Funds' administrator.

304.     As IFS's website states, "IFS provides comprehensive fund accounting and administrative services to traders, investors, and regulatory agencies for our Hedge Funds and Fund of Funds clients."

305.    Each of the Administrative Services Agreements between IFS and the Funds contains an "Exhibit A" listing the services to be provided.  Among other tasks, IFS agreed to provide daily reconciliation and exception reports comparing the information it received from Lancer Management with the information it received from BofA as well as daily "P&L and portfolio reporting."  In addition to these daily reports, IFS also agreed to "[p]rovide monthly final NAVs," "[p]repare investor statements," "[r]eview all statements for accuracy, completeness and presentation," and "[p]rice [the] portfolio in accordance with the Fund's offering memorandum."

306.    Thus, IFS was required to properly value the securities in the Funds' portfolios and calculate and report the Funds' NAVs based on those valuations.

307.    IFS did not perform an independent valuation of the Funds' NAVs.  Instead, IFS negligently relied on the fraudulent valuations provided by Lauer, Lancer Management and BofA.  As a result, IFS distributed fraudulent NAV reports to plaintiffs for at least the months of October, November and December 2002.

308.    IFS, too, received falsified documentation regarding the composition and valuation of Funds' portfolios, including from defendant BofA.  In particular, IFS had a login and password that gave it access to BofA's computer systems to review the BofA Position Reports for the Funds which were falsified and manipulated by Lauer, Lancer Management and BofA.

309.    IFS noticed numerous obvious and alarming problems with the Position Reports, as well as other errors in the valuations of the Funds' portfolios.  Yet IFS blindly used false and unjustifiable valuations to prepare the NAV statements that it distributed to the Funds' investors, causing them to retain their investments at a time when the values of the Funds'

portfolios were in serious and irreversible decline, and costing them hundreds of millions of dollars.

**Plaintiffs' Reliance**

310.    Plaintiffs all reasonably relied upon the representations regarding the Funds' NAVs and other statements made in the NAV statements, audit reports and newsletters and other communications from Lauer, Lancer Management and the Funds' service providers in deciding to invest in and/or remain invested in the Funds.

311.    Alternatively, the reported NAV, a figure that was solely within the control of Lauer, Lancer Management and the defendants, was the only measure by which shares in the Funds could be evaluated and purchased, therefore plaintiffs are entitled to a presumption of reliance.

**The Funds' Collapse and Resulting Litigation**

312.    Following a series of negative news stories, beginning in the Fall of 2002, several large investors in the Funds began to make requests to redeem their investments in the Funds, which the Funds could not satisfy.  Investors in Lancer Partners, L.P. ("Lancer Partners") – a domestic hedge fund also managed by Lauer and Lancer Management – commenced litigation in Winter 2003 seeking, among other things, satisfaction of investors' redemptions from that fund.

313.    On April 16, 2003, Lauer caused Lancer Partners to file for bankruptcy in the United States Bankruptcy Court for the District of Connecticut.

314.    On May 2, 2003 the BVI Financial Services Commission ("FSC"), an enforcement agency roughly equivalent to the SEC in the United States, instituted an action against the Funds in The Eastern Caribbean Supreme Court in the High Court of Justice in the Virgin Islands.  The FSC sought the appointment of a liquidator to wind up the Funds in an

orderly fashion. The FSC also retained Deloitte & Touche to assist the FSC in reviewing the affairs and circumstances of the Funds. In connection with that engagement, Deloitte & Touche prepared two substantive reports (the "Deloitte Reports"), which detail some of the fraudulent conduct engaged in by the Funds.

315.    On July 8, 2003, the SEC commenced an action in the United States District Court for the Southern District of Florida against numerous individuals and entities involved with the Funds (the "SEC Action"). At the SEC's request, the Receiver was appointed for Lancer Management, the Funds and various related entities.

316.    In addition to this action, several investors commenced individual and putative class actions titled *AXA Alternative Advisers, Inc. et al. v. John W. Bendall, Jr., et al.*, No. 03-CV-6763 (S.D.N.Y.), *Bruhl v. PricewaterhouseCoopers International Ltd., et al.*, No. 03-CV-6644 (S.D.N.Y.) and *Rotman v. John W. Bendall, Jr., et al.*, No. 03-23044-CV (S.D. Fla.).

317.    Unless otherwise noted, the foregoing allegations, except for allegations relating to plaintiffs, are based upon information and belief, which belief is based upon an investigation conducted by counsel. Allegations regarding the nature of the fraud at issue herein and the involvement of the defendants in that fraud are based primarily upon: (a) the Funds' offering memoranda, marketing materials, NAV statements, monthly performance reports and other communications from Lauer and Lancer Management to plaintiffs; (b) the PWC NA audit reports; (c) monthly NAV statements prepared and disseminated by Citco NV and IFS; (d) information provided to the plaintiffs by various confidential sources, directly or indirectly; (e) articles published by the media; (f) the complaint in the SEC Action; (g) the complaints in actions brought by other investors; (h) the Deloitte Reports; (i) complaints, pleadings and other materials filed by the Receiver; and (j) various public filings, including SEC filings and releases.

# FIRST CLAIM FOR RELIEF
### (Against Citco NV, Stocks, Quilligan and Conroy for
### Violations of Section 10(b) of the Securities Exchange Act of 1934
### and Rule 10b-5 thereunder)

318.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

319.    This claim is brought on behalf of only those plaintiffs that purchased all or part of their shares in the Funds after March 2000.

320.    Citco NV and the Citco Directors disseminated materially false and misleading monthly NAV statements to plaintiffs.

321.    Citco NV and the Citco Directors knew that the portfolios were not being properly valued.  Among other things, each of the Citco Directors was personally involved in Citco NV's preparation of the Funds' NAV statements and knew that the valuations provided by Lauer and Lancer Management to Citco NV were false.  Their knowledge must be imputed to Citco NV.

322.    Moreover, Citco NV and the Citco Directors knew or recklessly disregarded that investors and prospective investors in the Funds, including plaintiffs, would rely upon the materially false and misleading NAV statements for the Funds that Citco NV and the Citco Directors distributed in deciding to invest in and remain invested in the Funds.

323.    Plaintiffs relied upon these misstatements in deciding to purchase shares of the Funds.  Plaintiffs would not have purchased the securities of the Funds if they had known that the NAV statements being distributed by Citco NV and the Citco Directors were materially false and misleading.  Furthermore, had they known of such misstatements, plaintiffs would have divested themselves of any securities they had purchased in the Funds.

324. By virtue of the foregoing, Citco NV and the Citco Directors violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that it, directly or indirectly, by use of the means or instrumentalities of interstate commerce and/or the mails, or of a facility of a national securities exchange, knowingly or recklessly employed devices, schemes, and artifices to defraud, made untrue statements of material facts or omitted to state facts that they were under a duty to speak, and engaged in acts of fraud and deceit upon plaintiffs, all in connection with the purchase or sale of a security.

325. Each of the plaintiffs has been damaged by the wrongful conduct of Citco NV and the Citco Directors in that it caused each of them to purchase and hold shares in the Funds at inflated values, and also caused each plaintiff to lose all or a substantial portion of its investment in the Funds when the Funds collapsed.

326. By reason of the foregoing, plaintiffs are entitled to judgment against Citco NV and the Citco Directors awarding plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## SECOND CLAIM FOR RELIEF
### (Against Citco Group for
### Violations of Section 20(a) of the Securities Exchange Act of 1934)

327. Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

328. This claim is brought on behalf of only those plaintiffs that purchased all or part of their shares in the Funds after March 2000.

329. As alleged more fully above, the conduct of Citco NV violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder.

330.     At all relevant times, Citco Group had the power, both direct and indirect, to control Citco NV, which was a subsidiary of Citco Group, did in fact exercise such control and was therefore controlling a person within the meaning of Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78(t)).

331.     An oversight process links defendant Citco Group to defendant Citco NV despite their purported legal or technical separateness.

332.     Citco NV specifically touts Citco Group's integrated corporate structure when soliciting clients.  Likewise, Citco Group represents that its operating subsidiaries together constitute a "global fund administrator" and that the subsidiaries' ability to administer funds in offices throughout the world makes it possible for the combined enterprise to provide a "consistent service platform."  Citco Group also represents that its operating subsidiaries allow their personnel "the ability to transfer between offices and divisions" to maintain consistent levels of performance worldwide.

333.     A brochure located on the Citco Group website provides further laudatory statements regarding Citco Group's worldwide capabilities and oversight functions.  It states:

> The Citco Group is an integrated company.  Citco has substantial hedge fund experience.  Citco is prepared to take advantage of the growth of the hedge fund industry.  Its offices in Curacao and in other venues "typically work with our North American clients."

334.     Substantially all information regarding all of the funds administered by Citco Group's offices is maintained in a centralized database that can be accessed by the managers of the funds that those offices administer.  Citco Group's website represents that "This online reporting service is available to Fund Managers of Funds administered by any of the Citco Fund Services offices."

335.     Citco Group's website contains a brochure that describes its computer system that contains all client information, which is located in Fort Lauderdale, Florida and operated by Citco Technology Management, Inc.:

> Citco's dedicated Information Technology Group, based in Fort Lauderdale, Florida is responsible for maintaining and monitoring all software and hardware configurations, and network support.  The group also maintains Citco's exclusive database of security information (CDS Citco Data Source), providing prices and corporate actions for US and non-U.S. securities, with integrated cross-reference identification codes, using multiple vendors such as Interactive Data Corporation (IDC), Reuters, Bloomberg and Telekurs.  Each office is set up with a dedicated team of on-site IT staff to monitor daily operations and tailor the needs of our clients.

336.     The managing director of each Citco Group office that provides fund administration services – including defendant Citco NV – reports to Keunen, who has served as Global Director of Fund Services for Citco Group since 2001.  Keunen is resident in the Miami, Florida office of Citco USA.  The managing director of each office of Citco Group that provides fund administration services – including defendant Citco NV – reports to Keunen, who, in turn, reports to the four-person executive committee of Citco Group.

337.     In his role with Citco Group, and operating from Citco USA's offices in the United States, Keunen was personally involved in the issues in this case.  Keunen personally received and responded to e-mail inquiries regarding the Funds both from within Citco Group (including from defendants Citco NV, Quilligan and Conroy) and from third parties.  Keunen also engaged in correspondence regarding the Funds, and participated in meetings and telephone conversations concerning the Funds with various personnel from Citco NV, Citco Group and other Citco entities, as well as BofA and Lancer Management personnel.  Keunen also initiated discussions with defendant PWC NA concerning the Funds' portfolio valuations and NAV calculations.

338.    Citco Group's Keunen also personally directed Citco NV to disseminate NAV statements for the Funds, despite knowing them to be false and misleading.

339.    In May 2002, Keunen reported to all Citco Group directors regarding issues raised by Citco Group's internal audit department regarding the portfolio valuation and NAV calculations for the Funds.

340.    Each of the plaintiffs has been damaged by the wrongful conduct of Citco Group through its control of Citco NV, in that the wrongful conduct caused each of the plaintiffs to purchase shares in the Funds at inflated values and to remain invested in the Funds.

341.    By reason of the foregoing, plaintiffs are entitled to a judgment against the Citco Group awarding plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

### THIRD CLAIM FOR RELIEF
**(Against Citco NV and the Citco Directors for
Common Law Fraud)**

342.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

343.    As set forth more fully above, Citco NV and the Citco Directors knowingly and/or recklessly made numerous false and misleading statements of material fact and omitted to state material facts to plaintiffs regarding the NAVs of the Funds.

344.    Citco NV and the Citco Directors repeatedly disseminated fraudulent and grossly inflated NAV statements to the Funds' investors and prospective investors.

345.    Citco NV and the Citco Directors knew, or were reckless in not knowing, that their conduct constituted a fraud on plaintiffs and would result in, and did in fact result in, the purchase of Fund shares by plaintiffs at inflated prices and/or the retention of such shares, all resulting in the subsequent loss of all or a substantial portion of plaintiffs' investments.

346.     Citco NV and the Citco Directors made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing plaintiffs to purchase and retain securities in reliance thereon.

347.     Plaintiffs reasonably and justifiably relied on the misrepresentations and omissions of Citco NV and the Citco Directors in deciding to purchase and/or retain shares in the Funds.

348.     Each of the plaintiffs has been damaged by the wrongful conduct of Citco NV and the Citco Directors in that such wrongful conduct caused each of them to purchase and/or hold shares in the Funds at inflated values and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose all or a substantial portion of its investment.

349.     The fraudulent conduct of Citco NV and the Citco Directors, as outlined above, was done purposefully, maliciously, recklessly and without regard for the rights and interests of plaintiffs.

350.     By reason of the foregoing, plaintiffs are entitled to a judgment against Citco NV and the Citco Directors, awarding plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

### FOURTH CLAIM FOR RELIEF
**(Against Citco NV and the Citco Directors for
Aiding and Abetting Common Law Fraud)**

351.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

352.     Defendants Citco NV and the Citco Directors played a significant and vital role in the fraudulent scheme alleged herein, with knowledge thereof.

353.     Citco NV and the Citco Directors knew that investors would rely on the NAV statements that they were disseminating as a basis for investing in and/or maintaining their investments in the Funds.  Plaintiffs derived great comfort from representations that Citco NV and the Citco Directors would independently value the Funds' portfolios and calculate the Funds' NAVs.

354.     Instead, Citco NV and the Citco Directors knowingly failed in their role. Citco NV and the Citco Directors knowingly and substantially aided and abetted the fraud committed by Lauer and Lancer Management by, *inter alia*, using the falsified valuations provided by Lauer and Lancer Management without conducting the requisite independent valuation of the Funds' portfolios, and then, knowing those valuations to be false and misleading, using them to prepare and disseminate false and misleading NAV statements to plaintiffs.

355.     Based on the information that they had, Citco NV and the Citco Directors knew that Lauer and Lancer Management were defrauding plaintiffs.

356.     The conduct of Citco NV and the Citco Directors proximately caused significant damage to plaintiffs.  The fraud could not have succeeded without the active and knowing participation of Citco NV and the Citco Directors.

357.     Each of the plaintiffs has been damaged by the wrongful conduct of Citco NV and the Citco Directors in that plaintiffs were induced to purchase and/or hold shares of the Funds at inflated values, and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose all or a substantial portion of its investment in the Funds.

358.     The conduct of Citco NV and the Citco Directors was purposeful and malicious, and departed in the extreme from the norms of conduct expected of an administrator and directors, respectively.  Citco NV and the Citco Directors cavalierly disregarded their duties to, and the interests of, plaintiffs.

359.     By reason of the foregoing, plaintiffs are entitled to a judgment against Citco NV and the Citco Directors awarding plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## FIFTH CLAIM FOR RELIEF
### (Against Citco NV, Stocks, Quilligan and Conroy for Aiding and Abetting Breach of Fiduciary Duty)

360.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

361.     Citco NV and the Citco Directors knew that Lauer and Lancer Management owed fiduciary and other obligations to plaintiffs, and knew that these defendants were breaching said obligations by engaging in the conduct alleged herein.

362.     With such knowledge, Citco NV and the Citco Directors knowingly participated, aided and abetted, and otherwise conspired to bring about these breaches of fiduciary obligations by, *inter alia*, using the falsified valuations provided by Lauer and Lancer Management without conducting the requisite independent valuation of the Funds' portfolios, and then, knowing those valuations to be false and misleading, using them to prepare and disseminate false and misleading NAV statements to plaintiffs.

363.     Based on the information that they had, Citco NV and the Citco Directors knew that Lauer and Lancer Management were breaching their fiduciary duties to plaintiffs.

364.     Each of the plaintiffs has been damaged by the wrongful conduct of Citco NV and the Citco Directors in that the wrongful conduct caused each plaintiff to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose all or a substantial portion of its investment.

365.     The wrongful conduct of Citco NV and the Citco Directors, as alleged herein, was done purposefully and maliciously, and without regard for the rights and interests of plaintiffs.

366.     By reason of the foregoing, plaintiffs are entitled to a judgment against Citco NV and the Citco Directors awarding plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

### SIXTH CLAIM FOR RELIEF
**(Against Citco NV, Stocks, Quilligan and Conroy for**
**Negligence, Negligent Misrepresentation and Professional Malpractice)**

367.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

368.     Citco NV and the Citco Directors had a duty to plaintiffs to independently value the Funds' portfolios and to calculate and verify Funds' NAVs each month, to verify that the NAVs used by Lauer and Lancer Management reflected market value and to send accurate NAV statements to plaintiffs.

369.     Citco NV and the Citco Directors performed their duties negligently and/or grossly negligently, and in reckless disregard of their duties, thereby enabling Lauer and Lancer Management to perpetrate and continue their fraudulent scheme.  Citco NV and the Citco Directors failed to independently value the Funds' portfolios and to calculate the NAVs of the Funds and to ensure the accuracy of the values supplied by Lauer and Lancer Management.

Instead, Citco NV and the Citco Directors used valuation information provided by Lauer and Lancer Management to calculate and send false NAV statements to plaintiffs. Citco NV and the Citco Directors then disseminated this false and fraudulent information directly to plaintiffs.

370. Citco NV and the Citco Directors knew, or reasonably should have known, that plaintiffs would rely upon this information in purchasing their shares or, with respect to existing investors, that those investors would rely upon this information in determining not to redeem their shares and/or to purchase new and additional shares in the Funds.

371. Citco NV and the Citco Directors did not utilize the requisite skill and knowledge to perform their duties, woefully failed to exercise ordinary and reasonable care in the application of their professional knowledge and skill, and woefully failed to use their best professional judgment in the application of their knowledge and skill.

372. In the course of this conduct, Citco NV and the Citco Directors failed to inquire into many crucial facts, which, in the exercise of ordinary care, they should not have ignored and should have investigated. Citco NV and the Citco Directors demonstrated a complete disregard for the rights of plaintiffs, as well as for the security of their investments.

373. Plaintiffs were damaged by the negligence of Citco NV and the Citco Directors. Plaintiffs would not have purchased and/or maintained their shares in the Funds had they known that Citco NV and the Citco Directors had engaged in the negligent conduct alleged herein.

374. Each of the plaintiffs has been damaged by the wrongful conduct of Citco NV and the Citco Directors in that plaintiffs were induced to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, which caused each plaintiff to lose all or a substantial portion of its investment.

375.     By reason of the foregoing, plaintiffs are entitled to a judgment against Citco NV and the Citco Directors awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## SEVENTH CLAIM FOR RELIEF
### (Against IFS for
### Negligence and Professional Malpractice)

376.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

377.     IFS had a duty to plaintiffs to independently calculate and verify the NAVs each month, to verify that the NAVs used by Lauer and Lancer Management reflected market value and to send accurate NAV statements to plaintiffs.  IFS sent fraudulent NAV statements directly to plaintiffs.

378.     IFS performed its duties negligently, thereby enabling Lauer and Lancer Management to perpetrate and continue his fraudulent scheme.  IFS failed to independently confirm or assess the NAVs of the Funds and to ensure the accuracy of the values supplied by Lauer and Lancer Management.  IFS simply used Lauer's and Lancer Management's valuations to calculate and send false NAV statements to plaintiffs.

379.     IFS did not utilize the requisite skill and knowledge to perform its duties as administrator, woefully failed to exercise ordinary and reasonable care in the application of its professional knowledge and skill, and woefully failed to use its best professional judgment in the application of its knowledge and skill.

380.     In the course of this conduct, IFS failed to inquire into many crucial facts, which, in the exercise of ordinary care, it should not have ignored and should have investigated.  IFS demonstrated a complete disregard for the rights of plaintiffs, as well as for the security of their investments.

381.     Plaintiffs were damaged by IFS's negligence.  Plaintiffs would not have maintained their shares in the Funds had they known that IFS had engaged in the negligent conduct alleged herein.

382.     Each of the plaintiffs has been damaged by the wrongful conduct of IFS in that plaintiffs were induced to hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, which caused each plaintiff to lose all or a substantial portion of its investment.

383.     By reason of the foregoing, plaintiffs are entitled to a judgment against IFS awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## EIGHTH CLAIM FOR RELIEF
### (Against Citco NV and IFS for
### Breach of Fiduciary Duty)

384.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

385.     Defendants Citco NV and IFS, as administrators of the Funds, owed the highest obligations and fiduciary duties to plaintiffs as shareholders of the Funds.

386.     The Funds' investors and prospective investors did not know what securities the Funds held.  As a result, they were unable to monitor the value of the Funds' portfolios themselves.  Instead, they relied on the NAV statements they received from defendants Citco NV and IFS as the sole source of information about the value of the Funds' portfolios and the performance of the Funds.  Citco NV and IFS, in turn, had superior access to confidential information about the composition and valuation of the Funds' portfolios.

387.    These defendants were duty bound to act in a responsible and lawful manner, in utmost good faith, and in accordance with the representations on which plaintiffs relied in entrusting their monies to these defendants, so as not to cause injury to plaintiffs.

388.    These defendants each owed directly to each of the plaintiffs, as shareholders of the Funds, the duty to exercise due care and diligence in the management and administration of the Funds, in the use and preservation of plaintiffs' property and assets and in ensuring the accuracy of information transmitted to investors concerning the holdings and valuation of the Funds' assets. These defendants also each owed directly to plaintiffs the duties of full and candid disclosure of all material facts relevant to the Funds and duties to deal fairly and honestly with plaintiffs. These defendants were obligated to ensure that Lauer and Lancer Management did not engage in any fraudulent, unsafe or unsound valuation practices.

389.    In engaging in the conduct alleged herein, including, but not limited to, falsely reporting valuations and results of plaintiffs' investments, and by failing to report that Lauer and Lancer Management was fraudulently overstating the value of the Funds' portfolios and otherwise disregarding the representations made in the PPMs, these defendants repeatedly breached their fiduciary and related obligations to plaintiffs.

390.    Each of the plaintiffs has been damaged by the wrongful conduct of these defendants in that plaintiffs were induced to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose all or a substantial portion of its investment.

391.    The conduct of these defendants was purposeful and it departed in the extreme from the norms expected of such persons. Citco NV and IFS cavalierly disregarded their duties to, and the interests of, plaintiffs. By reason of the foregoing, plaintiffs are entitled

to a judgment against these defendants, jointly and severally, awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

**NINTH CLAIM FOR RELIEF**
**(Against PWC NA for**
**Violations of Section 10(b) of the Securities Exchange Act of 1934**
**and Rule 10b-5 thereunder)**

392.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

393.     This claim is brought on behalf of only those plaintiffs that purchased all or part of their shares in the Funds after March 2000.

394.     The audit reports that were issued by PWC NA to Plaintiffs were materially false and misleading in that they falsely represented that the audits of the Funds' financial statements were conducted "in accordance with international standards on auditing." PWC NA's representation and commitment was false and misleading in that PWC NA did not conduct its audits of the Funds in the manner represented.  Moreover, it did not establish reasonable procedures to confirm the values presented in the Funds financial statements as it claimed to have done.

395.     The audit reports issued by PWC NA were also materially false and misleading in that they falsely represented that the Funds' financial statements "[p]resented fairly, in all material respects the financial positions of [the Funds] … in conformity with international accounting standards."  In fact, as PWC NA knowingly or recklessly disregarded, the Funds' financial statements materially overstated the financial position, performance and net assets of the Funds and had not been prepared in accordance with international accounting standards.

396. PWC NA knew or recklessly disregarded the fact that its audit reports would be a principal means by which investors would be induced to purchase shares of the Funds, in that there was no other purportedly independently verified information available to investors upon which they could rely to value the assets of the Funds. PWC NA further knew that plaintiffs would rely on this false and misleading information in making decisions on whether to purchase and retain shares in the Funds.

397. Plaintiffs relied upon these misstatements in making investment and retention decisions with respect to the shares of the Funds. Plaintiffs would not have purchased the securities of the Funds at the prices they did, or at all, if they had known that the statements made and/or caused to be made by PWC NA were materially false and misleading and/or omitted to state material facts necessary in order to make the statements accurate. Furthermore, had they known of such misstatements, plaintiffs would have divested themselves of any securities they had purchased in the Funds.

398. By virtue of the foregoing, PWC NA violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that it, directly or indirectly, by use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct whereby it knowingly and/or recklessly made material misrepresentations and failed to correct misrepresentations which were materially false and misleading in light of the circumstances in which they were made, employed devices, schemes and artifices to defraud, participated in fraudulent manipulation and engaged in acts and practices and a course of business that operated as a fraud and deceit upon plaintiffs in connection with their purchase of shares of the Fund.

399. Each of the plaintiffs has been damaged by PWC NA's wrongful conduct in that such wrongful conduct caused each of them to purchase and/or hold shares in the Funds at inflated values and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose all or a substantial portion of its investment in the Funds.

400. By reason of the foregoing, plaintiffs are entitled to judgment against PWC NA awarding plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## TENTH CLAIM FOR RELIEF
### (Against PWC NA for
### Common Law Fraud)

401. Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

402. As set forth more fully above, PWC NA knowingly and/or recklessly issued materially false and misleading audit reports, specifically addressing such audit reports to the investors in the Funds, including plaintiffs.

403. PWC NA materially misrepresented to plaintiffs that it had conducted audits in accordance with international standards on auditing, and that it had a reasonable basis for expressing its opinion that the Funds' financial statements were fairly presented in accordance with international accounting standards. Neither of these statements was correct. In fact, PWC NA had not conducted any meaningful audit in accordance with international standards on auditing, and PWC NA had no reasonable basis upon which to express an opinion on the Funds' financial statements.

404. Moreover, as detailed above, the audit reports issued by PWC NA were materially false and misleading in that they falsely represented that the Funds' financial

statements "presented fairly, in all material respects, the financial positions" of the Funds. In fact, as PWC NA knowingly or recklessly failed to know, the Funds' financial statements materially overstated the Funds' NAVs.

405. PWC NA knew that investors would rely upon the fact that it had audited the Funds' financial statements in deciding to invest in the Funds, and in deciding not to redeem their shares. PWC NA's audit opinions gave investors, including plaintiffs, a false sense of security in the historical performance of the Funds and provided investors with assurance that the returns being reported by the Funds had been independently verified by a "Big Four" accounting firm. PWC NA's misrepresentations in its audit opinions concerning the adequacy of its audits and the basis for its opinions were material.

406. Plaintiffs relied on PWC NA's misrepresentations in deciding to purchase shares in the Funds, to increase their investments in the Funds and/or not to redeem the shares they held. Given that there was no other purportedly independent verification of the Funds' financial information, PWC NA knew or recklessly disregarded that the audit reports it issued would be a principal means by which investors would be induced to purchase shares of the Funds, to increase their shares in the Funds and/or to retain their existing shares. PWC NA was under an affirmative duty to obtain competent evidentiary material verifying the assets held by the Funds, as well as the true value of such assets, yet it failed to do so.

407. Each of the plaintiffs has been damaged by PWC NA's wrongful conduct in that such wrongful conduct caused each of them to purchase and/or hold shares in the Funds at inflated values and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose all or a substantial portion of its investment.

408.    The fraudulent conduct of PWC NA, as outlined above, was done purposefully, maliciously, recklessly and without regard for the rights and interests of plaintiffs.

409.    By reason of the foregoing, plaintiffs are entitled to a judgment against PWC NA, awarding plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

### ELEVENTH CLAIM FOR RELIEF
**(Against PWC NA for**
**Aiding and Abetting Common Law Fraud)**

410.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

411.    Defendant PWC NA played a significant and vital role in the fraudulent scheme alleged herein, with knowledge or reckless disregard thereof.

412.    PWC NA knowingly and substantially aided and abetted the fraud committed by Lauer and Lancer Management by providing the Funds with clean audit opinions purportedly performed in accordance with the acceptable international accounting procedures.

413.    Plaintiffs derived great comfort from PWC NA's participation in the business of the Funds, particularly  PWC NA's consistently clean audit opinions.

414.    PWC NA knowingly or recklessly failed in its role as auditor of the Funds. PWC NA knew or should have known that the Funds' NAVs that it was "auditing" were grossly over-inflated.

415.    The conduct of PWC NA proximately caused significant damage to plaintiffs.  The fraud could not have succeeded without the active and knowing participation of PWC NA.

416.    Each of the plaintiffs has been damaged by the wrongful conduct of PWC NA in that plaintiffs were induced to purchase and/or hold shares of the Funds at inflated values,

and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose all or a substantial portion of its investment in the Funds.

417.     PWC NA's conduct was purposeful and malicious, or reckless, and departed in the extreme from the norms expected of an auditor.  PWC NA cavalierly disregarded its duties to, and the interests of, plaintiffs.

418.     By reason of the foregoing, plaintiffs are entitled to a judgment against PWC NA awarding plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

### TWELFTH CLAIM FOR RELIEF
**(Against PWC NA for**
**Aiding and Abetting Breach of Fiduciary Duty)**

419.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

420.     PWC NA knew or recklessly disregarded the fact that Lauer and Lancer Management owed fiduciary and other obligations to plaintiffs, and knew or recklessly disregarded the fact that these Defendants were breaching said obligations by engaging in the conduct alleged herein.

421.     With such knowledge, PWC NA knowingly participated, aided and abetted, and otherwise conspired to bring about Lauer's, Lancer Management's and the Director Defendants' breaches of fiduciary obligations by, *inter alia*, issuing "clean" audit opinions in 2000 and 2001.

422.     Each of the plaintiffs has been damaged by the wrongful conduct of PWC NA in that the wrongful conduct caused each plaintiff to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose all or a substantial portion of its investment.

423.     PWC NA's wrongful conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of plaintiffs.

424.     By reason of the foregoing, plaintiffs are entitled to a judgment against PWC NA awarding plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## THIRTEENTH CLAIM FOR RELIEF
### (Against PWC NA for
### Negligence, Negligent Misrepresentation and Professional Malpractice)

425.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

426.     PWC NA had a duty to plaintiffs to independently audit the books and records of the Funds.  The audits prepared by PWC NA were specifically addressed and distributed to the investors in the Funds.

427.     PWC NA performed its duties negligently and/or grossly negligently, thereby enabling Lauer and Lancer Management to perpetrate and continue their fraudulent scheme.  PWC NA failed to properly audit the financial records of the Funds and to ensure the accuracy of the NAV values supplied by Lauer and Lancer Management.

428.     PWC NA knew, or reasonably should have known, that plaintiffs would rely upon its audits in purchasing their shares or, with respect to existing plaintiffs, that those plaintiffs would rely upon this information in determining not to redeem their shares and to purchase new and additional shares in the Funds.

429.     PWC NA did not utilize the requisite skill and knowledge to perform its duties as auditor, woefully failed to exercise ordinary and reasonable care in the application of its professional knowledge and skill, and woefully failed to use its best professional judgment in the application of its knowledge and skill.

430.     In the course of this conduct, PWC NA failed to inquire into many crucial facts, which, in the exercise of ordinary care, they should not have ignored and should have investigated.  PWC NA demonstrated a complete disregard for the rights of plaintiffs, as well as for the security of their investments.

431.     PWC NA failed to perform duties with the due and professional care required of an experienced auditor of hedge funds such as Lancer Offshore and OmniFund.

432.     Plaintiffs were damaged by PWC NA's negligence.  Plaintiffs would not have purchased or maintained their shares in the Funds had they known that PWC NA had engaged in the negligent conduct alleged herein.

433.     Each of the plaintiffs has been damaged by the wrongful conduct of PWC NA in that plaintiffs were induced to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, which caused each plaintiff to lose all or a substantial portion of its investment.

434.     By reason of the foregoing, plaintiffs are entitled to a judgment against PWC NA awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

**FOURTEENTH CLAIM FOR RELIEF**
**(Against BofA for**
**Aiding and Abetting Common Law Fraud)**

435.     Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

436.     BofA played a vital role in Lauer's fraudulent scheme by inflating the values of the Funds' holdings on the Position Reports at the request of Lauer and Lancer Management with actual knowledge that the information that BofA input into its computer system, and included in the Position Reports, was false.  BofA then generated the falsified

Position Reports and posted them on the BofA Website, knowing that they would be used and relied upon by the Funds' auditor and administrators in calculating and verifying the Funds' NAVs because:

 (a) BofA knew that the Position Reports were the only reports reflecting the entirety of the Funds' holdings by depicting the values of the positions held both in the custody of BofA and away from BofA;

 (b) BofA knew that Lauer and Lancer Management were downloading and printing the Position Reports and providing them to third parties, including PWC NA, Citco NV and IFS; and

 (c) BofA itself provided IFS and, upon information and belief, also provided PWC NA and Citco NV, with direct access to the BofA computer system for the purpose of allowing them to review, download and print the Position Reports generated and posted there by BofA.

 437. BofA also had actual knowledge that investors and potential investors would receive the NAV statements and audits based on the falsified valuations and use and rely on them in making investment decisions.

 438. BofA substantially assisted in Lauer and Lancer Management's fraud by entering the false information concerning the Funds' holdings onto the BofA computer system at the request of Lauer and Lancer Management.

 439. BofA's conduct proximately caused plaintiffs' damages because, absent BofA's knowing and active participation, Lauer could not have perpetrated his fraudulent scheme. Only BofA had the authority and ability to enter and modify trades and prices on the BofA computer system for eventual inclusion in the fraudulent Position Reports that Lauer and Lancer Management disseminated to PWC NA, Citco NV and IFS which, in turn, used the fraudulent Position Reports to create fraudulent NAV statements and audit reports.

 440. Each of the plaintiffs has been damaged by the wrongful conduct of BofA in that the plaintiffs were induced to purchase and/or hold shares of the Funds at the inflated

values set forth in the fraudulent NAV statements, audit reports and/or Position Reports, and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment in the Funds.

441. By reason of the foregoing, plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

442. In addition, because BofA acted knowingly, intentionally, purposefully, maliciously, and without regard for the rights and interests of plaintiffs, plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### FIFTEENTH CLAIM FOR RELIEF
**(Against BofA for**
**Aiding and Abetting Breach of Fiduciary Duty)**

443. Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

444. Lauer and Lancer Management owed fiduciary duties to the plaintiffs.

445. Lauer and Lancer Management breached their fiduciary duties to plaintiffs by, among other things, misrepresenting the nature and value of the securities in the Funds' portfolios.

446. BofA played a vital role in Lauer's fraudulent scheme by inflating the values of the Funds' holdings on the Position Reports at the request of Lauer and Lancer Management with actual knowledge that the information that BofA input into its computer system, and included in the Position Reports, was false. BofA then generated the falsified Position Reports and posted them on the BofA Website, knowing that they would be used and relied upon by the Funds' auditor and administrators in calculating and verifying the Funds' NAVs because:

(a) BofA knew that the Position Reports were the only reports reflecting the entirety of the Funds' holdings by depicting the values of the positions held both in the custody of BofA and away from BofA;

(b) BofA knew that Lauer and Lancer Management were downloading and printing the Position Reports and providing them to third parties, including PWC NA, Citco NV and IFS; and

(c) BofA itself provided IFS and, upon information and belief, also provided PWC NA and Citco NV, with direct access to the BofA computer system for the purpose of allowing them to review, download and print the Position Reports generated and posted there by BofA.

447. BofA also had actual knowledge that investors and potential investors would receive the NAV statements and audits based on the falsified valuations and use and rely on them in making investment decisions.

448. BofA knew that Lauer and Lancer Management were breaching their fiduciary duties to plaintiffs by inflating the value of the Funds' holdings for the purpose of fraudulently inflating the Funds' NAV. BofA also knew that it was assisting Lauer and Lancer Management inflate the value of the Funds' NAV in order to mask severe losses incurred by the Funds.

449. BofA's conduct proximately caused plaintiffs' damages because, absent BofA's knowing and active participation, Lauer and Lancer Management could not have perpetrated their fraudulent scheme. Only BofA had the authority and ability to enter and modify trades and prices on the BofA computer system for eventual inclusion in the fraudulent Position Reports that Lauer and Lancer Management disseminated to PWC NA, Citco NV and IFS which, in turn, used the fraudulent Position Reports to create fraudulent NAV statements and audit reports.

450. Each of the plaintiffs has been damaged by the wrongful conduct of BofA in that the plaintiffs were induced to purchase and/or hold shares of the Funds at the inflated

values set forth in the fraudulent NAV statements, audit reports and/or Position Reports, and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment in the Funds.

451. By reason of the foregoing, plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

452. In addition, because BofA acted knowingly, intentionally, purposefully, maliciously, and without regard for the rights and interests of plaintiffs, plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### SIXTEENTH CLAIM FOR RELIEF
**(Against the Director Defendants for
Breach of Fiduciary Duty)**

453. Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

454. The Director Defendants owed the highest obligations and fiduciary duties to plaintiffs as shareholders of the Funds. These defendants were duty bound to act in a responsible and lawful manner, in utmost good faith, and in accordance with the representations on which plaintiffs relied in entrusting their monies to these defendants, so as not to cause injury to plaintiffs.

455. The Funds' investors and prospective investors did not know what securities the Funds held. As a result, they were unable to monitor the value of the Funds' portfolios themselves. Instead, they relied on the Director Defendants to ensure that the Funds' portfolios would be properly valued. The Director Defendants had superior access to confidential information about the composition and valuation of the Funds' portfolios.

456. The Director Defendants each owed directly to each of the plaintiffs, as shareholders of the Funds, the duty to exercise due care and diligence in the management and administration of the Funds and in the use and preservation of plaintiffs' property and assets. These defendants also each owed directly to plaintiffs the duties of full and candid disclosure of all material facts relevant to the Funds and duties to deal fairly and honestly with plaintiffs. These defendants were obligated to ensure that Lauer and Lancer Management did not engage in any fraudulent, unsafe or unsound valuation practices.

457. In engaging in the conduct alleged herein, including, but not limited to, falsely reporting values of plaintiffs' investments, these defendants repeatedly breached their fiduciary and related obligations to plaintiffs.

458. Each of the plaintiffs has been damaged by the wrongful conduct of these defendants in that plaintiffs were induced to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose all or a substantial portion of its investment.

459. The conduct of these defendants was purposeful and it departed in the extreme from the norms expected of such persons. Lauer and Lancer Management cavalierly disregarded their duties to, and the interests of, plaintiffs.

460. By reason of the foregoing, plaintiffs are entitled to a judgment against these defendants, jointly and severally, awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## CONCLUSION

WHEREFORE, plaintiffs demand judgment from this Court awarding:

(a)     Compensatory damages to all plaintiffs against each of the defendants, jointly and severally, in an amount to be determined at the trial of this action, but no less than the entire consideration paid by these plaintiffs for their interests in Lancer Offshore and OmniFund, net of any redemption proceeds received;

(b)     On Counts 1, 3, 4, 5, 8, 9, 10, 11, 12, 14, 15 and 16, punitive damages in an amount to be determined at the trial of this action;

(c)     Interest on any award at the maximum allowable rate; and.

(d)     Such other and further relief as this Court deems just and proper to adequately compensate plaintiffs.

## JURY DEMAND

Plaintiffs further demand a trial by jury of all claims set forth in this Complaint.

Dated:   New York, New York
       August 25, 2006

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP


By: /s/ Scott M. Berman
Scott M. Berman (SB4023)
Anne E. Beaumont (AB7139)
Amy C. Brown (AB5233)
Jenny F. Kaufman (JK7832)
1633 Broadway, 46th Floor
New York, New York 10019
(212) 833-1100

*Attorneys for Plaintiffs*