**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- X

**THE PENSION COMMITTEE OF THE**
**UNIVERSITY OF MONTREAL**
**PENSION PLAN**, *et al.*,

          **Plaintiffs,**

      **- against -**

**BANC OF AMERICA SECURITIES,**
**LLC, CITCO FUND SERVICES**
**(CURACAO) N.V., THE CITCO GROUP**
**LIMITED, INTERNATIONAL FUND**
**SERVICES (IRELAND) LIMITED,**
**PRICEWATERHOUSECOOPERS**
**(NETHERLAND ANTILLES), JOHN W.**
**BENDALL, JR., RICHARD GEIST,**
**ANTHONY STOCKS, KIERAN**
**CONROY, and DECLAN QUILLIGAN,**

         **Defendants.**

-------------------------------------------------- X

**OPINION AND ORDER**

**05 Civ. 9016 (SAS)**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/5/09

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

A group of investors brings this action to recover losses stemming

from the liquidation of two British Virgin Islands ("BVI") based hedge funds in

which they held shares: Lancer Offshore, Inc. ("Lancer Offshore") and OmniFund

1

Ltd. ("OmniFund" and together with Lancer Offshore, the "Lancer Funds" or the

"Funds").[1] Plaintiffs bring various claims under federal securities laws and

common law claims under New York law against former directors, administrators,

the auditor, and the prime broker and custodian of the Funds.[2] Following the close

of discovery, former administrator, Citco Fund Services (Curacao), N.V. ("Citco

NV"), its parent company, The Citco Group Limited ("Citco Group") and former

Lancer Offshore directors who were Citco officers ("Citco Directors," and

collectively with Citco NV, the "Citco Defendants") now move for partial

summary judgment with respect to all claims against them.[3] For the reasons that

follow, their motions for partial summary judgment are granted in part and denied

in part.

## II.    BACKGROUND

### A.    Facts[4]

[1]      *See* Second Amended Complaint ("SAC") ¶ 1.

[2]      *See id.* ¶¶ 318-460.

[3]      *See* Defendants Citco Fund Services (Curacao), N.V. and the Citco
Directors' Memorandum of Law in Support of Their Motion for Summary
Judgment ("Def. Mem.") at 1.

[4]      The facts in this section are not in dispute and are drawn from
Defendants' Rule 56.1 Statements and Plaintiffs' Counterstatements Pursuant to
Rule 56.1 and from the evidence submitted to this Court with respect to this
motion. Some background facts, if not material to this motion, have been taken

### 1.    The Claims and the Parties

This action involves the claims of twenty sophisticated investors[5] –

some domestic, but mostly foreign[6] – who allege damages in connection with their

purchase and retention of shares in the Lancer Funds.[7]  In July 2003, the Funds

were placed into receivership in the Southern District of Florida.[8]  Plaintiffs allege

that almost all of the capital invested in the Funds – totaling over $550 million –

has been lost.[9]

The Lancer Funds were managed by Lancer Management Group LLC

and its principal, Michael Lauer.[10]  Lancer Management's principal place of

---

from the Second Amended Complaint.

[5]    Although the action involves the claims of 96 plaintiff investors, on
February 1, 2008, the Court ordered that the case would proceed initially on the
claims of twenty plaintiffs.  *See* 2/1/08 Case Management and Amended
Scheduling Order.

[6]    *See* Defendants Citco Fund Services (Curacao), N.V. and the Citco
Directors' Rule 56.1 Statement of Undisputed Facts in Support of their Motion for
Summary Judgment ("Def. 56.1") ¶ 1.

[7]    *See id.* ¶¶ 1, 2.

[8]    *See id.* ¶ 2.

[9]    *See* SAC ¶ 1.

[10]   *See* Def. 56.1 ¶ 2.

business is New York City.[11]  Lauer and Lancer Management are not parties in this action,[12] but were significant actors in the current action.

The Funds were administered until late 2002 by Citco NV,[13] a business entity organized in the Netherlands Antilles, with places of business in Curacao, Netherlands Antilles and the British Virgin Islands.[14]  Citco Group is Citco NV's parent company.[15]  Citco Group is an "integrated financial services holding company that operates through numerous subsidiaries, including defendant Citco NV."[16]  Its principal place of business is in the Cayman Islands.[17]

The Citco Directors are three Citco N.V. officers – Anthony Stocks, Declan Quilligan, and Kieran Conroy – who also "served as directors of Lancer

---

[11]     *See* SAC ¶ 32.

[12]     *See id.* ¶ 33.

[13]     *See id.* ¶ 13.

[14]     *See id.* ¶ 34.

[15]     *See* Defendant, the Citco Group Limited's Rule 56.1 Statement ("CGL 56.1") ¶ 5; Plaintiffs' Counterstatement Pursuant to Rule 56.1 in Opposition to Motion for Summary Judgment of Defendant Citco Group Limited ¶ 5 ("Pl. CGL Counter. 56.1").

[16]     SAC ¶ 35.

[17]     *See id.*

4

Offshore at different points in time."[18]  Stocks served as a director of Lancer

Offshore from 1998 until 2001, when he resigned as a director of the Fund.[19]

Conroy, a managing director of Citco NV, resides in Dublin, Ireland, and was a

director of Lancer Offshore from 1998 until early 2002.[20]  Quilligan was a director

of Lancer Offshore from 2001 to early 2002 while he was General Manager and a

Managing Director of Citco NV.[21]  While engaged in those positions, he was a

resident of Curacao, Netherlands Antilles.[22]

### 2.    Citco NV's Contractual Duties to the Lancer Funds

Citco NV was retained by the Lancer Funds to perform certain

administrative duties as detailed in the Administrative Services Agreements

("ASAs").[23]  These duties included the computation of the monthly net asset

---

[18]    *See* Def. 56.1 ¶ 3; Plaintiffs' Amended Counterstatement Pursuant to Rule 56.1 in Opposition to Motion for Summary Judgment of Defendants Citco Fund Services (Curacao), N.V., Kieran Conroy, Declan Quilligan, and Anthony Stocks ("Pl. Counter. 56.1") ¶ 3.

[19]    *See* SAC ¶ 36.  Defendant Stocks has passed away, and plaintiffs have stated that they "do not intend to pursue their claims against [his] estate . . . ." Pl. Counter. 56.1 ¶ 23.

[20]    *See* SAC ¶ 37.

[21]    *See id.* ¶ 38.

[22]    *See id.*

[23]    *See* Def. 56.1 ¶ 19; Pl. Counter. 56.1 ¶ 19.

5

values ("NAVs") and the "independent[] pricing [of] the fund by reference to . . .

independent pricing sources, or as agreed by the Board of Directors pursuant to

the [Private Placement Memorandum]."[24]  In addition to sending out monthly

NAV statements, Citco NV was responsible for responding to investor inquiries.[25]

Lancer Offshore's Private Placement Memorandum ("PPM") also provided that

Citco NV's obligations included "maintaining a registry of the shares, accepting

payment for subscriptions, performing acts relating to redemptions, and keeping

the financial books and records of the [F]unds . . . ."[26]

According to the PPM, the Fund's NAV is equal to the gross assets

minus the gross liabilities of the Fund.[27]  The PPM also provides that "[s]ecurities

[that are] listed on a securities or exchange market are to be valued at their last

sales prices on the date of determination."[28]  Finally, the PPM directs that the

pricing of unlisted securities was to be based "upon the advice of the Fund's

---

[24]     Def. 56.1 ¶ 19.

[25]     *See* ASA, Ex. 7 to 9/15/08 Declaration of Dyanne Feinberg, counsel
for the Citco Defendants ("Feinberg Decl."), at 2.

[26]     Def. 56.1 ¶ 20.

[27]     *See id.* ¶ 21.

[28]     *Id.*

6

Investment Manager and Prime Broker."[29]

### 3. The Character of the Lancer Funds and the Alleged Scheme

The PPM indicates that the Funds were directed at sophisticated investors who were aware that the Funds invested primarily in small-cap companies and that many of the investments would lack liquidity.[30]  Despite warnings in the PPM,[31] the Funds were able to attract a number of institutional investors.[32]

Beginning in March 2000, the Funds began to lose money, but such losses were hidden from investors through a scheme allegedly perpetrated by Lauer and Lancer Management.[33]  Under the scheme, the Funds would make large investments in shell companies for "pennies per share, or sometimes nothing at all."[34]  Prior to the end of the month, the Fund would purchase additional shares of these companies for higher prices than the initial acquisition prices.[35]  Lauer and

---

[29]    *Id.*

[30]    *See* Def. 56.1 ¶¶ 6, 8, 10; Pl. Counter. 56.1 ¶¶ 6, 8, 10.

[31]    *See* Def. 56.1 ¶ 8; Pl. Counter. 56.1 ¶ 8.

[32]    *See* SAC ¶¶ 14, 15.

[33]    *See id.* ¶ 2.

[34]    *See id.* ¶ 3.

[35]    *See id.*

Lancer Management would then use these artificial market prices to inflate the NAVs of these investments and have them reported to investors each month.[36] Because the management fees paid to Lancer Management were based on the NAVs of the Funds, higher NAVs also meant increased fees for Lauer.[37]

### 4.   Events Leading to Citco NV's Resignation

Beginning in June 2001, PricewaterhouseCoopers NA ("PWC NA"), the Funds' independent auditor, began questioning Lauer's valuation methodology with respect to warrants while auditing the 2000 financial statements.[38] PWC NA sent its analysis of warrant valuations to Citco NV, indicating concerns with the NAVs calculated by Citco NV.[39] Thereafter, Citco NV became more actively involved in questioning the valuations of the portfolio securities.[40] Citco NV's

---

[36]   *See id.*

[37]   *See id.* ¶¶ 109, 117.

[38]   *See* Def. 56.1 ¶ 33.

[39]   *See id.* ¶36; Pl. Counter. 56.1 ¶ 36.

[40]   *See* Def. 56.1 ¶¶ 37-42 (noting that a meeting in September 2001 took place with Lancer Management to discuss these concerns and that Lauer was subsequently asked to submit additional valuation information and explain his methodology).

valuation concerns were first communicated to William Keunen, Division Director of Fund Services, by Quilligan in September 2001.[41] Keunen eventually informed the Executive Committee of Citco Group of the problems in May 2002.[42] Citco NV finally resigned as administrator of Lancer Offshore on July 16, 2002 and as administrator of OmniFund on November 30, 2002.[43]

### B. Procedural History

Plaintiffs filed their Second Amended Complaint on August 25, 2006, alleging claims for violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, against PWC NA, Citco NV, and the Citco Directors.[44] Plaintiffs also bring a claim under Section 20(a) of the Securities Exchange Act of 1934 against Citco Group, based on its alleged status

---

[41]    *See* Deposition of William Keunen ("Keunen Dep."), Ex. 5 to 8/25/08 Declaration of Anne Beaumont, plaintiffs' counsel ("Beaumont Decl."), at 131:25-132:10.

[42]    *See* 5/22/02 Email from Keunen to the Citco Group Executive Committee, Ex. 6 to 8/11/08 Declaration of Dyanne Feinberg, counsel for Citco Group ("Feinberg CGL Decl."), at 1.

[43]    *See* 7/25/02 Letter from Citco NV to the Board of Directors of Lancer Offshore, with copy to Lauer ("7/25/02 Let."), Ex. 2 to Beaumont Decl., at 1 (stating that Citco NV's letter of July 16, 2002 "constitut[ed] notice of [its] resignation as the Fund's administrator . . ."); Deposition of Declan Quilligan ("Quilligan Dep."), Ex. 9 to Beaumont Decl., at 169:23-170:1.

[44]    *See* SAC ¶¶ 318-326, 392-400.

as a control person of Citco NV.[45]

Plaintiffs also assert various common law claims under New York law against International Fund Services (International) Ltd. ("IFSI"), the entity that became administrator of the Funds after Citco NV resigned, PWC NA, and Banc of America Securities, LLC ("BAS"), the former prime broker and custodian of the Funds.[46]  Regarding the Citco Defendants, plaintiffs bring claims alleging common law fraud; breach of fiduciary duty; negligence, negligent misrepresentation, and professional malpractice; aiding and abetting common law fraud; and aiding and abetting breach of fiduciary duty.[47]

On September 25, 2006, BAS made a motion to dismiss the claims against it.  On October 4, 2006, the Citco Defendants and Citco Group similarly moved to dismiss the claims with respect to them.  By opinion and order dated February 20, 2007, BAS's and certain of the Citco Directors' motions to dismiss were granted.[48]  Following a year and a half of discovery, the remaining

---

[45]     *See id.* ¶¶ 327-341.

[46]     *See id.* ¶¶ 376-391, 401-452.

[47]     *See id.* ¶¶ 342-375, 384-391, 453-460.

[48]     *See Pension Comm. of the Univ. of Montreal Pension Plan, et al. v. Banc of America Sec., et al.*, No. 05 Civ. 9016, 2007 WL 528703 (S.D.N.Y. Feb. 20, 2007).

defendants now move for summary judgment.  By opinion and order dated

October 29, 2008, this Court granted IFSI's motion for summary judgment.[49]  This

opinion considers the motion of the Citco Defendants and Citco Group.

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."[50]  An issue of fact is genuine "'if

the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.'"[51]  A fact is material when it "'might affect the outcome of the

suit under the governing law.'"[52]  "It is the movant's burden to show that no

genuine factual dispute exists."[53]

---

[49]     *See Pension Comm. of the Univ. of Montreal Pension Plan, et al. v. Banc of America Sec., et al.*, No. 05 Civ. 9016, 2008 WL 4755734 (S.D.N.Y. Oct. 29, 2008).

[50]     Fed. R. Civ. P. 56(c).

[51]     *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[52]     *Ricci v. DeStefano*, 530 F.3d 88, 109 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

[53]     *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"[54]   To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[55] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[56]   However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[57]

In determining whether a genuine issue of material fact exists, the

---

[54]   *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). *Accord In re September 11 Litig.*, No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

[55]   *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[56]   *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[57]   *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248-49).

court must construe the evidence in the light most favorable to the non-moving

party and draw all justifiable inferences in that party's favor.[58]  However, "[i]t is a

settled rule that '[c]redibility assessments, choices between conflicting versions of

the events, and the weighing of evidence are matters for the jury, not for the court

on a motion for summary judgment.'"[59]  Summary judgment is therefore "only

appropriate when there is no genuine issue as to any material fact, making

judgment appropriate as a matter of law."[60]

## IV.   APPLICABLE LAW

### A.   Federal Securities Law

#### 1.   Extraterritorial Jurisdiction

"'When . . . a court is confronted with transactions that on any view

are predominantly foreign, it must seek to determine whether Congress would

have wished the precious resources of United States courts and law enforcement

agencies to be devoted to them rather than leave the problem to foreign

---

[58]     *See Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008)
(quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir.2005)).

[59]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl
v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).  *Accord Anderson*, 477 U.S. at 249.

[60]     *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007) (citing *Tocker v.
Philip Morris Cos.*, 470 F.3d 481, 486-87 (2d Cir. 2006)).

countries.'"[61] "The test in this Circuit for [determining] whether Congress would

so wish is '(1) whether the wrongful conduct occurred in the United States, and (2)

whether the wrongful conduct had a substantial effect in the United States or upon

United States citizens.'"[62]

The conduct test "concern[s] activity in the United States that causes,

or plays a substantial part in causing, harm to foreign interests overseas. By

contrast, [] the effects test concerns the impact of overseas activity on U.S.

investors and securities traded on U.S. securities exchanges."[63] Where the court is

determining whether the claims of foreign plaintiffs should be dismissed, the

relevant analysis is the conduct test.[64]

"Conduct in the United States will support application of the

securities laws only when 'substantial acts in furtherance of the fraud were

---

[61]     *In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 531 (S.D.N.Y. 2007)
(quoting *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir. 1975)).
*Accord Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991).

[62]     *Id.* (quoting *SEC v. Berger*, 322 F.3d 187, 192 (2d Cir. 2003)).
*Accord Morrison v. National Australia Bank*, 547 F.3d 167, 171 (2d Cir. 2008)
(citations omitted).

[63]     *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas
London*, 147 F.3d 118, 128 (2d Cir. 1998) (citations omitted).

[64]     *See In re Parmalat*, 497 F. Supp. 2d at 532.

14

committed within the United States.'"[65]  "U.S. acts or culpable failures to act must

have been 'more than merely preparatory' and must have 'directly caused' the

claimed losses."[66]  Thus, under the conduct test, courts may nevertheless possess

jurisdiction over predominantly foreign securities transactions where "in addition

to communications with or meetings in the United States, there has also been a

transaction on a U.S. exchange, economic activity in the U.S., harm to a U.S.

party, or activity by a U.S. person or entity meriting redress."[67]

### 2. Section 10(b) of the Securities Exchange Act and Rule 10b-5

#### a. Prima Facie Case

Section 10(b) of the Securities Exchange Act of 1934 forbids the "use

or employ, in connection with the purchase or sale of any security . . . [of] any

manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors."[68]  Thus, "'the basic elements of a cause

---

[65]  *Id.* at 531 (quoting *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir. 1983)).

[66]  *Id.* (quoting *Berger*, 322 F.3d at 193 (internal quotation marks omitted)).  *Accord Morrison*, 547 F.3d at 171 (citations omitted).

[67]  *Europe and Overseas Commodity Traders*, 147 F.3d at 128 (discussing numerous Second Circuit cases that have so held).

[68]  15 U.S.C. § 78j(b).

15

of action for securities fraud under Section 10(b) and Rule 10b-5 are (1) a material misstatement or omission, (2) scienter, (3) [in] connection with the purchase or sale of a security, (4) reliance, [] (5) economic loss, and (6) 'loss causation, i.e., a causal connection between the material misrepresentation and the loss.'"[69]

### b.    Scienter

"To establish liability under [Section] 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'"[70]   "[R]ecklessness is a sufficiently culpable mental state in the securities fraud context."[71]   Recklessness is "'conduct [that] is, at the least, . . . highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"[72]   "'An egregious refusal to see the obvious, or to

---

[69]    *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 478 n.1 (2d Cir. 2008) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005)).

[70]    *Tellabs Inc. v. Makor Issues and Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976)).

[71]    *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (citation omitted).   *Accord ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 n.3 (2d Cir. 2007).

[72]    *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).

16

investigate the doubtful, may in some cases give rise to an inference of . . .

recklessness.'"[73]

"'[I]ssues of motive or intent are usually inappropriate for disposition

on summary judgment.'"[74]  "In a [Section] 10(b) action, a court may not grant such

relief to the defendants on the ground of lack of scienter unless the plaintiff has

failed to present facts that can support an inference of bad faith or an inference

that defendants acted with an intent to deceive."[75]

### c.   Reliance

A plaintiff must also establish transaction causation, that is, his

"reliance upon the defendant's deceptive statements . . . ."[76]  This reliance must be

"'reasonable'" and "'justifiable.'"[77]  "'An investor may not justifiably rely on a

---

[73]     *Id.* (quoting *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.
Supp. 256, 259 (S.D.N.Y. 1989)).

[74]     *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742,
751 (2d Cir. 1992) (quoting *Wechsler v. Steinberg*, 733 F.2d 1054, 1058-59 (2d
Cir. 1984)).

[75]     *Wechsler*, 733 F.2d at 1059 (citing *State Teachers Ret. Bd. v. Fluor
Corp.*, 500 F. Supp. 278, 294 (S.D.N.Y. 1980), *aff'd*, 654 F.2d 843 (2d Cir.
1981)).

[76]     *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87,
96 (2d Cir. 2001).

[77]     *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996) (quotations
omitted).

17

misrepresentation if, through minimal diligence, the investor should have discovered the truth.'"[78]  Factors that courts in this circuit have used to determine whether an investor acted without justifiable reliance are: "(1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations."[79]

### d.      Individual Liability Under Federal Securities Laws

Section 10(b) imposes liability only on those who make material misstatements.[80]  Following the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver* that there is no liability for aiding and abetting under Section 10(b), the Second Circuit propounded a bright-line rule that

---

[78]     *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005) (quoting *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993)).

[79]     *Brown*, 991 F.2d at 1032 (citations omitted).

[80]     *See Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 177 (1994) (finding that there can be no liability for aiding and abetting under Section 10(b).

18

a defendant "cannot incur primary liability . . . for a statement not attributed to that actor at the time of its dissemination."[81]  This rule has since been relaxed.[82]  The prevailing rule in this Circuit is that a statement need not be "'publicly attributed to the defendant, [if] the defendant's participation is substantial enough that s/he may be deemed to have made the statement, and [if] investors are sufficiently aware of defendant's participation that they may be found to have relied on it as if the statement had been attributed to the defendant.'"[83]

### 3.    Control Person Liability under Section 20(a)

"'To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'"[84]

### B.    Common Law Claims

---

[81]     *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998).

[82]     *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401-02 (S.D.N.Y. 2005) (discussing Second Circuit jurisprudence since *Central Bank of Denver*).

[83]     *Id.* at 402 (quoting *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 330-32 (S.D.N.Y. 2004)).

[84]     *ATSI Commc'ns, Inc.*, 493 F.3d at 108 (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

19

### 1.    Common Law Fraud

"Under New York law, the elements of common law fraud are 'a

material, false representation, an intent to defraud thereby, and reasonable reliance

on the representation, causing damage to the plaintiff.'"[85] "The elements of

common law fraud thus are largely the same as those of a Rule 10b-5 claim except

that there is no requirement that the fraud be 'in connection with the purchase or

sale of securities.'"[86] Thus, "a claim for common law fraud is available to

investors who retain their securities in reliance on a defendant's

misrepresentations."[87]

### 2.    New York's Martin Act

The New York Court of Appeals has held – pursuant to the Martin

Act, New York's blue sky law – that "there is no implied private right of action"

for securities fraud.[88] Under the Martin Act, the New York Attorney General

---

[85]    *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999) (quoting *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970-71 (2d Cir. 1987).

[86]    *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*, 376 F. Supp. 2d 385, 406 (S.D.N.Y. 2005) (quoting *Manela v. Garantia Banking*, 5 F. Supp. 2d 165, 178-79 (S.D.N.Y. 1998)).

[87]    *Id.* (citations omitted).

[88]    *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) (citing *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 276 (N.Y. 1987)). The Martin Act is codified at Section 352 of the New York State General Business

20

possesses exclusive power to regulate the sale of securities.[89] In addition, "courts have held that the Act not only bars private claims brought directly under the statute, but also precludes common-law claims based on facts that provide the Attorney General grounds for instituting an action under the Act."[90] The common-law claims covered under the Act extend only to those that do not require "proof of deceitful intent."[91] Thus, "the Martin Act preempts claims of [] negligence and breach of fiduciary duty predicated on securities fraud" but does not preempt claims of common law fraud.[92] Where, however, the Attorney General has no enforcement power, common law causes of action may proceed.[93]

_____

Law.

[89]     See Castellano, 257 F.3d at 190.

[90]     Lehman Brothers Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co., 179 F. Supp. 2d 159, 162 (S.D.N.Y. 2001) (citation omitted).

[91]     Nanopierce Tech., Inc. v. Southridge Capital Mgmt. LLC, No. 02 Civ. 0767, 2003 WL 22052894, at *4 (S.D.N.Y. Sept. 2, 2003). Accord Eagle Tenants Corp. v. Fishbein, 582 N.Y.S.2d 218, 219 (2d Dep't 1992) (holding that the claim for constructive fraud must be dismissed pursuant to the Martin Act because of the requirement to show "deceitful intent").

[92]     Lehman Bros. Commercial Corp., 179 F. Supp. 2d at 162 (citations omitted). Accord Nanopierce, 2003 WL 22052894, at *4 (noting that "New York courts have allowed common law fraud claims to proceed while dismissing negligent misrepresentation and breach of fiduciary duty claims . . . .").

[93]     See Nanopierce Tech., Inc., 2003 WL 22052894, at *6 (". . . New York courts did not intend to eviscerate New York's common law causes of

21

### 3.    Breach of Fiduciary Duty

The elements of a claim for breach of fiduciary duty under New York

law are "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing

participation in the breach; and damages."[94]  Where damages are sought in a

breach of fiduciary duty claim, "the plaintiff must demonstrate that the defendant's

conduct proximately caused injury in order to establish liability."[95]

Generally, no fiduciary duties arise where parties deal at arm's length

in conventional business transactions.[96]  However, a fiduciary relationship may

arise where the parties to a contract specifically agree to such a relationship, or if

"'one party's superior position or superior access to confidential information is so

great as virtually to require the other party to repose trust and confidence in the

---

action, except where those causes of action fell squarely within the range of cases
on which the Attorney General has been empowered to act.").

[94]    *SCS Commc'ns., Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir.
2004) (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 281-82
(2d Cir. 1992)).

[95]    *LNC Invs., Inc. v. Charter Nat'l Life Ins. Co.*, 173 F.3d 454, 465 (2d
Cir. 1999) (citing *R.M. Newell Co. v. Rice*, 653 N.Y.S.2d 1004, 1005 (4th Dep't
1997)).

[96]    *See In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002);
*SNS Bank, N.V. v. Citibank, N.A.*, 777 N.Y.S.2d 62, 65 (1st Dep't 2004).

first party.'"[97]  The plaintiff must demonstrate that the defendant was "'under a

duty to act for or to give advice for the benefit of another upon matters within the

scope of the relation.'"[98]

"While the 'exact limits' of what constitutes a fiduciary relationship

are 'impossible of statement,' a fiduciary relationship may be found in any case 'in

which influence has been acquired and abused, in which confidence has been

reposed and betrayed.'"[99]  Contractual relations or formal writings are not required

to establish a fiduciary duty.[100]  "Rather, the ongoing conduct between parties must

be considered."[101] Whether a party reposed confidence in another and reasonably

---

[97]     *Ross v. FSG PrivatAir, Inc.,* No. 03 Civ. 7292, 2004 WL 1837366, at
*5 (S.D.N.Y. Aug. 17, 2004) (quoting *Calvin Klein Trademark Trust v. Wachner,*
123 F. Supp. 2d 731, 733-34 (S.D.N.Y. 2000)).

[98]     *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir.
1991) (quoting *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (1st
Dep't 1987)).

[99]     *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216
F. Supp. 2d 198, 218 (S.D.N.Y. 2002) (quoting *Penato v. George*, 383 N.Y.S.2d
900, 904 (2d Dep't 1976)).

[100]     *See, e.g., Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins.
Services,* 388 F. Supp. 2d 292, 305 (S.D.N.Y. 2005).

[101]     *United Feature Syndicate*, 216 F. Supp. 2d at 218 (citations and
quotation marks omitted). *Accord United States v. Chestman*, 947 F.2d 551, 568
(2d Cir. 1991) (finding a fiduciary relationship "exists when confidence is reposed
on one side and there is resulting superiority and influence on the other").

23

relied on the other's superior expertise or knowledge is a "fact-specific inquiry."[102]

## 4.    Negligence and Professional Malpractice

To prevail on a negligence claim, a plaintiff must demonstrate "(1) that the defendant owed him or her a cognizable duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach."[103]  Where the parties are not bound by contractual privity, a duty of care will arise where the parties are in a relationship "so close as to approach that of privity."[104]  To establish such relationship, a plaintiff must prove (1) awareness by the defendant that the statement would be used for a "particular purpose;" (2) plaintiff's reliance on that statement; and (3) some conduct linking the two parties that "evinces the [defendant's] understanding of [plaintiff's] reliance."[105]

---

[102]    *Lumbermens Mut. Cas. Co.*, 388 F. Supp. 2d at 305. *Accord Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 14 (1st Dep't 1998) (noting that whether a fiduciary duty exists "is necessarily fact-specific to the particular case") (citing New York cases).

[103]    *DiBenedetto v. Pan Am World Serv., Inc.*, 359 F.3d 627, 630 (2d Cir. 2004) (citing *Solomon by Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)).

[104]    *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 546 (1985).

[105]    *Id.* at 551.

24

"Under New York law, 'professional malpractice [] is a species of negligence.'"[106]  To prevail on a professional malpractice claim, a plaintiff must demonstrate the elements of negligence, and the breach of duty must be by a professional in a "departure from accepted standards of practice . . . ."[107]

The qualities of a "professional" include "extensive formal learning and training, licensure and regulation indicating a qualification to practice, a code of conduct imposing standards beyond those accepted in the marketplace and a system of discipline for violation of those standards."[108]  "Additionally, a professional relationship is one of trust and confidence, carrying with it a duty to counsel and advise clients."[109]

### 5.    Aiding and Abetting Common Law Fraud

"To establish liability for aiding and abetting fraud, the plaintiffs must show '(1) the existence of a fraud; (2) [the] defendant's knowledge of the

---

[106]    *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000) (quoting *Marks Polarized Corp. v. Solinger & Gordon*, 476 N.Y.S.2d 743, 744 (Sup. Ct. N.Y. Co. 1984)).

[107]    *Vtech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 262 (S.D.N.Y. 2004) (citing *Herbert H. Post & Co. v. Sidney Bitterman, Inc.*, 639 N.Y.S.2d 329, 335 (1st Dep't 1996)).

[108]    *Chase Scientific Research, Inc. v. NIA Group, Inc.*, 96 N.Y.2d 20, 29 (2001) (citations omitted).

[109]    *Id.* (citations omitted).

fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'"[110]  Under New York law, a defendant must be shown to possess actual knowledge of the underlying fraud.[111]

### 6.     Aiding and Abetting Breach of Fiduciary Duty

The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) "a breach by a fiduciary of obligations to another of which the aider and abettor had actual knowledge;" (2) "that the defendant knowingly induced or participated in the breach;" and (3) "that plaintiff suffered damage as a result of the breach."[112]

## V.     DISCUSSION

### A.     Federal Securities Law

#### 1.     Extraterritorial Jurisdiction

Defendants argue that they are entitled to summary judgment with respect to those claims brought by foreign plaintiffs because the federal securities

---

[110]     *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (quoting *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005).

[111]     *See id.* (citing *Kolbeck v. LIT America, Inc.*, 939 F.Supp. 240, 246 (S.D.N.Y. 1996)).

[112]     *In re Sharp Int'l Corp.*, 403 F.3d 43, 49-50 (2d Cir. 2005) (quotations omitted).

26

laws do not apply to foreign securities transactions.[113]  They contend that because

the calculation of the NAVs was performed in Curacao and the NAV statements

were sent from Curacao, their conduct should not be subject to federal securities

laws.[114]  Plaintiffs argue that although the NAVs were calculated in and

disseminated from Curacao, the Funds were managed from the United States by

Lancer Management and were invested in securities in the United States and

traded on United States exchanges.[115]  In addition, plaintiffs argue that Citco NV

"regularly communicated and corresponded with Lancer Management, and also

traveled to the United States for meetings."[116]

Because the actions that "directly caused harm" to plaintiffs took

place in the United States, I conclude that this Court has subject matter jurisdiction

over the claims of the foreign plaintiffs.[117]  Plaintiffs allege fraud in connection

---

[113]     *See* Def. Mem. at 13.

[114]     *See id.* at 14.

[115]     *See* Plaintiffs' Memorandum of Law in Opposition to Motion for
Summary Judgment of Defendants Citco Fund Services (Curacao), N.V., Kieran
Conroy, Declan Quilligan and Anthony Stocks ("Pl. Mem.") at 15.

[116]     *Id.*

[117]     *Morrison*, 547 F.3d at 173 (directing courts to "identify which action
or actions constituted the fraud and directly caused harm . . . and then determine if
that act or those actions emanated from the United States").

with the NAVs of the Funds.[118]  These NAVs were based on valuations of

portfolio securities.[119]  The PPM states that listed securities are to be valued at

their "last sales prices on the date of determination."[120]  It also provides that

unlisted securities are to be valued at quoted prices or assigned a value by the

Board of Directors, and that in the latter situation, the Board is "entitled to rely

upon the advice of the Fund's Investment Manager and Prime Broker."[121]  Thus,

the conduct that "directly caused harm" to plaintiffs was not the dissemination of

the NAV statements.  Rather, the harm was caused by Lauer's purchase of listed

securities at inflated prices and his fraudulent advice regarding the valuation of

unlisted securities.  These acts took place in the United States.[122]

That the Funds were invested in securities that traded on various

---

[118]   *See* SAC ¶ 320.

[119]   *See* PPM, Ex. 5 to Feinberg Decl., at 19.

[120]   *Id.*

[121]   *Id.* at 19-20.

[122]   *See id.* at 1 (stating that Lancer Management is a company formed under the laws of Connecticut); Keunen Dep., Ex. 5 to Beaumont Decl., at 136:16-137:4 (testifying that Lauer's office is in New York).  This conclusion is consistent with *SEC v. Berger*, in which the Second Circuit, confronted with almost identical facts, ruled that – although the NAVs had been calculated and the NAV statements sent by offshore [f]und administrators to investors – the "fraudulent scheme was masterminded and implemented by [the fund manager] in the United States." 322 F.3d at 194.

stock exchanges in the United States[123] and significant communications took place

between Citco NV and Lauer in the United States with respect to Citco NV's

calculation of the NAVs[124] further support jurisdiction over this case.[125]  Summary

judgment is thus denied on this ground.

---

[123]     *See* PPM, Ex. 5 to Feinberg Decl., at 2 ("The majority of the common
stocks in which the Fund has and intends to invest in are traded on the New York
Stock Exchange, the American Stock Exchange or in the over-the-counter market
in the United States of America.").

[124]     *See, e.g.*, Keunen Dep., Ex. 5 to Beaumont Decl., at 136:16-137:11
(attesting to the September 2001 meeting in which Keunen and Quilligan met with
Lancer Management at its offices in New York to discuss valuation concerns);
2/6/02 Email from Quilligan to Keunen and others, Ex. 1 to Beaumont Decl., at 1
(summarizing a meeting that took place between Citco NV and Lancer
Management in New York to further discuss valuation issues).  The Citco
Defendants argue that the jurisdictional inquiry is defendant-specific – that only
their acts within the United States must be examined – and that their
communications with Lancer Management in the United States were "ancillary"
compared to the preparation and dissemination of the NAV statements.  *See* Def.
Mem. at 6.  This is false.  As discussed, the work that "directly caused harm" to
plaintiffs was performed by Lauer in New York, and the Citco Defendants were
regularly in contact with Lauer regarding his valuations of the portfolio securities.
It was thus their conduct with Lauer in the United States that "directly caused
harm" to plaintiffs.

[125]     Similar facts have been found to support jurisdiction.  *See Europe &
Overseas Commodity Traders, S.A.*, 147 F.3d at 130 (reviewing past Second
Circuit cases in which jurisdiction has been found on a showing that meetings
occurred in the United States and there was a transaction on a United States
exchange).

## 2.    Section 10(b) of the Securities Exchange Act[126]

### a.    Scienter[127]

The Citco Defendants contend that plaintiffs cannot establish that

they acted recklessly prior to June 2001.[128]  Plaintiffs argue that the Citco

Defendants were "willfully blind or recklessly indifferent to conspicuous evidence

of portfolio and price manipulation that was readily detectable from their own

documents."[129]  In support of their conclusion, plaintiffs point to a 1996 memo –

created by Ger-Jan Meijer, a Citco NV internal auditor – that "warned that [Citco

NV] was improperly valuing the restricted shares in the Lancer Offshore portfolio

at free-trading prices" instead of at a discount.[130]  Plaintiffs contend that if Citco

---

[126]    Only plaintiffs who purchased "all or part of their shares in the Fund after March 2000" are alleging violations of Section 10(b) and Rule 10b-5. *See* SAC ¶ 319. Thus, Andre Chagnon, Coronation Universal Fund, Coronation International Active Fund, and Bombardier Trust (US) Master Trust do not allege violations of federal securities laws against the Citco Defendants. *See* Def. 56.1 ¶ 26.

[127]    Plaintiffs and the Citco Defendants appear to impute any knowledge that Citco NV might possess about Lauer's scheme to the Citco Directors in their papers. *See* Def. Mem. at 5-10; Pl. Mem. at 2-6. Thus, for the purposes of the analysis of the Citco Defendants' scienter, the terms "Citco NV" and the "Citco Defendants" are used interchangeably.

[128]    *See* Def. Mem. at 5.

[129]    Pl. Mem. at 4.

[130]    *Id.*

30

NV had followed the correct methodology of applying a discount to such shares, inflated prices would not have been used to calculate the fraudulent NAVs, and Lauer's scheme of "painting the tape" would not have been successful.[131]

This memorandum, alone, is insufficient to establish that the Citco Defendants were reckless.  In the memorandum, Meijer challenged Citco NV's valuation of restricted securities, suggesting that these securities be valued at a discount to the market value.[132]  There is no mention of Lauer's "painting the tape" scheme.[133]  The most that can be said of the memorandum is that the Citco Defendants were made aware that Citco NV's methodology for pricing restricted securities was imprudent.  The memorandum cannot, however, be said to have put the Citco Defendants on notice of Lauer's fraud.[134]

---

[131]     *See id.*

[132]     *See* 9/30/96 Ger-Jan Meijer Memorandum, Ex. 4 to Feinberg Decl., at 2.

[133]     *See id.*  The methodology of pricing restricted securities at their market price was later disclosed by PWC NA in the 1996 Financial Statements. *See* 12/31/96 Lancer Offshore, Inc. Notes to Financial Statements, Ex. 8 to Feinberg Decl., at 9.

[134]     This conclusion is consistent with the holding in my previous opinion on the Citco Defendants' motion to dismiss. *See Pension Comm. of the Univ. of Montreal Pension Plan*, 2007 WL 528703, at *6 (dismissing claims against defendant Stocks because plaintiffs' allegations – that he was a director of Lancer Offshore, he was employed by Citco NV, and he had received the 1996 memo by Meijer – were inadequate to plead scienter).

31

Plaintiffs also argue that the Citco Defendants blindly accepted prices for unlisted securities from Lancer Management when they should have ensured that these prices were reasonable.[135]  Thus, plaintiffs contend, Citco NV "acted in direct contravention of the applicable and proper policies and procedures, and with reckless indifference to the accuracy of the prices used for the unlisted securities . . . ."[136]  However, as discussed, the PPM directs the Board of Directors to determine the value of unlisted securities and further allows the Board to "rely upon the advice of the Fund's Investment Manager and Prime Broker."[137]  This language suggests that the Citco Defendants may not have had a duty to ensure these prices were reasonable.  Even assuming the Citco Defendants had a duty to verify the value of the securities in the portfolio, their failure to do so – in the absence of further evidence of deceit – would at most amount to negligence, not recklessness.

The only other evidence plaintiffs put forth to establish the Citco Defendants' recklessness is the report of Professor Israel Shaked, plaintiffs' expert, in which Shaked raises examples of "patently bogus portfolio entries and

---

[135]    *See* Pl. Mem. at 5.

[136]    *Id.*

[137]    PPM, Ex. 5 to Feinberg Decl., at 19-20.

conspicuous 'painting the tape' transactions" of which Citco NV should have been aware.[138]  Shaked is a Professor of Finance and Economics at Boston University's School of Management, who teaches courses in business valuation, corporate finance and financial economics.[139]  He has also worked as a consultant, providing valuation and investment banking services to companies, and has provided expertise and consulting services to various government agencies.[140]  He is not, however, an expert on hedge fund administration and cannot opine on what Citco NV should have noticed as indications of fraud.  Thus, the portion of Shaked's report that discusses the "obvious signs" of fraud of which Citco NV should have been aware, must be disregarded.[141]  Because plaintiffs have not adduced any other evidence of recklessness by the Citco Defendants, summary judgment on the Section 10(b) claims is granted to the Citco Defendants with respect to the

---

[138]    Pl. Mem. at 5.  *See also* Report of Professor Israel Shaked ("Shaked Rep."), Ex. 15 to 10/14/08 Declaration of Amy C. Brown, plaintiffs' counsel ("Brown Decl."), at 5-9.

[139]    *See* Report of Professor Israel Shaked, Ex. 15 to Declaration of Scott Berman, plaintiffs' counsel, attached to plaintiffs' opposition papers regarding IFSI's summary judgment motion, at 1-2.

[140]    *See id.* at 2.

[141]    *See Miller v. Astucci U.S. Ltd.*, No. 04 Civ. 2201, 2007 WL 102092, at *14 (S.D.N.Y. Jan. 16, 2007) (citing *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir. 1977) (excluding testimony regarding legal conclusions of an expert retained to give opinions about "[building] safety engineering")).

plaintiffs who purchased all of their shares in the Funds prior to June 2001.[142]

### b.    Actual Reliance

The Citco Defendants further contend that they should be entitled to summary judgment on the Section 10(b) claims of those plaintiffs who cannot show that they relied on the NAV statements in purchasing shares of the Lancer Funds.[143] *First*, the Citco Defendants argue that where it is shown that the NAV statements were not sent to plaintiffs prior to their initial investment in the Funds, then plaintiffs cannot establish actual reliance on the statements, and their Section 10(b) claims with respect to these initial investments should be dismissed.[144] I

---

[142]    Thus, the Section 10(b) claims of Bombardier Trust (Canada), Pension Committee/University of Montreal, Pension Committee/l'Ecole Polytechnique, Corbett Family Charitable Foundation, Commonfund Global Hedged Partners, Okabena Marketable Alternatives Fund, Hunnicut IRA/VFTC as Custodian, and Fondation J. Armand Bombardier, are dismissed.  The Section 10(b) claims with respect to the pre-June 2001 purchases of the remaining plaintiffs are also dismissed.  These include Fondation Lucie et Andre Chagnon's March 1, 2001 purchase; Sojecci II Ltée's October 1, 1999, February 29, 2000 and March 1, 2000 purchases; Bombardier Trust (UK)'s March 1, 2000 and April 1, 2000 purchases; Kuwait and Middle East Financial Investment Company's November 1, 1997, January 1, 1998, May 1, 1998, January 1, 2000, March 1, 2000, and June 1, 2000 purchases; Defined Benefit Plan for Hunnicutt & Co., Inc.'s November 1, 1999, March 1, 2000, February 1, 2000 and July 1, 2000 purchases; and The Altar Fund's October 1, 2000, December 1, 2000, February 1, 2001, March 1, 2001, and May 1, 2001 purchases.

[143]    *See* Def. Mem. at 10.

[144]    *See id.* at 11 (citing *Gabriel Capital, L.P. v. NatWest Finance, Inc.*, 177 F. Supp. 2d 169, 174 (S.D.N.Y. 2001) ("Belated reliance cannot support a

agree.  Accordingly, summary judgment is granted with respect to the Section

10(b) claims of the remaining plaintiffs pertaining to their initial investments in

the Fund.[145]

Second, the Citco Defendants argue that they can point to evidence in

the record that shows that neither plaintiffs – Kuwait and Middle East Financial

Investment Company ("KMEFIC"), Commonfund Global Hedged Partners, LLC,

Altar Fund, Andre Chagnon, The Morton Meyerson Family Foundation, and the

Meyerson 1999 Charitable Remainder Trust – nor their representatives actually

relied on the NAV statements.[146]  The Section 10(b) claims of Commonfund

Global Hedged Partners, LLC and Andre Chagnon have been dismissed based on a

lack of scienter.[147]  The Meyerson 1999 Charitable Remainder Trust made one

---

federal securities claim . . . .")).  Plaintiffs have only provided evidence sufficient
to show that Richard Lombardi of the Altar Fund received and may have relied on
Citco NV's NAV information prior to the Altar Fund's initial investment.  See Pl.
Mem. at 7.  However, because the Altar Fund's initial investments occurred on
October 1, 2000, the Section 10(b) claims with respect to these purchases have
already been dismissed based on a lack of scienter.  See supra Part V.A.2.a.

[145]    This includes the March 1, 2002 purchases of The 1999 Meyerson
Charitable Remainder Trust and The Morton Meyerson Family Foundation.

[146]    See Def. Mem. at 12.

[147]    See supra Part V.A.2.a.

investment in Lancer Offshore.[148] Because it has not shown that it received a

monthly NAV statement prior to its investment in the Fund, its Section 10(b)

claim has already been dismissed. Thus, I will analyze the evidence regarding

reliance with respect only to the remaining three plaintiffs who still have surviving

Section 10(b) claims.

### i. The Altar Fund

During his deposition, Richard Lombardi of the Altar Fund noted

that, as an "interested party" (and not yet an investor), he would receive NAV

information from Citco NV and would analyze the NAVs as "official performance

numbers."[149] Thus, there is an issue of fact with regards to whether Lombardi

reviewed the monthly NAV statements prior to each of the Altar Fund's

investments. Summary judgment has been granted with respect to the Altar

Fund's Section 10(b) claims pertaining to its pre-June 2001 investments in the

Funds because plaintiffs have not been able to show that the Citco Defendants

possessed scienter prior to that date.[150] However, summary judgment is denied

with respect to the Altar Fund's Section 10(b) claim with respect to its August

---

[148]     *See* SAC ¶ 15(ddd).

[149]     Deposition Transcript of Richard Lombardi ("Lombardi Dep."), Ex.
13 to Brown Decl., at 428:13-430-21.

[150]     *See supra* Part V.A.2.a.

36

2002 purchase.

## ii.    KMEFIC

Because plaintiffs have not been able to show that the Citco

Defendants possessed scienter prior to June 2001, KMEFIC's only surviving

Section 10(b) claim relates to its purchase of shares in Lancer Offshore on June 1,

2002.  The Citco Defendants note that the last six purchases of shares in the Funds

by KMEFIC – including the June 2002 investment – were made on behalf of other

clients and those clients ultimately made the investment decisions.[151]  They also

note that KMEFIC has represented that only Mohammed Almarzook – an

investment analyst employed by KMEFIC who had evaluated KMEFIC's own

proprietary investments in the Funds – will be called to testify.[152]  Because there is

no evidence that the client for which KMEFIC purchased shares in June 2002

relied on the NAV statements, the Citco Defendants are entitled to summary

judgment with respect to KMEFIC's Section 10(b) claim based on this

investment.[153]

_____

[151]    *See* Def. Mem. at 12.

[152]    *See* 5/26/08 Email from Amy Brown to Dyanne Feinberg, May 26, 2008, Ex. 8 to Feinberg Decl. at 1 (confirming that "the only substantive witness [plaintiffs] intend to call at trial on behalf of KMEFIC is Mohamed Almarzook").

[153]    Plaintiffs also argue that Almarzook undertook due diligence on behalf of three of the four clients – KFAOS, Fadia Limited, and the KMEFIC

### iii.    The Morton Meyerson Family Foundation

Because The Morton Meyerson Family Foundation has not shown

that it received the monthly NAV statements prior to its initial purchase of shares

in Lancer Offshore on March 1, 2002, its Section 10(b) claim with respect to this

purchase has been dismissed.  Thus, the only remaining Section 10(b) claim

pertains to the Foundation's April 1, 2002 purchase.

Morton Meyerson of The Morton Meyerson Family Foundation

testified at his deposition that he delegated the due diligence of the Funds to Scott

Letier, one of his employees.[154]  At his deposition, Letier testified that he had

reviewed the PPM, monthly newsletters and the audited financial statements prior

to the Foundation's investment in the Funds.[155]  Although Letier began receiving

_____

Prime Fund.  *See* Pl. Mem. at 7 n.8.  However, although plaintiffs present evidence
to show that KMEFIC received historical performance records from Citco NV
around the times of the initial investments by three of its clients and that it
forwarded NAV statements and other information about the Funds to its clients,
*see* Pl. Counter. 56.1 ¶ 44, they have not presented evidence that Almarzook
analyzed the NAV information for these clients or that the clients relied on this
information themselves in deciding to invest in Lancer Offshore.

This disposes of all of KMEFIC's Section 10(b) claims.

[154]     *See* Deposition Transcript of Morton Meyerson, Ex. 15 to Feinberg
Decl., at 21:5-21.

[155]     *See* Deposition Transcript of Scott Letier, Ex. 11 to Feinberg Decl., at
61:19-62:8.

NAV information for the Funds prior to the Foundation's April 2002 investment,[156] there is no evidence that Letier or any other representative of the Foundation relied on this information.  Because the Foundation has not shown that it relied on the NAV information, summary judgment on its Section 10(b) claim with respect to its April 2002 purchase is granted to the Citco Defendants.[157]

### c.      Justifiable Reliance

The Citco Defendants next argue that several plaintiffs cannot establish their Section 10(b) claims because they had either failed to perform adequate due diligence on the Funds or had ignored adverse information about the Funds that would have made them aware of the scheme.[158]  Thus, they contend, these plaintiffs were not justified in relying on the NAV statements.[159]

### i.      Failure to Perform Adequate Due Diligence

The only plaintiffs with surviving Section 10(b) claims of the plaintiffs that the Citco Defendants have alleged did not conduct adequate due

---

[156]      *See* 3/18/02 Subscription Letter from Citco NV to Letier, Ex. 5 to Brown Decl., at 1.

[157]      This disposes of all of The Morton Meyerson Family Foundation's Section 10(b) claims.

[158]      *See* Def. Mem. at 12-13.

[159]      *See id.*

39

diligence are Claude Chagnon, who purchased shares through Sojecci II Ltée,[160]

and Bombardier Trust (UK).  I will review the evidence pertaining to each of these

plaintiffs in turn.

### aa.    Claude Chagnon

Contrary to the Citco Defendants' argument that Chagnon did no due

diligence on Lancer Offshore, Chagnon explained during his deposition that he

had relied in part on the due diligence of Germain Bourgeois, a representative of

Fondation Lucie et Andre Chagnon.[161]  Chagnon also testified that he had

reviewed the NAV statements of the Fund in making his decision to invest.[162]  It is

also unclear whether additional due diligence by Chagnon would have uncovered

the scheme to defraud.  Even though the PPM listed a number of risks, including

the lack of liquidity,[163] it did not warn that investor money would be used to

---

[160]    The Citco Defendants had also argued that Bombardier Trust
(Canada), Bombardier Trust (U.S.) Master Trust, Okabena Marketable
Alternatives Fund, The Corbett Family Foundation, Coronation International
Active Fund of Funds, Coronation Universal Fund, Andre Chagnon, and
Fondation J. Armand Bombardier failed to perform adequate due diligence on the
Funds.  Because the Section 10(b) claims of these plaintiffs have been dismissed
for lack of scienter, I do not discuss those arguments here.

[161]    *See* Deposition Transcript of Claude Chagnon ("Chagnon Dep."), Ex.
14 to Feinberg Decl., at 70:23-71:6.

[162]    *See* Chagnon Dep., Ex. 13 to Brown Decl., at 135:15-136:8.

[163]    *See* PPM, Ex. 5 to Feinberg Decl., at 6.

purchase worthless securities whose lack of value would be hidden from investors

by a scheme whereby the prices of these stocks would be artificially inflated and

reported to investors. Summary judgment with respect to the Section 10(b) claim

of Claude Chagnon based on his May 1, 2002 purchase of shares is therefore

denied on this ground.

### bb.   Bombardier Trust (UK)

Plaintiffs have also presented sufficient evidence to show that the

Bombardier Trusts conducted due diligence prior to making investments in Lancer

Offshore. Jean Pierre Goyer, Chairman of the Investment Committee for the

Bombardier Trusts, testified that he had met with Lauer to discuss the investment

by the Bombardier Trusts and had asked Lauer to present the Funds to the

Investment Committee.[164]  Goyer also delegated the responsibility of performing

due diligence on Lancer Offshore to a team of individuals.[165]  He testified that this

team would have reviewed Lancer Offshore's financial statements prior to the

Trust's investment in the Fund.[166]  Like Chagnon, it is unclear that additional due

---

[164]   See Deposition Transcript of Goyer, Ex. 14 to Brown Decl., at 54:3-57:17.

[165]   *See id.* at 90:13-93:6 (also testifying that someone on his team would have been responsible for reviewing the financial statements of Lancer Offshore and flagging any problems to him).

[166]   *See id.*

41

diligence would have alerted Goyer to Lauer's scheme. Thus, summary judgment of Bombardier Trust (UK)'s Section 10(b) claims with respect to its purchases in March and June 2002 are similarly denied on this ground.

### ii.    Adverse Information

The Citco Defendants further contend that Bourgeois, who was responsible for the investments of The Pension Committee of the University of Montreal, the Fondation Lucie et Andre Chagnon, Sojecci Ltée,[167] and The Pension Committee of the Pension Plan for the Regime de Retraite de law Corporation de L'Ecole Polytechnique should have been alerted – by the disclosure of significant adverse information – that something was wrong at the Funds.[168] This argument is unpersuasive.

*First*, the Citco Defendants contend that the "surge of redemption requests" in 1998 should have put Bourgeois on notice of the Funds' lack of liquidity.[169] However, Bourgeois testified that he was not aware of the redemption requests at this time and he was not sure that he had received the January 28, 1999

---

[167]    Sojecci II Ltée was assigned the claim of Sojecci Ltée. *See* SAC ¶ 15(ee).

[168]    *See* Def. Mem. at 13.

[169]    *See* Def. 56.1 ¶ 58.

42

newsletter that discussed the issue.[170]  Regardless of Bourgeois' lack of awareness,

it is unclear why this would have been a significant event.  In fact, other plaintiffs

who had been aware of these redemption requests had attributed them to market

events at that time.[171]

> *Second*, the Citco Defendants argue that Bourgeois and other

plaintiffs should have been skeptical when the Funds reported an investment loss

in 1999 and net unrealized gains in 2000 and 2001.[172]  Consistent with Bourgeois'

testimony, however, it is unclear that investors would have been suddenly aroused

by these figures in the annual reports, particularly because the NAV statements

they were receiving monthly reported that the Funds were performing well.[173]  In

addition, Bourgeois testified that he had questioned Lauer about the unrealized

gains, but was reassured by Lauer that he was waiting to sell the securities in case

---

[170]    *See* Deposition Transcript of Germain Bourgeois ("Bourgeois Dep."),
Ex. 11 to Brown Decl., at 307:3-11, 308:11-309:14.

[171]    *See, e.g.*, Deposition Transcript of William Hunnicutt, representative
of IRA f/b/o William Hunnicutt VFTC as Custodian, Ex. 13 to Brown Decl., at
147:4-15 (opining that the redemptions could have been the result of the "Long-
Term Capital debacle in 1998"); Lombardi Dep. at 234:14-235:25 (stating that
there had been redemptions "in the industry as a whole").

[172]    *See* Def. Mem. at 13; Def. 56.1 ¶¶ 60-61.

[173]    *See* Bourgeois Dep., Ex. 11 to Brown Decl., at 440:19-441:15 (stating
that although the loss in 1999 was "big," the net asset value is "[w]hat counts . . .
.").

43

some "catalyst" occurred that would increase prices further.[174]

     *Third*, the Citco Defendants contend that Bourgeois should have been aware that Citco NV was not valuing the portfolio, particularly because a footnote to the 2001 financial statements informed investors that the portfolio was being valued by "the Board of Directors in conjunction with the investment manager."[175] This argument is similarly unpersuasive. Citco NV's senior officers were still directors of the Funds in 2001,[176] and Bourgeois still believed – and had no reason to disbelieve – that the NAVs calculated by Citco NV could be trusted.[177] It is unclear whether a footnote in the financial statements describing valuation methodology would have been sufficient to put any plaintiff on notice of Lauer's scheme. I find that although plaintiffs were sophisticated investors, their lack of access to critical information about the Funds and the continued concealment of the scheme by Lauer are enough to raise a "genuine issue of fact" regarding whether they justifiably relied on the NAV statements. Summary judgment is thus denied on this ground.

---

[174]    *See id.* at 160:9-161:17.

[175]    *See* Def. 56.1 ¶ 61.

[176]    *See* Bourgeois Dep., Ex. 9 to Feinberg Decl., at 170:13-20; SAC ¶¶ 37-38.

[177]    *See* Bourgeois Dep., Ex. 9 to Feinberg Decl., at 169:15-170:12.

### d.     Individual Liability of the Citco Directors

With regards to Conroy and Quilligan, the Citco Defendants argue

that the NAV statements were not "publicly attributable to [them] when made."[178]

This statement, however, is false.  The PPM states unequivocally that "[t]he Board

of Directors of the Fund, in consultation with the Investment Manager, will value

the securities held by the Fund in accordance with the Fund's Articles of

Association."[179]  In addition, the Articles of Association of Lancer Offshore states

that "[t]he Net Asset Value per Share shall be determined by the Directors . . . ."[180]

Although the NAV statements were signed by Citco NV, investors would have

reasonably believed that the Board of Directors substantially participated in the

calculation of the NAV.  Thus, summary judgment with respect to the Citco

Directors on this ground is denied.

### 3.     Control Person Liability under Section 20(a)

Citco Group argues that it is entitled to summary judgment on

plaintiffs' Section 20(a) claim because plaintiffs cannot establish that it was "a

---

[178]     Def. Mem. at 15.

[179]     PPM, Ex. 1 to Brown Decl., at 12.

[180]     Articles of Association of Lancer Offshore, Ex. 2 to Brown Decl., at
12.

culpable participant in [Citco NV's] fraud."[181]  Citco Group contends that it "never

provided administrative services or any other services to the Lancer Funds."[182]  It

further argues that its Executive Committee was not apprised of problems

regarding the valuation of the Funds until May 21, 2002, when Christoffel Smeets,

President and CEO of the Citco Group, received an email from William Keunen,

Division Director of Fund Services and President of Citco Fund Services USA.[183]

Therefore, Citco Group claims that it could not have been a "culpable participant"

in the fraudulent scheme until May 21, 2002.[184]  I disagree.

Citco Group contends that its Executive Committee was not

intimately involved in the day-to-day affairs of Citco NV, and that therefore,

plaintiffs cannot show that it knew of the Lancer Funds scheme prior to May 21,

2002.[185]  However, this argument assumes that the only people who could have

acted on behalf of the company were members of the Executive Committee.  The

---

[181]     Defendant, The Citco Group Limited's Memorandum of Law in
Support of its Motion for Summary Judgment ("CGL Mem."), at 2 (quoting *ATSI
Commc'ns, Inc.*, 493 F.3d at 108 (internal quotations omitted)).

[182]     *Id.* at 3.

[183]     *See id.*

[184]     *See id.* at 4.

[185]     *See* Defendant The Citco Group Limited's Reply Memorandum of
Law in Support of Its Motion for Summary Judgment ("CGL Rep. Mem."), at 7.

argument fails to consider whether Keunen was acting on behalf of Citco Group

while fulfilling his duties as division director, and whether his actions constituted

"culpable participation" by the Citco Group.

As explained by Smeets at his deposition, the Executive Committee

of the Citco Group hired division directors to oversee the day-to-day operations of

its business segments.[186]  Keunen was the division director for the fund services

segment of Citco Group's business.[187]  The undisputed evidence shows not only

that Keunen was hired by the Executive Committee of Citco Group, but that the

committee reviewed his performance and set his compensation.[188]  In addition,

Keunen reported regularly to the Citco Group's Executive Committee.[189]

Furthermore, there were times when the managing directors of individual fund

services entities would substitute Keunen's approval for that of the Citco Group

---

[186]     *See* Deposition Transcript of Christoffel Smeets ("Smeets Dep."), Ex.
1 to Feinberg CGL Decl., at 21:6-21; 195:12-196:6.

[187]     *See id.* at 24:4-11; Keunen Dep., Ex. 5 to Beaumont Decl., at 13:22-
14:11.

[188]     *See* Keunen Dep., Ex. 5 to Beaumont Decl., at 38:5-39:5; Smeets
Dep., Ex. 8 to Beaumont Decl., at 107:22-108:2.

[189]     *See* Keunen Dep., Ex. 5 to Beaumont Decl., at 14:15-16.

Executive Committee.[190] This evidence demonstrates that Keunen was acting on

behalf of the Citco Group while in his capacity as division director of the fund

services segment.[191]

This finding – that Keunen was acting on behalf of the Citco Group –

makes it unnecessary for this Court to make a ruling with respect to whether

"culpable participation" requires scienter[192] because it is undisputed that Keunen

---

[190]    For example, the Citco Group Code of Ethics requires the approval of
the Executive Committee before an employee serves on a professional or business
committee of outside entities or otherwise engages in paid work with outside
entities. *See* The Citco Group Limited Corporate Code of Ethics, Ex. 3 to
Beaumont Decl., at 6. Nevertheless, Conroy testified that he obtained the approval
of Keunen rather than the Executive Committee on those occasions. *See*
Deposition Transcript of Kieran Conroy, Ex. 11 to Beaumont Decl., at 131:19-
133:11. Quilligan and Citco NV General Manager Patrick Fenlon also testified
that they would seek approval from Keunan before participating in activities
covered by the Code of Ethics. *See* Quilligan Dep. at 124:13-126:25; Deposition
Transcript of Patrick Fenlon, Ex. 10 to Beaumont Decl., at 87:14-88:13.

[191]    Plaintiffs argue that Keunen was an agent for Citco Group, and that
therefore, his knowledge of Lauer's scheme is imputed to the Citco Group. *See*
Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment
of Defendant The Citco Group Limited ("Pl. CGL Mem."), at 6-8. I decline to
adopt plaintiffs' argument here because this could result in the imposition of
liability on parent companies based merely on the suggestion that one of its
subsidiary companies' employees was an agent of the parent company and that he
or she was aware of the fraudulent scheme. Here, by contrast, Keunen was not
only an employee of a subsidiary company, but had been delegated the task of
overseeing the fund services business on behalf of Citco Group. In this capacity,
he was more of a principal than an agent.

[192]    The Second Circuit has not defined what is meant by the requirement
that a controlling entity be a "culpable participant." *See In re IPO Sec. Litig.*, 241

had knowledge of the Lancer Funds situation beginning in September 2001, when Quilligan apprised him of concerns regarding the funds.[193] From that date onwards, Keunen was actively involved in monitoring the Lancer Funds. On September 12, 2001, he participated in a meeting with Lancer Management to discuss Citco NV's concerns.[194] Following that meeting, he was kept apprised of Citco NV's monitoring of the situation by Quilligan and others at Citco NV.[195]

---

F. Supp. 2d 281, 395 (S.D.N.Y. 2003) (examining Second Circuit cases that have failed to define "culpable participant"). This Court, while deciding certain defendants' motions to dismiss in this matter, previously held that scienter need not be pleaded on a Section 20(a) claim for control person liability. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 191 (S.D.N.Y. 2006) (citing *In re IPO*, 241 F. Supp. 2d at 395-96). *See also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392-415 (S.D.N.Y. 2003) (holding that "there is no required state of mind for a defendant's culpable participation in a Section 20(a) offense"). Nevertheless, it should be noted that other district courts that have confronted this issue have disagreed with this conclusion, finding that the plaintiff must demonstrate that the control person acted with recklessness. *See, e.g.*, *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008) (quoting *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 248 (S.D.N.Y. 2006) ("The weight of well-reasoned authority is that to withstand a motion to dismiss a section 20(a) controlling person liability claim, a plaintiff must allege 'some level of culpable participation at least approximating recklessness in the section 10(b) context.'").

[193]     *See* Keunen Dep., Ex. 5 to Beaumont Decl., at 131:25-132:10.

[194]     *See id.* at 136:16-137:11.

[195]     *See* 2/6/02 Email from Quilligan to Keunen and others, Ex. 1 to Beaumont Decl., at 1 (reporting that Quilligan and another Citco NV executive met with Lancer Management to discuss concerns regarding the securities of a portfolio company that had "suspended ongoing operations" three years before and

Despite receiving information that Lancer Management was not fully cooperating

with the investigation and repeated indications that the NAVs were inaccurate, he

nevertheless directed the continued reporting of the inflated NAVs.[196]

Citco Group continued to be a "culpable participant" even after

Smeets was informed of the situation by Keunen in May 2002.  The evidence

shows that Citco NV continued to communicate NAVs for Lancer Offshore until

August 31, 2002 and continued to act as administrator of OmniFund until

November 30, 2002.[197]  Citco Group also allowed the scheme to continue after

---

had reported no revenue; securities of a company for which no information could
be found; and securities of a company that had reduced its workforce by 75%, had
"divested itself of all non-core business segments" and could not give "assurance
that [it] will be able to continue to fund its operations . . . ."); 4/5/02 Email from
Quilligan to Keunen, Ex. 1 to Beaumont Decl., at 1 (apprising Keunen that Lancer
Management had "not fulfilled [its] commitment" to provide further valuation
information and that the deadline of March 31, 2002 had passed); 5/20/02 Memo
by Ger-Jan Meijer to Citco NV executives and copying Keunen and others, Ex. 1
to Beaumont Decl., at 2-3 (outlining conclusions from his review of
documentation provided by Lancer Management and opining that "the portfolio is
overvalued for most [of] the positions" and that "[t]here are serious indications
that Lancer is/was manipulating the prices for" certain securities).

[196]    *See* 2/7/02 Email from Keunen to Quilligan and others, Ex. 1 to
Beaumont Decl., at 1 (directing Citco NV to release the NAV for January 2002);
6/10/02 Email from Keunen to Quilligan, Ex. 1 to Beaumont Decl., at 1 (Keunen
responds "[y]es" to Quilligan's email asking whether he was "ok with releasing
the NAV and waiting for [Lancer Management] to revert to us" about further
valuation information).

[197]    *See* Keunen Dep., Ex. 6 to Beaumont Decl., at 179:24-180:19;
Quilligan Dep. at 169:23-170:1.

Citco NV's resignation as administrator of the Funds. When Citco NV resigned as administrator of Lancer Offshore on July 16, 2002, investors were not informed of its departure.[198] When they finally were informed about Citco NV's resignation a month later, investors were not told the reasons for its resignation.[199] Instead, they were told merely that "Citco and [Lancer Offshore] have mutually and amicably agreed, on the termination of the Administration Agreement . . . ."[200] Plaintiffs have put forth sufficient evidence to show that Citco Group may have been a "culpable participant" in Lauer's scheme beginning in September 2001.

Citco Group makes much of its efforts to "obtain[] certifications from the Board of Directors of the Lancer Funds attesting to the propriety of the valuations," "its full disclosure to [PriceWaterhouse Coopers, the Lancer Funds' independent auditor], regarding its concerns over the valuations," and its seeking and following of "legal advice of the law firm of Shearman and Sterling in New York with respect to its resignation . . . ."[201] Although these actions demonstrate

---

[198] *See* 7/25/02 Let. at 1 (stating that Citco NV's letter of July 16, 2002 "constitut[ed] notice of [its] resignation as the Fund's administrator"); 8/16/02 Letter from Citco NV to KMEFIC ("8/16/02 Let."), Ex. 2 to Beaumont Decl., at 1 (informing of Citco NV's resignation as Lancer Offshore's administrator).

[199] *See* 8/16/02 Let. at 1.

[200] *Id.*

[201] CGL Mem. at 4.

Citco Group's questioning of the numbers, they could also be interpreted as Citco

Group's efforts to shield its own involvement in the process. A jury could also

conclude that any inference of good faith is negated by Citco Group's failure to

stop Citco NV from disseminating the allegedly inflated NAVs. In any case, I

conclude that plaintiffs have put forth enough evidence to show that Citco Group

was a "culpable participant" such that it may be subject to control person liability.

Whether it will ultimately be found to be a culpable participant is an issue best

resolved by a jury.[202]

There is no real dispute that Citco Group controlled Citco NV.[203]

However, Citco Group argues that even though it was the indirect parent of Citco

NV, there is no evidence that it "dictated the policies and procedures employed by

[Citco NV]" or that it had any "actual control over[] the day-to-day administrative

---

[202]    Plaintiffs contend that Citco Group had been a "culpable participant"
since 1997 when defendant Stocks, Keunen's predecessor, began serving as
Division Director of the Fund Services Division. *See* Pl. CGL Mem. at 6.
Because plaintiffs have provided no evidence that Stocks knew of the scheme
during his tenure, liability for the Citco Group only begins in September 2001
when Keunen was first apprised of Citco NV's concerns.

[203]    Although Citco Group did not move for summary judgment on the
element of "control," which is required to be proven by plaintiffs to sustain a
Section 20(a) claim for control person liability, *see* CGL Mem. at 2 n.3, Citco
Group did contest this element in its reply papers in response to plaintiffs'
argument that they only need to prove that Citco Group controls Citco NV to
establish Section 20(a) control person liability. *See* CGL Rep. Mem. at 4-5.

services provided by Citco NV to the Lancer Funds."[204]  However, as discussed,

this assertion is directly contradicted by Citco Group's employment of Keunen to

supervise its fund services division.  If a jury was to find that Keunen was acting

on behalf of the Citco Group in supervising the affairs of Citco NV, then Citco

Group's argument would fail.  Thus, there is also a "genuine issue of fact" with

respect to whether Citco Group controlled Citco NV's duties to the Lancer Funds.

Because issues of fact remain with respect to the control person claim, Citco

Group's motion for partial summary judgment is denied.[205]

## B.    Common Law Claims

### 1.    "Holder Claims" - Loss Causation

---

[204]    CGL Rep. Mem. at 4-5.  "Control over a primary violator may be
established by showing that the defendant 'possessed the power to direct or cause
the direction of the management and policies of a person, whether through the
ownership of voting securities, by contract, or otherwise.'" *In re Alstrom SA*, 406
F. Supp. 2d 433-486-87 (S.D.N.Y. 2005) (quoting *First Jersey*, 101 F.3d at 1472-
73).  In addition, "the Section 20(a) defendant must not only have actual control
over the primary violator, but have 'actual control over the transaction in
question.'" *Id.* at 487 (quoting *In re Global Crossing*, 2005 WL 1875445, at *3).

[205]    Plaintiffs argue that Citco Group should be jointly and severally
liable for the "full amount of all of plaintiffs' damages resulting from [Citco NV's]
securities fraud." Pl. CGL Mem. at 9.  They fail to acknowledge that Section
20(a) liability will not be imposed where Citco Group acted in good faith and "did
not directly or indirectly induce the act or acts constituting the violation or cause
of action."  15 U.S.C. § 78t(a).  Citco Group will therefore only be held liable for
plaintiffs' losses for which a jury finds were "directly or indirectly induce[d]" by
Citco Group and for which Citco Group cannot prove it acted in "good faith."

The Citco Defendants contend that they should be granted summary judgment with respect to plaintiffs' "holder claims" because plaintiffs cannot establish loss causation.[206]  In support of this argument, they submit the expert report of Tsvetan N. Beloreshki, who is a Managing Director in the Forensic and Litigation Consulting Practice of FTI Consulting, Incorporated.[207]

Based on the assumption that discovery of Lauer's scheme at an earlier time would have caused investors in the Funds to redeem their shares all at once, triggering the liquidation of the Funds at the time, Beloreshki conducted an analysis that compared the losses sustained by plaintiffs by continuing to retain shares in the Funds until the liquidation by the Receiver to the losses that plaintiffs would have sustained had the Citco Defendants uncovered Lauer's scheme at some date before then.[208]  His analysis shows that at any date from December 1997 (the date after which the first investment by one of the twenty plaintiffs was made)

---

[206]     *See* Def. Mem. at 16 (quoting SAC ¶¶ 373-374) (noting that plaintiffs alleged that they "'would not have . . . maintained their shares in the Funds had they known' that the NAVs were overstated, and that the Citco Defendants' 'wrongful conduct caused each of them to . . . hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests.'").

[207]     *See* Expert Report of Tsvetan Beloreshki ("Beloreshki Rep."), Ex. 1 to Feinberg Decl., at 1.  Beloreshki "specialize[s] in securities and financial economics, concentrating on structured finance products, financial engineering, and risk management." *Id.*

[208]     *See id.* at 2, 8.

to December 2002, each plaintiff's losses would have been more than or equal to each plaintiff's losses as the result of the liquidation of the Funds by the Receiver.[209] Thus, the Citco Defendants argue, because plaintiffs cannot show that they would have been in a better position if the fraud had been discovered sooner, the Citco Defendants' alleged misconduct could not have proximately caused their losses.[210]

Plaintiffs respond by arguing that "millions of dollars would not have flowed improperly out of the funds and would have been available to satisfy plaintiffs' claims" had the Citco Defendants acted properly in disclosing the inflated NAVs.[211] In support of this contention, plaintiffs submit the expert report of Israel Shaked, Professor of Finance and Economics at Boston University's School of Management.[212] In his report, Shaked concludes that $226 million of improper payments would not have been made by Lancer Offshore had the Citco Defendants disclosed the inflated NAVs.[213] These improper payments included (1)

---

[209]   *See* Exhibit 6 to Beloreshki Rep., Ex. 3 to Feinberg Decl. at 2-4.

[210]   *See* Def. Mem. at 17.

[211]   Pl. Mem. at 18.

[212]   *See* Shaked Rep.

[213]   *See id.* at 3-5. It appears that the amount used to pay for positions in shell companies in Shaked's report differs slightly from the amount stated by

amounts used "to acquire positions in small or micro-cap companies and shell companies that were used to inflate the Lancer Offshore NAVs;" (2) "amounts paid to the administrator [and Lancer Management]" based upon inflated NAVs; and (3) redemptions which were also calculated based upon the inflated NAVs.[214]

*First*, plaintiffs have failed to establish a "genuine issue" of fact regarding loss causation on their "holder claims" in the OmniFund.[215]  Thus, summary judgment is granted for the Citco Defendants on these claims. *Second*, as explained by Beloreshki in his report, the proper analysis is whether plaintiffs would have been in a better position (i.e., whether they would have lost less) had the Citco Defendants disclosed Lauer's fraud at an earlier time.  While plaintiffs may be able to show that the Citco Defendants could have prevented a significant amount of money from improperly flowing out of Lancer Offshore had they uncovered Lauer's scheme earlier, they have not demonstrated whether these improper payments would have decreased the realizable value of plaintiffs'

---

plaintiffs in their opposition brief. *Compare id.* at 4 (stating that this amount is $124,921,730), *with* Pl. Mem. at 19 (reporting this amount to be $124,797,913). The difference is inconsequential, but I have chosen to use Shaked's number in this Opinion.

[214]    Shaked Rep. at 3, 4.

[215]    Shaked states that although he had reviewed documents relating to OmniFund, Ltd. and its predecessor funds, he had not quantified the deterioration of their assets for the purposes of the report. *See id.* at 1 n.2.

investments in the Funds.[216]  Because plaintiffs have not raised a "genuine issue"

with respect to loss causation on their common law "holder claims," summary

judgment is granted to the Citco Defendants on these claims.[217]

### 2.    Common Law Fraud

The elements of common law fraud under New York law are

"substantially identical to those governing Section 10(b)" and an "identical

analysis applies."[218]  Thus, the conclusions I reached regarding plaintiffs' Section

10(b) claims also apply to these claims.  Because plaintiffs have not established

the Citco Defendants' scienter prior to June 2001, those claims of plaintiffs who

purchased their shares in the Funds before June 2001 fail.[219]  None of the plaintiffs

---

[216]    It should also be noted that Shaked's computation of improper
payments includes the entire amount of redemptions and fees paid to the
administrator and Lancer Management, instead of the difference between what
was paid and what would have been paid if the NAVs had not been inflated.

[217]    Because summary judgment with respect to these claims is granted to
the Citco Defendants for lack of loss causation, it is unnecessary for me to
consider the Citco Defendants' argument that plaintiffs cannot establish
transaction causation. *See* Def. Mem. at 18-19.

[218]    *AIG Global Sec. Lending Corp. v. Banc of Am. Sec.*, LLC, No. 01 Civ
11448, 2005 WL 2385854 at *16 (S.D.N.Y. Sept. 25, 2005) (citation and
quotation marks omitted).

[219]    Here, unlike the allegations of the Citco Defendants' violations of
Section 10(b) of the Securities Exchange Act of 1934, all plaintiffs are alleging
common law fraud claims against the Citco Defendants, including plaintiffs who
purchased shares in the Funds prior to March 2000.  Thus, summary judgment is

with remaining common law fraud claims have established that they received and

relied on the NAV statements prior to their first purchase in the Funds.[220]   Thus,

summary judgment is granted to the Citco Defendants with respect to these

plaintiffs' first investments.   Summary judgment is also granted on the claims of

KMEFIC and the Morton Meyerson Family Foundation because they have not

established actual reliance on the NAV statements.[221]

### 3.    New York's Martin Act

The Citco Defendants next argue that plaintiffs' claims for breach of

---

granted to the Citco Defendants regarding the common law fraud claims of Andre
Chagnon, Bombardier Trust (Canada), Bombardier Trust (U.S.) Master Trust,
Coronation International Active Fund of Funds, Coronation Universal Fund,
Pension Committee/University of Montreal, Pension Committee/l'Ecole
Polytechnique, Corbett Family Charitable Foundation, Commonfund Global
Hedged Partners, Okabena Marketable Alternatives Fund, Hunnicut IRA/VFTC as
Custodian, and Fondation J. Armand Bombardier.  Summary judgment is also
granted on the pre-June 2001 purchases of the remaining plaintiffs.  These include
Fondation Lucie et Andre Chagnon's March 1, 2001 purchase; Sojecci II Ltée's
October 1, 1999, February 29, 2000 and March 1, 2000 purchases; Bombardier
Trust (UK)'s March 1, 2000 and April 1, 2000 purchases; KMEFIC's November
1, 1997, January 1, 1998, May 1, 1998, January 1, 2000, March 1, 2000, and June
1, 2000 purchases; Defined Benefit Plan for Hunnicutt & Co., Inc.'s November 1,
1999, March 1, 2000, February 1, 2000 and July 1, 2000 purchases; and The Altar
Fund's October 1, 2000, December 1, 2000, February 1, 2001, March 1, 2001, and
May 1, 2001 purchases.

[220]     *See supra* Part V.A.2.b.

[221]     *See id.*

fiduciary duty and negligence are barred by New York's Martin Act.[222] I disagree.

Although the Citco Defendants communicated regularly with Lauer in New York,

they performed most of their work for the Funds in Curacao, Netherlands

Antilles.[223] In addition, the securities were mostly marketed and sold to foreign

investors, and only a limited number of investors in the United States

participated.[224] Thus, plaintiffs' claims for breach of fiduciary duty and

negligence are not preempted by the Martin Act.

## 4. Breach of Fiduciary Duty

Citco NV argues that it owed no fiduciary duty to the plaintiffs. In

support of this argument, it relies principally on *Jordan (Bermuda) Investment Co.*

*v. Hunter Green Investments, LLC*, in which the court found that the hedge fund's

administrator did not owe a fiduciary duty to one of the fund's investors.[225]

---

[222]  *See* Def. Mem. at 21.

[223]  *See Fraternity Fund Ltd.*, 376 F. Supp. 2d at 410 (finding – in
declining to dismiss breach of fiduciary duty claims on the grounds that the Martin
Act preempted them – that "the conduct was not confined to New York and,
indeed, that some plaintiffs may have interacted with defendants exclusively
outside of New York.").

[224]  *See Lehman Bros. Commercial Corp.*, 179 F. Supp. 2d at 165 (finding
that the Martin Act did not apply where negotiations with respect to the sale of
securities took place between traders in London and Hong Kong and the investor,
who was situated in Beijing).

[225]  No. 00 Civ. 9214, 2007 WL 2948115, at *24 (S.D.N.Y. Oct. 3, 2007).

However, *Jordan* is distinguishable from the instant case.

In *Jordan*, the court found two factors to be particularly supportive of its conclusion that no fiduciary duty existed. *First*, the court noted that the fund administrator in that case had never had any contact with the plaintiff.[226]  Indeed, the plaintiff had never known that the administrator existed.[227]  By contrast, one of Citco NV's responsibilities was communicating with investors.[228]  And as part of its communications, Citco NV made representations directly to investors attesting to the quality of their services.[229]  For instance, in one letter that was sent to Almarzook of KMEFIC, Citco NV described the existence of "detailed written procedures and operations manuals for all our operations" and the utilization of "[a]utomatic reconciliation programs" and other independent pricing programs to

---

[226]    *See id.*

[227]    *See id.*

[228]    *See* ASA at 2 (stating that one of Citco NV's duties was "responding to inquiries from time to time received by the Company from shareholders, prospective investors or other"); PPM, Ex. 5 to Feinberg Decl., at i (stating that Citco NV "will make available to each Offeree [] the opportunity to ask questions of, and receive answers from, the Administrator or a person acting on its behalf, concerning the terms and conditions of this Offering, and to obtain any additional information . . . necessary to verify the accuracy of the information set forth herein.").

[229]    *See, e.g.*, 4/31/00 Fax from Quilligan to Almarzook ("Quilligan Fax"), Ex. 1 to Brown Decl., at 1; 6/30/00 Letter from Citco NV to Bourgeois ("6/30/00 Let."), Ex. 6 to Brown Decl., at 1.

ensure accuracy in their services.[230] This correspondence shows that Citco NV not only accepted that it owed a fiduciary duty to investors, but that it invited this duty.

Second, the Jordan court found that the administrator had merely been charged with providing "nondiscretionary administrative services," which services included calculating the monthly NAV "based solely on information provided to it by [the fund managers]."[231] Unlike the administrator in Jordan, it is unclear whether Citco NV's services were "nondiscretionary," particularly considering that it had undertaken, pursuant to the ASA, to "independently pric[e] the fund."[232] In any case, I find that there is enough evidence to show that plaintiffs reposed trust in Citco NV to allow this claim to be tried by a jury. Thus, summary judgment is denied on plaintiffs' breach of fiduciary duty claims against

---

[230]    Quilligan Fax. An identical letter was sent to Bourgeois. See 6/30/00 Let.

[231]    See Jordan, 2007 WL 2948115, at *23-24.

[232]    ASA at 2. Citco NV argues that it had no contractual duty to "independently *value*" the portfolio. Def. Mem. at 22 (emphasis in original). Because – as noted above – Citco NV had made representations to investors regarding its utilization of reconciliation and other programs for accuracy, this is a question best left to the jury.

Citco NV.[233]

### 5.   Negligence and Professional Malpractice

Because no contract exists between the plaintiffs and Citco NV, a duty of care will only arise where the parties have a relationship "so close as to approach that of privity."[234]  With regards to the factors set out by the New York Court of Appeals in *Credit Alliance*, plaintiffs have established the first and last prongs of the test – that Citco NV was aware that the NAV statement would be used for "a particular purpose" and that Citco NV had sufficient contact with plaintiffs such that it should have understood plaintiffs' reliance on its statements. Citco Fund Services' procedure manual – likely one of the procedure manuals mentioned in Citco NV's letter to KMEFIC – states that "[t]he net asset value is an important indicator for a fund" and that "[s]hareholders and partners will make decisions to invest or redeem based on the net asset value."[235]  Thus, it would be disingenuous for Citco NV to argue that it was not aware that plaintiffs would rely

---

[233]    The Citco Directors did not move for summary judgment on this claim. *See* Def. Mem. at 21 (contending only that "[p]laintiffs cannot establish the existence of a fiduciary relationship between [Citco NV] and [p]laintiffs"). Thus, the breach of fiduciary duty claim with respect to the Citco Directors survives as well.

[234]    *Credit Alliance*, 65 N.Y.2d at 546.

[235]    Ex. 4 to Brown Decl., at Section 7.1.

on the NAV statements to evaluate the performance of their investments. In addition, Citco NV's monthly mailing of NAV statements and other correspondence with plaintiffs is sufficient to establish a "linking" to plaintiffs such that it would have understood plaintiffs' reliance on these statements.[236]

However, as discussed, some plaintiffs have not been able to demonstrate the second prong of the *Credit Alliance* test – that they relied on the NAV statements sent by Citco NV when making all of their purchases.[237] As discussed, plaintiffs have not shown that they received the NAV statements prior to their initial investments in the Funds and therefore cannot prove that they relied on these statements.[238] Thus, the negligence claims related to these initial purchases are dismissed. In addition, plaintiffs have not provided sufficient evidence to show that KMEFIC or the Morton Meyerson Family Foundation actually relied on the statements in making their subsequent investments. Thus, their negligence claims are also dismissed.[239] Summary judgment with respect to

---

[236]     *See supra* Part V.B.4.

[237]     *See supra* Part V.A.2.b.

[238]     *See id.*

[239]     The Citco Defendants have also contended that Andre Chagnon and Commonfund Global Hedged Partners, LLC ("Commonfund") did not rely on the NAV statements. The evidence regarding these plaintiffs' reliance was not discussed when evaluating their Section 10(b) claims because such claims had

the negligence claims on remaining purchases is denied.[240]

Summary judgment is also granted to the Citco Defendants on plaintiffs' professional malpractice claims. Plaintiffs have not shown that hedge fund administrators are "professionals" under New York law.[241] Specifically, plaintiffs have not established the requirements of "extensive formal learning and training, licensure and regulation [], a code of conduct imposing standards beyond those accepted in the marketplace and a system of discipline for violation of those standards" with respect to administrators.[242] For these reasons, plaintiffs' professional malpractice claims are dismissed.

---

been dismissed on the basis of a lack of scienter of the Citco Defendants when their purchases were made. It is similarly unnecessary to evaluate evidence regarding Andre Chagnon's reliance because Chagnon made one purchase of shares in Lancer Offshore in June 1998. *See* SAC ¶ 15(dd). His common law fraud claim has been dismissed because he has not shown that he received the monthly NAV statements prior to investment and thus cannot show that he relied on them. The evidence put forth to show that Commonfund did not rely on the NAV statements, however, fails to aid the Citco Defendants. While the evidence appears to demonstrate that Commonfund may not have relied on the NAV statements for its initial investments, it also shows that Commonfund relied on the NAV statements when making subsequent investments. *See* Def. 56.1 ¶ 46.

[240]    The Citco Directors have not moved for summary judgment on plaintiffs' negligence claims. Thus, these claims also survive.

[241]    Indeed, plaintiffs do not even mention their professional malpractice claims in their opposition papers.

[242]    *Chase Scientific Research*, 96 N.Y.2d at 29.

### 6.    Aiding and Abetting Claims

Both of plaintiffs' aiding and abetting claims require proof of knowledge by the Citco Defendants of the alleged fraudulent scheme.[243]  As discussed, plaintiffs have not shown that the Citco Defendants acted recklessly – much less with knowledge of the fraud – prior to June 2001.[244]  Thus, summary judgment is granted to the Citco Defendants on claims based on purchases prior to this date.

---

[243]    *See Lerner*, 459 F.3d at 292 (holding that "knowledge of the fraud" is an element of the claim of aiding and abetting common law fraud); *In re Sharp Int'l Corp.*, 403 F.3d at 49 (holding that defendant must be found to have "knowingly induced or participated in the breach" in order for plaintiffs to succeed on a claim for aiding and abetting breach of fiduciary duty).

[244]    *See supra* Part V.A.2.a.  Plaintiffs argue that they need only adduce evidence sufficient "to give rise to the inference of the Citco Defendants' knowledge of the fraud." Pl. Mem. at 25 (citing *JP Morgan Chase*, 406 F. Supp. 2d at 252-56).  I find that plaintiffs have also failed to meet this standard.

## VI.   CONCLUSION

For the reasons stated above, the Citco Defendants' motion for partial summary judgment is granted in part and denied in part.  Citco Group's motion for summary judgment is denied.  In sum:

(1) Summary judgment is granted to the Citco Defendants on plaintiffs' Section 10(b) claims based on purchases of shares made before June 2001 because plaintiffs have not shown that the Citco Defendants possessed scienter prior to this date;

(2) Summary judgment is granted to the Citco Defendants on plaintiffs' Section 10(b) claims with respect to plaintiffs' initial purchases because plaintiffs have not shown that they received the allegedly misleading monthly NAV statements prior to their initial purchases in the Funds and thus cannot show that they relied on them;

(3) Summary judgment is granted to the Citco Defendants on KMEFIC's and the Morton Meyerson Family Foundation's Section 10(b) claims because they have not shown that they actually relied on the allegedly misleading monthly NAV statements;

(4) Summary judgment is denied with respect to plaintiffs' Section 10(b) claims based on remaining purchases.  These include claims based on Fondation Lucie et

66

Andre Chagnon's December 1, 2001 purchase; Sojecci II Ltée's April 30, 2002 and May 1, 2002 purchases; Bombardier Trust (UK)'s March 1, 2002 and June 1, 2002 purchases; Defined Benefit Plan for Hunnicutt & Co., Inc.'s June 1, 2001 and March 1, 2002 purchases; and The Altar Fund's August 1, 2002 purchase; (5) Summary judgment is denied on plaintiffs' claim for Section 20(a) control person liability against Citco Group;

(6) With respect to plaintiffs' common law claims, summary judgment is granted to the Citco Defendants on plaintiffs' holder claims;

(7) Summary judgment is granted to the Citco Defendants on plaintiffs' common law fraud claims based on purchases made before June 2001 because plaintiffs have not shown that the Citco Defendants possessed scienter prior to that date;

(8) Summary judgment is granted to the Citco Defendants on plaintiffs' common law fraud claims with respect to plaintiffs' initial investments because plaintiffs have not shown that they received the allegedly misleading monthly NAV statements prior to their initial investments in the Funds and thus cannot show that they relied on them;

(9) Summary judgment is granted to the Citco Defendants on KMEFIC's and the Morton Meyerson Family Foundation's common law fraud claims because they have not shown that they actually relied on the allegedly misleading monthly NAV

67

statements;

(10) Summary judgment is denied with respect to plaintiffs' common law fraud claims based on remaining purchases. These include claims based on Fondation Lucie et Andre Chagnon's December 1, 2001 purchase; Sojecci II Ltée's April 30, 2002 and May 1, 2002 purchases; Bombardier Trust (UK)'s March 1, 2002 and June 1, 2002 purchases; Defined Benefit Plan for Hunnicutt & Co., Inc.'s June 1, 2001 and March 1, 2002 purchases; and The Altar Fund's August 1, 2002 purchase;

(11) Summary judgment is denied on plaintiffs' breach of fiduciary duty claims;

(12) Summary judgment is granted on plaintiffs' negligence claims for which they have not shown that they relied on the allegedly misleading monthly NAV statements when making their investments. These include all of plaintiffs' initial purchases and the purchases of KMEFIC and the Morton Meyerson Family Foundation;

(13) Summary judgment is denied on plaintiffs' remaining negligence claims;

(14) Summary judgment is granted to the Citco Defendants on plaintiffs' professional malpractice claims; and

(15) Summary judgment is granted to the Citco Defendants on plaintiffs' aiding and abetting claims for purchases made prior to June 2001 because they have not

shown that the Citco Defendants possessed actual knowledge of the alleged

scheme prior to this date.  The remaining aiding and abetting claims include those

based on Fondation Lucie et Andre Chagnon's December 1, 2001 purchase;

Sojecci II Ltée's April 30, 2002 and May 1, 2002 purchases; Bombardier Trust

(UK)'s March 1, 2002 and June 1, 2002 purchases; KMEFIC's June 1, 2002

purchase; The 1999 Meyerson Charitable Remainder Trust's March 1, 2002

purchase; The Morton Meyerson Family Foundation's March 1, 2002 and April 1,

2002 purchases; Defined Benefit Plan for Hunnicutt & Co., Inc.'s June 1, 2001

and March 1, 2002 purchases; and The Altar Fund's August 1, 2002 purchase.


The Clerk of the Court is directed to close these motions (document nos. 175 and

190).  A conference is scheduled for January 14, 2009 at 4:30 p.m.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.


Dated:     New York, New York
           January 5, 2009


69

## - Appearances -

### For the Plaintiffs:

Scott Berman, Esq.
Anne E. Beaumont, Esq.
Amy C. Brown, Esq.
Robert S. Landy, Esq.
Lili Zandpour, Esq.
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway
New York, NY 10019-6708
(212) 833-1100

### For Defendants Citco Group and the Citco Defendants:

Lewis Brown, Esq.
Dyanne E. Feinberg, Esq.
Terence M. Mullen, Esq.
Elizabeth A. Izquierdo, Esq.
Gilbride, Heller & Brown, P.A.
One Biscayne Tower, 15th Floor
2 South Biscayne Blvd.
Miami, FL 33131
(305) 358-3580