UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X

THE PENSION COMMITTEE OF THE
UNIVERSITY OF MONTREAL
PENSION PLAN, *et al.*,

        **Plaintiffs,**

       **- against -**

BANC OF AMERICA SECURITIES,
LLC, CITCO FUND SERVICES
(CURACAO) N.V., THE CITCO GROUP
LIMITED, INTERNATIONAL FUND
SERVICES (IRELAND) LIMITED,
PRICEWATERHOUSECOOPERS
(NETHERLAND ANTILLES), JOHN W.
BENDALL, JR., RICHARD GEIST,
ANTHONY STOCKS, KIERAN
CONROY, and DECLAN QUILLIGAN,

        **Defendants.**

------------------------------------------------ X

**OPINION AND ORDER**

**05 Civ. 9016 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

      A group of investors brings this action to recover losses stemming

from the liquidation of two British Virgin Islands based hedge funds in which they

held shares: Lancer Offshore, Inc. ("Lancer Offshore") and OmniFund Ltd.

1

(together with Lancer Offshore, the "Lancer Funds" or the "Funds").[1]  Plaintiffs

bring various claims under the federal securities laws and New York common law

against the former directors and administrators of the Funds, the auditor, as well as

the prime broker and custodian of the Funds, Banc of America LLC ("BAS").[2]

Relevant to this motion, plaintiffs allege that BAS aided and abetted the Funds'

management in deceiving plaintiffs as to the net asset values ("NAVs") of the

Funds by falsifying values of the Funds' holdings.  BAS now moves for summary

judgment with respect to the two claims against it.[3]  For the reasons that follow,

BAS's motion for summary judgment is denied.

---

[1]    *See* Second Amended Complaint ("SAC") ¶ 1.

[2]    *See id.* ¶¶ 318-460.

[3]    *See* Memorandum of Law in Support of Defendant Banc of America
Securities LLC's Motion for Summary Judgment ("BAS Mem.") at 1.  At the June
18, 2009 conference, BAS's counsel stated that BAS would not be moving on the
issue of proximate cause. *See* Transcript at 6, *Pension Comm. of the Univ. of
Montreal Pension Plan v. Banc of Am. Sec.*, No. 05 Civ. 9016 (S.D.N.Y. argued
June 18, 2009).  I directed that if BAS's current motion for summary judgment is
denied, BAS may then take discovery on that issue. *See id.* at 18.  Accordingly,
BAS, the plaintiffs, and the Citco Defendants did not brief, and this Opinion does
not address, proximate cause as it relates to plaintiffs' claims against BAS.

## II.   BACKGROUND

### A.   Facts[4]

#### 1.   Parties and Claims

This action involves the claims of twenty investors[5] who allege

damages in connection with their purchase and retention of shares in the Lancer

Funds.[6]  In July 2003, the Funds were placed into receivership in the Southern

District of Florida.[7]  Plaintiffs allege that almost all of the capital invested in the

Funds – totaling over $550 million – has been lost.[8]  The Lancer Funds were

managed by Lancer Management Group LLC ("Lancer") and its principal,

---

[4]      The facts in this section are not in dispute and are drawn from BAS's
Rule 56.1 Statement ("BAS 56.1") and Counterstatement ("BAS C-56.1"),
Plaintiffs' Counterstatement Pursuant to Rule 56.1 ("Pl. 56.1"), the Citco
Defendants' Counterstatement Pursuant to Rule 56.1 ("Citco 56.1"), and from the
evidence submitted to this Court with respect to this motion.  Some background
facts, if not material to this motion, have been taken from the Second Amended
Complaint.  Additional undisputed facts have been taken from declarations
submitted by BAS in connection with this motion.

[5]      Although the action involves the claims of 96 plaintiff investors, on
February 1, 2008, the Court ordered that the case would proceed initially on the
claims of twenty plaintiffs.  *See* 2/1/08 Case Management and Amended
Scheduling Order.

[6]      *See* SAC ¶ 15.

[7]      *See id.* ¶ 1.

[8]      *See id.*

Michael Lauer.[9]

Lancer, through Lauer, was responsible for all investment decisions for the Funds.[10]  Nevertheless, plaintiffs claim that Lancer and Lauer provided BAS with fraudulently inflated stock and warrant prices that BAS then included in reports and account statements issued to the Funds' accountant and administrators even though BAS knew that these prices were fraudulent.[11]

### 2.    Lancer and the Lancer Funds

From around 2000, the Funds' holdings were in largely illiquid companies.[12]  Many of the securities in which Lancer invested were thinly traded or private.[13]  As a result, the securities often were subject to dramatic price volatility or had no publicly available price.[14]  The Private Placement Memoranda ("PPMs") for the Lancer Funds contemplated that "when no market exists for an investment" or when the Funds and the board "determine[] that the market price

---

[9]      *See* BAS 56.1 ¶ 1; Pl. 56.1 ¶ 1.

[10]     *See* BAS 56.1 ¶ 5; Pl. 56.1 ¶ 5.  Lauer and Lancer are not parties in this action, but were significant actors in the alleged scheme to defraud.

[11]     *See* SAC ¶¶ 143-191.

[12]     *See* BAS 56.1 ¶ 4; Pl. 56.1 ¶ 4.

[13]     *See id.*

[14]     *See id.*

does not fairly represent the value of the investment," Lauer, along with each of

the Funds' Board of Directors, would be responsible for assigning a value to the

securities.[15]  The PPMs further stated that "[i]n connection with the determination

of the Net Asset Value of Shares, the Board of Directors may consult with and is

entitled to rely upon the advice of the Fund's Investment Manager and Prime

Broker."[16]

### 3.    The Fraud and Breaches of Fiduciary Duty of Lauer and Lancer

Beginning in 2000, the Funds began to lose money, but such losses

were hidden from investors through a scheme allegedly perpetrated by Lauer and

Lancer.[17]  Under the scheme, known as "marking the close," Lancer would buy

substantial positions for the Lancer Funds in companies whose common shares

were thinly traded on the open market, paying only pennies or less per share.[18]

This concentrated trading in an otherwise infrequently traded stock was designed

---

[15]    2/15/02 Lancer Offshore, Inc. Private Placement Memorandum, Ex. 1
to 7/2/09 Declaration of Dawn Wilson, counsel for BAS ("Wilson Decl."), at 12.

[16]    1/1/98 Lancer Offshore, Inc. Private Placement Memorandum, Ex. B
to 7/31/09 Corrected Declaration of Philip A. Wellner, counsel for plaintiffs
("Wellner Decl."), at 20 (PW19).  "PW [page number]" refers to the consecutive
pagination of the exhibits to the corrected Wellner Declaration.

[17]    *See* BAS 56.1 ¶ 7; Pl. 56.1 ¶ 7.

[18]    *See* BAS 56.1 ¶¶ 7, 8; Pl. 56.1 ¶¶ 7, 8.

to artificially increase the market price of the stock.[19]  After purchasing a large amount of the thinly traded stock over the course of a month, Lauer would purchase a comparatively small number of shares of the same companies at the end of the month at the artificially inflated price Lauer's trades had created.[20]  In its month-end reports, Lancer would then value all of the Funds' shares of the company at the artificially inflated month-end market price.[21]  In addition, Lancer instructed BAS to record a private stock or warrant purchase at a value substantially higher than its actual worth.[22]  BAS then reported the false values to the Funds' accountant and administrators responsible for conducting audits and calculating NAVs, respectively.[23]

---

[19]    *See id.*

[20]    *See id.*

[21]    *See id.*

[22]    *See, e.g.*, 1/8/03 Email from David Newman, Lancer employee, to Andrew Pennecke, BAS account executive, Ex. C to 6/29/09 Declaration of Andrew Pennecke ("Pennecke Decl.") (instructing Pennecke to price warrants that had been purchased "@0.00 [on] 12/16/02" at $3.97 per share as of 12/31/02).

[23]    *See, e.g.,* 4/2/08 Deposition of Roman Krawciw ("4/2/08 Krawciw Dep."), BAS managing director and daily operations director, Ex. 2 to 7/30/09 Declaration of Dyanne Feinberg, counsel to CFS-Curacao and The Citco Group Limited (together, the "Citco Defendants") ("Feinberg Decl."), at 282:17-284:25 (acknowledging that PWC and CFS-Curacao received and relied upon BAS's reports).

### 4.    BAS's Role

From 1999 until October 2008, Lancer was a customer of BAS's prime brokerage unit.[24]  As a prime broker, BAS cleared and settled trades for Lancer and the Funds and served as the central custodian for some of the securities held by the Funds.[25]  Account executives served as the primary liaison between BAS and its prime brokerage customers.[26]  During the time Lancer was a client of BAS, it had three account executives.[27]  Lancer's first account executive, from 1997 until 1999, was Penn Miller-Jones.[28]  David Newman then took over as Lancer's account executive.[29]  In June 2000, Newman left BAS to work for Lancer.[30]  Upon his departure, Andrew Pennecke replaced him as Lancer's account

---

[24]    *See* BAS 56.1 ¶ 9; Pl. 56.1 ¶ 9.

[25]    *See* BAS 56.1 ¶¶ 9, 11, 17; Pl. 56.1 ¶¶ 9, 11, 17.

[26]    *See* BAS 56.1 ¶ 23; Pl. 56.1 ¶ 23.

[27]    *See* 6/30/09 Declaration of Roman Krawciw ("Krawciw Decl.") ¶ 10; Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment of Defendant Banc of America Securities, LLC ("Pl. Opp.") at 7.

[28]    *See* Krawciw Decl. ¶ 11; Pl. 56.1 ¶ 12.

[29]    *See* Krawciw Decl. ¶ 11; Pennecke Decl. ¶ 9; Pl. 56.1 ¶ 12.

[30]    *See* 7/22/08 Deposition of David Newman, Ex. 4 to 8/13/09 Supplemental Declaration of Dawn M. Wilson ("Wilson Supp. Decl."), at 12:25-13:4 (DW32).  "DW[page number]" refers to the consecutive pagination of the exhibits to the Wilson Supplemental Declaration.

executive.[31]  Pennecke remained in that role until October 2008, when the BAS

prime brokerage business was sold.[32]  Roman Krawciw was a managing director

and daily operations director for account executives in the prime brokerage group

at BAS during the relevant period.[33]  Krawciw's role was to supervise and monitor

the performance of all BAS account executives, including Pennecke and

Newman.[34]

BAS primarily acquired information regarding the Lancer Funds'

position in two ways.  The first was through BAS's own involvement in settling a

trade for Lancer Funds' positions housed at BAS.  The second was through

information communicated to the account executive directly by Lancer regarding

positions housed outside of BAS.  By settling trades for the Lancer Funds'

positions housed at BAS, BAS received information from both Lancer and from

the executing brokers with whom Lancer traded.[35]  At the end of the trading day,

Lancer would relay trade data to BAS by facsimile or electronic feed, referred to at

---

[31]    *See* Krawciw Decl. ¶ 11; Pennecke Decl. ¶ 9; Pl. 56.1 ¶ 12.

[32]    *See* BAS 56.1 ¶ 24; Pl. 56.1 ¶ 24.

[33]    *See* BAS 56.1 ¶ 33; Pl. 56.1 ¶ 33.

[34]    *See* Krawciw Decl. ¶ 4; Pl. 56.1 ¶ 12.

[35]    *See* BAS 56.1 ¶ 36; Pl. 56.1 ¶ 36.

BAS as "trade sheets" or "trade blotters."[36]  These trade sheets were addressed to Lancer's BAS account executive – namely, Newman and then Pennecke.[37]  The account executives then gave the trade sheets to other BAS employees, called "keypunchers."[38] The keypunchers entered the trade data into one or both of BAS's trade databases – Automatic Data Processing, Inc. ("ADP"), a third-party system, and Global Investment Management ("GIM2"), BAS's internal database.[39] Account executives could also enter trade data into GIM2.[40]  Account executives could enter trade data, but not price data, into ADP.[41]

BAS also kept track of Lancer's positions that were not housed at BAS – i.e., positions housed at other prime brokers or at Lancer itself.[42]  These

---

[36]    *See id.*

[37]    *See* Lancer Group Trade Sheet, ATTN: David Newman, Ex. G to Wellner Decl., at PW98; Lancer Group Trade Sheet, ATTN: Andrew Pennecke, Ex. H to Wellner Decl., at PW110 ("Lancer Group Trade Sheets").

[38]    *See* BAS 56.1 ¶ 37; Pl. 56.1 ¶ 37.

[39]    *See* BAS 56.1 ¶ 43; Pl. 56.1 ¶ 43.  *See also* 3/26/08 Deposition of Andrew Pennecke ("3/26/08 Pennecke Dep."), Ex. K to Wellner Decl., at 102:9-103:9 (PW150).

[40]    *See* BAS 56.1 ¶ 63; Pl. 56.1 ¶ 63.

[41]    *See* 7/13/09 Deposition of David Newman ("7/13/09 Newman Dep."), Ex. 2 to Feinberg Decl., at 148:17-149:2.

[42]    *See* BAS 56.1 ¶ 57; Pl. 56.1 ¶ 57.

positions are referred to as "away" positions.[43]  Away positions could consist of

assets such as private placements, warrants, and unregistered or restricted shares

of publicly-traded stocks.[44]  BAS, at Lancer's request, listed the Lancer Funds'

away positions on reports available at primebroker.com, including Position

Reports (described below).[45]  Because BAS was not involved in settling the

Funds' away positions, BAS relied on Lancer to provide BAS with the pertinent

information regarding these trades.[46]  Such information included the name and

ticker of the company, the number of shares purchased or sold, the cost of the

purchase, and the current price.[47]  Lancer would send this information to the

account executive, who would then input the data into GIM2.[48]  By contrast, ADP

– the system used to record the Lancer Funds' positions housed at BAS – used a

pricing feed to verify the price of every publicly-traded position entered into its

---

[43]     *See id.*

[44]     *See* BAS 56.1 ¶ 59; Pl. 56.1 ¶ 59.

[45]     *See* BAS 56.1 ¶ 62; Pl. 56.1 ¶ 62.

[46]     *See* BAS 56.1 ¶ 60; Pl. 56.1 ¶ 60.

[47]     *See* BAS 56.1 ¶ 63; Pl. 56.1 ¶ 63.

[48]     *See id.*

system.[49]  Neither BAS employees nor others could override ADP prices.[50]

Typically, where a price feed could not be verified for ADP, such as in the case of

privately-placed shares, the price was to register as "N/A."[51]

      BAS generated two types of reports for Lancer at issue here – account

statements reflecting the Lancer Funds' positions housed at BAS ("Account

Statements") and position reports reflecting both the Lancer Funds' positions

housed at BAS and those housed at other prime brokers or at Lancer itself

("Position Reports").[52]  Data from ADP was used to create the Account

Statements.[53]  Data from GIM2 was used to create the Position Reports.[54]

      Account Statements were generated monthly and yearly and were

used, among other things, by the Funds' accountant, PricewaterhouseCoopers

(Netherlands Antilles) ("PwC"), for accounting purposes, including the year-end

---

[49]    *See* BAS 56.1 ¶ 45; Pl. 56.1 ¶ 45.

[50]    *See* BAS 56.1 ¶ 48; Pl. 56.1 ¶ 48.

[51]    *See* BAS 56.1 ¶ 47; Pl. 56.1 ¶ 47.

[52]    *See* BAS 56.1 ¶¶ 9, 41, 42, 50; Pl. 56.1 ¶¶ 9, 41, 42, 50.

[53]    *See* BAS 56.1 ¶ 44; Pl. 56.1 ¶ 44.

[54]    *See* 3/26/08 Pennecke Dep., Ex. K to Wellner Decl., at 102:9-103:9
(PW150).

audit.[55]  As with many prime brokers, BAS also provided Lancer with the option to track its entire portfolios, including away positions, through reports available on BAS's password protected website, "primebroker.com."[56]  BAS's Position Reports were among the reports that could be found on primebroker.com.[57]  As noted, GIM2 provided the values in the Position Reports.[58]  After Account Statements generated from ADP were sent out to customers, they too were posted on primebroker.com.[59]  Lancer could access primebroker.com to view its own portfolio, but had to expressly grant access to others.[60]  BAS account executives and supervisors knew that Lancer granted permission to PwC for auditing purposes and to the Lancer Funds' administrator, Citco Fund Services (Curacao) N.V. ("CFS-Curacao"), for purposes of calculating the Lancer Funds' NAVs.[61]  In

---

[55]    *See* 7/17/09 Deposition of Andrew Pennecke ("7/17/09 Pennecke Dep."), Ex. L to Wellner Decl., at 116:23-117:8 (PW160).

[56]    *See* BAS 56.1 ¶ 51; Pl. 56.1 ¶ 51.

[57]    *See id.*

[58]    *See id.*; 3/26/08 Pennecke Dep., Ex. K to Wellner Decl., at 102:9-103:9 (PW150).

[59]    *See* 8/13/09 Supplemental Declaration of Andrew Pennecke ¶ 10; Pl. 56.1 ¶ 41.

[60]    *See* BAS 56.1 ¶ 51; Pl. 56.1 ¶ 51.

[61]    *See* 4/2/08 Krawciw Dep., Ex. 2 to Feinberg Decl., at 284:16-285:23.

addition to the Position Reports available on primebroker.com, Lauer fabricated

position reports and provided them to investors as though they were position

reports generated by BAS.[62]

## B.    Procedural History

Plaintiffs filed their Second Amended Complaint on August 25, 2006,

bringing federal and common law claims against, among others, BAS, PwC, the

Citco Defendants, and International Fund Services (Ireland) Ltd. ("IFSI").[63]

Plaintiffs' claims against BAS include aiding and abetting fraud and breaches of

fiduciary duty.[64]  BAS now moves for summary judgment.  Plaintiffs, as well as

the Citco Defendants, oppose the motion.

## III.    LEGAL STANDARD

### A.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving

---

[62]    *See* BAS Mem. at 6 (citing *S.E.C. v. Lauer*, No. 03 Civ. 80612, 2008 WL 4372896, at *9 (S.D. Fla. Sept. 24, 2008)).

[63]    *See* SAC ¶¶ 318-460.  All claims against IFSI have been dismissed.

[64]    *See id.* ¶¶ 435-452.

13

party is entitled to judgment as a matter of law."[65] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'"[66] "[T]he burden of demonstrating that no material fact exists lies with the moving party. . . ."[67]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[68] To do so, the non-moving party must do more than show

---

[65]    Fed. R. Civ. P. 56(c).

[66]    *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[67]    *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)). *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

[68]    *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). *Accord In re September 11 Litig.*, No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks omitted).

14

that there is "'some metaphysical doubt as to the material facts,'"[69] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[70] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[71]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[72] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[73] Summary judgment is therefore

---

[69]    *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[70]    *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[71]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[72]    *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

[73]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

"appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[74]

## B.    Aiding and Abetting Common Law Fraud and Breach of Fiduciary Duty

"To establish liability for aiding and abetting fraud, the plaintiffs must show '(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'"[75]  Under New York law, a defendant must be shown to possess actual knowledge of the underlying fraud.[76]

Aiding and abetting a breach of fiduciary duty has three elements under New York Law.[77] "The first element is a breach by a fiduciary of obligations to another of which the aider and abettor had actual knowledge[;] [t]he second element is that the defendant knowingly induced or participated in the breach; and the third element is that plaintiff suffered damage as a result of the

---

[74]    *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

[75]    *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (quoting *J.P. Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005)).

[76]    *See id.* (citing *Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996)).

[77]    *See In re Sharp Int'l Corp.*, 403 F.3d 43, 49-50 (2d Cir. 2005).

breach."[78]

"The 'knowledge' element of an aiding and abetting fraud claim is not identical to the scienter required for the underlying fraud."[79] While a strong inference of scienter can be satisfied by a showing of "'facts that constitute strong circumstantial evidence of . . . recklessness,'" aiding and abetting requires a reasonable inference of actual knowledge.[80] The "substantial assistance" requirement is satisfied where "'a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach [or fraud] to occur.'"[81] "[T]he mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."[82]

---

[78]    *Id.* (quotation marks and citations omitted).

[79]    *J.P. Morgan Chase Bank*, 406 F. Supp. 2d at 253 n.4.

[80]    *Id.* (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). *Accord id.* at 254 (finding plaintiffs' evidence sufficient to give rise to an inference of the defendants' actual knowledge of the fraud where emails submitted by plaintiffs "contain[ed] language which could reasonably be understood to demonstrate [the defendants'] actual knowledge" of the fraud).

[81]    *Lerner,* 459 F.3d at 295 (quoting *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (1st Dep't 2003)). *Accord Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).

[82]    *Lerner*, 459 F.3d at 295 (quotation marks omitted).

## IV.    DISCUSSION

Both of plaintiffs' aiding and abetting claims require evidence from which a jury could reasonably infer that BAS actually knew of Lancer's fraudulent scheme.[83]  Because BAS did not have a duty to monitor or verify the information disseminated by Lauer and Lancer, a question of fact must be raised as to actual knowledge; evidence that BAS merely ignored obvious warning signs of fraud will not suffice.[84]  Plaintiffs must also provide sufficient evidence from which a jury could reasonably conclude that BAS substantially assisted Lauer and Lancer in their fraud.  Because BAS did not have a confidential or fiduciary relationship with plaintiffs, plaintiffs must prove that BAS affirmatively assisted Lauer and Lancer in their fraud.[85]

### A.    No Admission of Actual Knowledge

BAS argues that summary judgment is warranted because "every key BAS employee who worked on the Lancer account has consistently and steadfastly

---

[83]    *See id.* at 292 (holding that "knowledge of the fraud" is an element of the claim of aiding and abetting common law fraud); *In re Sharp Int'l Corp.*, 403 F.3d at 49 (holding that defendant must be found to have "knowingly induced or participated in the breach" in order for plaintiffs to succeed on a claim for aiding and abetting breach of fiduciary duty).

[84]    *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 202-03 (S.D.N.Y. 2006).

[85]    *See id.* at 201.

denied any actual knowledge of the fraud."[86] While it may be true that every BAS employee has denied actual knowledge, these statements are subject to an assessment of credibility.[87] BAS further contends that because there is no email, memorandum, or other BAS document that expressly admits knowledge of the fraud, BAS is entitled to summary judgment.[88] Such an argument ignores the remaining evidence that plaintiffs have provided which, for the reasons discussed below, would permit a reasonable jury to infer that BAS had actual knowledge of the underlying fraud.[89] As a result, the lack of admissions of knowledge does not entitle BAS to summary judgment.

### B.  Actual Knowledge that the Funds' Core Holdings Were Reported at Inflated Values

#### 1.  Position Reports

Plaintiffs provide at least six examples of instances where Pennecke

---

[86]    BAS Mem. at 1. *Accord id.* at 12.

[87]    *See McClellan*, 439 F.3d at 144 ("It is a settled rule that [c]redibility assessments . . . are matters for the jury, not for the court on a motion for summary judgment.") (quotation marks omitted) (alteration in original).

[88]    *See* BAS Mem. at 13.

[89]    *See, e.g., Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (holding that a jury could find retaliation even if defendant denied direct knowledge of plaintiff's protected activities, so long as jury found circumstances evidencing knowledge of such activities).

19

or another BAS account executive was instructed to purchase or wire the funds to purchase a stock or warrant and record it in BAS's GIM2 system at a much higher value than its purchase price.[90]  The result was that instant or near instant gains of between 1,000 and 5,000 percent were recorded in the Funds' portfolio.[91]

For example, on August 31, 2000 – just two months after he moved from BAS to Lancer – Newman emailed Pennecke instructions to record a transaction for Lancer Offshore for the acquisition of 750,000 privately-placed warrants for EDV Corp. exercisable at $0.01 per share and expiring on July 31, 2005.[92]  The email indicated that the warrants were acquired at no cost, but Newman instructed Pennecke to price them at ten dollars each, resulting in an immediate gain in BAS's Position Reports of approximately 7.5 million dollars.[93]  Similarly, on March 31, 2001, Lauer faxed Pennecke a Letter of Authorization ("LOA") instructing Pennecke to purchase five million shares of Nu-D-Zine, Inc. ("NUDZ") "@ 10¢/share."[94]  On the March 31, 2001 Position Report, these same

---

[90]    *See* Pl. Mem. at 4-6, 7-9; Pl. 56.1 ¶¶ 113-144.

[91]    *See id.*

[92]    *See* Pl. 56.1 ¶ 139; BAS 56.1 ¶ 139.

[93]    *See id.*

[94]    3/30/01 LOA from Lauer to Newman, Ex. G to Wellner Decl., at PW92.

five million shares were valued at $1.25 per share, representing a one-day increase of 1,150 percent, or 5.75 million dollars.[95]   When questioned about this one-day gain at his deposition, Pennecke testified that this transaction might have been "too good to be true."[96]

On December 16, 2002, the Funds purchased, at no cost, 3.5 million warrants of XtraCard Corp., formerly known as NUDZ.[97]  Then, on January 8, 2003, Newman emailed Pennecke instructing him to retroactively increase the value of these warrants to almost $3.97 per share as of December 31, 2002.[98]  This resulted in a gain of $13,895,000 in approximately two weeks.[99]  Pennecke replied to Newman forty-five minutes after receiving these instructions that the "dec 2002 report has been redone."[100]  Newman replied, "you da man, thanks."[101]

---

[95]    *See* 3/31/01 Position Report, Ex. B to Pennecke Decl., at 2.

[96]    3/26/08 Pennecke Dep., Ex. K to Wellner Decl., at 204:9-206:19 (PW154).

[97]    *See* 1/8/03 Email from Newman to Pennecke, Ex. C to Pennecke Decl. (noting that Lancer Offshore had purchased the XtraCard Corp. warrants "@0.00 [on] 12/16/02").

[98]    *See id.*

[99]    *See* Pl. 56.1 ¶ 75.

[100]   1/8/03 Email from Pennecke to Newman, Ex. C to Pennecke Decl.

[101]   1/8/03 Email from Newman to Pennecke, Ex. C to Pennecke Decl.

21

Pennecke was not the only account executive that cooperated fully with Lancer's instructions. On April 30, 1999, Lauer sent Miller-Jones – Newman's predecessor at BAS – a LOA directing BAS to wire $675,000 on behalf of Lancer Offshore for the purchase of 450,000 shares of FiberNet Telecom ("FTGX") at $1.50 per share.[102] These privately-placed (and thus restricted) shares appeared on the Position Reports for April 1999 under the same ticker symbol as freely-trading shares of FTGX, and were priced at $4.1875 per share – representing a single day gain of 179 percent, or $1.2 million.[103]

BAS refutes the evidence surrounding the Position Reports by arguing that its role in generating the Position Reports was "so minimal" that the Position Reports should not be "viewed as reports of BAS."[104] Instead, BAS argues, the Position Reports should be viewed as reports of the investment manager, Lancer.[105] In support of this argument BAS relies on plaintiffs' expert,

---

[102]    See 4/30/99 LOA from Lauer to Miller-Jones, Ex. A to Wellner Decl., at PW1.

[103]    See 4/30/99 Position Report, Ex. A to Wellner Decl., at PW2-PW3. For additional examples, see Pl. 56.1 ¶¶ 134, 140, 141, 143 and record citations therein.

[104]    BAS Mem. at 19.

[105]    See id. at 19-20.

22

James Collins.[106]  According to Collins, the Citco Defendants, namely CFS-Curacao, should have known that "'[r]eports from BAS's primebroker.com system were not sufficient backup for either transactions or positions'" and that the BAS Position Reports "'should have been treated by CFS-Curacao as the functional equivalent of reports from the investment manager, which they were.'"[107]

Both the plaintiffs and the Citco Defendants refute this characterization.  BAS's Position Reports bore the name "Banc of America Securities LLC" at the top and lacked any disclaimer or other language indicating that they were not official reports prepared by BAS.[108]  The Position Reports were generated by BAS based on data that only BAS could record or alter and were published on primebroker.com.[109]  BAS account executives and supervisors both knew that the data reflecting artificially inflated prices was provided to the Funds' auditor, PwC, and administrator, CFS-Curacao, by virtue of their access to the

---

[106]     *See id.*

[107]     BAS 56.1 ¶ 53 (quoting 4/7/09 Expert Report of James C. Collins, Ex. 4 to Wilson Decl., at 23-24).

[108]     *See* Pl. 56.1 ¶¶ 18, 41, 50, 52; Citco 56.1 ¶ 41.

[109]     *See* BAS 56.1 ¶¶ 50, 55, 56; Pl. 56.1 ¶¶ 50, 55, 56.  *Accord* Citco 56.1 ¶ 41.

reports on primebroker.com.[110] They also knew that PwC and CFS-Curacao did,

in fact, access and rely upon the reports on primebroker.com.[111] Yet BAS never

informed PwC or CFS-Curacao that the reports were unofficial or unreliable.[112]

Krawciw, Newman, Pennecke, and other individuals have acknowledged that the

primary purpose of the Position Reports was to convey data to CFS-Curacao for

the purpose of preparing monthly NAV statements for the Funds.[113] On some

occasions, a CFS-Curacao representative or another Citco employee would contact

BAS to ask whether monthly reports were ready to be downloaded.[114] On at least

---

[110]    *See* Pl. 56.1 ¶ 18; *see also* The Citco Defendants' Memorandum in Opposition to Banc of America Securities LLC's Motion for Summary Judgment as to the Purpose and Use of BAS Monthly Position Reports ("Citco Opp.") at 3-4.

[111]    *See* 4/2/08 Krawciw Dep., Ex. 2 to Feinberg Decl., at 282:17-284:25.

[112]    *See* 7/16/09 Deposition of Roman Krawciw ("7/16/09 Krawciw Dep."), Ex. 2 to Feinberg Decl., at 237:17-238:2; 7/13/09 Newman Dep., Ex. 2 to Feinberg Decl., at 146:23-147:5, 148:10-16).

[113]    *See* 7/16/09 Krawciw Dep., Ex. 2 to Feinberg Decl., at 234:3-20; 7/13/09 Newman Dep., Ex. 2 to Feinberg Decl., at 137:8-138:20, 140:6-141:6, 145:25-146:22; 7/17/09 Pennecke Dep., Ex. 3 to Feinberg Decl., at 67:6-20.

[114]    *See* 2/2/00 Email from Conor O'Brien of Citco to Newman, Ex. E to Wellner Decl., at PW72 ("pls advise how soon I will be able to goto [sic] web for the correct final monthly broker statements for [Lancer Offshore Inc.]"); 7/17/09 Pennecke Dep., Ex. E to Wellner Decl., at 676:6-13; *see also* 7/16/01 Email from Serge van der Kruijk of CFS-Curacao to Pennecke, Newman, et al., Ex. E to Wellner Decl., at PW73-PW74 (requesting clarification of a discrepancy in the January 2000 closing balance for Lancer's Orbiter Fund, Ltd.'s away position, which, Newman notes in an email to Pennecke only, "is for the audit").

one occasion, Newman emailed a report from the BAS website to Citco.[115]  On

another occasion, BAS sent a letter directly to PwC confirming the positions

recorded in Lancer Offshore's portfolio.[116]  This letter, sent as part of PwC's

annual audit of the Funds, included specific away positions and prices provided by

Lancer.[117]  Krawciw reviewed this information before it was mailed by Pennecke

to PwC.[118]  Based on these facts, and drawing all inferences in favor of plaintiffs, a

reasonable jury could conclude that BAS had actual knowledge that Lancer was

providing fraudulently inflated data to its accountant and administrators through

BAS's Position Reports for purposes of conducting audits and calculating the

Funds' NAVs.

### 2.  Account Statements

Plaintiffs provide at least four instances between December 2000 and

December 2001 in which BAS accepted custody of privately-placed shares from

---

[115]  *See* 6/24/99 Email from Newman to O'Brien, Ex. E to Wellner Decl., at PW67.

[116]  *See* 6/24/02 Fax from Pennecke and Krawciw to PwC, Ex. G to Wellner Decl., at PW103 (confirming Lancer Offshore's away positions and BAS-housed positions, including data regarding NUDZ).

[117]  *See id.*

[118]  *See* 4/2/08 Krawciw Dep., Ex. I to Wellner Decl., at 271:10-272:23 (PW129-PW130).

25

Lancer that were both unregistered and restricted and reported them in BAS's Account Statements using the ticker symbol for the same company's more valuable freely-trading shares.[119] The result was to artificially inflate the value of the shares by deceptively reporting less valuable unregistered and restricted shares at the market price for freely-trading shares.

For example, on December 8, 2000, Newman instructed Pennecke to enter into BAS's computer system a Lancer Offshore purchase of forty million privately-placed shares of SMX Corp. at $0.04186 per share (for $1.7 million).[120] BAS's Account Statement for December 2000 shows that these same forty million shares were deposited into the custody of BAS on December 13, 2000.[121] These shares, although purchased in a private placement and bearing a legend stating that they were unregistered and restricted, were reported on Lancer's Account Statement using the ticker symbol for freely-trading SMX Corp. stock at $1.50 per share.[122] The result was that these shares were purchased for $1.7 million and valued at sixty million dollars on the Account Statement.[123] This increase in

---

[119]    *See* Pl. 56.1 ¶¶ 113-131.

[120]    *See* Pl. 56.1 ¶ 113; BAS 56.1 ¶ 113.

[121]    *See* 12/28/00 Account Statement, Ex. B to Wellner Decl., at PW30.

[122]    *See id.* at PW31.

[123]    *See* Pl. 56.1 ¶ 114.

recorded value reflected a paper gain of 3,384 percent in under four weeks, and represented fourteen percent of the entire value of the Lancer Offshore portfolio housed at BAS at year end.[124]

Similarly, on December 27, 2000, Lauer sent Pennecke a LOA directing BAS to wire 250,000 dollars for the purchase of 6,812,500 shares of NUDZ.[125] Simple division reveals that the unit price of the NUDZ shares was $0.0367.[126] The following day, Lauer sent Pennecke another LOA directing BAS to wire 175,000 dollars to an account in the name of NUDZ for the "[p]urchase of 15,000,000 [shares of] NUDZ @ [$0].01/share."[127] BAS's January 2001 Account Statement for Lancer shows the deposit of the 6,812,500 shares of NUDZ into BAS's custody on January 9, 2001.[128] Lancer's Account Statement for March 2001 shows the deposit of the fifteen million shares of NUDZ into the custody of BAS on March 23, 2001.[129] All 21,812,000 NUDZ shares, although purchased in

---

[124]    See id.

[125]    See 12/27/00 LOA from Lauer to Pennecke, Ex. A to Wellner Decl., at PW9.

[126]    See Pl. 56.1 ¶ 117.

[127]    12/28/00 LOA from Lauer to Pennecke, Ex. C to Wellner Decl., at PW34.

[128]    See 1/31/01 Account Statement, Ex. C to Wellner Decl., at PW35.

[129]    See 3/30/01 Account Statement, Ex. C to Wellner Decl., at PW36.

a private placement and bearing a legend stating that they were unregistered and restricted, were reported by BAS on its Account Statement using the ticker symbol for freely-trading NUDZ stock, at a price of $0.73 per share.[130]  The result was that these shares were valued at $15,923,125 on BAS's Account Statement.[131]  This value, when compared to the prices paid for the shares in December 2000 reflected a gain of 3,647 percent in three months.[132]

BAS attempts to dispel the inferences that could be drawn from this evidence by claiming that no account executive ever knew the true value of privately-placed shares and could not ascertain this information even if he or she had undertaken such an investigation.[133]  Yet, Pennecke admitted that he could have used BAS's Bloomberg terminal, which would have given him considerable information about the company in which Lancer was purchasing shares.[134]  He further could have called the company directly and asked it to verify the

---

[130]    *See id.* at PW37.

[131]    *See id.*

[132]    *See* Pl. 56.1 ¶ 121.

[133]    *See* BAS Mem. at 14-15.

[134]    *See* 7/17/09 Pennecke Dep., Ex. L to Wellner Decl., at 82:8-25 (PW 157), 99:4-99:12 (PW159).

information given to him by Lancer.[135]  Finally, he could have asked Lancer to provide backup documentation.[136]  Although BAS had no duty to verify or investigate the information it received, BAS may not assert that it *could not have done so* in the face of testimony by its own employees that it could.

BAS next argues that the Account Statements do not give rise to an inference of actual knowledge of fraud because "it was BAS's standard procedure to enter data about restricted stock with the same ticker in the same way as the trading stock unless otherwise instructed by the client."[137]  However, plaintiffs argue that, in fact, privately-placed stock should have been listed on Account Statements with an "N/A," because those stocks had no price feed from ADP.[138]

BAS also contends that Pennecke and other BAS account executives were not responsible for entering prices into ADP, which refutes an inference of actual knowledge.[139]  Instead, keypunchers – those tasked with the ministerial role

---

[135]    *See id.* at 98:11-98:21 (PW158).

[136]    *See id.* at 98:22-99:2 (PW158-PW159).

[137]    BAS Mem. at 5.

[138]    *See* Pl. 56.1 ¶ 47; *see also* Pl. Mem. at 4 n.6.

[139]    *See* Reply Memorandum of Law in Support of Defendant Banc of America Securities LLC's Motion for Summary Judgment ("BAS Reply") at 8-10.

of typing numbers into the computer – were solely responsible.[140]  BAS argues

that the involvement of its account executives would have been "passing" only,

limited to "no more than a few minutes opening the mail containing the share

certificates, making a photocopy, and then sending the original certificates to the

Cashiering department."[141]

BAS's attempt to characterize its prime broker role as merely taking

orders and inputting numbers into a computer system is disingenuous.  It ignores

the fact that Lancer's trade sheets were expressly addressed to the BAS account

executive and that it was the account executive who passed the trade sheets to the

keypunchers.[142]  It also ignores the discrepancy between the testimony of

Pennecke and Newman.  Newman recalled receiving and reviewing Lancer's trade

blotters addressed to his attention before they went to the keypunchers when he

was BAS's account executive.[143]  Newman testified that he would review the trade

sheets to check that the closing position existed in those accounts and check the

broker codes to make sure that they were valid prior to directing them to the

---

[140]    *See id.*

[141]    BAS C-56.1 ¶ 114.

[142]    *See* Lancer Group Trade Sheets, at PW98, PW100.

[143]    *See* 7/13/09 Newman Dep., Ex. K to Wellner Decl., 82:14-84:10
(PW143-PW144).

keypunchers.[144]  Pennecke, in contrast, denied having ever received or reviewed the trade sheets, even though they were addressed to him.[145]  Furthermore, BAS account executives and their supervisors closely oversaw each of their accounts.[146] They received daily reports detailing their customers' fund transfers, unusually large price percentage changes (daily changes of over 10%), and uncommon year-to-date rates of return.[147]

BAS additionally disputes plaintiffs' assertion of actual knowledge because account executives only "rarely" saw Lancer's Account Statements and therefore would have no way of knowing that the privately-placed shares were being valued at the price of freely-traded shares.[148]  Yet, it was the account executive's responsibility, in part, to have these purchases recorded into the Funds' account and to facilitate the deposit of these shares into BAS's custody.[149]

---

[144]    *See id.*

[145]    *See* 7/17/09 Pennecke Dep., Ex. 1 to Wilson Supp. Decl., at 52:7-22 (DW3).

[146]    *See* Pl. Opp. at 11.

[147]    *See* 12/5/02 Email from Krawciw to "PB Client Reps," Ex. B to Wellner Decl., at PW17 (stating that it is "important" that account executives review client reports "on a daily basis").

[148]    BAS C-56.1 ¶ 114.

[149]    *See id.*

This responsibility, coupled with the other evidence provided by plaintiffs, could permit a reasonable jury to conclude that BAS knew that Lancer was deceptively recording privately-placed shares at their freely-trading price in its Account Statements, thereby artificially inflating the Funds' portfolio for purposes of the Funds' audits and calculating their NAVs.

### 3.    Inconsistent and False Statements

Between 2000 and 2003, BAS employees made statements to Lancer Offshore investors, auditors, and administrators assuring them of Lancer's conservative pricing even though they knew such statements were false. For example, although Pennecke was regularly processing stock and warrant purchases with extraordinarily high immediate gains pursuant to Lancer's instructions, Pennecke represented the opposite to a Lancer Offshore investor in October 2002.[150] Pennecke told the investor that Lancer did not "mark [ ] up" its illiquid securities held away from BAS.[151] Pennecke also stated that "[t]here is a fairly substantial warrants position which are [sic] either marked at zero or at a gain if

---

[150]    *See* 10/21/02 Memorandum of Richard Lombardi, representative of a Lancer Offshore third-party investor, regarding "Discussions with the Custodian/Prime Broker," Ex. E to Wellner Decl, at PW75.

[151]    *Id.*

32

the strike is below the market price (confirmed by the auditor)."[152] Pennecke

asserted that "[t]here have been no red flags" with regard to the Lancer account.[153]

Finally, Pennecke noted that he, "his team," and Lauer "went through 'tons' of

[the Funds'] certificates and he is comfortable with the holdings."[154]  Each of these

statements is inconsistent with Pennecke's regular receipt of, and compliance with,

Lancer's instructions to price illiquid, restricted shares or warrants at values

substantially higher than their purchase price for immediate false gains.

Furthermore, Pennecke testified that he did not really understand how warrants

were priced and he "[didn't] know warrants very well" at the time he spoke to the

Lancer Offshore investor's representative.[155]   Pennecke's statements to the

investor are also contradicted by Pennecke's direct involvement in a September

2000 American Stock Exchange investigation into Lancer Offshore's accounts.[156]

---

[152]    *Id.*

[153]    *Id.*

[154]    *Id. See also* 5/22/08 Deposition of Richard Lombardi, Ex. J to
Wellner Decl., at 550:11-550:20 (PW138) (stating that this conversation with
Pennecke left him with a "measure of comfort" regarding maintaining an
investment with Lancer Offshore).

[155]    7/17/09 Pennecke Dep., Ex. L to Wellner Decl., at 85:16-86:14
(PW157).

[156]    *See* 9/26/00 Email from Krawciw to Pennecke, Ex. D to Wellner
Decl., at PW59 (instructing Pennecke to respond to an "AMEX Inquiry" "to the
best of [Pennecke's] knowledge" and to "[c]heck with Newman if [he had] to").

As part of this investigation, Pennecke was asked by Krawciw to provide information about the transactions in question and about Lancer.[157] At his deposition, however, Pennecke claimed to have no recollection of the investigation.[158]

Newman has also made contradictory statements regarding the Funds' conservative pricing. On May 24, 2000 – just prior to his departure from BAS to Lancer – Newman assured a Citco representative that Lancer "CONSERVATIVELY prices the warrants."[159] As with Pennecke, this statement is inconsistent with his knowledge of, and involvement in, Lancer's fraudulent practices. When asked about this statement at his deposition, Newman could not explain what he meant to convey to Citco with this statement or why "conservatively" was written in all capital letters.[160] Such inconsistencies, when considered together with the other evidence of actual knowledge, could be indicative of BAS's intent to conceal the known fraud.

---

[157]    *See id.*

[158]    *See* 7/17/09 Pennecke Dep., Ex. L to Wellner Decl., at 161:8-18 (PW163).

[159]    5/24/00 Fax to O'Brien of Citco from Newman, Ex. E to Wellner Decl., at PW68 (emphasis in original).

[160]    *See* 7/13/09 Newman Dep., Ex. K to Wellner Decl., at 103:10-19 (PW144).

### 4.    Additional Evidence Related to Other Lancer Funds

Plaintiffs have provided a number of additional facts regarding BAS's conduct in connection with other Lancer funds for which BAS served as prime broker. For instance, on October 10, 2001, Newman emailed Pennecke instructions to record a transaction for Lancer Partners, another Lancer fund for which BAS was prime broker and custodian.[161] Newman directed Pennecke to purchase 17,500,000 shares of CENKPFD at $0.02 per share with a transaction date of September 28 and to price the shares at $1.00 per share for September 30.[162] The result would have been a gain of 4,900 percent in two days.[163] In the cover email to these instructions, Newman asked Pennecke if he could "get this re-run . . . ."[164] The following morning, Newman emailed Pennecke again stating that "[Lancer] Partners looks great in terms of positions and performance. Can I just get the monthly report not to reflect such a large DAY gain?"[165] Pennecke replied,

---

[161]    *See* 10/10/01 Email from Newman to Pennecke, Ex. D to Wellner Decl., at PW57.

[162]    *See id.*

[163]    *See* Pl. 56.1 ¶ 136.

[164]    10/10/01 Email from Newman to Pennecke, Ex. D to Wellner Decl., at PW57.

[165]    10/11/01 Email from Newman to Pennecke, Ex. F to Wellner Decl., at PW86.

"I think Gus fixed this last time . . . I will talk to him."[166] Assuming *arguendo* that

these facts are admissible at trial,[167] they raise a further question as to whether

BAS had actual knowledge of Lancer's fraud.

Drawing all inferences in favor of plaintiffs, these facts, coupled with

the facts regarding the Position Reports, Account Statements, and inconsistencies

among BAS employees' statements, are sufficient to raise a genuine issue of

material fact such that a reasonable jury could find that Pennecke[168] or other

account executives and supervisors – and thus BAS – knew of Lauer and Lancer's

fraud.

## C.    **Substantial Assistance**

BAS also claims that its services were merely "clerical" and therefore

not sufficient to show that BAS provided substantial assistance to Lancer's

---

[166]    *Id.*  Pennecke testified, however, that such a request is not an attempt to manipulate reports to accommodate Lancer, but rather an effort to correct a "day-to-day number" that was inadvertently "skewed" on account of a "glitch in the [computer] system." 7/17/09 Pennecke Dep., Ex. 1 to Feinberg Decl., at 178:14-179:10 (DW10).

[167]    *See* Pl. Mem. at 7 n.8 (noting that damages and causation are currently limited to plaintiffs' Lancer Offshore investments).

[168]    BAS argues that plaintiffs must establish actual knowledge as to at least one BAS employee. *See* BAS Reply at 1-3.  As each instance of suspicious conduct evidencing actual knowledge involves either Newman or Pennecke, a jury could find that either had actual knowledge of the fraud.

fraud.[169] Plaintiffs oppose this characterization, arguing that BAS provided significant substantive services to Lancer in its prime broker and custodian role.[170] Even assuming that BAS only performed clerical and ministerial tasks, BAS ignores the principle that "[t]he critical test [for substantial assistance] is not . . . whether the alleged aiding and abetting conduct was routine, but whether it made a substantial contribution to the perpetration of the fraud."[171]

BAS's conduct substantially contributed to Lancer's fraud in three key ways. *First*, by recording the pricing and purchase information provided by Lancer even though it knew that the resulting gains were extraordinary and probably "too good to be true," BAS permitted Lancer to artificially and deceptively inflate the value of the Funds' portfolio. *Second*, when BAS generated Account Statements and Position Reports that incorporated these artificially inflated holdings with the knowledge that the Funds' auditors and

---

[169]    BAS Mem. at 14 (citing Declaration of Richard R. Lindsey, BAS's expert, ¶ 10 ("The prime broker's function is what is traditionally known in the industry as a 'back office' function – that is, the prime broker provides a ministerial, clerical role.")).

[170]    *See* Pl. Opp. at 10-13 (citing Declaration of Louis Ricciardelli, plaintiffs' expert, ¶ 13 ("In my experience, Mr. Lindsey's characterization of prime brokerage employees as no more than clerks who merely satisfy requests from clients is not an accurate representation of prime brokerage operations.")).

[171]    *J.P. Morgan Chase Bank*, 406 F. Supp. 2d at 257.

37

administrators would rely on them to conduct their audits and calculate NAVs,

BAS permitted the Funds to issue artificially and deceptively inflated values to

investors. *Third*, BAS made statements to the Funds' accountant, administrators

and investors that concealed Lancer's fraud. This conduct is sufficient to raise a

genuine issue of material fact as to whether BAS substantially assisted Lancer's

fraud.[172] Drawing all inferences in favor of plaintiffs, plaintiffs have raised a

genuine issue of material fact that BAS actually knew of, and substantially

assisted in, Lancer's fraud.

---

[172]     As noted by BAS, the Court's exclusion of plaintiffs' "holder" claims
– claims based on allegations that plaintiffs would not have "held" their shares had
the Citco Defendants exposed the fraud earlier – is law of the case. *See* BAS
Mem. at 10 (citing *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc
of Am. Sec.*, 592 F. Supp. 2d 608, 638 (S.D.N.Y. 2009)). This holding has no
effect on the outcome of this motion. BAS further argues that this Court's
decision to grant IFSI's motion for summary judgment because plaintiffs could not
raise a genuine issue of material fact with respect to the lack of proximate cause
after IFSI became administrator in September 2002 means that "no BAS conduct
after that date could be a proximate cause of [plaintiffs'] injures." *Id.* at 9 (citing
*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 591 F.
Supp. 2d 586, 592-93 (S.D.N.Y. 2008)). BAS claims that "[i]t follows from this
decision," that if BAS developed actual knowledge or substantially assisted
Lancer's fraud after that date, summary judgment should be granted because such
conduct could not be the proximate cause of plaintiffs' losses. *Id.* at 9-10.
Because plaintiffs have provided sufficient evidence from which a jury could
conclude that BAS had actual knowledge and substantially assisted Lancer prior to
September 2002 – and even June 30, 2002, the date BAS contends is controlling –
this holding also has no effect on the outcome of this motion.

## V.    CONCLUSION

For the reasons stated above, BAS's motion for summary judgment is

denied.  The Clerk of the Court is directed to close this motion (document no.

254).  A conference is scheduled for September 15, 2009 at 4:30 p.m.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            September 4, 2009

39

## - Appearances -

**For the Plaintiffs:**

Scott M. Berman, Esq.
Anne E. Beaumont, Esq.
Amy C. Brown, Esq.
Philip A. Wellner, Esq.
Robert S. Landy, Esq.
Lili Zandpour, Esq.
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

**For Defendant Banc of America Securities LLC:**

Peter K. Vigeland, Esq.
Dawn M. Wilson, Esq.
Paul M. Winke, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800

**For the Citco Defendants:**

Lewis N. Brown, Esq.
Dyanne E. Feinberg, Esq.
Terence M. Mullen, Esq.
Elizabeth A. Izquierdo, Esq.
Gilbride, Heller & Brown, P.A.
One Biscayne Tower, 15th Floor
2 South Biscayne Blvd.
Miami, Florida 33131
(305) 358-3580

Eliot Lauer, Esq.
Michael Moscato, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178
(212) 696-6000