**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __1/15/2010__

------------------------------------------------------- X

**THE PENSION COMMITTEE OF THE**
**UNIVERSITY OF MONTREAL**
**PENSION PLAN,** *et al.,*

                **Plaintiffs,**

        **- against -**

**BANC OF AMERICA SECURITIES,**
**LLC, CITCO FUND SERVICES**
**(CURACAO) N.V., THE CITCO GROUP**
**LIMITED, INTERNATIONAL FUND**
**SERVICES (IRELAND) LIMITED,**
**PRICEWATERHOUSECOOPERS**
**(NETHERLAND ANTILLES), JOHN W.**
**BENDALL, JR., RICHARD GEIST,**
**ANTHONY STOCKS, KIERAN**
**CONROY, and DECLAN QUILLIGAN,**

                **Defendants.**

------------------------------------------------------- X

**AMENDED**
**OPINION AND ORDER**

**05 Civ. 9016 (SAS)**

*Zubulake* Revisited: Six Years Later

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.     INTRODUCTION

In an era where vast amounts of electronic information is available for review, discovery in certain cases has become increasingly complex and

expensive. Courts cannot and do not expect that any party can meet a standard of perfection. Nonetheless, the courts have a right to expect that litigants and counsel will take the necessary steps to ensure that relevant records are preserved when litigation is reasonably anticipated, and that such records are collected, reviewed, and produced to the opposing party. As discussed six years ago in the *Zubulake* opinions, when this does not happen, the integrity of the judicial process is harmed and the courts are required to fashion a remedy. Once again, I have been compelled to closely review the discovery efforts of parties in a litigation, and once again have found that those efforts were flawed. As famously noted, "[t]hose who cannot remember the past are condemned to repeat it."[1] By now, it should be abundantly clear that the duty to preserve means what it says and that a failure to preserve records – paper or electronic – and to search in the right places for those records, will inevitably result in the spoliation of evidence.

In February, 2004, a group of investors brought this action to recover losses of 550 million dollars stemming from the liquidation of two British Virgin Islands based hedge funds in which they held shares: Lancer Offshore, Inc. and

---

[1]     George Santayana, *Reason in Common Sense*, Vol. 1 of The Life of Reason (1905) (Prometheus Books 1998 at 82).

OmniFund Ltd. (the "Funds").[2]  Plaintiffs[3] have asserted claims under the federal

securities laws and under New York law against former directors, administrators,

the auditor, and the prime broker and custodian of the Funds.[4]  The Funds were

managed by Lancer Management Group LLC ("Lancer") and its principal,

Michael Lauer.[5]  The Funds retained Citco Fund Services (Curacao) N.V. ("Citco

---

[2]     *See* Second Amended Complaint ("SAC") ¶ 1.  Familiarity with the facts underlying this action is assumed.  For a more detailed discussion of the facts see *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, No. 05 Civ. 9016, 2009 WL 2876262 (S.D.N.Y. Sept. 4, 2009) and *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 592 F. Supp. 2d 608 (S.D.N.Y. Jan. 5, 2009).

[3]     Although there are ninety-six plaintiffs in this action, only thirteen are relevant for this motion.  They are: the Morton Meyerson Family Foundation and the 1999 Meyerson Charitable Remainder Trust ("2M"); Defined Benefit Plan for Hunnicutt & Co., Inc., IRA F/B/O William Hunnicutt VFTC as Custodian ("Hunnicutt"); the Coronation International Active Fund of Funds and Fortis Global Custody Management and Trustee Services (Ireland) Limited as Trustee for Coronation Universal Fund ("Coronation"); Andre Chagnon, Foundation Lucie Et Andre Chagnon, Sojecci II Ltee, and Claude Chagnon (the "Chagnon Plaintiffs"); Bombardier Trust (Canada), the Bombardier Trust (UK), and the Bombardier Trust (U.S.) Master Trust ("Bombardier Trusts"); Fondation J. Armand Bombardier ("Bombardier Foundation"); the Altar Fund; the Pension Committee of the Pension Plan for The Régime De Retraite De La Corporation De L'Ecole Polytechnique ("L'Ecole Polytechnique"); Okabena Marketable Alternatives Fund, LLC ("Okabena"); the Corbett Family Charitable Foundation, Inc. ("Corbett Foundation"); Commonfund Global Hedged Partners, LLC ("Commonfund"); Kuwait and Middle East Financial Investment Company ("KMEFIC"); and the Pension Committee of the University of Montreal Pension Plan ("UM").

[4]     *See* SAC ¶¶ 318-460.

[5]     *See id.* ¶ 1.

3

NV") to perform certain administrative duties, but it eventually resigned as administrator of the Funds.[6]   On April 16, 2003, Lancer filed for bankruptcy.[7]   On July 8, 2003, the Funds were placed into receivership in the Southern District of Florida.[8]

In October, 2007, during the discovery process, Citco NV, its parent company, the Citco Group Limited, and former Lancer Offshore directors who were Citco officers (collectively with Citco NV, the "Citco Defendants") claimed that substantial gaps were found in plaintiffs' document productions.  As a result, depositions were held and declarations were submitted.  This occurred from October, 2007 through June, 2008.  Following the close of this discovery, the Citco Defendants moved for sanctions, alleging that each plaintiff failed to preserve and produce documents – including those stored electronically – and submitted false and misleading declarations regarding their document collection and preservation efforts.  The Citco Defendants seek dismissal of the Complaint – or any lesser sanction the Court deems appropriate – based on plaintiffs' alleged misconduct.

---

[6]   *See id.* ¶¶ 4, 13.

[7]   *See id.* ¶ 313.

[8]   *See id.* ¶ 315.

Because this is a long and complicated opinion, it may be helpful to provide a brief summary up front. I begin with a discussion of how to define negligence, gross negligence, and willfulness in the discovery context and what conduct falls in each of these categories. I then review the law governing the imposition of sanctions for a party's failure to produce relevant information during discovery. This is followed by factual summaries regarding the discovery efforts – or lack thereof – undertaken by each of the thirteen plaintiffs against whom sanctions are sought, and then by an application of the law to those facts. Based on my review of the evidence, I conclude that all of these plaintiffs were either negligent or grossly negligent in meeting their discovery obligations. As a result, sanctions are required.

## II.    AN ANALYTICAL FRAMEWORK AND APPLICABLE LAW

From the outset, it is important to recognize what this case involves and what it does not. This case does not present any egregious examples of litigants purposefully destroying evidence. This is a case where plaintiffs failed to timely institute written litigation holds and engaged in careless and indifferent collection efforts after the duty to preserve arose. As a result, there can be little doubt that some documents were lost or destroyed.

The question, then, is whether plaintiffs' conduct requires this Court

5

to impose a sanction for the spoliation of evidence.   To answer this question, there

are several concepts that must be carefully reviewed and analyzed.  The first is

plaintiffs' level of culpability – that is, was their conduct of discovery acceptable

or was it negligent, grossly negligent, or willful.  The second is the interplay

between the duty to preserve evidence and the spoliation of evidence.  The third is

which party should bear the burden of proving that evidence has been lost or

destroyed and the consequences resulting from that loss.  And the fourth is the

appropriate remedy for the harm caused by the spoliation.

### A.    Defining Negligence, Gross Negligence, and Willfulness in the Discovery Context

While many treatises and cases routinely define negligence, gross

negligence, and willfulness in the context of tortious conduct, I have found no

clear definition of these terms in the context of discovery misconduct.   It is

apparent to me that these terms simply describe a continuum.[9]  Conduct is either

acceptable or unacceptable.  Once it is unacceptable the only question is how bad

is the conduct.  That is a judgment call that must be made by a court reviewing the

---

[9]      *See Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (stating that the failure to produce evidence occurs "'along a continuum of fault – ranging from innocence through the degrees of negligence to intentionality'") (quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988)).

conduct through the backward lens known as hindsight. It is also a call that

cannot be measured with exactitude and might be called differently by a different

judge. That said, it is well established that *negligence* involves unreasonable

conduct in that it creates a risk of harm to others, but *willfulness* involves

intentional or reckless conduct that is so unreasonable that harm is highly likely to

occur.

It is useful to begin with standard definitions of each term and then to

explore the conduct, in the discovery context, that causes certain conduct to fall in

one category or another.

> [Negligence] is conduct "which falls below the standard
> established by law for the protection of others against
> unreasonable risk of harm." [Negligence] is caused by
> heedlessness or inadvertence, by which the negligent party
> is unaware of the results which may follow from [its] act.
> But it may also arise where the negligent party has
> considered the possible consequences carefully, and has
> exercised [its] own best judgment.[10]

The standard of acceptable conduct is determined through experience. In the

discovery context, the standards have been set by years of judicial decisions

analyzing allegations of misconduct and reaching a determination as to what a

party must do to meet its obligation to participate meaningfully and fairly in the

---

[10]    Prosser & Keeton on Torts § 31 at 169 (5th ed. 1984) (quoting
Restatement (Second) of Torts § 282) (citations omitted).

7

discovery phase of a judicial proceeding.  A failure to conform to this standard is negligent even if it results from a pure heart and an empty head.

"Gross negligence has been described as a failure to exercise even that care which a careless person would use."[11]  According to a leading treatise – *Prosser & Keeton on Torts* – most courts find that gross negligence is something more than negligence "and differs from ordinary negligence only in degree, and not in kind."[12]

The same treatise groups willful, wanton, and reckless into one category that requires "that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences."[13]

Applying these terms in the discovery context is the next task. Proceeding chronologically, the first step in any discovery effort is the preservation of relevant information.  A failure to preserve evidence resulting in the loss or destruction of relevant information is surely negligent, and, depending

---

[11]    *Id.* § 34 at 211-12.

[12]    *Id.* at 212 (citations omitted).

[13]    *Id.* at 213 (citing Restatement (Second) of Torts § 500 and collecting cases).

on the circumstances, may be grossly negligent or willful.[14]  For example, the

intentional destruction of relevant records, either paper or electronic, after the duty

to preserve has attached, is willful.[15]  Possibly after October, 2003, when

*Zubulake IV* was issued,[16] and definitely after July, 2004, when the final relevant

*Zubulake* opinion was issued,[17] the failure to issue a *written* litigation hold

constitutes gross negligence because that failure is likely to result in the

destruction of relevant information.[18]

------

[14]    *See Treppel v. Biovail*, 249 F.R.D. 111, 121 (S.D.N.Y. 2008)
(collecting cases); *Doe v. Norwalk Cmty. Coll.*, 248 F.R.D. 372, 380 (D. Conn.
2007) (finding gross negligence where there was "no evidence that the defendants
did anything to stop the routine destruction of the backup tapes after [their]
obligation to preserve arose"); *Pastorello v. City of New York*, No. 95 Civ. 470,
2003 WL 1740606, at *11-*12 (S.D.N.Y. Apr. 1, 2003) (concluding that loss of
data due to unfamiliarity with record-keeping policy by employee responsible for
preserving document was grossly negligent).

[15]    *See, e.g.*, *Gutman v. Klein*, No. 03 Civ. 1570, 2008 WL 5084182
(E.D.N.Y. Dec. 2, 2008) (adopting finding of the Magistrate Judge that spoliator
acted in bad faith by intentionally deleting computer files).

[16]    *See Zubulake v. UBS Warburg LLC ("Zubulake IV")*, 220 F.R.D. 212
(S.D.N.Y. 2003).

[17]    *See Zubulake v. UBS Warburg LLC ("Zubulake V")*, 229 F.R.D. 422
(S.D.N.Y. 2004).

[18]    *Compare Adorno v. Port Auth. of N.Y. & N.J.*, 258 F.R.D. 217, 228-
29 (S.D.N.Y. 2009) (holding that defendants were only negligent where they
instituted some form of a litigation hold – albeit limited in scope – when the duty
to preserve arose in 2001); *with Treppel*, 249 F.R.D. at 121 (holding that the
failure to preserve backup tapes after December 2003 was sufficient to constitute

9

The next step in the discovery process is collection and review. Once again, depending on the extent of the failure to collect evidence, or the sloppiness of the review, the resulting loss or destruction of evidence is surely negligent, and, depending on the circumstances may be grossly negligent or willful. For example, the failure to collect records – either paper or electronic – from key players constitutes gross negligence or willfulness as does the destruction of email or certain backup tapes after the duty to preserve has attached. By contrast, the failure to obtain records from *all* employees (some of whom may have had only a passing encounter with the issues in the litigation), as opposed to key players, likely constitutes negligence as opposed to a higher degree of culpability. Similarly, the failure to take all appropriate measures to preserve ESI likely falls in the negligence category.[19] These examples are not meant as a definitive list. Each case will turn on its own facts and the varieties of efforts and failures is infinite. I have drawn the examples above from this case and others. Recent cases have also addressed the failure to collect information from the files of former employees that

gross negligence or recklessness); *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 198-99 (S.D.N.Y. 2007) ("[T]he Court finds that [the] utter failure to preserve documents and ESI [electronically stored information] relevant to plaintiffs' allegations in this case . . . to be at least grossly negligent.") (collecting cases).

[19]     *See Treppel*, 249 F.R.D. at 121.

10

remain in a party's possession, custody, or control after the duty to preserve has attached (gross negligence)[20] or the failure to assess the accuracy and validity of selected search terms (negligence).[21]

**B.    The Duty to Preserve and Spoliation**

> Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct "which abuses the judicial process." The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth. . . . The courts must protect the integrity of the judicial process because, "[a]s soon as the process falters . . . the people are then justified in abandoning support for the system."[22]

The common law duty to preserve evidence relevant to litigation is well recognized.[23]

---

[20]    *See Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 627-28 (D. Colo. 2007).

[21]    *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 259-62 (D. Md. 2008).

[22]    *Silvestri v. General Motors*, 271 F.3d 583, 589 (4th Cir. 2001) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991), and *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457 (4th Cir. 1993)) (citations omitted).

[23]    *See* Fed. R. Civ. P. 37(f) Advisory Committee Note ("A preservation obligation may arise from many sources, including common law, statutes, regulations, or a court order in the case."). *See also Kronisch v. United States*, 150

The case law makes crystal clear that the breach of the duty to preserve, and the resulting spoliation of evidence, may result in the imposition of sanctions by a court because the court has the obligation to ensure that the judicial process is not abused.[24]

It is well established that the duty to preserve evidence arises when a party reasonably anticipates litigation.[25] "'[O]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.'"[26] A plaintiff's duty is more often triggered before litigation commences, in large part because plaintiffs control the timing of litigation.[27]

---

F. 3d 112, 126-27 (2d Cir. 1998).

[24]     *See generally Chambers*, 501 U.S. 32.

[25]     *See Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 433, 436 (2d Cir. 2001).

[26]     *Treppel*, 249 F.R.D. at 118 (quoting *Zubulake IV*, 220 F.R.D. at 218).

[27]     *See Innis Arden Golf Club v. Pitney Bowes, Inc.*, 257 F.R.D. 334, 340 (D. Conn. 2009) (concluding that a duty to preserve arose when plaintiff retained counsel in connection with potential legal action but had not yet identified responsible parties); *Cyntegra, Inc. v. Idexx Labs., Inc.*, No. 06 Civ. 4170, 2007 WL 5193736, at *3 (C.D. Cal. Sept. 21, 2007) (stating that because plaintiffs control when litigation begins, they "must necessarily anticipate litigation before the complaint is filed"); *Indemnity Ins. Co. of N. Am. v. Liberty Corp.*, No. 96 Civ. 6675, 1998 WL 363834, at *4 n.3 (S.D.N.Y. June 29, 1998) (holding that "the following factors demonstrate that plaintiff was on notice that a lawsuit was likely so as to trigger a duty to preserve the evidence: (1) the sheer magnitude of the losses; (2) that plaintiff attempted to document the damage through photographs

## C.    Burdens of Proof

The third preliminary matter that must be analyzed is what can be

done when documents are no longer available.  This is not an easy question.  It is

often impossible to know what lost documents would have contained.  At best,

their content can be inferred from existing documents or recalled during

depositions.[28]  But this is not always possible.  Who then should bear the burden of

establishing the relevance of evidence that can no longer be found?  And, an even

more difficult question is who should be required to prove that the absence of the

missing material has caused prejudice to the innocent party.

The burden of proof question differs depending on the severity of the

sanction.  For less severe sanctions – such as fines and cost-shifting – the inquiry

---

and reports; and (3) that it immediately brought in counsel as well as experts to
assess the damage and attempt to ascertain its likely causes in anticipation of
litigation").

[28]    *See, e.g.*, *Connor v. Sun Trust Bank*, 546 F. Supp. 2d 1360, 1376-77
(N.D. Ga. 2008) (holding that the nonproduction of a relevant email that must
have been deleted no more than ten days prior to the case being filed tended to
indicate that other relevant emails were not produced); *Treppel*, 249 F.R.D. at 123
(noting that the existence of emails produced by other custodians "does suggest
that additional relevant discoverable materials may be present on [defendant
employee's] laptop that were neither preserved by him nor backed up in 2005.
While almost all of the e-mails were created before the obligation to preserve
arose, this does not rule out the possibility that other relevant e-mails may have
been deleted from [defendant employee's] laptop after that date").

focuses more on the conduct of the spoliating party than on whether documents were lost, and, if so, whether those documents were relevant and resulted in prejudice to the innocent party. As explained more thoroughly below, for more severe sanctions – such as dismissal, preclusion, or the imposition of an adverse inference – the court must consider, in addition to the conduct of the spoliating party, whether any missing evidence was relevant and whether the innocent party has suffered prejudice as a result of the loss of evidence.

On the question of what is "relevant," the Second Circuit has provided the following guidance:

> [O]ur cases make clear that "relevant" in this context means something *more than sufficiently probative to satisfy Rule 401* of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that "the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction."[29]

It is not enough for the innocent party to show that the destroyed evidence would have been responsive to a document request. The innocent party must also show that the evidence would have been helpful in proving its claims or defenses – *i.e.*, that the innocent party is prejudiced without that evidence. Proof of relevance

---

[29]    *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108-09 (2d Cir. 2002) (quoting *Kronisch*, 150 F.3d at 127) (emphasis added).

14

does not necessarily equal proof of prejudice.

In short, the innocent party must prove the following three elements: that the spoliating party (1) had control over the evidence and an obligation to preserve it at the time of destruction or loss; (2) acted with a culpable state of mind upon destroying or losing the evidence; and that (3) the missing evidence is relevant to the innocent party's claim or defense.[30]

Relevance and prejudice may be presumed when the spoliating party acted in bad faith or in a grossly negligent manner. "Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party."[31] Although many courts in this district presume relevance where there is a finding of gross negligence, application of the presumption is not required.[32] However, when the spoliating party was merely

---

[30]    *See id.* at 107.

[31]    *Id.* at 109 (citing *Kronisch*, 150 F.3d at 126).

[32]    *See id.* ("[A] showing of gross negligence in the destruction or untimely production of evidence will *in some circumstances* suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party.") (emphasis added); *Treppel*, 249 F.R.D. at 121-22 ("While it is true that under certain circumstances 'a showing of gross negligence in the destruction or untimely production of evidence' will support [a relevance] inference, the circumstances here do not warrant such a finding, as the defendants' conduct 'does not rise to the egregious level seen in cases where relevance is

15

negligent, the innocent party must prove both relevance and prejudice in order to justify the imposition of a severe sanction.[33] The innocent party may do so by "adduc[ing] sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'"[34] "In other words, the [innocent party] must present extrinsic evidence tending to show that the destroyed e-mails

---

determined as a matter of law.'") (quoting *Residential Funding*, 306 F.3d at 109 and *Toussie v. County of Suffolk*, No. 01 Civ. 6716, 2007 WL 4565160, at *8 (E.D.N.Y. Dec. 21, 2007)); *Zubulake IV*, 220 F.R.D. at 221 ("[B]ecause UBS's spoliation was negligent and possibly reckless, but not willful, Zubulake must demonstrate that a reasonable trier of fact could find that the missing e-mails would support her claims."). *Cf. In re NTL, Inc. Sec. Litig.*, 244 F.R.D. at 200 (holding that movant was not required to submit extrinsic proof of relevance where movant had established gross negligence).

[33]    *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001) ("[T]he burden falls on the 'prejudiced party' to produce 'some evidence suggesting that a document or documents relevant to substantiating [its] claim would have been included among the destroyed files.'") (quoting *Kronisch*, 150 F.3d at 127).

[34]    *Residential Funding*, 306 F.3d at 109 (quoting *Kronisch*, 150 F.3d at 127). *Accord Scalera v. Electrograph Sys., Inc.*, No. 08 Civ. 50, 2009 WL 3126637, at *16 (E.D.N.Y. Sept. 29, 2009) ("'[A] party seeking sanctions for spoliation must demonstrate that the evidence destroyed was 'relevant' to its claims or defenses. At least where more severe sanctions are at issue, this means that the moving party must show that the lost information would have been favorable to it.'") (quoting *Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048, 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005)).

would have been favorable to [its] case."[35]  "Courts must take care not to 'hold[ ]
the prejudiced party to too strict a standard of proof regarding the likely contents
of the destroyed [or unavailable] evidence,' because doing so 'would . . . allow
parties who have . . . destroyed evidence to profit from that destruction.'"[36]

No matter what level of culpability is found, any presumption is
rebuttable and the spoliating party should have the opportunity to demonstrate that
the innocent party has not been prejudiced by the absence of the missing
information.[37]  If the spoliating party offers proof that there has been no prejudice,
the innocent party, of course, may offer evidence to counter that proof.  While
requiring the innocent party to demonstrate the relevance of information that it can
never review may seem unfair, the party seeking relief has some obligation to
make a showing of relevance and eventually prejudice, lest litigation become a
"gotcha" game rather than a full and fair opportunity to air the merits of a dispute.

[35]    *Toussie*, 2007 WL 4565160, at *8.

[36]    *Residential Funding*, 306 F.3d at 109 (quoting *Kronisch*, 150 F.3d at
128).

[37]    *See, e.g.*, *Stevenson v. Union Pacific R.R. Co.*, 354 F.3d 739, 750 (8th
Cir. 2004) (holding that district court properly imposed an adverse instruction but
abused its discretion when it did not permit defendant to rebut the presumption
that it destroyed documents in bad faith).  If the court orders a mandatory
presumption, or if the jury chooses to draw a presumption, that the missing
evidence is both relevant and prejudicial, the burden of rebutting this presumption
will always rest with the spoliating party.

17

If a presumption of relevance and prejudice were awarded to every party who can show that an adversary failed to produce any document, even if such failure is completely inadvertent, the incentive to find such error and capitalize on it would be overwhelming. This would not be a good thing.

To ensure that no party's task is too onerous or too lenient, I am employing the following burden shifting test: When the spoliating party's conduct is sufficiently egregious to justify a court's *imposition* of a presumption of relevance and prejudice, or when the spoliating party's conduct warrants *permitting* the jury to make such a presumption, the burden then shifts to the spoliating party to rebut that presumption. The spoliating party can do so, for example, by demonstrating that the innocent party had access to the evidence alleged to have been destroyed or that the evidence would not support the innocent party's claims or defenses. If the spoliating party demonstrates to a court's satisfaction that there could not have been any prejudice to the innocent party, then no jury instruction will be warranted, although a lesser sanction might still be required.

## D.    Remedies

The remaining question is what remedy should the court impose. "The determination of an appropriate sanction for spoliation, if any, is confined to

18

the sound discretion of the trial judge and is assessed on a case-by-case basis."[38]

Where the breach of a discovery obligation is the non-production of evidence, a court has broad discretion to determine the appropriate sanction.[39] Appropriate sanctions should "(1) deter the parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position [it] would have been in absent the wrongful destruction of evidence by the opposing party.'"[40]

It is well accepted that a court should always impose the least harsh sanction that can provide an adequate remedy. The choices include – from least

---

[38]    *Fujitsu*, 247 F.3d at 436.

[39]    *See Residential Funding*, 306 F.3d at 107. *See also Fujitsu*, 247 F.3d at 436 (reiterating the Second Circuit's "case-by-case approach to the failure to produce relevant evidence" in determining sanctions); *Reilly*, 181 F.3d at 267 ("Trial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing – a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case.").

[40]    *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (quoting *Kronisch*, 150 F.3d at 126).

harsh to most harsh – further discovery,[41] cost-shifting,[42] fines,[43] special jury instructions,[44] preclusion,[45] and the entry of default judgment or dismissal (terminating sanctions).[46] The selection of the appropriate remedy is a delicate matter requiring a great deal of time and attention by a court.

The Citco Defendants request dismissal – the most extreme sanction. However, a terminating sanction is justified in only the most egregious cases,[47] such as where a party has engaged in perjury, tampering with evidence, or

---

[41]    *See, e.g.*, *Treppel*, 249 F.R.D. at 123-24 (ordering additional discovery, including forensic search of adversary's computer).

[42]    *See, e.g.*, *Green (Fine Paintings) v. McClendon*, No. 08 Civ. 8496, 2009 WL 2496275, at *7 (S.D.N.Y. Aug. 13, 2009) (awarding monetary sanctions to the movant).

[43]    *See, e.g.*, *United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 21, 25 (D.D.C. 2004) (ordering defendant to pay $2.75 million in fines).

[44]    *See, e.g.*, *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 443-44 (S.D.N.Y. 2009) (ordering an adverse inference instruction as a sanction for defendants' spoliation of evidence).

[45]    *See, e.g.*, *Brown v. Coleman*, No. 07 Civ. 1345, 2009 WL 2877602, at *4 (S.D.N.Y. Sept. 8, 2009) (precluding certain evidence from being introduced at trial).

[46]    *See, e.g.*, *Gutman*, 2008 WL 5084182, at *2 (granting a default judgment for defendants' intentional destruction of evidence).

[47]    *See West*, 167 F.3d at 779  ("Because dismissal is a 'drastic remedy,' it 'should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions.'") (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988)).

intentionally destroying evidence by burning, shredding, or wiping out computer hard drives.[48] As described below, there is no evidence of such misconduct in this case.

Instead, the appropriate sanction here is some form of an adverse inference instruction that is intended to alleviate the harm suffered by the Citco Defendants. Like many other sanctions, an adverse inference instruction can take many forms, again ranging in degrees of harshness. The harshness of the instruction should be determined based on the nature of the spoliating party's conduct – the more egregious the conduct, the more harsh the instruction.

In its most harsh form, when a spoliating party has acted willfully or in bad faith, a jury can be instructed that certain facts are deemed admitted and

---

[48]    *See, e.g., Gutman*, 2008 WL 5084182 (granting default judgment where court-appointed digital forensic expert had determined that defendants had tampered with a computer to permanently delete files and conceal the chronology of the deletions); *McMunn v. Memorial Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 446-62 (S.D.N.Y. 2002) (dismissing plaintiff's claims for intentionally and in bad faith lying during depositions, destroying potentially critical evidence which could have harmed her case, repeatedly lying and misleading defendant to prevent the deposition of key witnesses, editing certain tapes before turning them over to defendant so that they would provide stronger evidence in plaintiff's favor, and engaging in a sham transaction to unfairly bolster her claim); *Miller v. Time-Warner Commc'ns*, No. 97 Civ. 7286, 1999 WL 739528, at *2-*4 (S.D.N.Y. Sept. 22, 1999) (granting dismissal where plaintiff deliberately erased a harmful handwritten notation and committed perjury in pre-trial proceedings).

must be accepted as true.[49] At the next level, when a spoliating party has acted

willfully or recklessly, a court may impose a mandatory presumption.[50] Even a

mandatory *presumption*, however, is considered to be rebuttable.[51]

      The least harsh instruction *permits* (but does not require) a jury to

*presume* that the lost evidence is both relevant and favorable to the innocent party.

If it makes this presumption, the spoliating party's rebuttal evidence must then be

considered by the jury, which must then decide whether to draw an adverse

inference against the spoliating party.[52] This sanction still benefits the innocent

---

[49]    *See, e.g., Smith v. Kmart Corp.*, 177 F.3d 19, 29 n.4 (1st Cir. 1999) ("[I]t it a permissible sanction to instruct a jury to accept certain facts as true."). *See also Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co., Inc.*, No. CA 03-5049, 2005 WL 674885, at *10 (Fla. Cir. Ct. Mar. 23, 2005) (ordering that portions of plaintiff's amended complaint be read to the jury and then instructing the jury "that those facts are deemed established for all purposes in this action"), *rev'd on other grounds*, 955 So. 2d 1124 (Fla. Dist. Ct. App. 2007).

[50]    *See, e.g., West*, 167 F.3d at 780 ("[T]he trial judge could (1) instruct the jury to presume that the exemplar tire was overinflated; (2) instruct the jury to presume that the tire mounting machine and air compressor malfunctioned; and (3) preclude [plaintiff] from offering evidence on these issues."); *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1182 (10th Cir. 1999) ("[Y]ou *must presume* that the evidence which Teltrust Phones, Inc. would not provide would have weighed against Teltrust Phones, Inc. and in favor of Knowlton.") (emphasis added).

[51]    *See Knowlton*, 189 F.3d at 1184 ("Because the sanction [of the mandatory presumption] was not a default, however, the presumption was rebuttable.").

[52]    *See Zimmerman v. Associates First Capital Corp.*, 251 F.3d 376, 383 (2d Cir. 2001) (upholding adverse inference instruction that permitted parties to

party in that it allows the jury to consider both the misconduct of the spoliating party as well as proof of prejudice to the innocent party.[53] Such a charge should be termed a "spoliation charge" to distinguish it from a charge where the a jury is *directed* to presume, albeit still subject to rebuttal, that the missing evidence would have been favorable to the innocent party, and from a charge where the jury is *directed* to deem certain facts admitted.

Monetary sanctions are also appropriate in this case. "Monetary sanctions are appropriate 'to punish the offending party for its actions [and] to deter the litigant's conduct, sending the message that egregious conduct will not be tolerated.'"[54] Awarding monetary sanctions "serves the remedial purpose of compensating [the movant] for the reasonable costs it incurred in bringing [a

---

present spoliation evidence to the jury and instructed the jury that it was "permitted, but not required, to infer that [the destroyed] evidence would have been unfavorable to the defendant"); *Reilly*, 181 F.3d at 267; *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995); *Nucor Corp. v. Bell*, 251 F.R.D. 191, 203 (D.S.C. 2008); *Zubulake V*, 229 F.R.D. at 439-40; *see also* Leonard B. Sand, *et al.*, 4 Modern Federal Jury Instructions-Civil ¶ 75.01.

[53]    *See Residential Funding*, 306 F.3d at 209 n.4 ("[A] court's role in evaluating the 'relevance' factor in the adverse inference analysis is limited to insuring that the party seeking the inference had adduced enough evidence of the contents of the missing materials such that a reasonable jury *could* find in its favor.") (emphasis in original).

[54]    *Green,* 2009 WL 2496275, at *6 (quoting *In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 201 (S.D.N.Y. 2007)).

23

motion for sanctions]."[55] This sanction is imposed in order to compensate the Citco Defendants for reviewing the declarations, conducting the additional depositions, and bringing this motion.

Three final notes. *First*, I stress that at the end of the day the judgment call of whether to award sanctions is inherently subjective. A court has a "gut reaction" based on years of experience as to whether a litigant has complied with its discovery obligations and how hard it worked to comply. *Second*, while it would be helpful to develop a list of relevant criteria a court should review in evaluating discovery conduct, these inquiries are inherently fact intensive and must be reviewed case by case. Nonetheless, I offer the following guidance.

After a discovery duty is well established, the failure to adhere to contemporary standards can be considered gross negligence. Thus, after the final relevant *Zubulake* opinion in July, 2004, the following failures support a finding of gross negligence, when the duty to preserve has attached: to issue a written litigation hold; to identify all of the key players and to ensure that their electronic and paper records are preserved; to cease the deletion of email or to preserve the records of former employees that are in a party's possession, custody, or control; and to preserve backup tapes when they are the sole source of relevant information

---

[55]    *Id.*

or when they relate to key players, if the relevant information maintained by those players is not obtainable from readily accessible sources.

Finally, I note the risk that sanctions motions, which are very, very time consuming, distracting, and expensive for the parties and the court,[56] will be increasingly sought by litigants. This, too, is not a good thing. For this reason alone, the most careful consideration should be given before a court finds that a party has violated its duty to comply with discovery obligations and deserves to be sanctioned. Likewise, parties need to anticipate and undertake document preservation with the most serious and thorough care, if for no other reason than to avoid the detour of sanctions.

## III.    PROCEDURAL HISTORY[57]

---

[56]    I, together with two of my law clerks, have spent an inordinate amount of time on this motion. We estimate that collectively we have spent close to three hundred hours resolving this motion. I note, in passing, that our blended hourly rate is approximately thirty dollars per hour (!) well below that of the most inexperienced paralegal, let alone lawyer, appearing in this case. My point is only that sanctions motions, and the behavior that caused them to be made, divert court time from other important duties – namely deciding cases on the merits.

[57]    This was not the first Lancer-related suit filed. UM filed a complaint with the Financial Services Commission of the British Virgin Islands on March 23, 2003 seeking redemption of its shares in the Funds. *See* 4/8/04 Affidavit of Johnny Quigley, former director of Chagnon Foundation, Ex. 1 to the 6/26/09 Declaration of Dyanne Feinberg, the Citco Defendants' counsel ("Feinberg Decl.") ("Quigley Aff."), ¶ 10(b). In June 2003, UM engaged White & Case LLP to commence an action against Lauer and Lancer and a complaint was filed (the "First Complaint"). *See* 3/27/08 Declaration of Andree Mayrand, Director,

In the summer of 2003, a group of investors formed an ad hoc "policy consultative committee" to represent the interests of the Funds' investors, including "monitor[ing] the court proceedings" against Lancer and the Funds and "retain[ing] legal counsel as necessary . . . ."[58]  On September 17 and 18, 2003, this group of investors met prospective legal counsel.[59]  Although some plaintiffs had previously retained counsel,[60] in October or November, 2003,[61] plaintiffs

---

Investment Management of UM, Ex. 2 to the Declaration of Lance Gotko, plaintiffs' counsel ("Gotko Decl.") ("Mayrand Decl."), ¶ 2.  In July 2003, the Securities Exchange Commission ("SEC") brought an action against Lauer and Lancer in connection with the Funds.  *See Securities and Exchange Commission v. Lauer*, No. 03 Civ. 80612 (S.D. Fla. 2003) (the "SEC Action").  At the request of the Receiver appointed in the SEC Action, UM withdrew its First Complaint.  In September 2003, UM engaged Hoguet Newman Regal & Kenney, LLP to commence an action against Lancer's service providers and filed a second complaint (the "Second Complaint").  *See* Mayrand Decl. ¶ 3.  In January 2004, UM withdrew the Second Complaint and engaged Counsel to commence this action on its behalf.  *See id.* ¶ 4.  Scott Berman has served as lead counsel for plaintiffs throughout this litigation.  He was originally with Brown Rudnick Berlack Israels ("BRBI"), but, on January 10, 2005, his present law firm, Friedman Kaplan Seiler & Adelman LLP ("FKSA") was substituted as counsel of record for plaintiffs.  Reference to Berman his present and former firms is intended by the use of the term "Counsel."

[58]    Quigley Aff. ¶ 15.

[59]    *See id.* ¶ 19.

[60]    In March 2003, the Chagnon Plaintiffs retained counsel "in connection with matters related to its investment in the Funds." *Id.* ¶¶ 10-11. Hunnicutt also engaged counsel in March 2003 to file a complaint against Lancer and the Funds "to recover fees owed . . . for marketing services [he] performed . . . ."  Declaration of William Hunnicutt, President of Hunnicutt & Co., Inc., Ex. 4

retained BRBI and Berman as lead counsel for this suit.[62] This lawsuit was then
instituted on February 12, 2004 in the Southern District of Florida.[63] On October
25, 2005, the case was transferred to this Court as a result of defendants' motion to
transfer venue.

## IV.   PLAINTIFFS' EFFORTS AT PRESERVATION AND PRODUCTION

Shortly after its retention in October or November, 2003, Counsel
contacted plaintiffs to begin document collection and preservation.[64] Counsel

---

to Gotko Decl. ("Hunnicutt Decl."), ¶ 2.  In mid-2003, Okabena engaged Foley &
Lardner LLP to file a claim in the United States Bankruptcy Court for the District
of Connecticut against Lancer, Lauer and others.  *See* Declaration of Sherry Van
Zee, Vice President of Investment Administration and Chief Compliance Officer
of Okabena Investment Services, Inc., Ex. 4 to Gotko Decl. ("Van Zee Decl."), ¶¶
2, 4.  All plaintiffs have retained current Counsel in connection with this action.

[61]    Although plaintiffs represent that Counsel was retained in November
2003, at least one email indicates that Counsel may have been retained as early as
October 17, 2003.  *See* 10/17/03 Email to Counsel, Ex. 12 to Gotko Decl., at IC 1.
Documents with page numbers "IC ___" are documents submitted to the Court *in
camera* and remain subject to the attorney-client privilege.  I disclose no more
information than necessary to identify the documents on which I rely.

[62]    *See* Quigley Aff. ¶ 19.

[63]    Plaintiffs note that they have "objected to producing any documents
dated after February 12, 2004 (the date this action was commenced)."  *See*
Plaintiffs' Memorandum of Law in Opposition to the Citco Defendants' Motion
for Sanctions ("Pl. Opp.") at 10.  Plaintiffs do not disclose whether they raised this
objection in response to a motion to compel from the Citco Defendants or whether
both parties agreed to the February 12, 2004 discovery cutoff.

[64]    *See* 10/17/03 Email to Counsel, Ex. 12 to Gotko Decl., at IC 1.

27

telephoned and emailed plaintiffs and distributed memoranda instructing plaintiffs

to be over, rather than under, inclusive, and noting that emails and electronic

documents should be included in the production.[65]  Counsel indicated that the

documents were necessary to draft the complaint, although they did not expressly

direct that the search be limited to those documents.[66]

    This instruction does not meet the standard for a litigation hold.  It

does not direct employees to *preserve* all relevant records – both paper and

electronic – nor does it create a mechanism for *collecting* the preserved records so

that they can be searched by someone other than the employee.[67]  Rather, the

directive places total reliance on the employee to search and select what that

employee believed to be responsive records without any supervision from

Counsel.[68]  Throughout the litigation, Counsel sent plaintiffs monthly case status

---

[65]    *See* 11/11/03 Memorandum to Investors from Counsel, Ex. 12 to
Gotko Decl. ("11/11/03 Memorandum") at IC 5; 8/5/09 Declaration of Travis A.
Corder, plaintiffs' counsel, in Opposition to Citco Defendants' Motion for
Sanctions ("Corder Decl.") ¶ 4.

[66]    *See* 11/11/03 Memorandum.

[67]    *See* Shira A. Scheindlin, *et al.*, Electronic Discovery and Digital
Evidence: Cases and Materials 147-49 (2009) (providing a sample litigation hold,
including instruction to "immediately suspend the destruction of any responsive"
paper or electronic documents or data).

[68]    *See, e.g.*, *Adams v. Dell*, 621 F. Supp. 2d 1173, 1194 (D. Utah 2009)
(holding that defendant had violated its duty to preserve information, in part

28

memoranda, which included additional requests for Lancer-related documents,

including electronic documents. But these memoranda never specifically

instructed plaintiffs not to destroy records so that Counsel could monitor the

collection and production of documents.[69]

In 2004, a stay pursuant to the Private Securities Litigation Reform

Act ("PSLRA") was instituted and remained in place until early 2007.[70] Counsel

"did not focus [their] efforts . . . on discovery" while the PSLRA discovery stay

---

because the defendant's preservation practices "place operations-level employees
in the position of deciding what information is relevant"); *see also Zubulake V*,
229 F.R.D. at 432 ("[I]t is *not* sufficient to notify all employees of a litigation hold
and expect that the party will then retain and produce all relevant information.")
(emphasis in original). I note that not every employee will require hands-on
supervision from an attorney. However, attorney oversight of the process,
including the ability to review, sample, or spot-check the collection efforts is
important. The adequacy of each search must be evaluated on a case by case
basis.

[69]    *See* 8/7/09 Declaration of Amy C. Brown, plaintiffs' counsel, in
Opposition to Citco Defendants' Motion for Sanctions ("Brown Decl.") ¶¶ 5-14,
16, 20, 21, 22, 26-33, 38 (and documents cited therein).

[70]    *See* Corder Decl. ¶ 10. In June, 2004, defendants moved to dismiss
the First Amended Complaint. As a result, discovery was stayed pursuant to the
PSLRA. *See* 15 U.S.C. §§ 77z-1(b)(1); 78u-4(b)(3)(B). In September, 2005, the
district court in Florida denied defendants' motion to dismiss, without prejudice,
and ordered this matter transferred to this District. Various motions and
amendments of pleadings caused the continuation of the discovery stay until
February 2007, when this Court resolved defendants' motions to dismiss the
Second Amended Complaint.

was in place and plaintiffs did not issue a written litigation hold until 2007.[71]  In

May, 2007, the Citco Defendants made their first document requests.[72]

Depositions of plaintiffs commenced on August 30, 2007.  Those

depositions revealed that there were gaps in plaintiffs' document production.[73]  By

October, 2007, the Citco Defendants were dissatisfied with plaintiffs' efforts to

produce missing documents.[74]  In response to a request from the Citco

Defendants, the Court ordered plaintiffs to provide declarations regarding their

efforts to preserve and produce documents.[75]

Counsel spent a huge amount of time preparing the declarations,

including drafting, questioning plaintiffs' employees, and attempting to locate

---

[71]    Pl. Opp. at 4.  Plaintiffs' statement implies that somehow they were
absolved of their collection and preservation obligations while the PSLRA stay
was in place.  But this would directly contravene the PSLRA, which expressly
requires parties to preserve all potentially relevant evidence during the pendency
of a stay and provides for sanctions for a failure to comply.  *See* 15 U.S.C. § 78u-
4(b)(3).

[72]    *See* Brown Decl. ¶ 24.

[73]    *See* 10/1/07 Letter from Feinberg to Berman, Ex. 1 to the 9/15/09
Supplemental Declaration of Dyanne Feinberg ("Supp. Feinberg Decl.") ("10/1/07
Feinberg Letter"); Brown Decl. ¶ 28.

[74]    *See* 10/1/07 Feinberg Letter.

[75]    *See* 10/30/07 Hearing Transcript, Ex. 1 to Feinberg Decl.

documents that had not yet been produced.[76] Counsel emphasized to each declarant the importance of the declarations' accuracy and that each should be carefully reviewed prior to its execution.[77] In a systematic manner, each declaration identifies the declarant's relationship to the plaintiff and that, upon retaining Counsel in late 2003 or early 2004 – if not earlier – the steps plaintiff took to locate and preserve documents relating to its Lancer investment (the "2003/2004 Search"). Most declarations also discuss receiving, and complying with, a second search request in late 2007 or early 2008 (the "2007/2008 Search"). Each declarant states that he or she believes the company located, preserved, and produced "all" Lancer-related documents in its possession at the time of either the 2003/2004 search, the 2007/2008 search, or both. Each declarant also states that no responsive documents in plaintiff's possession, custody, or control were discarded or destroyed following a specific point in time – either after the "request to preserve them," a specified date, or after the declarant arrived at the company.

Plaintiffs' declarations were submitted in the first half of 2008. At

---

[76]    *See* 8/6/09 Declaration of Lizbeth Parker, plaintiffs' counsel, in Opposition to Citco Defendants' Motion for Sanctions ("Parker Decl.") ¶ 5 (attesting to a total of 910 hours). FKSA handled all declarations except for the initial declarations of Scott Letier and Ian Trumpower of 2M. These were produced by 2M's additional counsel, Curran Tomko Tarski, LLP. *See id.* ¶ 8.

[77]    *See* Emails from Counsel to plaintiffs, Ex. 14 to Gotko Decl., at IC 18-24.

least four declarants submitted amended declarations,[78] and at least one deponent

submitted a declaration containing information not revealed prior to his

deposition.[79] The Citco Defendants then sought to depose certain declarants and

other relevant individuals. The Court granted that request.[80] The Citco

Defendants found additional gaps in plaintiffs' productions. By cross referencing

the productions of other plaintiffs, former co-defendants, and the Receiver in the

SEC Action, the Citco Defendants were able to identify at least 311 documents

from twelve of the thirteen plaintiffs (all but the Bombardier Foundation) that

should have been in plaintiffs' productions, but were not included ("311

Documents").[81] In addition, the Citco Defendants discovered that almost all of the

---

[78]     These declarants include Letier and Trumpower of 2M, Isabelle
Poissant of L'Ecole Polytechnique, and Normand Gregoire of the Chagnon
Plaintiffs. The circumstances surrounding the amendments made by Letier and
Trumpower are discussed *infra* at Part V.D.1.a.

[79]     *See* Hunicutt Decl. ¶ 8 (revealing that he recalled after his deposition
that sometime prior to March 13, 2003, Hunnicutt "inadvertently deleted [his] sent
e-mail messages from his computer. While some pre-March 2003 e-mail survived,
the overwhelming majority were lost . . . . ").

[80]     *See* 4/22/08 Hearing Transcript, Ex. 1 to Feinberg Decl. Some
declarants had been deposed prior to submitting declarations and were not
deposed again.

[81]     The Citco Defendants have provided a chart for each plaintiff
identifying the documents they believe should have been produced by that
plaintiff. Each document is identified by date, sender, recipient, Bates number,
and deposition exhibit number. The parties employed a system that identified the

declarations were false and misleading and/or executed by a declarant without personal knowledge of its contents.

## V.    DISCUSSION

### A.    Duty to Preserve and Document Destruction

By April, 2003, Lancer had filed for bankruptcy, UM had filed a complaint with the Financial Services Commission of the British Virgin Islands, Hunnicutt and the Chagnon Plaintiffs had retained counsel, and the Chagnon Plaintiffs had initiated communication with a number of other plaintiffs. It is unreasonable to assume that the remaining plaintiffs – all sophisticated investors – were unaware of the impending Lancer collapse while other investors were filing suit and retaining counsel. Accordingly, each plaintiff was under a duty to preserve at that time. While, as discussed below, the duty to issue a written litigation hold might not have been well established at that time, it was beyond cavil that the duty to preserve evidence included a duty to preserve electronic records.[82]

---

party that produced that document as part of the Bates number. For example, the Bates number for a document produced by the Chagnon Plaintiffs begins "CHAG ___" and the Bates number for a document produced by the Altar Fund begins "ALT ___." The Bates number on a document that the Citco Defendants claim a particular plaintiff failed to produce identifies the entity that did produce it.

[82]    This duty was well established as early as 1985 and has been repeatedly stated by courts across the country. *See, e.g.*, *Rowe Enter., Inc. v.*

33

The burden then falls to the Citco Defendants to demonstrate that documents were destroyed after the duty to preserve arose. The Citco Defendants first point to the 311 Documents, most of which post-date the onset of plaintiffs' duty to preserve. Thus, those plaintiffs that failed to produce these documents clearly failed to preserve and produce relevant documents that existed at the time (or shortly after) the duty to preserve arose. This is not true, however, with respect to the Bombardier Foundation, Commonfund, KMEFIC, and UM.[83]  While three of these plaintiffs (all but the Bombardier Foundation) failed to produce documents that the Citco Defendants now have, those documents are older records that may not have been in plaintiffs' possession and/or control at the time the duty to preserve arose.

In addition to citing specific documents not produced by each plaintiff, the Citco Defendants next ask this Court to assume that each plaintiff

---

*William Morris Agency, Inc.*, 205 F.R.D. 421, 428 (S.D.N.Y. 2002) (stating that "[e]lectronic documents are no less subject to disclosure than paper records" (citing, *inter alia*, *Bills v. Kennecott Corp.*, 108 F.R.D. 459, 461 (D. Utah 1985)).

[83]    *See* Documents Not Produced by Commonfund, Ex. 11 to Feinberg Decl., (emails between 7/12/99 and 4/10/02); Deposition of Abdullateef Al-Tammar, Ex. 11 to Feinberg Decl. ("Al-Tammar Dep."), at 90-92 (1997 Executive Summary prepared by KMEFIC); five UM documents, 9/30/98 Letter, Ex. 13 to Feinberg Decl., 6/30/99 Letter, Ex. 13 to Feinberg Decl., 4/02 and 7/02 Poulin Notes, Ex. 13 to Feinberg Decl., 1999 Lancer Year End Review Newsletter, Ex. 13 to Feinberg Decl. The Citco Defendants have failed to identify *any* documents or emails not produced by the Bombardier Foundation.

also received or generated documents that have not been produced by anyone and are now presumed to be missing.[84] Plaintiffs call such a request "absurd" and argue that any such inference would be based on no more than "rank speculation."[85] The Citco Defendants' argument is by far the more compelling.

All plaintiffs had a fiduciary duty to conduct due diligence before making significant investments in the Funds. Surely records must have existed documenting the due diligence, investments, and subsequent monitoring of these investments. The paucity of records produced by some plaintiffs[86] and the admitted failure to preserve some records or search at all for others by all plaintiffs leads inexorably to the conclusion that relevant records have been lost or destroyed.[87]

---

[84]    *See* Citco Defendants' Motion for Sanctions ("Citco Mem.") at 4.

[85]    Pl. Opp. at 3.

[86]    Coronation produced *no* documents from 1999 to 2000, and very few documents from 2001 to 2002. The Chagnon Plaintiffs produced only four documents from 1998 through 2002. Okabena produced only ten emails for the entire relevant period.

[87]    For example, in August, 2009, 2M produced nearly seven hundred additional emails, over one hundred of which were copied to, but never produced by, Coronation, the Chagnon Plaintiffs, Okabena, Bombardier Trusts, L'Ecole Polytechnique, and the Altar Fund. *See* Citco Defendants' Reply Memorandum in Support of Their Motion for Sanctions ("Citco Reply") at 7 n.10.

35

## B.    Culpability[88]

The age of this case requires a dual analysis of culpability – plaintiffs'

conduct before and after 2005.  The Citco Defendants contend that plaintiffs acted

willfully or with reckless disregard, such that the sanction of dismissal is

warranted.[89]  Plaintiffs admit that they failed to institute written litigation holds

until 2007 when they returned their attention to discovery after a four year hiatus.

Plaintiffs should have done so no later than 2005, when the action was transferred

to this District.  This requirement was clearly established in this District by mid-

2004, after the last relevant *Zubulake* opinion was issued.[90]  Thus, the failure to do

so as of that date was, at a minimum, grossly negligent.  The severity of this

misconduct would have justified severe sanctions had the Citco Defendants

---

[88]    The culpability, relevance of lost documents, prejudice, and appropriate sanctions are evaluated for each plaintiff *infra* Part V.D.

[89]    *See* Citco Mem. at 1.

[90]    *See Zubulake V*, 229 F.R.D. 422.  While a duty to preserve existed in the Southern District of Florida at the time this action was filed, no court in the Eleventh Circuit articulated a "litigation hold" requirement until 2007.  *Compare Banco Latino, S.A.C.A. v. Gomez Lopez*, 53 F. Supp. 2d 1273, 1277 (S.D. Fla. 1999) ("A litigant is under a duty to preserve evidence which it knows, or reasonably should know, is relevant in an action. . . .  Sanctions may be imposed upon litigants who destroy documents while on notice that they are or may be relevant to litigation or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence.") *with In re Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 663 (M.D. Fla. 2007) (adopting the Southern District of New York's litigation hold requirement).

demonstrated that any documents were destroyed *after* 2005. They have not done so.[91] It is likely that most of the evidence was lost before that date due to the failure to institute written litigation holds.

Almost all plaintiffs' pre-2005 conduct, apart from the failure to issue written litigation holds, is best characterized as either grossly negligent or negligent because they failed to execute a comprehensive search for documents and/or failed to sufficiently supervise or monitor their employees' document collection. For some plaintiffs, no further evidence of culpable conduct is offered. For others, the Citco Defendants have provided additional evidence. For example, one plaintiff – the Bombardier Foundation – admitted that it destroyed backup data in 2004, after the duty to preserve at least some backup tapes was well-established. Similarly, several plaintiffs failed to collect and preserve documents of key players – including members of investment committees and/or boards of directors.[92] One further problem bears mention. Each plaintiff was directed by

---

[91]    *See Farella v. City of New York*, Nos. 05 Civ. 5711 & 05 Civ. 8264, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007) ("[F]or sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence actually existed and was destroyed.") (emphasis omitted).

[92]    These plaintiffs include Hunnicutt, Coronation, the Chagnon Plaintiffs, Bombardier Trusts, and the Bombardier Foundation. *See, e.g., In re NTL Sec. Litig.*, 244 F.R.D. at 198-99 (finding gross negligence when not all key players received the litigation hold memoranda).

this Court to submit a declaration documenting its search efforts for two periods –

2003/2004 and 2007/2008, as well as any steps taken in between. In the end,

almost every plaintiff submitted a declaration that – at best – lacked attention to

detail, or – at worst – was intentionally vague in an attempt to mislead the Citco

Defendants and the Court. In addition, plaintiffs had a duty to adequately prepare

knowledgeable witnesses with respect to these topics. Which files were searched,

how the search was conducted, who was asked to search, what they were told, and

the extent of any supervision are all topics reasonably within the scope of the

inquiry. Several plaintiffs violated this duty.[93]

From my review of the evidence submitted by the parties and

discussed at the hearings held on October 30, 2007 and April 22, 2008, I conclude

that no plaintiff engaged in willful misconduct. However, as outlined below, I

find that 2M, Hunnicutt, Coronation, the Chagnon Plaintiffs, Bombardier Trusts,

---

[93]    *All* plaintiffs failed in this duty to the extent that they stated that *all*
documents were produced when this was not so. However, in particular, 2M, the
Chagnon Plaintiffs, Bombardier Trusts, and the Bombardier Foundation submitted
misleading or inaccurate declarations. *See, e.g., Continental Cas. Co. v. Compass
Bank*, No. 04 Civ. 766, 2006 WL 533510, at *17 (S.D. Ala. Mar. 3, 2006)
(ordering monetary sanctions where affidavit suggested that defendant had not
found any responsive documents in its possession at the time of the request, but
responsive documents were later found after a more thorough search). While
Counsel took substantial steps to ensure that plaintiffs' declarations were truthful,
the declarants appear to have ignored Counsel's instructions to verify the accuracy
of the declaration prior to signing.

and the Bombardier Foundation acted with gross negligence, and the Altar Fund,

L'Ecole Polytechnique, Okabena, the Corbett Foundation, Commonfund,

KMEFIC, and UM acted in a negligent manner.

## C.    Relevance and Prejudice

For those plaintiffs that were grossly negligent, I find that the Citco

Defendants have "adduced enough evidence" that plaintiffs have failed to produce

relevant documents and that the Citco Defendants have been prejudiced as a result.

Thus, a jury will be permitted to presume, if it so chooses, both the relevance of

the missing documents and resulting prejudice to the Citco Defendants, subject to

the plaintiffs' ability to rebut the presumption to the satisfaction of the trier of fact.

For those plaintiffs that were negligent, the Citco Defendants must

demonstrate that any destroyed documents were relevant and the loss was

prejudicial. To meet this burden, the Citco Defendants begin by pointing to the

311 Documents. While many of these documents may be relevant, the Citco

Defendants suffered no prejudice because all were eventually obtained from other

sources. As noted by plaintiffs, "Citco possesses every one of the 311

[D]ocuments; indeed, every one of these documents was marked as an exhibit and

used by Citco at depositions."[94]  The Citco Defendants had the opportunity to

---

[94]    Pl. Opp. at 6.

39

question witnesses about these documents and will be able to introduce them at trial. Severe sanctions based on the failure to produce the 311 Documents is not justified.

By contrast, it is impossible to know the extent of the prejudice suffered by the Citco Defendants as a result of those emails and documents that have been permanently lost due to plaintiffs' conduct. The volume of missing emails and documents can never be learned, nor can their substance be known. "Because we do not know what has been destroyed, it is impossible to accurately assess what harm has been done to the [innocent party] and what prejudice it has suffered."[95] Such documents may have been helpful to the Citco Defendants, helpful to plaintiffs, or of no value to any party. But it is plaintiffs' misconduct that destroyed the emails and documents. Given the facts and circumstances presented here, I can only conclude that the Citco Defendants have carried their

---

[95]    *Philip Morris*, 327 F. Supp. 2d at 25. *Accord United States ex rel. Miller v. Holzmann*, No. 95 Civ. 1231, 2007 WL 781941, at *1 (D.D.C. Mar. 12, 2007) ("The government's conduct created a situation where we cannot assess exactly what or how much information was lost and what or how much information was important to the defendants' case. It would defy logic at this point to give the government the benefit of the doubt on its word alone that it gave the defendants the functional equivalent of the information contained within those documents in some form or another. The government is in little better position to make such a statement based on information or belief than defendant is in arguing that every document destroyed was a potential 'smoking gun.' The documents are lost. The fact is that there is no way of verifying either contention, and this is caused directly by the government's conduct in handling these documents.").

limited burden[96] of demonstrating that the lost documents would have been relevant.  The documents that no longer exist were created during the critical time period.  Key players must have engaged in correspondence regarding the relevant transactions.  There can be no serious question that the missing material would have been relevant.

Prejudice is another matter.  The Citco Defendants have gathered an enormous amount of discovery – both from documents and witnesses.[97]  Unless they can show through extrinsic evidence that the loss of the documents has prejudiced their ability to defend the case, then a lesser sanction than a spoliation charge is sufficient to address any lapse in the discovery efforts of the negligent plaintiffs.

### D.    Individual Plaintiffs

Because this motion involves the conduct of thirteen plaintiffs, and

---

[96]    While I have already noted that this burden cannot be too strict, the citation bears repeating.  *See Residential Funding*, 306 F.3d at 109 (noting that the prejudiced party should not be held "'to too strict a standard of proof regarding the likely contents of the destroyed evidence,' because doing so 'would . . . allow parties who have . . . destroyed evidence to profit from that destruction'") (quoting *Kronisch*, 150 F.3d at 128).

[97]    Plaintiffs state that they "produced some 43,000 pages of documents . . . ."  Pl. Opp. at 4.  They do not explain, however, whether the 43,000 figure includes all ninety-six plaintiffs, the twenty Phase I plaintiffs, or the thirteen plaintiffs discussed in this motion.

41

because the Citco Defendants have charged each plaintiff with distinct discovery misconduct, a factual summary as to each plaintiff is required.[98]  In addition, because the stakes are high for both sides, and because sanctions should not be awarded lightly nor should discovery misconduct be tolerated, it is important to carefully review that conduct to determine whether any plaintiff engaged in culpable conduct and, if so, what level of culpability should be assigned.  Each plaintiff's discovery efforts is described below together with my determination of the adequacy of those efforts .

### 1.    Plaintiffs that Acted in a Grossly Negligent Manner

As detailed below, 2M, Hunnicutt, Coronation, the Chagnon Plaintiffs, Bombardier Trusts, and the Bombardier Foundation were grossly negligent in their discovery efforts.  In each instance, these plaintiffs' 2003/2004 Searches were severely deficient.  In addition to failing to institute a timely written litigation hold, one or more of these plaintiffs failed to collect or preserve *any* electronic documents prior to 2007, continued to delete electronic documents after the duty to preserve arose, did not request documents from key players, delegated

---

[98]    The parties submitted nearly sixty-five pages of briefing consisting almost entirely of factual arguments and almost five hundred pages of evidence. To detail every plaintiff's search efforts and their alleged faults would be extremely onerous.  Although all submitted materials were carefully considered, this Opinion and Order sets forth a limited recitation of the material evidence.

42

search efforts without any supervision from management, destroyed backup data potentially containing responsive documents of key players that were not otherwise available, and/or submitted misleading or inaccurate declarations.[99] From this conduct, it is fair to presume that responsive documents were lost or destroyed. The relevance of any destroyed documents and the prejudice caused by their loss may also be presumed.

Because this permissive presumption is rebuttable, I find that no reasonable juror could conclude that the Citco Defendants were prejudiced by plaintiffs' failure to produce the 311 Documents. With regard to those documents that are missing or destroyed, however, the Citco Defendants are entitled to a spoliation instruction permitting the jury to presume, if it so chooses, that these documents would have been both relevant and prejudicial. The jury must then consider whether the plaintiffs have successfully rebutted this presumption. If plaintiffs succeed, no adverse inference will be drawn. If plaintiffs cannot rebut the presumption, the jury will be entitled to draw an adverse inference in favor of

---

[99]    A cautionary note with respect to backup tapes is warranted. I am not requiring that *all* backup tapes must be preserved. Rather, if such tapes are the *sole* source of relevant information (*e.g.*, the active files of key players are no longer available), then such backup tapes should be segregated and preserved. When accessible data satisfies the requirement to search for and produce relevant information, there is no need to save or search backup tapes. *See* Fed. R. Civ. P. 26(b)(2)(B).

the Citco Defendants.

### a.    2M

In his October, 2007 deposition, Letier, 2M's former Chief Financial

Officer ("CFO"), testified that although he served as the lead contact with Counsel

prior to leaving 2M in 2004, he was not in charge of gathering and producing

documents.[100] He further testified that he neither took any steps to ensure that

emails relating to the Funds were not deleted nor was he aware of anyone else at

2M doing so.[101] He testified that he did not recall "ever giv[ing] instructions to

anyone to preserve" Lancer-related documents and never received any such

instructions.[102] On March 31, 2008, Letier submitted a declaration stating that he

directed other employees to locate and preserve Lancer-related documents and that

"all documents" related to Lancer had been produced to Counsel during the

2003/2004 Search.[103] Letier also declared that to the best of his knowledge no

Lancer-related documents were discarded or destroyed after Counsel instructed

---

[100]    *See* Deposition of Scott Letier, Ex. 2 to Feinberg Decl. &  Ex. 1 to
Supp. Feinberg Decl. ("Letier Dep."), at 27, 100-101.

[101]    *See id.* at 109-110.

[102]    *Id.* at 110.

[103]    3/31/08 Declaration of Scott Letier, Ex. 2 to Feinberg Decl., ¶¶ 3, 4.

2M to locate all documents in its possession in late 2003 or early 2004.[104]

Subsequently, Letier amended his declaration to clarify that only "*paper*

documents" had been produced.[105]

Trumpower, 2M's current CFO and General Counsel, also submitted

a declaration requiring amendment.  Trumpower's initial declaration indicated that

2M had searched for electronic documents prior to his arrival at 2M in 2007.  In

his amended declaration, Trumpower clarified that his declaration addressed only

the 2007/2008 Search.[106]  Trumpower also declared that to the best of his

knowledge, all relevant documents in 2M's possession at the time of the

2007/2008 Search were submitted to Counsel and no documents had been

discarded or destroyed at 2M since his arrival in February 2007.[107]  Trumpower

---

[104]    *See id.* ¶¶ 2, 5-6.

[105]    6/19/08 Amended Declaration of Scott Letier, Ex. 1 to Gotko Decl.,
¶ 4 (emphasis added).

[106]    *Compare* Declaration of Ian Trumpower, Ex. 2 to Feinberg Decl., ¶ 3
("In October 2007, 2M was requested (the 'Request') to conduct *another search*
for any electronic documents and e-mails relating to the Meyerson Entities'
investments in Lancer.") (emphasis added) *with* Amended Declaration of Ian
Trumpower, Ex. 1 to Gotko Decl., ("Am. Trumpower Decl.") ¶ 3 ("In October
2007, 2M was requested to conduct another search, *including a search for* any
electronic documents and e-mails relating to the Meyerson Entities' investments in
Lancer.  In May 2008, 2M was requested to confirm that it had searched its
network computer server for any electronic documents relating to Lancer that were
not attachments to emails (together, the 'Request').").

[107]    *See* Am. Trumpower Decl. ¶¶ 2, 5-6.

testified that no emails had been deleted from 2M's server since 2004 and personal

folders were not automatically deleted from 2M's network.[108] The Citco

Defendants also complain that 2M failed to produce "reams of research" on Lancer

referenced in Trumpower's deposition and another email.[109] This research was, in

fact, destroyed after April, 2003.[110] Finally, the Citco Defendants have identified

forty-six emails[111] that were sent or received by 2M between June 9, 2003 and

October 28, 2003, that were not produced by 2M.[112] 2M "did not produce a single

---

[108]    *See* Deposition of Ian Trumpower, Ex. 5 to Gotko Decl., at 49; 8/7/09
Declaration of Andrew S. Pak, plaintiffs' counsel, in Opposition to Citco
Defendants' Motion for Sanctions ("Pak Decl.") ¶¶ 22-24.  The majority of the
Pak Declaration is comprised of inadmissible hearsay gleaned from "follow-up"
information from clients.  Only those portions of the Pak Declaration substantiated
by documentary evidence were considered.  *See Sellers v. M.C. Floor Crafters,
Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("A hearsay affidavit is not a substitute for
the personal knowledge of a party.").  Even if the unsubstantiated assertions in the
Pak Declaration had been considered, they would not have affected the outcomes
for any plaintiff.

[109]    Citco Mem. at 7.

[110]    *See* 4/22/08 Email to Counsel, Ex. 14 to Gotko Decl., at IC 25.

[111]    Plaintiffs quibble with defendants over the number of emails each
plaintiff failed to produce, arguing, among other things, that defendants double
counted emails.  For example, if a single email was sent to five plaintiffs and no
plaintiff produced the email, the Citco Defendants counted the email against each
plaintiff that received it.  Plaintiffs' argument is unavailing.  If each plaintiff had
preserved and produced the same email, then the Citco Defendants should have
received five copies it – one from each plaintiff.

[112]    *See* Documents Not Produced by [2M], Ex. 2 to Feinberg Decl.

46

email or electronic document" until 2008.[113]  Then, on August 7 and 21, 2009, just

days after plaintiffs submitted their opposition to this motion, 2M produced 8,084

pages of documents – more than three times the number of documents previously

produced.[114]  This production included nearly seven hundred emails.[115]

The Citco Defendants have shown that 2M took no action to collect

or preserve electronic documents prior to 2007, did not produce a single email or

electronic document until 2008, and then dumped thousands of pages on the Citco

Defendants only when it faced the prospect of sanctions.[116]  Although 2M can

verify that it has not deleted any emails from its server since 2004, there is no

similar representation for the most relevant period – *i.e.*, *prior* to 2004.  2M also

concedes that its employees' collection lacked oversight and that no direction was

given either orally or in writing to preserve documents or cease deleting emails,

until a written litigation hold was issued in 2007.  Finally, 2M's initial

declarations were misleading as to whether 2M had conducted any electronic

searches prior to 2007.  These declarations, alone, would have supported a finding

---

[113]    Citco Mem. at 5.

[114]    *See* Citco Reply at 7 n.10.

[115]    *See id.*

[116]    That documents were suddenly discovered a few months ago only
heightens the concern that there may be additional relevant documents that still
have not been produced.

of bad faith. However, given that each declarant submitted an amended declaration within a reasonable time of being notified of the deficiencies in the original declaration,[117] 2M's conduct, on the whole, amounts to gross negligence.

### b.    Hunnicutt

At his deposition, William Hunnicutt, President of Hunnicutt, testified that to the best of his recollection, he maintained all of the emails he sent regarding Lancer from the inception of his relationship with Lancer in April 1998 through the first quarter of 2003.[118] However, Mr. Hunnicutt also testified that he had a practice of deleting emails unless he "felt there was an important reason to keep them" and did not recall anyone ever instructing him to discontinue that practice.[119] In addition, Mr. Hunnicutt took no steps during the 2003/2004 Search to request documents from, or search the files of, one current and one former employee to whom Hunnicutt assigned Lancer-related work.[120] Some of this work was done by the employees on their personal computers outside of Hunnicutt's

---

[117]    *See* Fed. R. Civ. P. 26(e)(1).

[118]    *See* Deposition of William Hunnicutt, Ex. 3 to Feinberg Decl. ("Hunnicutt Dep."), at 25-27.

[119]    *Id.* at 36-37. *Accord* Pl. Opp. at 10 (admitting that after November 2003, "Hunnicutt apparently did not alter his practice of deleting received emails that he did not think sufficiently important to be saved").

[120]    *See* Hunnicutt Dep. at 32-35. The record does not reflect when the former employee stopped working for Hunnicutt.

offices.[121]  When shown emails he had sent but not produced, Mr. Hunnicutt could

not explain why he had not produced them.[122]  However, when Mr. Hunnicutt

submitted his declaration approximately two months later, he stated that he now

recalled having accidently deleted his email "sent" file prior to March 13, 2003.[123]

The Citco Defendants have identified fifty-seven emails that Mr. Hunnicutt sent

between February 3, 1999 and May 14, 2003, but did not produce.[124]

     Mr. Hunnicutt's continued deletion of emails long after 2003 is

inexcusable, as is Hunnicutt's failure to seek *any* Lancer-related documents or

emails from one current employee and one former employee who worked on the

Lancer investment.[125]  These actions and inactions – including the loss of the fifty-

---

[121]    *See id.*

[122]    *See id.* at 26, 37-38.

[123]    *See* Hunnicutt Decl. ¶ 8.

[124]    *See* Documents From Hunnicutt Not Produced, Ex. 3 to Feinberg
Decl.  While only one of these emails post-date April, 2003, it is likely that as of
that date many of these emails would have been in the possession of Hunnicutt, as
most entities maintain electronic records for at least a year on active servers or on
backup media.

[125]    Although this employee's files were not physically in Hunnicutt's
possession because she worked outside Hunnicutt's offices, this fact does not
affect Hunnicutt's obligation to search her files. *See In re NTL, Inc. Sec. Litig.*,
244 F.R.D. at 195 ("Under Rule 34, control does not require that the party have
legal ownership or actual physical possession of the documents at issue; rather,
documents are considered to be under a party's control when that party has the
right, authority, or practical ability to obtain the documents from a non-party to the

seven emails – lead inexorably to the conclusion that relevant documents were not produced and are now lost. This conduct amounts to gross negligence.

### c.    Coronation

Coronation, operating out of offices in London and Cape Town, South Africa, delegated the 2003/2004 Search to Mei Hardman, an employee in the "due diligence area."[126] Despite declaring that to the best of her knowledge Coronation located and preserved "all documents relating to Lancer,"[127] Hardman testified at her deposition that she had no experience conducting searches, received no instruction on how to do so, had no supervision during the collection, and no contact with Counsel during the search.[128] Hardman stated that she searched only the investment team's drive on the London computer network, even though she was aware that not all emails or electronic documents on the office computers of investment team members would be on that drive.[129] Hardman

---

action.") (quotation marks omitted). Hunnicutt may also have had an obligation to request documents from its former employees during the 2003/2004 Search, assuming it had the "practical ability" to do so.

[126]    Declaration of Mei Hardman, Ex. 3 to Gotko Decl., ¶ 1.

[127]    *Id.* ¶ 8.

[128]    *See* Deposition of Mei Hardman, Ex. 4 to Feinberg Decl. & Ex. 10 to Gotko Decl. ("Hardman Dep."), at 18-21, 47-48, 39-42, 41-43, 55-57, 62-64, 73-74, 81.

[129]    *See id.* at 47-48.

50

communicated the request for documents to the Cape Town office during a brief telephone conversation without imparting instructions.[130] Hardman was also aware that Coronation kept backup tapes, but never searched them for Lancer-related documents and was unaware of anyone else doing so.[131]

Hardman also asked only three employees – Stuart Davies, Anthony Gibson, and Maria Meadows – out of a number of other employees in the London office to search their computers for emails and electronic documents.[132] According to an internal Coronation memorandum, Davies, Gibson, and Meadows were part of a larger "investment team" comprised of up to twenty "investment specialists" in London, including fund managers, research analysts, due diligence analysts, and risk managers.[133] Although Hardman resisted the characterization that the other investment specialists would have been involved in Lancer-related

---

[130]    *See id.* at 55-57, 73-74, 81, 62-64, 68-75, 84-90.  Plaintiffs respond that the files of employees in the Cape Town office, who played a role in Coronation's investment decisions, were produced. *See* Pl. Opp. at 11-12.

[131]    *See* Hardman Dep. at 41-43.  Plaintiffs argue that Hardman was not obligated to search the backup tapes because they are server-wide and not readily accessible, and that the key players searched their own computers.  They further argue that there is no evidence that any other employees had Lancer-related documents. *See* Pl. Opp. at 12.

[132]    *See* Hardman Dep. at 57.

[133]    *See id.* at 70-71.

decisions,[134] she acknowledged that investment specialist Fred Ingham was

involved in Lancer-related decisions in July, 2003.[135] Hardman also

acknowledged that the files of Amrusta Blignaut, Coronation's compliance officer

and Arne Hassel, Chief Investment Officer of Coronation's investment team, were

never searched, but she did not know whether either Blignaut or Hassel held those

positions prior to late 2003.[136] The Citco Defendants have identified thirty-nine

emails from May 16, 2003 through September 19, 2003 that Coronation did not

produce.[137] Coronation produced *no emails or correspondence* from 1998 through

1999 and only limited emails and correspondence from 2000 through 2002.[138]

---

[134]    *See id.* at 72 ("Q. Did you have an understanding one way or the
other whether those were the only three individuals in the London office who were
involved in either the due diligence for the Lancer investments or the monitoring
of the Lancer investments? A. Yes, those were the only people involved. . . .
[Meadows], other than [Davies and Gibson], is the only employee that was there at
the time when Lancer was invested in I believe.").

[135]    *See id.* at 69-70.

[136]    *See id.* at 74.

[137]    *See* Documents Not Produced by Coronation, Ex. 5 to Feinberg Decl.

[138]    Coronation produced one email from 2000, six emails and three
letters from 2001, and eight emails and three letters from 2002. *See* Citco Mem. at
11. While it is impossible to know whether emails and correspondence from 1998
through 2002 were still in Coronation's possession in April, 2003, Coronation did
produce some documents from this time frame. Thus, it is fair to presume that
some records from this time frame were in Coronation's possession at the time the
duty to preserve arose. *See supra* n.123.

52

Hardman was ill-equipped to handle Coronation's discovery obligations without supervision. Given her inexperience, Hardman should have been taught proper search methods, remained in constant contact with Counsel, and should have been monitored by management. She searched only one network drive, permitted other employees to conduct their own searches, and delegated the Cape Town office search without follow-up. Hardman knew that backup tapes existed, but did not search them and, to the best of her knowledge, they have not been searched to this day.[139]

In addition to the paucity of Coronation's document production for the years 1998 through 2002 and the recent production of emails by 2M including many that were copied to Coronation, the Citco Defendants have identified a number of employees Coronation should have searched but did not – including approximately seventeen members of the investment team, Coronation's compliance officer, and Coronation's chief investment officer. While it is not entirely clear that all of these people were involved with Lancer, it is clear that Ingham's files were not searched and there is no question that Ingham was

---

[139]    *See* Hardman Dep. at 41-43. Because Coronation still has relevant backup tapes and because a search of these tapes is now justified, particularly given the very limited production of documents for the relevant period, Coronation is directed to search these tapes at its expense or explain why it is no longer possible to conduct such a search.

involved with Lancer-related investments in July, 2003. Based on the all of these facts it is apparent that Coronation acted in a grossly negligent manner.

### d.    The Chagnon Plaintiffs

The Chagnon Plaintiffs proffered Normand Gregoire, their Vice President of Investments,[140] as their declarant with regard to their discovery efforts.[141] Having joined the Chagnon Plaintiffs in 2004, the majority of Gregoire's declaration pertaining to the 2003/2004 Search was based on information given to him by others.[142] Gregoire's declaration stated that the Chagnon Plaintiffs produced "all documents" – including emails and electronic documents – in their possession to Counsel in February or March 2004.[143]

---

[140]    *See* Deposition of Normand Gregoire, Ex. 6 to Feinberg Decl. & Exs. 9 & 10 to Gotko Decl. ("Gregoire Dep."), at 10.

[141]    The Citco Defendants fault the Chagnon Plaintiffs for not providing current General Counsel, Jean Maurice Saulnier, as their declarant because, according to the Citco Defendants, Saulnier "oversaw" the 2003/2004 Search. *See* Citco Mem. at 13. Gregoire's deposition testimony is clear that, although Saulnier was involved in the search effort, it was former employee Johnny Quigley that coordinated the earlier search. *See* Gregoire Dep. at 30.

[142]    *See* Amended Declaration of Normand Gregoire ("Gregoire Decl."), Exs. 1-2 to Gotko Decl., ¶ 2 (stating that he was "relying on information and documents provided to [him] by current and former employees . . ."). In addition to Gregoire's admissions to this effect, Gregoire did not know how searches were conducted or the instructions given to employees and was unsure whether the Chagnon Plaintiffs' network was searched for emails and electronic documents.

[143]    *Id.* ¶ 4.

Gregoire then admitted that some emails that had been located in 2004 were not provided to Counsel until 2008.[144]

In response to a questionnaire served on all plaintiffs, the Chagnon Plaintiffs identified at least twelve employees as having either been involved in decisions to invest in Lancer or having had some contact with Lancer on behalf of Chagnon.[145] Of the twelve, Gregoire could only state conclusively that four were asked to search for relevant documents in the 2003/2004 Search.[146] When some of the eight were later questioned in connection with the 2007/2008 Search, the conversations were brief – the Chagnon Plaintiffs received cursory confirmation that the employees either had no documents or had only a few that had already been produced, and the Chagnon Plaintiffs did not follow up or conduct their own search.[147] The Citco Defendants have identified three emails from May and June

---

[144]   *See* Gregoire Dep. at 57-59.

[145]   *See id.* at 69-75.

[146]   *See id.* at 70-75.

[147]   *See id.* at 89-96. The Citco Defendants specifically focus on Germaine Bourgeois, a former employee of the Chagnon Plaintiffs. *See* Citco Mem. at 14. Bourgeois testified that he did not recall anyone from the Chagnon Plaintiffs asking him if he had any documents even though Gregoire's declaration states that he asked Bourgeois to search for and preserve all documents, including electronic data and email correspondence. *See* Gregoire Decl. ¶ 3(c); Deposition of Germaine Bourgeois, Ex. 6 to Feinberg Decl. ("Bourgeois Dep."), at 154-55. Despite his deposition testimony to the contrary, Counsel's records reflect that the Chagnon Plaintiffs did request such documents from Bourgeois and he turned

2003 that the Chagnon Plaintiffs did not produce.[148] The Citco Defendants also

note that the Chagnon Plaintiffs produced only two emails and two pieces of

correspondence from 1998 through 2002.[149] The Chagnon Plaintiffs produced an

unspecified number of emails from 2003.[150]

Gregoire's declaration was misleading and inaccurate in that it

indicated "all" documents had been produced, when, as Gregoire admitted, some

emails located in 2004 were not provided to Counsel until 2008. The Chagnon

Plaintiffs produced an unusually small number of emails and correspondence from

1998 through 2002 – a total of four.[151] In addition, the recent production of emails

by 2M included a number of emails on which the Chagnon Plaintiffs were copied.

These emails were not produced by the Chagnon Plaintiffs. Two-thirds of the key

players were never asked for documents during the 2003/2004 Search. When they

---

them over to Counsel in February 2004. *See* Parker Decl. ¶¶ 10-11 and documents
cited therein.

[148]    *See* Documents Not Produced by the Chagnon Plaintiffs, Ex. 6 to
Feinberg Decl. Although the Citco Defendants represent that the Chagnon
Plaintiffs did not produce seven emails, plaintiffs demonstrate that four were
produced by the Chagnon Plaintiffs. *See* Chart, Ex. 11 to Gotko Decl., at GD 156
(identifying these documents as produced by the Chagnon Plaintiffs).

[149]    *See* Citco Mem. at 13. *See also supra* n.137.

[150]    *See id.* at 13 n.11.

[151]    *See supra* nn.123 & 137.

were contacted in 2007/2008, those employees had few, if any, documents.   This combination of facts supports the conclusion that the Chagnon Plaintiffs were grossly negligent.

### e.    Bombardier Trusts

Patricia Romanovici, who joined Bombardier Trusts as Advisor, Compliance and Committee Secretary in May, 2007, submitted a declaration and testified regarding Bombardier Trusts' search efforts.  Because her arrival at Bombardier Trusts post-dated the 2003/2004 Search, she relied in large part on information provided to her by another employee, Guy Dionne.[152]  Romanovici declared that Bombardier Trusts had preserved and located "all documents" in their possession in 2003,[153] but also admitted that Bombardier Trusts failed to search for or preserve emails or electronic documents *prior to 2007*, despite the inherent conflict in these two statements.[154]

---

[152]    *See* Deposition of Patricia Romanovici, Ex. 7 to Feinberg Decl. & Ex. 10 to Gotko Decl. ("Romanovici Dep."), at 17-21.  Although still a Bombardier Trusts employee, Dionne no longer holds the same position.

[153]    Declaration of Patricia Romanovici, Ex. 2 to Gotko Decl. ("Romanovici Decl."), ¶ 10.

[154]    *See id.* ¶ 3 (declaring that in 2003 employees had been asked to "locate and preserve all *paper* documents relating to Lancer") (emphasis added); *id.* ¶ 4 ("Bombardier preserved all *paper* documents collected in response to" Counsel's request) (emphasis added).

57

In 2007, Bombardier Trusts hired a vendor to retrieve from backup tapes electronic data and email relating to Bombardier Trusts' investments in Lancer.[155]  Romanovici stated that to the best of her understanding, "it is the practice of Bombardier's Information Technology [("IT")] Department to back up electronic data and email correspondence monthly, but not necessarily to preserve it indefinitely."[156]  This practice was not suspended for any employee at any time. "For a number of months during the years 2001 and 2002," Bombardier Trusts was not able to recover emails because backup tapes either never existed or were blank.[157]  Romanovici speculated that the loss of these tapes was "possibl[y] due to systemic technological problems."[158]

Romanovici also acknowledged that only five current and former employees were asked to produce documents in the 2003/2004 Search.[159]  At least eleven individuals on the Investment Committee of the Bombardier Trusts were not asked for any documents – paper or electronic – during the 2003/2004 Search, even though they may have been involved in the decisions to invest or redeem

---

[155]     *See id.* ¶ 6.

[156]     *Id.* ¶ 7.

[157]     *Id.*

[158]     *Id.*

[159]     *See id.* ¶ 3; Romanovici Dep. at 41-44.

shares in the Funds.[160]  Romanovici did not know whether the company's central files had been searched during the 2003/2004 Search or the extent of communication between Dionne and Counsel.[161]  Romanovici also admitted that personal computers were not searched in the 2003/2004 Search and that if any documents were deleted from the server prior to the 2007/2008 Search, they would not be retrievable unless stored on a backup tape.[162]  The Citco Defendants have identified thirteen emails from June 10, 2003 through August 17, 2003 that Bombardier Trusts did not produce.[163]

In addition to submitting a misleading and inaccurate declaration, Bombardier Trusts failed to search for, or take steps to preserve, *any* electronic documents prior to 2007.[164]  Instead, it admittedly collected only *paper* documents from its employees who worked on Lancer.[165]  That the vendor hired in 2007 was not able to retrieve e-mails from some backup tapes is not surprising given that the

---

[160]     *See* Romanovici Dep. at 51-52, 67-68.

[161]     *See id.* at 105-107.

[162]     *See id.* at 83-84, 87, 90.

[163]     *See* Documents Not Produced by Bombardier Trusts, Ex. 6 to Feinberg Decl.

[164]     *See* Romanovici Decl. ¶ 7. Notably, no personal computers were searched in 2003/2004.

[165]     *See id.* ¶ 3.

recycling of backup tapes was never suspended.  In addition, at least eleven members of its Investment Committee were not asked for *any* documents – paper or electronic – or instructed to preserve documents, until 2007.[166]  Finally, a number of emails were never produced, including emails only recently produced by 2M on which Bombardier Trusts was copied.  The combination of these actions and inactions – coupled with Bombardier Trusts' failure to produce a number of emails – amounts to gross negligence.

### f.    The Bombardier Foundation

Lyne Lavoie, the Bombardier Foundation's director of administration and grants, supervised the Bombardier Foundation's search efforts.  Lavoie declared in 2004 that she instructed the Bombardier Foundation employees to locate and preserve "all files relating to Lancer."[167]  There is no indication that the Bombardier Foundation searched for electronic documents or emails at that time.  Lavoie admitted that the Bombardier Foundation gave Counsel only those documents the Foundation "understood to be responsive," even though additional Lancer-related documents were preserved.[168]  The documents that were preserved

---

[166]    *See id.*; Romanovici Dep. at 41-44, 51-52, 67-68.

[167]    Declaration of Lyne Lavoie, Ex. 3 to Gotko Decl. ("Lavoie Decl."), ¶¶ 3-4.

[168]    *Id.*

after the 2003/2004 Search were not produced to Counsel until 2007.[169]

The Bombardier Foundation "backs up electronic documents and e-mails for a period of one year, then overwrites the prior year's backed-up data with information from the next year."[170] This practice was never suspended.[171] In 2007, the Bombardier Foundation directed a vendor to search the company's servers for electronic documents and email relating to Lancer between January 1, 1999 and December 31, 2003.[172] This search "did not capture any documents or e-mails relating to Lancer that may have been deleted prior to 2007."[173] Noting that pursuant to the Foundation's document retention policy only backup data for the year 2003 would have been in existence in 2004, Lavoie admits that "certain electronic data and-or emails for the year 2003 [] may have been deleted from the [Foundation's] servers prior to the time of its electronic search" in 2007.[174]

At her deposition, Lavoie testified that it was also possible that emails

---

169    *See id.* ¶ 5(c).

170    *Id.* ¶ 9.

171    *See* Deposition of Lyne Lavoie ("Lavoie Dep."), Ex. 8 to Feinberg Decl., at 51-52.

172    *See* Lavoie Decl. ¶ 5.

173    *Id.* ¶ 9.

174    *Id.* ¶ 11. *Accord id.* ¶ 12.

and electronic documents from 1999 through 2003 may have been in employees'

possession but deleted after 2004.[175]  Lavoie also testified that she instructed only

two employees to search and preserve files related to Lancer, but did not recall

telling them to preserve electronic documents or email and did not confirm that

they had done so.[176]  The documents of the members of the Foundation's

Investment Committee or Board of Governors were never searched because any

documents in their possession would be "duplicative."[177]  The Bombardier

Foundation contends that its investment decisions were handled by Bombardier

Trusts and it is unlikely that the Foundation would have any documents that the

Trusts did not have.[178]  Plaintiffs provide no support for this contention.  If this

were correct, every document produced by the Bombardier Foundation would also

have been produced by Bombardier Trusts.  This is not the case.  The Citco

Defendants have not identified any emails or documents not produced by the

Bombardier Foundation.

The Bombardier Foundation's failure to search for *any* electronic

documents or emails related to Lancer *until 2007* cannot be rectified given

---

[175]    *See* Lavoie Dep. at 89-90.

[176]    *See id.* at 21-25, 90.

[177]    Lavoie Decl. ¶¶ 6-8.

[178]    *See* Pl. Opp. at 17 (citing Pak Decl. ¶ 7).

Lavoie's admission that relevant information has been deleted from the

Foundation's servers. The Bombardier Foundation's discovery efforts failed in

other significant respects: It failed to request any documents – paper or electronic

– from the Foundation's Investment Committee or its Board of Governors; it never

altered its practice of overwriting backup data to preserve the records of key

players; and it also withheld until 2008 documents it had collected in 2004, but

had independently and arbitrarily decided were not "responsive." Such conduct,

coupled with the Bombardier Foundation's misleading and inaccurate declaration,

amounts to gross negligence.

### 2.    Plaintiffs that Acted in a Negligent Manner

The Altar Fund, L'Ecole Polytechnique, Okabena, the Corbett

Foundation, Commonfund, KMEFIC, and UM were negligent in their discovery

efforts. None of them instituted a written litigation hold in a timely manner,

although all of them did so by 2007. Employees with possible Lancer

involvement were not clearly instructed to preserve and collect all Lancer-related

records. I have already held that after mid-2004, in the Southern District of New

York, the failure to issue a written litigation hold in a timely manner amounts to

gross negligence. I must therefore explain why, after careful consideration, I have

found that these plaintiffs were negligent rather than grossly negligent.

The failure to institute a written litigation hold in early 2004 in a case brought in federal court in Florida was on the borderline between a well-established duty and one that was not yet generally required. Thus, the rule of lenity compels the conclusion that this conduct *alone*, under these circumstances, is not sufficient to find that a plaintiff acted in a grossly negligent manner.[179] I therefore have looked to any additional errors made during the discovery phase to determine whether the conduct was negligent or grossly negligent. Here, as described below, each of the plaintiffs in this category engaged in additional negligent conduct in carrying out its discovery obligations.

### a.    The Altar Fund

Richard Lombardi, president of Altar Asset Management Inc., which served as investment advisor to the Altar Fund, was the sole decision-maker regarding the Altar Fund's Lancer investments.[180] Lombardi declared that he conducted the 2003/2004 Search and everything in the Altar Fund's possession

---

[179]    I reach this conclusion, in part, because once the duty to institute a litigation hold was clearly established – when the case was transferred to this District in 2005, it is very likely that electronic records that existed in 2003 would have been lost or destroyed. Thus, instituting the litigation hold in 2005 instead of 2007 may not have made any difference.

[180]    *See* Deposition of Richard Lombardi, Ex. 5 to Feinberg Decl. & Ex. 10 to Gotko Decl. ("Lombardi Dep."), at 383. Other than his two assistants, the Altar Fund's only other employee was his part-time analyst. *See id.*

was produced.[181]  According to Lombardi, in the normal course of business, employees are instructed to print all communications, including emails, related to clients.[182]  Those hard copies are then filed and those files on Lancer and the Funds were produced.[183]  When examined at his deposition, Lombardi did not know what email systems his company used, how electronic documents were stored, and admitted that he did not personally perform any electronic searches for responsive documents.[184]  Instead, Lombardi had instructed two assistants to conduct the searches without any supervision and was unfamiliar with the extent of their search.[185]  The Citco Defendants have identified fifty-three emails from March 20, 1997 through September 19, 2003 that the Altar Fund did not produce.[186]  These documents included emails to Lauer, Lancer, other plaintiffs and investors.  The Citco Defendants have also identified five paper documents, as well as Lancer Offshore financial statements for 1998 through 2000, that were not

---

[181]    *See* Declaration of Richard Lombardi, Ex. 4 to Gotko Decl., ¶¶ 3, 5, 9, 10.

[182]    *See* Lombardi Dep. at 582-585, 590-594.

[183]    *See id.*

[184]    *See id.* at 592-593, 598-599.

[185]    *See id.* at 608-609.

[186]    *See* Documents Not Produced by the Altar Fund, Ex. 5 to Feinberg Decl.

produced.[187]

Lombardi delegated the search for records to his assistants, but failed to provide any meaningful supervision. He was unfamiliar with the Altar Fund's email systems or how the Altar Fund maintained its electronic files. Moreover, the Citco Defendants have identified *nearly fifty* emails sent or received by Lombardi between May 2003 and September 2003 that were not produced by the Altar Fund as well as several paper documents. Moreover, the Altar Fund failed to produce emails it received that were discovered as a result of 2M's recent production of emails. This, alone, demonstrates that the Altar Fund's effort to find and produce all relevant documents was insufficient. The totality of the circumstances supports a finding of negligence.

### b.    L'Ecole Polytechnique

Declarant Isabelle Poissant, Director of L'Ecole Polytechnique,

---

[187]    *See* Citco Mem. at 12. *See also* Pl. Opp. at 14 n.13 (identifying the five documents as follows: two were produced by other plaintiffs; of the remaining three that were produced either by the Receiver or Lancer, one is a promissory note for $15,000, dated March 20, 1997, from Lombardi to Lancer, which he received as an advance on expenses he had incurred in his then-capacity as a marketing agent for Lancer; another is an October 2002 invoice from Lombardi to Lancer; and the last is an April 3, 2000 fax from Lombardi to Lauer, in which Lombardi confirms certain investor meetings).

supervised the 2003/2004 Search.[188]  In late 2003, Poissant undertook to produce

and preserve "all" employees' documents, including emails.[189]  L'Ecole

Polytechnique delegated the management of its assets, including recommending,

monitoring, and discontinuing its investments, to its Investment Committee.[190]

Despite the Investment Committee's role in L'Ecole Polytechnique's Lancer

investments, Poissant recalled asking at most five Investment Committee members

to search for Lancer-related documents and asked only one to preserve Lancer-

related documents prior to 2007.[191]  Francois Morin, chair of the Investment

Committee during the relevant period, was the one member both asked to search

and preserve his paper and electronic documents during the 2003/2004 Search,

which he confirmed doing.[192]  The Citco Defendants identify an additional three

individuals who they claim should have been contacted for documents: (1) Pierre

Bataille, whose role is not clear from the evidence; (2) Mario Lefebvre, who was a

---

[188]    See 6/19/08 Amended Declaration of Isabelle Poissant Decl. ("Am. Poissant Decl.") ¶ 1.

[189]    See id. ¶ 2.

[190]    See Deposition of Isabelle Poissant, director of L'Ecole Polytechnique, Ex. 8 to Feinberg Decl. ("Poissant Dep."), at 24-25; Am. Poissant Decl. ¶ 1.

[191]    See Poissant Dep. at 45-51, 53-54, 70-71.

[192]    See Deposition of Francois Morin, Ex. 10 to Gotko Decl., at 197-199, 202-207, 209.

member of the Investment Committee until March 15, 2000; and (3) Louis

Lefebvre, who joined the Investment Committee in September 2003.[193]  When

L'Ecole Polytechnique performed a system-wide search of its electronic

documents and emails in 2007 and 2008, the only responsive emails that were

located were found on Poissant's computer, because she had a practice of

preserving every email that she sent or received.[194]  Poissant, however, played no

role in the Investment Committee's decision to invest in Lancer[195] and no emails

were recovered for any other member of the Investment Committee.[196]  The Citco

Defendants have identified nine emails from March 26, 2003 through August 17,

2003 that were sent to or from Morin that were not produced by L'Ecole

Polytechnique.[197]

      L'Ecole Polytechnique failed to conduct a thorough search of its

---

[193]    *See* Poissant Dep. at 51-52.  Plaintiffs note that Mario Lefebvre was
no longer an Investment Committee member when the duty to preserve arose and
Louis Lefebvre could not have created any relevant material because he did not
join the Committee until September 2003 – long after the Funds entered into
receivership. *See* Pl. Opp. at 17-18.

[194]    *See* Am. Poissant Decl. ¶ 6.

[195]    *See* Citco Mem. at 18 n.13.

[196]    *See* Am. Poissant Decl. ¶ 7.

[197]    *See* Documents Not Produced by L'Ecole Polytechnique, Ex. 9 to
Feinberg Decl.

computer system for Lancer-related documents and failed to specifically direct all

the members of the Investment Committee of the need to preserve Lancer-related

documents. Nonetheless, the chair of the Committee and five of its members of

the Committee did search their records. Bataille's records should have been

searched during the 2003/2004 Search, although it is unclear whether he was even

a member of the Investment Committee or played any role in L'Ecole

Polytechnique's Lancer investment.[198]    Finally, the Citco Defendants have

identified nine emails that were not produced by L'Ecole Polytechnique, plus an

unspecified number recently produced by 2M on which L'Ecole Polytechnique

was copied. Taken together, L'Ecole Polytechnique's conduct was negligent.

### c.    Okabena

Sherry Van Zee, Vice President of Investment Administration and

Chief Compliance Officer, served as Okabena's declarant.[199]    Van Zee declared

that Okabena located and preserved "all documents," including electronic data and

emails, in connection with the 2003/2004 Search.[200]    She also declared that all files

---

[198]    The failure to search the records of a single possible member of the
Investment Committee – where the records of five other committee members and
the Chair *were searched* – is negligent but not grossly negligent.

[199]    *See* Van Zee Decl. ¶ 1.

[200]    *Id.* ¶ 5.

69

of employees who were involved in Okabena's Lancer investment were searched, including electronic files and all "servers" had been searched for email and electronic documents at that time.[201]  At her deposition, Van Zee testified that Okabena actually searched only certain email in-boxes and the "F" drive.[202]  Van Zee also testified that although she was aware that Okabena backed up its electronic data four times a year and maintains the tapes in a safety-deposit box, these tapes were never searched.[203]  While routine searches of backup tapes are not required, they should be searched when it has been shown that relevant material existed but was not produced, or relevant material *should have* existed but was not produced.  Because both conditions are met, Okabena is required to conduct this

---

[201]    *Id.*  The Citco Defendants complain that at least two key employees – Bruce Lueck, President and Chief Investment Officer of Okabena from pre-2000 to 2003, and Adele Gorilla, Investment Manager for Okabena Investment Services until October 2003 – testified that they had no recollection of receiving any instructions to preserve documents. *See* Citco Mem. at 19.  However, there is no indication that their documents were not collected as part of Okabena's search efforts. In fact, the opposite appears to be true. *See* Deposition of Bruce Lueck, Ex. 9 to Feinberg Decl., at 83 (testifying that he was asked to search his files for documents relating to Lancer "[e]arly on"); Deposition of Adele Gorilla, Ex. 9 to Feinberg Decl., at 70-75 (testifying that before her departure she collected and produced to Okabena all Lancer-related documents, including email and electronic documents).

[202]    *See* Deposition of Sherry Van Zee, Ex. 9 to Feinberg Decl. & Ex. 10 to Gotko Decl., at 74-77.  The "F" drive appears to be a shared network drive.

[203]    *See id.* at 85-89.

search or explain why it is unable to do so.

The Citco Defendants have identified thirty-nine emails from August 26, 1999 through September 19, 2003 that were not produced by Okabena[204] and note that Okabena produced approximately ten emails for the entire relevant period.[205] On August 7, 2009, after plaintiffs filed their opposition to this motion, Okabena produced three of the thirty-nine emails previously produced by others.[206] Finally, when 2M produced the seven hundred new emails in August, 2009, Okabena was among those plaintiffs to whom some of them were copied. The very small number of emails produced by Okabena, the failure to produce thirty-nine emails, and the recent production of emails by 2M including many that were copied to Okabena, together with the failure to conduct a thorough search for

---

[204]    *See* Documents Not Produced by Okabena, Ex. 10 to Feinberg Decl. Thirty-five of the emails not produced date from June through September, 2003. The remaining four are: (1) an August 26, 1999 fax from Okabena to Lancer analyst Martin Garvey requesting Lancer's historical returns for an internal project (plaintiffs claim that Okabena produced Garvey's response); (2) a February 8, 2000 email stating that Offshore was performing well; (3) a June 28, 2000 letter from Van Zee to Quilligan of Citco NV, asking him to send the June 30, 2000 market valuations (plaintiffs note that Okabena produced Citco NV's July 5, 2000 response); and (4) a May 22, 2002 request from Adele Gorilla (neé Neumann) of Okabena to Hunnicutt following up on Lancer's delayed IRS filling. *See* Exs. 6, 7 to Gotko Decl. at GD 87-96.

[205]    *See* Citco Mem. at 20 (stating that Okabena produced two emails for 1999, four emails for 2000, two emails for 2001, and two emails for 2002).

[206]    *See* Citco Reply at 12.

71

ESI, demonstrates that Okabena was negligent in carrying out its discovery

obligations.

### d.    The Corbett Foundation

Richard Corbett initially testified on behalf of the Corbett Foundation

with regard to its discovery efforts.  Corbett testified that at no point during the

2003/2004 Search had he personally instructed anyone to preserve emails and

documents.[207]  He also did not know what steps were taken to search for

documents, or which files, offices, and computers were searched.[208]  Corbett then

clarified that his assistant, Melanie Craig, had actually directed the search.  She

subsequently submitted a declaration.[209]

Craig stated that during the 2003/2004 Search, she located and

preserved all responsive documents, including electronic documents and emails.[210]

She searched her own computer and Corbett's other assistant was tasked with

---

[207]    *See* Deposition of Richard Corbett, Ex. 10 to Feinberg Decl. & Ex. 9
to Gotko Decl., at 255-260.

[208]    *See id.*

[209]    *See id.* at 255-256.

[210]    *See* 1/10/08 Declaration of Melanie Craig, Ex. 10 to Feinberg Decl.,
¶ 2.

searching the Foundation's only other computer.[211]  Craig did not oversee that

search and did not search Corbett's palm pilot.[212]  The Citco Defendants have

identified twenty-two emails that the Corbett Foundation received between June

23, 2003 and August 17, 2003, but that were not produced by the Corbett

Foundation.[213]

Craig admitted that she failed to search Corbett's palm pilot, which

may have contained emails.  Neither Corbett nor Craig instructed employees to

preserve their emails or paper documents.  This conduct, together with the Corbett

Foundation's failure to produce the twenty-two emails identified by the Citco

Defendants, demonstrates that the Corbett Foundation was negligent in meeting its

discovery obligations.

### e.    Commonfund

John Auchincloss, Commonfund's general counsel, declared that he

supervised Commonfund's 2003/2004 Search and that all Commonfund

---

[211]    *See* Deposition of Melanie Craig, Ex. 10 to Feinberg Decl., at 173-176.

[212]    *See id.*

[213]    *See* Documents Not Produced by Corbett Foundation, Ex. 10 to Feinberg Decl.

documents were located and produced in the first half of 2004.[214]  At his

deposition, Auchincloss testified that he delegated the search to paralegal Carolyn

Blanch.[215]  When pressed, Auchincloss did not know the details of Blanch's

communication with employees regarding preservation or whether employees

complied.[216]  On October 7, 2004, Blanch distributed a company-wide email

directing employees to search their records for Lancer-related documents.[217]  For

the same reasons discussed earlier with respect to Counsel's email directions to all

plaintiffs, this email is insufficient to constitute a written litigation hold.[218]

As far as Auchincloss was aware, no request for preservation or

collection was made to Commonfund's Audit and Risk Management

Committee.[219]  Although Auchincloss testified that concerns related to Lancer

"may" have been communicated to the Committee, the minutes of Committee

---

[214]    *See* 12/21/07 Declaration of John Auchincloss, Ex. 5 to Gotko Decl.,
¶¶ 2-5.

[215]    *See* Deposition of John Auchincloss, Ex. 10 to Feinberg Decl. & Ex.
9 to Gotko Decl. ("Auchincloss Dep."), at 11.

[216]    *See id.* at 66.

[217]    *See* 10/7/04 Blanch email, Ex. 15 to Gotko Decl., at IC 48.

[218]    *See supra* Part V.B.

[219]    *See* Auchincloss Dep. at 67.

meetings "specifically mention the Lancer investment."[220]  The Citco Defendants

have identified twenty-five emails between July 12, 1999 and April 10, 2002 sent

between Commonfund employees and Hunnicutt, but not produced to the Citco

Defendants.[221]  Twenty-four of these emails were produced by Commonfund in the

SEC Action, but not identified to the Citco Defendants as Commonfund

documents until September 10, 2007 – after the deposition of a key Commonfund

employee.[222]  The single email Commonfund never produced attached a March 1,

2000 Monthly Performance Review for Lancer.  Commonfund produced the

Performance Review, but not the cover email.[223]  On August 7, 2009, after

plaintiffs filed their opposition to this motion, Commonfund produced minutes of

meetings of its Audit and Risk Management Committee for September 20, 2002,

February 15, 2003, and June 21, 2003.[224]

     Auchincloss signed his declaration without fully investigating

---

[220]     Citco Reply at 12.

[221]     *See* Documents Not Produced by Commonfund, Ex. 11 to Feinberg Decl.

[222]     *See* Citco Mem. at 13; 9/10/07 Letter, Ex. 7 to Gotko Decl., at GD 97.

[223]     *See* 3/1/00 Lancer Monthly Performance Review, Ex. 7 to Gotko Decl., at GD 104-105.

[224]     *See* 8/7/09 Letter from Counsel to the Citco Defendants, Ex. 1 to Supp. Feinberg Decl.

Commonfund's 2003/2004 Search and lacked personal knowledge of the steps

taken by Commonfund to preserve and produce documents.  Although

Commonfund contacted a number of key players to collect documents,

Commonfund failed to collect documents from its Audit and Risk Management

Committee.  Because the Citco Defendants have demonstrated that the Committee

had some involvement in Lancer – although not at the level of key decision

makers – their documents should have been collected.   This conduct – together

with the failure to produce a variety of documents to the Citco Defendants[225] and

the late production of the Committee minutes – supports the conclusion that

Commonfund was negligent in complying with its discovery obligations.

### f.    KMEFIC

Abdullateef Al-Tammar, who joined KMEFIC in September, 2007 as

the General Manager, International Investments Division, submitted a declaration

on behalf of KMEFIC.  Al-Tammar acknowledged that his understanding of

KMEFIC's 2003/2004 Search stemmed from discussions with Mohamed

Almarzook, KMEFIC's former General Manager.[226]  Al-Tammar stated that "all

---

[225]    Because Commonfund produced twenty-four of these documents in
the SEC action, there is no doubt that these documents were in its possession after
the duty to preserve arose.

[226]    *See* Declaration of Abdullateef Al-Tammar, Ex. 3 to Gotko Decl.
("Al-Tammar Decl."), ¶ 2.

documents" were located and preserved.[227] But his declaration reveals that the employees were directed to search *their own* computers and files. KMEFIC did not conduct its own search of its servers and employee hard drives until 2007.[228] Al-Tammar also stated that Almarzook, who bore primary responsibility for monitoring KMEFIC's investments in Lancer, had informed him that Almarzook would have been copied on all Lancer-related emails.[229] His emails were searched and produced.[230] Prior to the 2007/2008 Search, members of KMEFIC's Investment Committee – which voted on investment decisions – were not asked to search for or retain documents.[231]

At his deposition, Al-Tammar was unable to testify to the facts underlying the statements related to the 2003/2004 Search in his declaration. When faced with two Lancer-related emails produced by KMEFIC on which Almarzook was not copied, Al-Tammar stated that Almarzook, in fact, never told him that Almarzook was copied on all emails.[232] Yet, Al-Tammar had previously

---

[227]    *Id.* ¶¶ 2, 3-6.

[228]    *See id.* ¶ 6.

[229]    *See id.*

[230]    *See id.*

[231]    *See id.* ¶¶ 9, 12.

[232]    *See* Al-Tammar Dep. at 76-77.

sent an email to Counsel, copying Almarzook, stating that Almarzook had

"confirmed that *he would have been copied on all correspondence* concerning

Lancer."[233]  While the Citco Defendants have not identified any emails that

KMEFIC has failed to produce, they state that KMEFIC failed to produce a 1997

executive summary.   Regarding the executive summary, Al-Tammar declared that

"an *additional* search" for the missing executive summary was conducted during

the 2007/2008 Search,[234] but he testified that he did not know whether a search for

this document was ever done previously.[235]

   KMEFIC did not request documents from its Investment Committee

before 2007.  Key players searched their own files without supervision from

management or counsel.  Finally, Al-Tammar failed to carefully inquire into the

details of KMEFIC's search prior to signing his declaration and relied on the

possibly false assertion that one employee – Almarzook – would have been copied

on any Lancer-related email.  This conduct was negligent.

    **g.**   **UM**

   Andree Mayrand, Director, Investment Management of UM, declared

---

[233]   *See* 3/27/08 email, Ex. 14 to Gotko Decl., at IC 28 (emphasis in original).

[234]   *See* Al-Tammar Decl. ¶ 9 (emphasis added).

[235]   *See* Al-Tammar Dep. at 102-103.

that at the time White & Case was retained in June, 2003, UM searched and

preserved "all" Lancer-related documents, including electronic documents and

email, in the possession of current and former UM employees.[236]  UM searched

again when Counsel was retained in January 2004.[237]  But, in fact, UM's efforts

did not include searching the electronic files of all employees.  Rather, the search

consisted of reviewing *only* UM's server's subfiles titled "Lancer."[238]  Mayrand

conducted this initial search herself, but consulted UM's IT personnel, possibly as

early as 2004 or as late as 2006.[239]  In early 2004, she contacted current and former

---

[236]    *See* Mayrand Decl. ¶ 2.  The Citco Defendants baselessly assert that
Mayrand "admit[s]" that UM failed to preserve any documents after it retained
White & Case in 2003 in connection with UM's first contemplated suit against
Lancer and the Funds.  Citco Mem. at 24.  Mayrand not only makes no such
admission, but expressly states that "[a]t or around that time, I undertook to locate
and preserve all documents" related to that action.  Mayrand Decl. ¶ 2.  The
evidence also contradicts the Citco Defendants' assertion, demonstrating that UM
sent White & Case documents "directly related with [UM] investments and
redemption notices" in May and June 2003.  Lancer Offshore Background
Documents, Ex. 8 to Gotko Decl., at GD 107-108 (identifying documents "sent to
White and Case on May 30 and June 2, 2003").  *Accord* 7/10/03 Letter to White &
Case, Ex. 15 to Gotko Decl., at IC 49-50 (attaching responsive documents).

[237]    *See* Mayrand Decl. ¶¶ 4-5.

[238]    *See* Deposition of Andree Mayrand, Ex. 12 to Feinberg Decl.
("Mayrand Dep."), at 137-138.

[239]    *See id.* at 124-129, 137-138.  The Citco Defendants claim that
Germaine Bourgeois – the Director of Investments for UM at the time of the
Lancer investment until 2001 – was never asked for his Lancer-related documents.
*See* Citco Mem. at 25.  Yet, Counsel's records show that Bourgeois was asked for
documents, which he produced in February, 2004.  *See* Parker Decl. ¶ 11.

members of UM's Investment Committee and asked for any Lancer-related documents.[240] However, she did not recall asking for emails or instructing them to preserve all Lancer-related materials.[241]

The Citco Defendants identify five documents that were never produced by UM.[242] The first is a September 30, 1998, "lock up" letter imposing restrictions on UM's ability to redeem its shares.[243] The second is a June 30, 2000 letter from Citco NV, containing a list of securities held by Lancer as of June 30, 1999.[244] The third and fourth are two sets of written questions by Mathieu Poulin, an analyst at UM, regarding concerns about Lancer in April and July, 2002.[245] Poulin testified that he drafted these questions on his computer and did not recall deleting them, but they were never produced by UM.[246] Instead, they were

---

[240]    *See* Mayrand Dep. at 139-140.

[241]    *See id.* at 124-129, 137-138.

[242]    The Citco Defendants offer no evidence that four of these documents were in UM's possession as of April, 2003.

[243]    *See* 9/30/98 Letter, Ex. 13 to Feinberg Decl.

[244]    *See* 6/30/00 Letter, Ex. 13 to Feinberg Decl.

[245]    *See* Poulin Lists, Ex. 13 to Feinberg Decl.

[246]    *See* Deposition of Mathieu Poulin, Ex. 13 to Feinberg Decl., at 223-225.

produced from Poulin's current employer, the Chagnon Plaintiffs.[247]  The fifth is

the 1999 Lancer Year End Review Newsletter (the "1999 Newsletter").[248]  The

1999 Newsletter first produced by UM was missing the page that disclosed a surge

in redemptions in the summer of 1998, which necessitated a liquidation of part of

the portfolio resulting in losses to the Fund.[249]  Plaintiffs contend that the

document was accidentally copied double sided to single sided.  The document

was recopied and reproduced.[250]  However, the reproduced copy did not include

the same handwritten notation "copie," as did the originally produced copy.

UM did not do a complete search of its ESI.  UM searched only its

electronic server's subfiles titled "Lancer."  This folder may, or may not, have

encompassed all Lancer-related documents.  UM did not check the electronic files

of each employee to confirm that his or her search was complete.  Although UM

sought documents from the Investment Committee in 2004, that request may not

have included ESI.  Finally, UM's initial production of the 1999 Newsletter was –

---

[247]     See Poulin Lists, Ex. 13 to Feinberg Decl. (bearing Bates stamps indicating that they were produced from the Chagnon Plaintiffs).

[248]     See 1/28/99 Lancer Offshore Year End Review, Ex. 14 to Feinberg Decl.

[249]     See id.

[250]     See Pak Decl. ¶ 13; 1/28/99 Lancer Offshore Year End Review, Ex. 8 to Gotko Decl., at GD 109-119.

at best – sloppy and – at worst – was an attempt to suppress information.  I decline

to credit the latter explanation offered by the Citco Defendants.  In sum, UM was

negligent in meeting its discovery obligations.

### E.   Sanctions

The Citco Defendants have demonstrated that most plaintiffs

conducted discovery in an ignorant and indifferent fashion.  With respect to the

grossly negligent plaintiffs – 2M, Hunnicutt, Coronation, the Chagnon Plaintiffs,

Bombardier Trusts, and the Bombardier Foundation –  I will give the following

jury charge:

> The Citco Defendants have argued that 2M, Hunnicutt, Coronation, the Chagnon Plaintiffs, Bombardier Trusts, and the Bombardier Foundation destroyed relevant evidence, or failed to prevent the destruction of relevant evidence.  This is known as the "spoliation of evidence."
>
> Spoliation is the destruction of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. To demonstrate that spoliation occurred, the Citco Defendants bear the burden of proving the following two elements by a preponderance of the evidence:
>
> *First*, that *relevant* evidence was destroyed after the duty to preserve arose.  Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence; and
>
> *Second*, that if relevant evidence was destroyed after the duty to preserve arose, the loss of such evidence would

have been favorable to the Citco Defendants.

I instruct you, as a matter of law, that each of these plaintiffs failed to preserve evidence after its duty to preserve arose.[251] This failure resulted from their gross negligence in performing their discovery obligations. As a result, you may presume, if you so choose, that such lost evidence was relevant, and that it would have been favorable to the Citco Defendants. In deciding whether to adopt this presumption, you may take into account the egregiousness of the plaintiffs' conduct in failing to preserve the evidence.

However, each of these plaintiffs has offered evidence that (1) no evidence was lost; (2) if evidence was lost, it was not relevant; and (3) if evidence was lost and it was relevant, it would not have been favorable to the Citco Defendants.

If you decline to presume that the lost evidence was relevant or would have been favorable to the Citco Defendants, then your consideration of the lost evidence is at an end, and you will *not* draw any inference arising from the lost evidence.

However, if you decide to presume that the lost evidence

---

[251] It is important to explain that the jury is bound by the Court's determination that certain plaintiffs destroyed documents after the duty to preserve arose. *See West*, 167 F.3d at 780 (upholding jury instruction that directed the jury to presume certain facts). However, the jury is not instructed that the Court has made any finding as to whether that evidence is *relevant* or whether its loss has caused any *prejudice* to the Citco Defendants. The jury must make these determinations because, if the jury finds both relevance and prejudice, it then may decide to draw an adverse inference in favor of the Citco Defendants which could have an impact on the verdict. Such a finding is within the province of the jury not the court. *Cf. Nucor*, 251 F.R.D. at 202-03 (discussing that certain sanctions, such as default, are imposed by the court rather than the jury).

was relevant and would have been unfavorable to the Citco Defendants, you must next decide whether any of the following plaintiffs have rebutted that presumption: 2M, Hunnicutt, Coronation, the Chagnon Plaintiffs, Bombardier Trusts, or the Bombardier Foundation. If you determine that a plaintiff has *rebutted* the presumption that the lost evidence was either relevant or favorable to the Citco Defendants, you will *not* draw any inference arising from the lost evidence against that plaintiff. If, on the other hand, you determine that a plaintiff has *not rebutted* the presumption that the lost evidence was both relevant and favorable to the Citco Defendants, you may draw an inference against that plaintiff and in favor of the Citco Defendants – namely that the lost evidence would have been favorable to the Citco Defendants.

Each plaintiff is entitled to your separate consideration. The question as to whether the Citco Defendants have proven spoliation is personal to each plaintiff and must be decided by you as to each plaintiff individually.

In addition, all plaintiffs are subject to monetary sanctions. The Citco Defendants are entitled to an award of reasonable costs, including attorneys' fees, associated with reviewing the declarations submitted, deposing these declarants and their substitutes where applicable, and bringing this motion. The Citco Defendants shall submit a reasonable fee application to this Court for approval. Once approved, the costs are to be allocated among these plaintiffs.

I have also considered whether the Citco Defendants should be entitled to additional discovery. If a lesser sanction is appropriate that is always a better course. With regard to Coronation and Okabena, plaintiffs admit that backup

84

tapes exist and have not been searched. They do not explain why such a search cannot still be conducted. The goal of discovery is to obtain evidence, not to issue sanctions. Thus, Coronation and Okabena are ordered to search their backup tapes for the relevant period at their expense, or demonstrate why such backup tapes cannot be searched, within thirty days.

Further discovery is not necessary for the remaining plaintiffs. Given the number of submitted declarations and numerous depositions that have already occurred in this action, more discovery of the remaining plaintiffs would not be fruitful. At this stage, the costs of conducting further discovery would far outweigh the benefit of any results. Therefore, no further discovery is warranted.

## VI.    CONCLUSION

For the reasons discussed above, the Citco Defendant's motion for sanctions is granted in part. While litigants are not required to execute document productions with absolute precision, at a minimum they must act diligently and search thoroughly at the time they reasonably anticipate litigation. All of the plaintiffs in this motion failed to do so and have been sanctioned accordingly.

The Clerk of the Court is directed to close this motion (Docket No. 248).

SO ORDERED:

85

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             January 15, 2010

## - Appearances -

**For the Plaintiffs:**

Scott M. Berman, Esq.
Anne E. Beaumont, Esq.
Amy C. Brown, Esq.
Philip A. Wellner, Esq.
Robert S. Landy, Esq.
Lili Zandpour, Esq.
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway
New York, New York 10019
(212) 833-1100

**For the Citco Defendants:**

Lewis N. Brown, Esq.
Dyanne E. Feinberg, Esq.
Terence M. Mullen, Esq.
Elizabeth A. Izquierdo, Esq.
Gilbride, Heller & Brown, P.A.
One Biscayne Tower, 15th Floor
2 South Biscayne Blvd.
Miami, Florida 33131
(305) 358-3580

Eliot Lauer, Esq.
Michael Moscato, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178
(212) 696-6000

**For Defendant Banc of America Securities LLC:**

Peter K. Vigeland, Esq.
Dawn M. Wilson, Esq.
Paul M. Winke, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800