UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

THE PENSION COMMITTEE OF THE
UNIVERSITY OF MONTREAL
PENSION PLAN, *et al.*,

                Plaintiffs,

        - against -

BANC OF AMERICA SECURITIES,
LLC, CITCO FUND SERVICES
(CURACAO) N.V., THE CITCO GROUP
LIMITED, INTERNATIONAL FUND
SERVICES (IRELAND) LIMITED,
PRICEWATERHOUSECOOPERS
(NETHERLAND ANTILLES), JOHN W.
BENDALL, JR., RICHARD GEIST,
ANTHONY STOCKS, KIERAN
CONROY, and DECLAN QUILLIGAN,

                Defendants.

-------------------------------------------------- X

**OPINION AND ORDER**

05 Civ. 9016 (SAS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/22/10

SHIRA A. SCHEINDLIN, U.S.D.J.:

## Table of Contents

Page

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    **BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    **Investor Due Diligence Experts** . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.    **Tsvetan Beloreshki** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            a.    **Scope of Proposed Testimony** . . . . . . . . . . . . . . . . . . . 2

            b.    **Relevant Qualifications** . . . . . . . . . . . . . . . . . . . . . . . 2

        2.    **Samuel Weiser** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            a.    **Scope of Proposed Testimony** . . . . . . . . . . . . . . . . . . . 3

            b.    **Relevant Qualifications** . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    **Hedge Fund Administration Experts** . . . . . . . . . . . . . . . . . . . . . . . 5

        1.    **Raymond O'Neill** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            a.    **Scope of Proposed Testimony** . . . . . . . . . . . . . . . . . . . 5

            b.    **Relevant Qualifications** . . . . . . . . . . . . . . . . . . . . . . . 5

        2.    **James Collins** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            a.    **Scope of Proposed Testimony** . . . . . . . . . . . . . . . . . . . 6

            b.    **Relevant Qualifications** . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    **Hedge Fund Auditing Experts** . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.    **Paul Regan** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          **a.**    **Scope of Proposed Testimony** . . . . . . . . . . . . . . . . . . **8**

          **b.**    **Relevant Qualifications** . . . . . . . . . . . . . . . . . . . . . . **9**

      **2.**    **Collins** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

**III.**    **APPLICABLE LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

**IV.**    **INVESTOR DUE DILIGENCE EXPERTS** . . . . . . . . . . . . . . . . . . . . . **14**

    **A.**    **Beloreshki** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

      **1.**    **Beloreshki Is Qualified to Testify as an Expert** . . . . . . . . **14**

      **2.**    **Summary of Lancer Funds Documents** . . . . . . . . . . . . . . . **19**

      **3.**    **Paragraphs Twenty-Four and Thirty-Four** . . . . . . . . . . . . **22**

    **B.**    **Weiser** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

      **1.**    **Testimony on Industry Standards** . . . . . . . . . . . . . . . . . . . **24**

          **a.**    **Weiser's Testimony Is Reliable** . . . . . . . . . . . . . . . . . **24**

          **b.**    **Objective Standards** . . . . . . . . . . . . . . . . . . . . . . . . . **27**

      **2.**    **Analysis of Each Plaintiff's Due Diligence Conduct** . . . . . **31**

          **a.**    **Weiser's Testimony Is Reliable and Not Impermissible Factual Narrative** . . . . . . . . . . . . . . . **31**

          **b.**    **State of Mind** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

      **3.**    **Testimony About Hedge Fund Administrators and Directors** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

      **4.**    **Testimony About Alleged Fraud** . . . . . . . . . . . . . . . . . . . . **36**

V.    HEDGE FUND ADMINISTRATION EXPERTS ................. 38

    A.    O'Neill ........................................... 38

        1.    Testimony on Standards of Investor Due Diligence and Auditing ......................................... 38

        2.    Legal Conclusions ................................ 40

        3.    Opinion on Credibility of Witness Testimony .......... 41

        4.    Speculative Testimony ............................ 43

    B.    Collins ............................................ 45

        1.    Industry Standards of Hedge Fund Administrators ..... 46

            a.    Collins's Testimony Is Reliable ................. 46

            b.    Speculative Opinions ......................... 49

            c.    Legal Conclusions ........................... 53

        2.    NAV Calculations ................................ 54

VI.    HEDGE FUND AUDITING EXPERTS ........................ 58

    A.    Regan ............................................ 58

        1.    Regan is Qualified to Testify ....................... 58

        2.    Opinions About Roles of Hedge Fund Administrators, Directors and Investment Managers .................. 61

        3.    The Orbiter Fund Ltd. and The Viator Fund Ltd ....... 64

        4.    Pricewaterhouse Coopers LLP and

PricewaterhouseCoopers International Ltd. ........... 66

B.    Collins Rebuttal Report ................................. 67

VII.  CONCLUSION ........................................... 69

## I.    INTRODUCTION

A group of investors brings this action to recover losses stemming from the liquidation of two British Virgin Islands based hedge funds in which they held shares:  Lancer Offshore, Inc. ("Lancer Offshore") and OmniFund Ltd. ("OmniFund") (collectively, the "Lancer Funds").  Although the action involves the claims of ninety-six plaintiff investors, on February 1, 2008, I ordered that the case would proceed initially on the claims of twenty plaintiffs ("Plaintiffs").  The only remaining defendants are the Lancer Funds' former administrator, Citco Fund Services (Curacao), N.V. ("CFS-Curacao"), its parent company, The Citco Group Limited, and former Lancer Offshore directors who were officers of CFS-Curacao (collectively, the "Citco Defendants").

In preparation for trial, both Plaintiffs and the Citco Defendants have retained experts to opine on three distinct, but related, issues – investor due diligence, hedge fund administration, and hedge fund auditing.  The parties have made motions *in limine* to exclude or limit the proposed testimony of all these experts.  For the reasons that follow, these motions are granted in part and denied in part.

## II.    BACKGROUND

### A.    Investor Due Diligence Experts

#### 1.    Tsvetan Beloreshki

##### a.    Scope of Proposed Testimony

The Citco Defendants have retained Tsvetan Beloreshki as an expert

on investor due diligence.[1]  Beloreshki intends to opine at trial on three issues: (1)

the minimum steps that an investor should take before investing in a hedge fund;

(2) whether Plaintiffs' due diligence was adequate in light of these minimum steps;

and (3) whether adequate due diligence would have caused a reasonable,

sophisticated investor to discover problems with the Lancer Funds that would have

dissuaded it from investing in them.[2]

##### b.    Relevant Qualifications

Beloreshki received a Bachelor of Arts in Economics in 1993 and an

Masters of Business Administration in Econometrics in 1996 – both from the

University of Chicago.[3]  He has also held several positions in the financial sector –

---

[1]    *See* Expert Report of Tsvetan Beloreshki ("Beloreshki Report"), Exs.
1 and 2 to Declaration of Dyanne E. Feinberg ("Feinberg Decl."), counsel for the
Citco Defendants.

[2]    *See id.* ¶¶ 4-5.

[3]    *See* Excerpts from Deposition of Tsvetan Beloreshki ("Beloreshki
Dep."), Exs. 7 and 8 to Feinberg Decl. and Exs. 4 and 5 to Amy C. Brown ("Brown

-2-

including as a trader at Banque Paribas and a senior consultant at National

Economic Research Associates ("NERA").[4] Presently, he is a managing director at

Forensic and Litigation Consulting where he "specializes in securities and financial

economics, focusing on credit products, foreign exchange and commodities,

derivative instruments, and structured finance."[5]

### 2. Samuel Weiser

#### a. Scope of Proposed Testimony

Plaintiffs have retained Samuel Weiser to rebut the expert report

submitted by Beloreshki.[6] Weiser intends to opine at trial on three issues:

> (i) the characteristics of hedge funds generally and the appropriate
> standards of due diligence for investments in hedge funds during
> the period 1997 through 2002; (ii) whether the Twenty Plaintiffs
> who were investors in the Lancer Funds conducted due diligence
> that was consistent with industry custom and practice at the
> relevant time; and (iii) whether any form of due diligence could
> have detected the wrongdoing that caused the Twenty Plaintiffs'
> losses and for which they seek to recover in this action.[7]

---

Decl."), counsel for Plaintiffs, at 14:20-15:6.

[4] *See id.* at 25:15-24, 32:5-33:23.

[5] Curriculum Vitae of Tsvetan Beloreshki, Ex. 3 to Feinberg Decl.

[6] *See* Rebuttal Expert Report of Samuel Weiser ("Weiser Rebuttal
Report"), Exs. 1, 2, 3, and 4 to Declaration of Elizabeth A. Izquierdo ("Izquierdo
Decl."), counsel for the Citco Defendants, at 1.

[7] *Id.*

-3-

### b.    Relevant Qualifications

Weiser received a Bachelor of Arts in Economics from Colby College in 1981 and a Masters of Science and Accounting from George Washington University in 1984.[8] He has held high-level positions at a number of financial institutions – including Managing Director at Citigroup, Director and Chairman of the Board at Managed Funds Association, and Partner at Ernst & Young, LLP.[9] During his career at these firms he "performed audit, accounting and marketing functions for hedge funds while also performing numerous due diligence reviews."[10] Weiser is currently President and Chief Executive Officer of Foxdale Management, "a consulting firm specializing in hedge funds and hedge-fund-related services,"[11] and Chief Operating Officer of Sellers Capital LLC, "a Chicago-based asset management firm that manages hedge funds with approximately $50 million under management."[12]

---

[8]    *See* Excerpts of Deposition of Samuel Weiser ("Weiser Dep."), Exs. 6 and 7 to Izquierdo Decl. and Exs. 1, 2, 3 and 4 to Declaration of Lili Zandpour ("Zandpour Decl."), counsel for Plaintiffs, at 12:21-13:5.

[9]    *See* Curriculum Vitae of Samuel Weiser ("Weiser CV"), Ex. 4 to Izquierdo Decl.

[10]    Weiser Rebuttal Report at 2.

[11]    *Id.* at 1.

[12]    *Id.* at 2.

-4-

### B.    Hedge Fund Administration Experts

#### 1.    Raymond O'Neill

##### a.    Scope of Proposed Testimony

CFS-Curacao was responsible for performing certain administrative duties for the Lancer Funds as detailed in the Administrative Services Agreements ("ASAs") – including calculating the monthly net asset values ("NAVs") of the funds. The Citco Defendants have retained Raymond O'Neill to opine on the standards of care applicable to administrators and to rebut the report of Plaintiffs' expert, James Collins, on the same issue.[13] In particular, O'Neill's proposed testimony will examine "the preparation of monthly, unaudited . . . NAV . . . statements, and whether the procedures employed by CFS-Curacao when calculating NAV statements for the Lancer Funds . . . were in line with those standards of care."[14]

##### b.    Relevant Qualifications

O'Neill is a founding member of Kinetic Partners, "a boutique professional services firm focused primarily on the Investment Management

---

[13]    *See* Expert Report of Raymond O'Neill ("O'Neill Report"), Exs. 12 and 13 to Feinberg Decl., ¶ 1.2.

[14]    *Id.*

-5-

section."[15]  Because Plaintiffs do not contest O'Neill's qualifications to testify on

the standards of care applicable to administrators of hedge funds, I need not recite

his qualifications.

### 2.    James Collins

#### a.    Scope of Proposed Testimony

Collins has been retained by Plaintiffs to address the standards

applicable to administrators of hedge funds and whether CFS-Curacao, as

administrator of the Lancer Funds, met those standards.[16]  More specifically, he

intends to opine "on whether CFS-Curacao followed accepted industry standards

and practices, used due care and otherwise acted properly in determining monthly

[NAVs] for each of the Lancer Funds and disseminating those NAVs to the Funds'

investors and others."[17]

#### b.    Relevant Qualifications

Collins received a Bachelor of Business Administration in Accounting

in 1972 from the University of Oklahoma and became a certified public accountant

---

[15]      *Id.* ¶ 1.11.

[16]      *See* Expert Report of James Collins ("Collins Report"), Exs. 1, 2, 3, 4,
and 5 to Declaration of Terence M. Mullen ("Mullen Decl."), counsel for the Citco
Defendants, at 1.

[17]      *Id.*

in 1974.[18]  From 1972 until 1988, he worked at several accounting firms including

KPMG Peat Marwick where he "audited financial statements of savings and loans,

thrifts, unit investment trusts, mutual funds, and hedge funds."[19]  After leaving

KPMG, Collins joined DiFranco & Company ("DiFranco"), which ultimately

merged with Rothstein, Kass, & Company ("RK").[20]  As a partner at RK, he helped

develop and run their hedge fund administration business.[21]  In 2001, RK moved

all of its administrative work to RK Consulting, LLC ("RK-Consulting"), a

licensed hedge fund administrator in the Cayman Islands, which after being

involved in a series of acquisitions became Citi Hedge Fund Services North

America, Inc.[22]  Throughout this period, until he retired in 2008, Collins remained

involved in the hedge fund administration businesses of these various entities.[23]

---

[18]   *See id.* at 2.

[19]   *Id.*

[20]   *See id.* at 2-3.

[21]   *See id.* at 3.

[22]   *See id.* at 3-4.

[23]   *See* Excerpts of Deposition of James Collins ("Collins Dep."), Exs. 8, 9, 10, 11, and 12 to Mullen Decl. and Ex. 7 to Zandpour Decl., at 39:21-40:20 (stating that he performed administrative work for a hedge fund while he was at DiFranco); *id.* at 70:6-73:25 (describing the formation of RK-Consulting and its role in providing administrative services for clients); *id.* at 85:18-86:18 (estimating that between 2003 and 2004 he provided administrative services for thirty to forty hedge funds and that between a third and a half of them were offshore funds).

-7-

## C.    Hedge Fund Auditing Experts

### 1.    Paul Regan

#### a.    Scope of Proposed Testimony

PricewaterhouseCoopers (Netherland Antilles) ("PwC NA" or "PwC") was responsible for conducting audits of the Lancer Funds for several years starting in the late 1990s.[24]  Paul Regan has been retained by the Citco Defendants to opine on whether those audits were conducted in accordance with International Standards on Auditing ("ISA") – a set of professional standards issued by the International Federation of Accountants.[25]  Regan proposes to testify about: (1) PwC NA's duties as the auditor of the Lancer Funds;[26] (2) whether PwC NA failed to fulfill those duties;[27] and (3) whether a departure from those standards resulted in PwC NA "improperly render[ing] unqualified audit reports on financial statements of the Lancer Funds that were materially misstated."[28]

---

[24]    PwC NA was originally a defendant in this action.

[25]    *See* Expert Report of D. Paul Regan ("Regan Report"), Exs. 9, 10 and 11 to Feinberg Decl., at 1.

[26]    *See id.*

[27]    *See id.*

[28]    *Id.*

-8-

### b. Relevant Qualifications

Regan received a Bachelor of Science in Accounting from the University of San Francisco in 1968, a Master of Science in Accounting from the Golden Gate University in 1979, and has been a certified public accountant since 1970.[29] He has held several positions at various accounting firms – including being a supervising senior accountant at Peat, Marwick, Mitchell, CPAs and forming Regan & Skelton, CPAs.[30] He is currently President and Chairman of the Board of Hemming Morse, Inc. where his duties include servicing clients as a litigation consultant on accounting issues.[31]

### B. Collins

Collins submitted a rebuttal report responding to Regan's proposed

---

[29]    *See* Curriculum Vitae of Paul Regan ("Regan CV"), Ex. 11 to Feinberg Decl.

[30]    *See* Excerpts from Deposition of Paul Regan ("Regan Dep."), Ex. 12 to Feinberg Decl. and Ex. 10 to Brown Decl., at 64:7-65:4.

[31]    *See id.* at 11:2-10 ("I spend generally about 2,000 hours a year working with clients, which are typically either governmental agencies or law firms that are representing entities which are either in a dispute or might be in a dispute, and our work tends to focus on financial and accounting issues or other issues that are data related which might relate to liability issues involved in the potential dispute or actual dispute.").

testimony on PwC NA's role as auditor of the Lancer Funds.[32] Collins proposes to

address:

> (i) Mr. Regan's statements concerning the duties of CFS-Curacao
> and the directors of the Lancer Funds; (ii) Mr. Regan's conclusion
> that PwC-NA looked only to the investment manager in
> connection with the valuation of the securities in the Funds'
> portfolios; (iii) the Regan Report's discussion of representation
> letters that CFS-Curacao and the directors of the Lancer Funds
> provided to PwC-NA.[33]

## III.   APPLICABLE LAW

The standard for the admissibility of expert testimony is established

by Rule 702 of the Federal Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact
> in issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

For expert testimony to be admissible under Rule 702, three

requirements must be met. *First*, the witness must be "qualified as an expert by

---

[32]   *See* Rebuttal Expert Report of James Collins ("Collins Rebuttal Report"), Ex. 7 to Mullen Decl., at 1.

[33]   *Id.* at 1.

knowledge, skill, experience, training, or education[.]"[34] Courts within the Second

Circuit have "liberally construed expert qualification requirements."[35] In

*McCullock v. H.B. Fuller Co.*, for example, the Second Circuit allowed an expert to

testify as to matters within his general expertise even though he lacked

qualifications as to certain technical matters within that field.[36]

*Second*, the expert's knowledge must be of the type that will "assist

the trier of fact to understand the evidence or to determine a fact in issue[.]"[37]

Thus, expert witnesses are generally not permitted to address issues of fact that a

jury is capable of understanding without the aid of expert testimony.[38] It is also

---

[34]    Fed. R. Evid. 702.

[35]    *TC Sys., Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 174
(N.D.N.Y. 2002). *Accord United States v. Brown*, 776 F.2d 397, 400 (2d Cir.
1985) ("The words 'qualified as an expert by knowledge, skill, experience, training
or education' must be read in light of the liberalizing purpose of the Rule[.]"
(quoting Fed. R. Evid. 702)).

[36]    *See* 61 F.3d 1038, 1042-43 (2d Cir. 1995) (holding that an industrial
engineer's testimony that a plaintiff was within the "breathing zone" of hot-glue
fumes "easily qualifie[d] for admission under *Daubert*" – despite the engineer's
lack of education on fume dispersal patterns, knowledge regarding the fumes'
chemical constituents or the glue vapor's concentration level, or experience
performing or interpreting air quality studies").

[37]    Fed. R. Evid. 702.

[38]    *See Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d
Cir. 1989) (stating that expert testimony is inadmissible when it addresses "lay
matters which [the trier of fact] is capable of understanding and deciding without
the expert's help").

well-established that expert witnesses are not permitted to testify about issues of

law – which are properly the domain of the trial judge and jury.[39]

   *Third*, the proposed expert testimony must be based "on a reliable

foundation."[40]

> In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on "sufficient facts or data"; (2) that the testimony "is the product of reliable principles and methods"; and (3) that "the witness has applied the principles and methods reliably to the facts of the case."[41]

Although the Supreme Court has instructed district courts to focus "on the

principles and methodology" employed by the expert, and "not on the conclusions

that they generate,"[42] it has recognized that "conclusions and methodology are not

---

[39] *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 548-49 (S.D.N.Y. 2004) ("[I]n deciding whether the proposed testimony will be helpful to the fact-finder, courts in this Circuit analyze the testimony to determine whether it 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" (quoting *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir.1999)); *In re Initial Pub. Offering Secs. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (Scheindlin, J.) ("In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law." (collecting cases)).

[40] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

[41] *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702).

[42] *Daubert*, 509 U.S. at 595.

entirely distinct from one another."[43] Accordingly, "nothing in either *Daubert* or

the Federal Rules of Evidence requires a district court to admit opinion evidence

that is connected to existing data only by the *ipse dixit* of the expert."[44]

"[A] judge assessing the proffer of expert . . . testimony under Rule

702 should also be mindful of other applicable rules."[45]  Importantly, Rule 403 of

the Federal Rules of Evidence states that relevant evidence "may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury."  "Expert evidence can be both

powerful and quite misleading because of the difficulty in evaluating it.  Because

of this risk, the judge in weighing possible prejudice against probative force under

Rule 403 . . . exercises more control over experts than over lay witnesses."[46]

In sum, district courts are charged with acting as "gatekeeper[s] to

exclude invalid and unreliable expert testimony."[47]  However, trial judges, whom

---

[43]    *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[44]    *Id.*

[45]    *Daubert*, 509 U.S. at 595 (quotation marks omitted).

[46]    *Id.*

[47]    *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999)
(quotation marks omitted).  *Accord Louis Vuitton Malletier v. Dooney & Bourke,
Inc.*, 525 F. Supp. 2d 558, 561, 565 (S.D.N.Y. 2007) (Scheindlin, J.) (discussing
district court's "special obligation" to gatekeep with respect to expert evidence).

-13-

are given "broad discretion" in making these determinations,[48] should remember that they are ruling on the admissibility of evidence and not its weight or credibility. "As the Supreme Court has explained, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"[49]

## IV.    INVESTOR DUE DILIGENCE EXPERTS

### A.    Beloreshki

Plaintiffs request the exclusion of Beloreshki's entire testimony on the ground that "he is not qualified to testify as an expert on hedge fund due diligence,"[50] or, in the alternative, the exclusion of portions of that proposed testimony on narrower grounds discussed below.

### 1.    Beloreshki Is Qualified to Testify as an Expert

Beloreshki is an experienced economist with undergraduate and

---

[48]    *McCullock*, 61 F.3d at 1042.

[49]    *Amorgianos*, 303 F.3d at 267 (quoting *Daubert*, 509 U.S. at 596) (citation omitted).

[50]    Plaintiffs' Memorandum of Law in Support of the Motion to Exclude and/or Limit the Testimony of the Citco Defendants' Experts ("Pl. Mem.") at 4.

graduate degrees in economics from the University of Chicago.[51]  Nevertheless,

Plaintiffs raise three concerns with Beloreshki's qualifications[52] – none of which

are sufficient to exclude his testimony.

       *First*, Plaintiffs argue that Beloreshki lacks training and experience in

some necessary aspects of hedge fund due diligence.  According to Plaintiffs,

hedge fund due diligence can be divided into two categories – quantitative analysis

(*e.g.*, valuing a hedge fund's financial portfolio) and qualitative analysis (*e.g.*,

evaluating a hedge fund's key personnel).[53]  While Plaintiffs agree that Beloreshki

has significant experience with the *quantitative* analysis of financial instruments

and portfolios,[54] they argue that he lacks sufficient experience with relevant aspects

---

[51]    *See* Beloreshki Dep. at 14:20-15:6.

[52]    *See* Pl. Mem. at 4-10.

[53]    *See* Pl. Mem. at 6 ("Beloreshki is an economist, and the bulk of his work over the course of his career has concerned finance and the quantitative analysis of securities and portfolios of securities.  Beloreshki has never taken any classes that taught him how to perform *qualitative*, as opposed to *quantitative*, due diligence on investments." (citations omitted) (emphasis added)).  In his deposition, Beloreshki agreed that there is more to due diligence than valuing a hedge fund's portfolio. *See* Beloreshki Dep. at 21:8-11.  However, he stressed his belief that it is difficult to separate the quantitative and qualitative facets of economic analysis. *See id.* at 108:14-109:4.

[54]    *See* Plaintiffs' Reply Memorandum of Law in Further Support of Motion to Exclude and/or Limit the Testimony of the Citco Defendants' Experts ("Pl. Reply") at 5 ("Valuation – not due diligence – is where [Beloreshki's] expertise lies.").  Plaintiffs nonetheless suggest that because Beloreshki's

-15-

of *qualitative* analysis.[55]  Plaintiffs are correct that Beloreshki has less experience

with the qualitative aspects of hedge fund analysis than he has with the quantitative

aspects.[56]  However, during his more than a decade-long career in the financial

sector, Beloreshki has worked on multiple projects that incorporated the qualitative

analysis of hedge funds.[57]  Given Beloreshki's in-depth knowledge of quantitative

---

quantitative skills were not developed in the context of performing hedge fund due
diligence, but through analyzing financial instruments and portfolios in other
contexts, he is not qualified to opine on even the quantitative aspects of hedge fund
due diligence. *See id.* at 6.  However, Beloreshki has had experience analyzing
hedge fund portfolios. *See, e.g.*, Beloreshki Dep. at 42:5-45:22 (describing a
project wherein Beloreshki analyzed an "[observed] discrepancy between [a hedge
fund's] stated objective performance and how the fund was actually performing").
Furthermore, even if Beloreshki's skills were not primarily developed in the
context of hedge fund due diligence, this does not mean that he is unqualified to
testify about such matters. *See, e.g.*, *Valentin v. New York City*, No. 94 Civ. 3911,
1997 WL 33323099, at *15 (E.D.N.Y. Sept. 9, 1997) ("[L]ack of extensive
practical experience directly on point does not necessarily preclude [an] expert
from testifying.").  Like all investment funds, one of the primary assets of a hedge
fund is its financial portfolio.  Plaintiffs have not explained why Beloreshki's
substantial training and experience in performing quantitative analysis of financial
portfolios does not extend to analyzing hedge fund portfolios.

[55]    *See* Pl. Mem. at 6.

[56]    *See* Beloreshki Dep. at 108:21-23 ("Q. Is it fair to say the bulk of your
work over your career has been quantitative analysis of securities, portfolios of
securities?. . . A. I would agree with your statement to the extent that I have
particular skills and expertise in various quantitative techniques, modeling and so
forth.").

[57]    *See, e.g., id.* at 49:14-22 (describing a project wherein Beloreshki
investigated "the degree to which [a hedge fund manager's] sophistication in the
area was consistent or not consistent with what was represented to investors"); *id.*

-16-

portfolio analysis, this general experience with qualitative analysis is sufficient to qualify him to educate the jury about the steps that an investor should take before investing in a hedge fund.[58]

*Second*, Plaintiffs argue that any experience Beloreshki does have with conducting hedge fund due diligence was gained as an expert witness.[59] While it would be troubling if Beloreshki's only relevant experience arose from his duties as a litigation consultant,[60] this is plainly not the case. He has significant experience in hedge fund analysis outside of the litigation context,[61] and "it would

at 52:5-53:12 (discussing Beloreshki's participation in discussions among a subset of NERA consultants that were designated to "develop expertise in the area of due diligence with respect to hedge funds" – including "assessing and advising hedge funds with respect to their risk management policies").

[58]    *See Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7396, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) ("[T]he only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth."); *McCullock*, 61 F.3d at 1042-43 (permitting an expert to testify as to matters within his general expertise even though he lacked qualifications as to certain technical matters within that field).

[59]    *See* Pl. Mem. at 8.

[60]    *See Kline v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989) ("[I]t would be absurd to conclude that one can become an expert simply by accumulating experience in testifying.").

[61]    *See supra* note 57; *see also* Beloreshki Dep. 27:7-30:25 (discussing Beloreshki's experience at Banque Paribas, where many of the bank's clients were hedge funds).

-17-

be incorrect to conclude that [being employed] as a professional expert" is a basis for excluding an expert's testimony.[62]

*Third*, Plaintiffs suggest that Beloreshki's testimony is primarily based upon his analysis of two articles, and that "[h]is ability to read those documents and craft a list of standards from them does not transform him into an expert on the subject of hedge fund due diligence."[63]  Plaintiffs are correct that reading two relevant articles does not qualify someone as an expert.  However, as discussed, Beloreshki's experience in hedge fund due diligence is not limited to his knowledge of these articles, and there is nothing impermissible about Beloreshki reviewing scholarly articles in forming his testimony.[64]

Beloreshki may not be the world's leading expert on hedge fund due diligence, and Plaintiffs are entitled to make their arguments about Beloreshki's qualifications to the jury.  However, these are matters "properly explored on cross-examination" and go to "his testimony's weight and credibility – not its

---

[62]    *Kline*, 878 F.2d at 800.

[63]    Pl. Mem. at 9-10.

[64]    *See Daubert*, 509 U.S. at 593-94 (stating that publication of a theory, while not required for admissibility under Rule 702, supports its reliability).

-18-

admissibility."[65]

## 2.    Summary of Lancer Funds Documents

In paragraphs fifteen through thirty-four of his expert report,

Beloreshki summarizes the contents of various Lancer Funds documents including

the contents of private placement memoranda ("PPM") that were distributed to

investors.  The referenced portions of the documents outline the Lancer Funds'

investment strategy,[66] the role of the investment manager in selecting and valuing

the funds' holdings,[67] and the role of CFS-Curacao as administrator of the funds.[68]

Plaintiffs argue that Beloreshki should not be allowed to summarize the content of

these documents on the ground that the jury is capable of understanding them on

its own and that the summary would therefore "amount to nothing more than an

---

[65]     *McCullock*, 61 F.3d at 1043.  Plaintiffs also argue that "the Court . . . should preclude Beloreshki from offering an opinion on the duties and responsibilities of directors of offshore hedge funds." Pl. Mem. at 10 n.10.  The Citco Defendants respond that they "do not intend to offer Beloreshki as an expert on the duties and responsibilities of offshore hedge fund directors[.]" Def. Mem. at 13 n.12.  In accordance with this representation, and because the Citco Defendants have not attempted to establish that Beloreshki is an expert on the duties and obligations of offshore hedge fund directors, Beloreshki may not opine on these matters.

[66]     *See* Beloreshki Report ¶¶ 17-25.

[67]     *See id.* ¶¶ 26-31.

[68]     *See id.* ¶¶ 32-34.

unnecessary and improper one-sided narrative[.]"[69]  The Citco Defendants respond

that this proposed testimony is not an unnecessary factual narrative, but instead,

provides "the essential foundation" for Beloreshki's analysis of Plaintiffs' due

diligence efforts.[70]  More specifically, they argue that "[b]ecause not every hedge

fund is the same – they differ in investment strategy, objectives, risk factors, etc. –

an understanding of the characteristics of the particular fund is an essential first

step to identifying the nature and extent of the due diligence an investor in that

fund should conduct."[71]

It is apparent from Beloreshki's expert report that the information

disclosed by the Lancer Funds documents is relevant to his opinion regarding the

adequacy of Plaintiffs' due diligence as investors in the Lancer Funds.[72]  Moreover,

---

[69]     Pl. Reply at 6.

[70]     Memorandum of Law of the Citco Defendants in Opposition to
Plaintiffs' Motion to Exclude and/or Limit the Testimony of the Citco Defendants'
Experts ("Def. Mem.") at 11-12.

[71]     *Id.* at 12.

[72]     *See, e.g.*, Beloreshki Report ¶¶ 28-29 (stating that the Lancer Funds'
documents disclosed that the investment manager "was granted substantial latitude
with respect to the valuation of the Lancer Funds' portfolio securities" and that, as
a result of this latitude, "the Lancer Funds investors were exposed to additional
risks, which emanated from the lack of transparency and the uncertainties related
to the nature, robustness and reliability of the Investment Manager's valuation
models as well as the reasonableness of the assumptions and inputs used by the
investment manager in the valuation process"); *id.* ¶ 31 (stating that the "weight of

-20-

contrary to Plaintiffs' assertion, these documents are studded with complex

terminology, and a lay juror may well have difficulty understanding their meaning

without the aid of expert testimony.[73]  Accordingly, because the content of the

documents is both relevant[74] to his testimony and is not unduly prejudicial,[75]

Beloreshki is entitled to summarize these documents for the jury.

### 3.    Paragraphs Twenty-Four and Thirty-Four

Plaintiffs request that Beloreshki be prohibited from testifying about

the subject matter set forth in paragraph twenty-four of his report because the

opinion therein is speculative.  Paragraph twenty-four states:

> In reality information on a significant number of the Lancer
> Funds' holdings was not proprietary – indeed as discussed below,
> it was publicly disclosed and available (an avenue of due diligence
> the Twenty Plaintiffs failed to pursue in a timely fashion if at all).
> Furthermore, *an argument could be made that*, at least in certain
> cases, the investors in the Lancer Funds stood to benefit from

---

the obligation" to ensure the integrity of the valuation process with respect to the
hedge fund's investments "was even greater considering the nature of the Lancer
Funds' investment strategy and key investment risks" that were disclosed by the
Lancer Funds documents).

[73]    *See* Beloreshki Dep. at 114:20-116:5 (testifying that he has the
relevant experience – including assisting in the "preparation of PPMs" – to analyze
the Lancer Funds documents and to "provide the jury with what the document[s]
say[]").

[74]    *See* Fed. R. Evid. 401, 402.

[75]    *See* Fed. R. Evid. 403.

disclosure of the funds' holdings. Such a disclosure *might* have invited the participation of other market participants who would have been interested in sharing the "upside potential [of] at least 100% within 12 months," thus enhancing the performance of the Lancer funds.[76]

The Citco Defendants argue that Beloreshki should be able to provide this expert testimony because "it is clear from paragraph 24 and the surrounding paragraphs that the purpose of paragraph 24 was to provide a context for the Twenty Plaintiffs' inexcusable failure to conduct any meaningful investigation to identify the positions held in the Lancer Funds' portfolios, in the face of Lauer's refusal to disclose such information."[77] The Citco Defendants may be correct as to the general content of Beloreshki's opinion. However, this does not change the fact that the particular point contained within paragraph twenty-four – that "*an argument could be made that* . . . the investors in the Lancer Funds stood to benefit from disclosure of the funds' holdings" – is speculative and hence inadmissible.[78]

Plaintiffs also request that Beloreshki be prohibited from testifying as to the subject matter contained in paragraph thirty-four because "the sole source of

---

[76]    Beloreshki Report ¶ 24 (emphasis added) (quoting defendants' exhibit 584).

[77]    Def. Mem. at 12.

[78]    *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("At trial, proffered 'expert testimony should be excluded if it is speculative or conjectural[.]'" (citation omitted)).

his knowledge of CFS-Curacao's role is what [certain Lancer Fund documents] say[] on the subject."[79]  Paragraph thirty-four states:

> In other words, the disclosures contained in the Lancer Funds' offering materials alerted investors as to the limited role played by [CFS-Curacao as administrator of the Lancer funds].  Among other things, it informed investors that the Investment Manager, rather than the Lancer Funds' administrator was tasked with valuing the securities held by Lancer funds, and that investors could not rely on the administrator as a substitute for conducting their own due diligence.

Because Beloreshki is not an expert on the duties and obligations of hedge fund administrators, he *may not* provide his opinion on whether CFS-Curacao fulfilled such obligations.  Nonetheless, Beloreshki *may* testify as to what the Lancer Funds' documents disclosed about CFS-Curacao's role to the extent it should have affected Plaintiffs' due diligence efforts.[80]

## B.    Weiser

The Citco Defendants have divided Weiser's proposed rebuttal testimony into four categories: his opinions describing industry standards for

---

[79]    Pl. Mem. at 12 (citing Beloreshki Dep. at 264:16-259:15) (quotation marks omitted).

[80]    *See* Beloreshki Report ¶ 34 (opining that, on the basis of what was disclosed by the Lancer Funds documents, the "investors could not rely on the administrator as a substitute for conducting their own due diligence"). Plaintiffs are entitled to a limiting instruction on the scope of this testimony. *See* Fed. R. Evid. 105.

conducting hedge fund due diligence; his opinions regarding whether Plaintiffs met those standards; his opinions about the duties of hedge fund administrators and directors; and his opinions on the alleged fraud that is the basis for this case. The Citco Defendants request that Weiser's proposed testimony about each of these categories be entirely excluded or limited for a variety of reasons discussed below.

### 1.    Testimony on Industry Standards

#### a.    Weiser's Testimony Is Reliable

Weiser's testimony is based upon his experience in the hedge fund industry rather than on published scholarship or existing data. While an expert's testimony may be based upon his or her experience,[81] the expert must show why "that experience is a sufficient basis for [his or her] opinion."[82] Weiser's experience in the hedge fund industry is sufficiently broad-based to satisfy that requirement. He has worked for several different financial institutions,[83] conducted more than fifty due diligence reviews of hedge funds,[84] and has gained further knowledge about common practices in the industry through personal relationships

---

[81]    *See* Fed. R. Evid. 702.

[82]    Fed. R. Evid. 702 Advisory Committee Note.

[83]    *See* Weiser CV.

[84]    *See* Weiser Rebuttal Report at 2.

-24-

and industry conferences.[85]

The Citco Defendants object that Plaintiffs are conflating the
reliability and qualifications analyses by focusing on the source of Weiser's
qualifications, and argue that Weiser's experience does not provide a reliable basis
for his testimony because he has not "specifically link[ed] [his] experience to his
opinions."[86] While courts do consider whether an expert has articulated how "the
specifics of [his] experience led to his conclusions,"[87] every case is fact-specific,[88]

---

[85]     *See, e.g.*, Weiser Dep. at 246:24-247:15. The Citco Defendants claim
that this experience is insufficient because he cannot remember the specifics of any
conversations he had with other industry participants about the appropriate steps to
take in performing hedge fund due diligence. *See* Reply Memorandum of Law of
the Citco Defendants in Support of Their Daubert Motion to Exclude Testimony of
Samuel Weiser ("Def. Weiser Reply") at 5. However, this criticism is more
appropriately dealt with through cross-examination than through exclusion of an
expert's proposed testimony. *See Amorgianos*, 303 F.3d at 267.

[86]     Def. Weiser Reply at 5.

[87]     *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 1585551, at
*4 (S.D.N.Y. July 16, 2002) (Scheindlin, J.). *Accord Primavera Familienstifung v.
Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001), *modified in part on reh'g*, 137 F.
Supp. 2d 438 (S.D.N.Y. 2001) ("While it is permissible for [an expert] to base his
opinion on his own experience, he must do more than aver conclusorily that his
experience led to his opinion.").

[88]     *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)
("The conclusion, in our view, is that we can neither rule out, nor rule in, for all
cases and for all time the applicability of the factors mentioned in *Daubert*, nor can
we now do so for subsets of cases categorized by category of expert or by kind of
evidence. Too much depends upon the particular circumstances of the particular
case at issue.").

-25-

and every expert is not required to provide the same degree of detail in linking his experience to his conclusions.[89]  In this case, both parties plan to call due diligence experts who will opine on the custom and practice of conducting hedge fund due diligence during the relevant time period.  Industry practices are not like scientific hypotheses, which can be tested through trial and error, or logical arguments, which can be analyzed through probing their underlying premises.[90]  For example, it would not be helpful for Weiser to opine that he had X experience, which taught him that Y custom was advisable.  The issue is not the adequacy of the customs and practices, but their general acceptance.  Thus, the reliability of Weiser's testimony largely depends on whether he has drawn the proffered industry standards from an adequate source – in this case, his experience.

   The Citco Defendants are entitled to test through cross-examination

---

[89] *See Emig v. Electrolux Home Prods. Inc.*, No. 06 Civ. 4791, 2008 WL 4200988, at \*8 (S.D.N.Y. Sept. 11, 2008) (holding that an expert witness had sufficiently demonstrated "a connection between his experience and the process he used and the conclusions he reached" by asserting that the methodology he employed "was the same one he utilized in the real world of American Industry when [he] evaluated the authored assembly instructions . . . ." (quotation marks and citations omitted)).

[90] *See Liriano v. Hobart Corp.*, 949 F. Supp. 171, 177 (S.D.N.Y. 1996) (Scheindlin, J.) ("Properly understood, the *Daubert* analysis applies to cases involving unique, untested, or controversial methodologies or techniques. It is not appropriate to invoke the *Daubert* test in cases where expert testimony is based solely on experience or training, as opposed to a methodology or technique." (citation omitted)).

whether Weiser's experience in the hedge fund industry is sufficient to provide an adequate basis for his testimony.[91]  However, Weiser's description of his experience – which includes performing due diligence on a multitude of hedge funds and communicating with others in the industry – provides a sufficient link between his experience and his opinions to satisfy the reliability requirement of Rule 702.[92]

### b.    Objective Standards

In his expert report, Weiser provides guidelines for analyzing the adequacy of investor due diligence.  Specifically, he asserts that the process of conducting due diligence includes four steps: (1) "Oral communications with the manager to assess the manager's background, investment acumen and strategy, and

---

[91]    In addition, the Citco Defendants will have the opportunity to test Weiser's conclusions through the custom and practice testimony of their own due diligence expert. *See Seneca Ins. Co. v. Wilcock*, No. 01 Civ. 7620, 2007 WL 415141, at *9 (S.D.N.Y. Feb. 5, 2007) ("Moreover, although plaintiff asserts that [the expert's] method is not testable, all that he is doing is to recount his experience concerning the use of certain terms in the industry.  Such testimony is of course testable, in the sense that industry practice is provable (or disprovable) by equivalent testimony by experienced participants in the industry.").

[92]    Of course, an expert must also show that he has reliably applied his knowledge of these customs and practices to the specific facts of the case.  It would not be acceptable for Weiser to opine, "I am an expert and therefore Plaintiffs' due diligence was inadequate according to custom and practice."  He must show how Plaintiffs' due diligence failed to meet the standards he has articulated.  However, that is an issue separate from whether an expert's opinion is reliably based upon his experience and one that I deal with in the subsequent subsections.

-27-

the fund's performance"; (2) "Review of relevant documents including [PPMs],

investment newsletters, and marketing materials produced by the manager

describing the manger's investment program as well as information produced by

third parties, such as audited financial statements and performance reports"; (3)

"Discussions with other investors, service providers and others with the ability to

provide a reference on the integrity and capabilities of the investment manager and

confirm the reported performance of the fund"; and (4) "The presence of quality

service providers upon whom the investor could rely."[93]

The Citco Defendants request the exclusion of Weiser's proposed

testimony on the ground that these standards are so vague as to be unhelpful to the

jury.[94] Their argument is primarily based upon two admissions made by Weiser at

deposition. *First*, Weiser stated that the four steps he articulated in his expert

report do not constitute a minimum level of adequate due diligence but instead fall

somewhere along a continuum of acceptable due diligence.[95] Certainly, providing

---

[93]    Weiser Rebuttal Report at 6.

[94]    *See* Def. Weiser Mem. at 4-7.

[95]    *See* Weiser Dep. at 187:25-188:7 ("Again, there is a continuum of
acceptable due diligence and there is along that spectrum, various steps that one
can take and you can underemphasize certain things and overemphasize other
things in order to gain comfort because it's an overall process and it's an art, it's
not a science."); *id.* at 189:3-13 ("Q. Do [the four steps you have set forth in your
report] constitute the low end of that spectrum that you're talking about, the bear

-28-

the jury with a checklist of minimum steps that must be taken by an investor to

conduct adequate due diligence simplifies the jury's analysis. However, unlike the

cases cited by the Citco Defendants where proposed expert testimony was

excluded for vagueness,[96] Weiser has not simply provided a tautological or overly

general standard, but has articulated a set of guidelines that will aid the jury in

analyzing Plaintiffs' conduct. The requirement that a custom and practice expert

witness provide *objective* standards is not a requirement that the witness provide

*minimum* standards.

　　　　*Second*, Weiser asserted at deposition that investor due diligence is

more of an art than a science and that due diligence is adequate when it provides

the investor with a sufficient level of comfort.[97] Admittedly, this deposition

---

[sic] minimum of what an investor is to do? . . . A. No. I think they constitute –
across that spectrum, I'd say that's average because its pretty much standard
operating kind of basic procedures. Not at the low end, not at the high-end of that
acceptable range but kind of, you know, down the middle.").

[96]　　*See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 543
(excluding "opinions regarding ethical standards for reporting or analyzing clinical
trial data or conducting clinical trials" because they "articulated nothing save for
the principle that research sponsors should be honest"); *Askin*, 130 F. Supp. 2d at
529 (excluding expert's testimony that "'[b]rokers and dealers are expected to act
with the highest integrity'" because this standard was too vague to be helpful to a
jury (citation omitted)).

[97]　　*See* Weiser Dep. at 188:6-7 (stating of due diligence, "it's an art; it's
not a science"); *id.* at 190:15-20 ("Q. And what steps or procedures would
constitute the minimum for due diligence during that time period? . . . A. In my

-29-

testimony is troubling. If Weiser is suggesting that the adequacy of due diligence

is based on what the investor *subjectively* needs to be comfortable *from his or her*

*perspective*, his opinion testimony cannot logically provide a basis for *objectively*

analyzing the adequacy of investor due diligence. However, reviewing Weiser's

deposition testimony and expert report as a whole, it does not appear that Weiser is

suggesting that the adequacy of due diligence is entirely dependent on the

perspective of the investor. Rather, he opines that an appropriate objective

analysis of investor due diligence must take into account the specific

characteristics of the investors conduting the due diligence.[98] While an analysis of

investor due diligence that incorporates investor characteristics is significantly

more complex, it is not subjective or overly vague.

    Accordingly, to the extent that Weiser is able to articulate objective

---

opinion, right, the minimum would be the least amount that an investor [sic] would
need to do in order to give themselves comfort that they had sufficiently answered
their questions with regard to whether or not this was an appropriate investment for
them.").

[98]    *See id.* at 188:11-22 ("It's evaluating the overall, overall entity and
making a determination of whether you trust the manager, whether you believe in
the process, whether you believe that the returns and the investment strategy are
aligned or you think the risk-reward is in alignment, and how each individual
investor comes to that conclusion is really, *is contextual for them based upon their
own individual level of knowledge, their own individual appetite for risk and their
own individual portfolio and how they choose to allocate their assets.*" (emphasis
added)).

standards that the jury can employ to analyze Plaintiffs' due diligence, his

testimony is admissible.

### 2.    Analysis of Each Plaintiff's Due Diligence Conduct

#### a.    Weiser's Testimony Is Reliable and Not Impermissible Factual Narrative

The Citco Defendants also argue that Weiser's analysis of each

plaintiff's due diligence is unreliable and constitutes impermissible factual

narrative. *First*, the Citco Defendants argue that Weiser's failure to articulate

objective standards that can be applied to each plaintiff's conduct renders his

testimony inadmissible.[99]  Because I have already held that Weiser has provided

objective standards, I also reject this argument. *Second*, the Citco Defendants

argue that Weiser's recitation of each plaintiff's due diligence efforts constitutes an

impermissible factual narrative because Weiser does not "compare the conduct to

any objective standards or benchmarks."[100]  However, Weiser does in fact apply his

four proposed steps of investor due diligence to his factual recitation.[101]  Although

this analysis is brief, it shows that Weiser intends to intertwine his factual narrative

with his opinion testimony – which he must do to justify his description of

---

[99]    *See* Def. Weiser Mem. at 10-12.

[100]    *Id.* at 13-14.

[101]    *See* Weiser Rebuttal Report at 36-38.

-31-

Plaintiffs' conduct.[102]

### b.    State of Mind

The Citco Defendants request the exclusion of portions of Weiser's testimony on the ground that he improperly opines on Plaintiffs' state of mind.[103] Plaintiffs do not dispute that Weiser may not opine on Plaintiffs' state of mind, but instead argue that Weiser only intends to opine "on what would have been customary for the plaintiffs to expect or assume, not what they actually did expect or assume."[104] Although some of Weiser's deposition testimony walks a fine line between opining on what investors would customarily assume and what Plaintiffs actually did assume,[105] so long as Weiser refrains from opining on the actual state

---

[102]    As an additional note, although I am permitting expert witnesses for both parties to recite some relevant factual details, both parties are warned that expert testimony should focus on the expert's opinions and factual analysis rather than on a recitation of facts. I will not permit any of the expert witnesses to spend an inordinate amount of time detailing the facts of the case.

[103]    *See* Def. Weiser Mem. at 14-15. *See also In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d. at 547 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").

[104]    Plaintiffs' Memorandum of Law in Opposition to the Citco Defendants' *Daubert* Motion to Exclude Testimony of Samuel Weiser ("Pl. Weiser Mem.") at 16.

[105]    *See* Weiser Dep. at 227:18-228:9 ("Q. On the next page, on page 17 of your report, at the bottom of the first full paragraph you say, the 20 plaintiffs understood that CFS (Curacao) would be providing them with monthly NAV statements which they *reasonably expected* would be independent and accurate. . . .

of mind of the Plaintiffs, his opinions on these matters are admissible.

### 3. Testimony About Hedge Fund Administrators and Directors

The Citco Defendants argue that Weiser should be precluded from testifying about the duties of hedge fund administrators and directors because he is not qualified to testify about these matters, his opinions are speculative, and they do not rebut any of the opinions set forth in Beloreshki's expert report.[106] Plaintiffs respond that Weiser does not intend to opine on the actual duties and responsibilities of administrators and hedge fund directors, but only "on how investors typically viewed third party administrators and hedge fund directors during the relevant time."[107]

As discussed earlier, Beloreshki is permitted to testify as to what the Lancer Funds' documents disclosed about CFS-Curacao's role to the extent this

---

What's your basis for saying that they *reasonably expected* that? . . . A. That was based upon – I think I've already stated that they had a basis for reliance and *an understanding that there would be an independent valuation being performed by the administrator*, in this particular case, Citco, in that they had a reason to believe that the NAV statements that they were receiving would be independent and accurate." (emphasis added) (quotation marks omitted)).

[106]    *See* Def. Weiser Mem. at 15-19.

[107]    Pl. Weiser Mem. at 17.

-33-

should have affected Plaintiffs' due diligence efforts.[108]  Similarly, Weiser is

permitted to rebut Beloreshki's opinions regarding the disclosure of CFS-

Curacao's role and how this information should have affected their due

diligence.[109]  However, there are other portions of Weiser's expert report where he

goes beyond rebutting Beloreshki's testimony and opines both on the duties of

hedge fund administrators and on whether CFS-Curacao properly fulfilled those

duties.[110]  Because this proposed testimony is outside Weiser's established

---

[108]    *See supra* Part IV.A.2.

[109]    *See* Weiser Rebuttal Report at 7 ("With respect to offshore hedge
funds, the role of the administrator was especially important to investors as the
administrator was perceived to be an independent check on the investment
manager and a valuable counterweight to a lack of transparency.  In addition, by
accepting and retaining hedge fund clients, service providers gave investors
comfort that the manager was in compliance with the terms of the relevant
agreements and offering documents.").

[110]    *See, e.g., id.* at 5 ("In my opinion, it was industry standard for third-
party administrators like CFS-Curacao to understand the reliance that investors
placed on their presence as a service provider when investors evaluated whether to
invest in a hedge fund."); *id.* at 45 ("CFS-Curacao . . . did not prepare the Lancer
Funds' NAV in compliance with the Lancer Funds' PPM, memoranda and articles
of association, Administrative Services Agreements with CFS-Curacao, CFS-
Curacao's own manuals and marketing materials, or industry custom and practice .
. . . As a result of these failures, the Lancer Funds' NAVs were materially inflated
and misled investors on a monthly basis as to the value of the Lancer Funds'
holdings and the value of each of the Twenty Plaintiffs' investment.").

expertise[111] and beyond the proper scope of Weiser's testimony as a rebuttal

witness,[112] Weiser is precluded from opining on these matters.[113]

---

[111]    Although Weiser claims that he has sufficient expertise to testify about the duties of hedge fund administrators, *see* Weiser Dep. at 212:10-15, both he and Plaintiffs agree that he has not been retained to opine on these duties, *see* Weiser Dep. at 210:20-25, Plaintiffs Weiser Mem. at 17, and Plaintiffs have not attempted to establish his expertise in hedge fund administration. Accordingly, because Plaintiffs have the burden of establishing the expertise of their witnesses, I assume that Weiser's sole area of expertise is investor due diligence. *See United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) (stating that the "proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied" (citation omitted)).

[112]    *See* Weiser Rebuttal Report at 1 ("I have been asked . . . to respond to the Expert report of Tsvetan Beloreshki[.]").

[113]    The Citco Defendants also request the exclusion of two related portions of Weiser's proposed testimony. *First*, they argue that Weiser should not be permitted to testify about "CFS-Curacao's alleged actions in this matter, where such testimony also constitutes an improper narrative[.]" Def. Weiser Mem. at 19 n.9. To the extent that Weiser's testimony is intertwined with his opinions about the adequacy of Plaintiffs' due diligence, such testimony will not constitute impermissible factual narrative. To the extent it is outside of this scope, I have already excluded such testimony as beyond Weiser's expertise and the scope of his testimony as a rebuttal witness. *Second*, the Citco Defendants argue that "Weiser's opinions regarding hedge fund characteristics are improper narrative and should be excluded." Def. Weiser Reply at 8 n.8. However, this two page section of Weiser's expert report – which describes relevant characteristics of hedge funds, such as their degree of transparency, during the relevant time period – is clearly relevant to Weiser's opinion testimony on investor due diligence and will provide the jury with important background information. *See* Fed. R. Evid. 702 Advisory Committee Note ("[I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. . . . The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles.").

-35-

## 4. Testimony About Alleged Fraud

Weiser spends several pages of his expert report describing the nature of the alleged fraud at issue in this case and opining on whether investors in the Lancer Funds should have discovered it.[114] The Citco Defendants request the exclusion of both aspects of this proposed testimony.

*First*, the Citco Defendants argue that Weiser's testimony about the nature of the alleged fraud should be excluded on the ground that it "constitute[s] nothing more than an impermissible factual narrative."[115] The Plaintiffs' fact witnesses and counsel will undoubtedly describe the alleged fraud at trial, and allowing Weiser to testify as an expert on that subject is likely to improperly bolster those descriptions.[116] Accordingly, because it would be unduly prejudicial to allow Weiser to testify about the nature of that fraud, he is precluded from doing so.[117]

---

[114]    *See* Weiser Rebuttal Report at 43-45.

[115]    Def. Weiser Reply at 9.

[116]    *See United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester County*, No. 06 Civ. 2860, 2009 WL 1110577, at *2 (S.D.N.Y. Apr. 22, 2009) ("It is appropriate, therefore, to exclude expert testimony offered to bolster the credibility of fact witnesses." (citing *United States v. Lombardozzi*, 491 F.3d 61, 77-78 (2d Cir. 2007) (citations omitted))).

[117]    *See* Fed. R. Civ. P. 403.

-36-

*Second*, the Citco Defendants argue that Weiser should also be prohibited from opining on whether Plaintiffs should have uncovered the alleged fraud on the ground that Beloreshki does not intend to opine on this issue and thus it would not be within the proper scope of Weiser's testimony as a rebuttal witness.[118]  Plaintiffs respond that Beloreshki does intend to opine that a reasonable, sophisticated investor would have uncovered significant problems and that this opinion implies that Plaintiffs should have "uncovered various red flags that supposedly should have alerted investors to misconduct."[119]  If Beloreshki does provide such testimony at trial, Weiser will be entitled to rebut it.  However, in his expert report, Beloreshki only opines on whether investors should have "uncovered problems" with the Lancer Funds.[120]  Accordingly, on the basis of the expert reports, Weiser may only discuss whether a reasonable, sophisticated investor would have uncovered problems with the Lancer Funds; he is not entitled

---

[118]    *See* Def. Weiser Mem. at 20-21.

[119]    Pl. Weiser Mem. at 19.

[120]    S*ee* Beloreshki Report ¶¶ 52-75 (opining that investors should have uncovered: discrepancies related to Lauer's educational background; that the Lancer Funds invested in companies potentially associated with individuals and entities accused of fraudulent or criminal activity; discrepancies between the performance of Lancer Funds' investments and the performance of the Lancer Funds; and inconsistencies between the Lancer Funds' reported performance and stated investment objectives).

to discuss whether the investors should have uncovered the alleged fraud.

## V.    HEDGE FUND ADMINISTRATION EXPERTS

### A.    O'Neill

Plaintiffs do not seek the exclusion of O'Neill's testimony in its entirety. Instead, they request that O'Neill's testimony be limited in several respects for reasons discussed below.

### 1.    Testimony on Standards of Investor Due Diligence and Auditing

Plaintiffs argue the O'Neill's "sole area of expertise" is the standard of care applicable to third party administrators of hedge funds and that O'Neill should therefore be precluded from testifying "about the standards applicable to *investor* due diligence and auditing."[121] While the Citco Defendants object to this characterization of O'Neill's expertise,[122] they do not attempt to establish O'Neill's expertise in these areas. Accordingly, I am assuming that O'Neill's expertise is limited to the *administration* of hedge funds.[123]

Plaintiffs request the exclusion of material in three paragraphs of

---

[121]    Pl. Mem. at 18 (emphasis added).

[122]    *See* Def. Mem. at 21 n.15.

[123]    *See Williams*, 506 F.3d at 161 (stating that the "proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied" (citation omitted)).

O'Neill's report. *First*, paragraph 4.5 states that "[t]he NAV was not ordinarily

sent to prospective investors, and would only be sent on the instruction of the

Investment Manager[.]" While Plaintiffs attempt to characterize this as an opinion

about investor due diligence, according to the Citco Defendants, the proposed

testimony is actually aimed at rebutting Collins's proposed opinion that CFS-

Curacao regularly distributed the NAV to investors.[124]   Accordingly, to the extent

that O'Neill intends to testify about CFS-Curacao's role, as administrator of the

Lancer Funds, in distributing the NAV to investors, this testimony is within his

area of expertise and does not warrant exclusion.[125]

     *Second*, in paragraphs 4.74[126] and 4.87,[127] O'Neill opines that

---

[124]    Def. Mem. at 21.

[125]    O'Neill also states in paragraph 4.5 that "according to the Beloreshki Report, it would appear that investors did not undertake adequate due diligence, review or rely upon this or any other detailed document pertaining to the Lancer Funds in detail." Because this statement is irrelevant to whether it is standard practice for administrators to distribute NAV statements to prospective investors, O'Neill may not testify as to this Beloreshki report conclusion.

[126]    "The Collins Report, in its description of what it considers CFS-Curacao should have done, applies a standard higher than that of an auditor. This is not a reasonable assumption. In practice, an auditor has defined standards (International Auditing Standards) as well as the contractual agreement (engagement letter) whereas an administrator, at this time, only had the contractual obligation and industry practice, not defined standards." (citation omitted).

[127]    "The Collins Report, in its analysis, suggests that CFS-Curacao was responsible for pricing the warrants. In doing so, he incorrectly applies a standard

-39-

Collins[128] applied a standard of care to CFS-Curacao that would more appropriately

be used to analyze an auditor's conduct. As stated, auditing standards are beyond

O'Neill's expertise. Accordingly, while O'Neill is entitled to opine that Collins

applied too high a standard of care to the actions of fund administrators, he may

not opine that these standards of care are more appropriately applied to auditors.[129]

## 2.    Legal Conclusions

Plaintiffs argue that O'Neill impermissibly offers legal conclusions by

providing "his own interpretation of the phrase 'computing the monthly Net Asset

Value,' which appears both in the ASAs between CFS-Curacao and Lancer

Management, and in the PPMs that investors received before investing in the

---

more applicable to auditors." (citation omitted).

[128]    O'Neill has been retained by the Citco Defendants, in part, to rebut
Collins's testimony. *See supra* Part II.B.1.a.

[129]    *United States v. Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir. 1990) ("A
witness may be qualified as an expert on certain matters and not on others."). The
Citco Defendants argue that "O'Neill does not opine on audit standards but rather
simply refers to the widely known *role* of an auditor to test for material
misstatements," Def. Mem. at 22 (emphasis in original), and that "[a]dministrators
regularly interact with a fund's auditors, and thus an experienced administrator
would necessarily have an understanding of the general role of the auditor," *id.* at
22 n.17. However, O'Neill clearly goes beyond discussing the general role of the
auditor – opining that particular standards apply to auditors and that these
standards are higher than those that apply to administrators. *See* O'Neill Report ¶
4.74. Moreover, regularly interacting with an auditor alone does not qualify
someone as an auditing expert.

-40-

Lancer Funds."[130]  The Citco Defendants respond that O'Neill does not offer a

legal interpretation of that term, but instead "identifies the provision in the ASAs

calling for 'computing the NAV' as typical in the industry, and then opines on the

standard practices employed by industry participants to carry out this function."[131]

Because it is not clear from the expert report whether Plaintiffs or the Citco

Defendants have more accurately characterized O'Neill's proposed testimony, I

simply instruct the Citco Defendants that O'Neill may testify about the standard

practices employed by industry participants in calculating the NAV, but he may

not provide a legal interpretation of the term as found in the Lancer Funds

documents.[132]  In addition, Plaintiffs are entitled to a limiting instruction to this

effect.[133]

### 3.    Opinion on Credibility of Witness Testimony

In his expert report, O'Neill states that another witness, Gerhan

---

[130]    Pl. Mem. at 19 (citing O'Neill Report ¶¶ 3.20-3.21).

[131]    Def. Mem. at 22.

[132]    *See Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir.
1977) (holding that while an expert was permitted to give his opinion about the
"ordinary practices of those engaged in the securities business," he was not
permitted to give "his opinion as to the legal standards" created by a relevant
contract (citations omitted)).

[133]    *See* Fed. R. Evid. 105.

Meijer, admitted "in his deposition that he made a typographical error" and opines that "[t]here is nothing to suggest that [Meijer's] explanation should not be accepted[.]"[134] Plaintiffs request O'Neill be "barred from testifying at trial about whether he believes Mr. Meijer's testimony."[135] Because it is improper for O'Neill to opine on the credibility of another witness, O'Neill may not testify about whether Meijer's explanation should be accepted.[136]

Defendants object to this ruling on the ground that "O'Neill does not make a credibility assessment, but rather sets forth one of many legitimate rebuttal points in response to Collins's opinion that CFS-Curacao was responsible for valuing restricted shares."[137] However, the fact that O'Neill's credibility assessment came in the course of rebutting another expert's report does not make it permissible. O'Neill is entitled to rebut Collins's opinion that CFS-Curacao was responsible for valuing restricted shares, and he may base that opinion on Meijer's deposition testimony. What he is not entitled to do is assess whether that

---

[134]    O'Neill Report ¶ 4.28(i) n.76.

[135]    Pl. Mem. at 20.

[136]    *See United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("The credibility of witnesses is exclusively for the determination of the jury[.]" (citation omitted)).

[137]    Def. Mem. at 23.

testimony is credible.

### 4. Speculative Testimony

Plaintiffs also request the exclusion of certain portions of O'Neill's proposed testimony on the ground that such testimony would be speculative.[138] *First*, Plaintiffs argue that O'Neill's statement that "[t]he Client Position Summary Report . . . *appears* to have been used to reconcile the portfolio to CFS-Curacao's records" is speculative because O'Neill states that "[i]t has not been possible to access the www.primebroker.com website for the Lancer Funds and thus to determine the entirety of the reports or functionality that would have been available to CFS-Curacao between 1995 and 2002."[139] However, while O'Neill was unable to determine the entirety of the reports available to CFS-Curacao, he was in possession of the summary report and has cited that report in support of his conclusion.[140] O'Neill's statement, therefore, has sufficient grounding to avoid exclusion as a speculative opinion. To the extent Plaintiffs believe this opinion

---

[138]    *See Major League Baseball Props.*, 542 F.3d at 311.

[139]    O'Neill Report ¶ 4.48 (emphasis added).

[140]    In addition, O'Neill's opinion is corroborated by the deposition testimony of one of Plaintiffs' own expert witnesses. *See* Collins Dep. at 270 ("Q. And during the NAV preparation process . . . is it your understanding that the CFS-Curacao personnel reconciled the data that was in their system to another report from the prime broker website? . . . A. That's correct.").

should not be given significant weight by the jury, they are of course entitled to cross-examine O'Neill as to the basis of his opinion.

     *Second*, Plaintiffs request the exclusion of O'Neill's statement that "[f]rom a review of the Bloomberg price reports *it would be highly unlikely* that CFS-Curacao staff would determine that transactions shown thereon had been carried out for, or on behalf of, the Lancer Funds or any other client."[141] As with the previous statement, O'Neill's proposed testimony is not unsupported, but rather, is based upon his review of the Bloomberg price reports and his understanding, as an expert in the field, of what information an administrator would likely obtain from reviewing them. The fact that an expert witness speaks in probabilities (*e.g.*, it would be unlikely), rather than certainties, does not by itself make his testimony unreliable.

     *Third*, Plaintiffs request the exclusion of O'Neill's statement that "*it was possible* the new directors had been provided with additional documentation and analysis from the [investment manager] not yet supplied to CFS-Curacao or PwC."[142] The Citco Defendants respond that this statement is taken out of context, and that O'Neill, in his expert report, "merely observes that CFS-Curacao staff had

---

[141]    O'Neill Report ¶ 4.115 (emphasis added).

[142]    *Id.* ¶ 5.6 (emphasis added).

[come to this conclusion]."[143]  While the Citco Defendants are apparently correct

that O'Neill intends to testify that this was CFS-Curacao's conclusion,[144] there is

little reason that an expert witness – as opposed to a lay witness with first-hand

knowledge – should be used to support this assertion.[145]  Accordingly, because

expert testimony might unnecessarily bolster the validity of CFS-Curacao's

opinion,[146] O'Neill is precluded from testifying that CFS-Curacao staff concluded

that "it was possible the new directors had been provided with additional

documentation and analysis from the [investment manager] not yet supplied to

CFS-Curacao or PwC."[147]

**B.    Collins**

The Citco Defendants divide Collins's expert report into two

categories: his opinions regarding the accepted industry standards applicable to

---

[143]    Def. Mem. at 25.

[144]    *See* O'Neill Report ¶ 5.6 ("Contrary to Mr. Collins' assertion, CFS-Curacao had no basis for meaningfully questioning the Directors' sign-offs. Whilst Mr. Collins summarises correspondence regarding the sign off, he has omitted the conclusion that CFS-Curacao reached: that it was possible the new directors had been provided with additional documentation and analysis from the IM not yet supplied to CFS-Curacao or PwC.").

[145]    *See* Fed. R. Evid. 703.

[146]    *See Lombardozzi*, 491 F.3d at 77 ("Expert testimony may not be used to bolster the credibility of fact witnesses.").

[147]    O'Neill Report ¶ 5.6.

-45-

hedge fund administrators and his opinions based on his revaluation of the Lancer

Funds' monthly NAVs. They request the exclusion of the first category of

testimony in its entirety on the ground that Collins's experience does not provide a

reliable basis for his opinions, or, in the alternative, the exclusion of portions of

that testimony on narrower grounds discussed below. They request the exclusion

of the second category of testimony on the grounds that it is unreliable and beyond

the scope of Collins's proffered expertise.

## 1.    Industry Standards of Hedge Fund Administrators

### a.    Collins's Testimony Is Reliable

Collins's testimony is primarily based on his experience as a hedge

fund administrator. As discussed earlier, while Rule 702 specifically contemplates

that expert testimony may be based upon experience, the witness must show why

that experience provides a reliable foundation for his or her testimony.[148] The

Citco Defendants claim that Collins has failed to demonstrate this reliability

because he has not explained "why the procedures followed by RK during the

relevant time period (1995 to 2002) were reflective of the standard practices of

---

[148]    *See* Fed. R. Evid. 702 Advisory Committee Note ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."). *Accord LinkCo*, 2002 WL 1585551, at *4 ("A court cannot permit experts to 'offer credentials rather than analysis.'" (*quoting Askin*, 130 F. Supp. 2d at 529)).

other industry participants in the hedge fund administration industry at the time."[149]

Although an expert will generally have more in-depth knowledge of industry standards if he or she has worked at more than one firm, Collins's years of experience at RK and RK-Consulting provide a reliable basis for Collins to aid the jury in determining whether CFS-Curacao acted in accordance with industry practice. Collins's experience with hedge fund administration was neither tangential nor short-lived. To the contrary, for a substantial portion of his career, he played a primary role in forming, developing and running RK and RK-Consulting's administration business.[150]

In addition, Collins's experience is not as insular as the Citco Defendants suggest. *First*, Collins worked for several accounting firms before joining RK. Although these firms primarily provided auditing services, Collins did

---

[149]    Reply Memorandum of Law of the Citco Defendants in Support of Their *Daubert* Motion to Exclude Testimony of James C. Collins ("Def. Collins Reply") at 3.

[150]    *See* Collins Expert Report at 3 ("In 1993, I was responsible for RK being retained by a group of hedge funds that used RK for recordkeeping, tax return preparation, and preparing financial statements, with another firm performing the audit. This marked RK's entry into the pure administration business."); Collins Dep. at 70:6-73:25 (describing the formation of RK-Consulting and its role in providing administrative services for clients); *id.* at 85:18-86:18 (estimating that between 2003 and 2004 he provided administrative services for thirty to forty hedge funds and that between a third and a half of them were offshore funds).

-47-

provide administrative services for one hedge fund during this period.[151]

Moreover, Collins gained general experience in the hedge fund industry working at

these firms.[152] *Second*, Collins has testified that while he was partner at RK and

RK-Consulting he became familiar with the practices of other administration firms

through personal relationships and industry conferences.[153]  The Citco Defendants

object that this source of experience cannot provide a reliable basis for his

testimony because "Collins was unable to provide any details regarding . . .

purported conversations [with other people in the industry], including who he

supposedly spoke with or what was allegedly discussed."[154]  However, these sorts

of memory gaps are more appropriately addressed through cross-examination and

do not warrant the exclusion of Collins's proposed testimony.[155]

Accordingly, Collins's experience as a hedge fund administrator

---

[151]    *See* Collins Dep. at 39:21-40:20.

[152]    *See* Collins Report at 2.

[153]    *See* Collins Dep. at 90:17-23 ("Q.  Are you aware whether or not the program that was prepared, the proprietary program used by RK, was that a standard in the industry? . . .  A. We had conversations with other people in the industry to know that we were doing exactly the same things they were.").

[154]    Memorandum of Law of the Citco Defendants in Support of Their *Daubert* Motion to Exclude Testimony of James C. Collins ("Def. Collins Mem.") at 6.

[155]    *See Amorgianos*, 303 F.3d at 267.

-48-

provides a sufficient basis for him to testify about the customs and practices of

hedge fund administrators.

### b.    Speculative Opinions

The Citco Defendants argue that some of Collins's proposed opinions

should be excluded as speculative because he has admitted that he is unsure of

whether they are reflective of industry standards.[156]  While Plaintiffs agree that the

reliability of Collins's testimony depends on his articulating "the custom and

practice that [he] observed through [his] experience in the industry,"[157] they argue

---

[156]    *See* Def. Collins Mem. at 9; Def. Collins Reply at 5 ("Collins's
opinions regarding alleged practices for questioning valuations provided by an
investment manager are not based on his knowledge of industry standards but on
his subjective feelings."); *id.* (arguing that Collins did not rely on industry practice
"with respect to his opinion that CFS-Curacao should have disclosed to investors
when an NAV was based in part on investment manager valuations"); *id.* at 6
("Collins opined that an NAV should be restated if there was a material error, but
he admitted that there was no 'industry standard' that he could point to as to what
would be deemed material." (citing Collins Dep. at 338:17-343:22)); *id.* at 7
("Collins opined that, after concerns arose regarding valuation issued in September
2001, CFS-Curacao should have stopped issuing the monthly NAVs, should have
resigned earlier, and should have made certain disclosures prior to resigning.
When cross-examined concerning these opinions, however, Collins repeatedly
admitted that he could not state that his views reflected any particular industry-
wide standards." (citing Collins Dep. at 407:22-412:18) (citations omitted)).

[157]    Plaintiffs' Memorandum of Law in Opposition to the Citco
Defendants' *Daubert* Motion to Exclude Testimony of James C. Collins ("Pl.
Collins Mem.") at 11.

that the Citco Defendants have "mischaracterize[d] Collins's testimony."[158]

Plaintiffs are correct that the Citco Defendants have, in some instances, overstated Collins's admissions. For example, the Citco Defendants claim that Collins admitted that his "opinions regarding alleged practices for questioning valuations provided by an investment manager are not based on his knowledge of industry standards[.]"[159] However, after examining the deposition testimony, I am doubtful that Collins was referring to his general opinion that CFS-Curacao should have questioned the investment manager's valuations when he stated that there was no relevant industry standard. More likely, Collins was referring only to his assertion that under the circumstances he would have had "a conversation with the investment manager."[160] Similarly, while the Citco Defendants argue that Collins admitted that his opinion regarding whether an administrator should restate a previously issued NAV when it finds a material mistake is not based on industry standards,[161] in fact, Collins stated only that there

---

[158]    *Id.* at 14.

[159]    Def. Collins Reply at 5.

[160]    Collins Dep. at 378:9-11.

[161]    *See* Def. Collins Mem. at 10 ("Regarding Collins's opinion as to the purported requirements to restate an NAV: '*I can't point to anything that would say it was an industry standard.* But typically it would be based on what the administrator would feel comfortable with.'" (citations omitted) (emphasis in

-50-

were no industry standards defining what amounted to a material mistake.[162]  It is

neither inconsistent nor unhelpful to opine that industry standards require that X be

done when a material mistake occurs, but that the industry has not settled on what

constitutes such a material mistake.  Indeed, standards of materiality are not

normally susceptible to bright line rules, and it is no surprise that different

participants in an industry would have different views on when a mistake is

material.  Accordingly, while these sorts of admissions may be used for

impeachment at trial, they do no warrant the exclusion of Collins's proposed

opinion testimony on these issues.

         In contrast, some of Collins's other admissions – specifically those

relating to CFS-Curacao's resignation as administrator of Lancer Offshore – are

sufficient to warrant the exclusion of portions of his proposed testimony.  *First*,

Collins opines in his expert report that CFS-Curacao should have resigned as

administrator earlier than it did.[163]  However, during his deposition, Collins

admitted that there was no industry standard requiring CFS-Curacao to resign and

original)).

[162]     *See* Collins Dep. at 338:17-342:14.  The Citco Defendants abandon
this assertion in their Reply Memorandum and agree that Collins was referring to
whether there was an industry standard for determining materiality but nonetheless
request the exclusion of Collins's opinion. *See* Def. Collins Reply at 6.

[163]     *See* Collins Expert Report at 57-58.

-51-

that the decision would be "up to each administrator[.]"[164]  *Second*, Collins opines

that CFS-Curacao should have disclosed the reasons for its resignation to

investors.[165]  During his deposition, however, Collins testified that he did not

believe there were "industry standards on this" and that he "was asked to give [his]

opinion based on [his] experience in this field."[166]  *Third*, Collins opines in his

expert report that CFS-Curacao should also have resigned as administrator of

OmniFund.[167]  However, Collins again testified that there were no industry

standards supporting this opinion and that he "has always been one that tries to do

the right thing."[168]  Plaintiffs agree that the reliability of Collins's opinions is based

on their grounding in his knowledge of the custom and practice of the industry.[169]

Without that grounding, Collins's general references to his experience, or

---

[164]    Collins Dep. at 407:22-408:3 ("Was CFS-Curacao required, under industry standards, to resign earlier than they did? . . . A. That's up to each administrator and if they were going to be put in that position. I can't really answer any other way.").

[165]    *See* Collins Expert Report at 58.

[166]    Collins Dep. at 411:12-15.

[167]    *See* Collins Expert Report at 58.

[168]    Collins Dep. at 412:13-18 ("Q. Is there any industry standard that supports your statement here? . . . A. I cannot reference to any kind of standard. I've always been one that tries to do the right thing.").

[169]    *See* Pl. Collins Mem. at 11.

-52-

alternatively, to his belief about the "right thing" to do, do not provide a reliable basis for his proposed testimony. Accordingly, Collins may not testify as to these opinions about CFS-Curacao's resignation.[170]

### c.    Legal Conclusions

The Citco Defendants request the exclusion of portions of Collins's proposed testimony relating to various Lancer Funds documents on the ground that Collins is seeking to provide legal interpretations of CFS-Curacao's contractual obligations.[171] While Plaintiffs assert that Collins will not opine on these obligations,[172] several portions of Collins's expert report do in fact suggest that he

---

[170]    While I have not specifically addressed the other portions of Collins's proposed testimony that the Citco Defendants assert contain speculative opinions, I have considered those arguments and find that Collins should only be precluded from testifying as to his opinions about CFS-Curacao's resignation. Collins's other admissions, while a basis for cross-examination, are not sufficient to warrant exclusion.

[171]    *See* Def. Collins Mem. at 11-13. The Citco Defendants have similarly requested the exclusion of Collins's references to CFS-Curacao's internal manuals. Because the Citco Defendants have also filed a motion *in limine* relating to the general admissibility of these manuals, and that admissibility may affect whether Collins is entitled to refer to the documents, I defer judgment on this issue until that motion *in limine* is decided.

[172]    *See* Pl. Collins Mem. at 16 ("Collins does not purport to interpret these documents as contracts, but rather opines that in order to understand the duties of a hedge fund administrator, one must look at a number of documents – administrative services agreements, PPMs, procedure manuals – through the prism of industry custom and practice. Collins may properly discuss the content of these documents and how they relate to industry custom and practice." (citing Collins

intends to opine on CFS-Curacao's contractual duties.[173] As stated earlier, this

type of expert opinion is inadmissible because it improperly usurps the role of the

trial judge in instructing the jury as to the applicable law and the role of the jury in

applying the law to the facts before it.[174] Accordingly, while Collins is permitted

to the use the Lancer Funds documents for some purposes,[175] he may not opine on

the legal obligations created by those documents to the extent that such legal

questions are to be submitted to the jury. In addition, if Collins's testimony is

confusing in this respect, the Citco Defendants will be entitled to a limiting

instruction.[176]

### 2.    NAV Calculations

---

Report at 9-17)).

[173]    *See* Collins Report at 13 (opining that certain provisions in Lancer
Funds documents "do not, of course, *alter* CFS-Curacao's *obligation* to do its work
carefully and properly and to obtain proper supporting documentation for the
existence, custody and valuation of each of the Lancer Funds' positions. Nor do
they *allow* the Funds' directors to blindly accept unsupportable or bad-faith
valuations from the investment manager or prime broker." (emphasis added)); *id.*
at 24 ("In the ASAs, CFS-Curacao *obligated* itself to 'independently' price the
Lancer Funds' portfolio[.]" (emphasis added)).

[174]    *See In re Rezulin*, 309 F. Supp. 2d at 541.

[175]    For example, Collins may opine that, according to industry practice, a
hedge fund administrator's duties are dependent on the content of agreements
between the administrator and the hedge fund's managers.

[176]    *See* Fed. R. Evid. 105.

-54-

Collins's expert report includes a month-by-month recalculation of the values of restricted securities and warrants in the Lancer Funds' portfolios.[177] According to Collins, "[t]hese positions were overvalued because they were valued using the price for free-trading shares. They should have been valued using at least a 20% discount, or preferably, at the lower of cost or market."[178] His report includes tables quantifying the overvaluation of the funds portfolios that resulted from these purported errors in the valuation process.[179] The Citco Defendants request the exclusion of Collins's proposed "opinions regarding the 'quantification' of the overstatements in the monthly NAVs"[180] on the grounds that "the methodology employed in revaluing each individual security is unreliable, in that it is arbitrary, subjective, and unsupported by any generally accepted peer-reviewed methodology for valuing the various securities at issue."[181]

---

[177]   *See* Month-by-Month Analysis and Quantification of Errors in CFS-Curacao's Monthly NAV Determinations, Ex. 3 to Collins Report, Ex. 6 to Mullen Decl., at 168-71.

[178]   *Id.* at 168.

[179]   *See id.* at 168-71.

[180]   Def. Collins Mem. at 19.

[181]   *Id.* at 16. The Citco Defendants also assert that Collins's testimony should be excluded because Collins "admitted that the valuation of a particular security is not the job of an administrator." *Id.* However, even if this is outside the expertise of a hedge fund administrator, Collins also has significant experience as an auditor, and has established this expertise in his reports. *See* Collins Rebuttal

As with other portions of Collins's proposed testimony, Plaintiffs do

not argue that his testimony is corroborated by external sources, but instead, that its

reliability is grounded in the fact that it reflects the custom and practice of the

industry.[182] The Citco Defendants suggest that Collins's admission during

deposition that he could not "say for certain" whether his use of the twenty percent

discount rate reflected "overall industry practice" makes his use of that discount

rate unreliable.[183] However, other portions of Collins's deposition show that RK

used this same methodology and that Collins is confident that RK was not alone in

---

Report at 1 (citing Collins Report at 1-4). Although the Citco Defendants argue
that determining NAVs is the responsibility of the investment manager, portfolio
valuation also clearly falls within the scope of an auditor's expertise. Accordingly,
I am satisfied that Collins – through either his experience as a hedge fund
administrator or as a hedge fund auditor – is qualified to calculate the NAVs.

[182]     *See* Pl. Collins Mem. at 18 ("Collins's calculation of the inflation of
the Lancer Funds' NAV are simply the results of applying his opinions on industry
custom and practice to the facts of the case and as such are well-grounded, well-
reasoned and not speculative."); *id.* at 19 ("[A]n expert in industry custom and
practice can testify reliably based on knowledge acquired in the course of her or his
professional experience without corroboration from external sources." (citation
omitted)).

[183]     Collins Dep. at 380:22-5 ("Q. And – and you're not saying that what
you would have done is necessarily industry practice? . . . A. I can't say for
certain what the overall industry practice is. It's what I feel like that in doing a
proper job as an administrator, that's what should be done.").

doing so.[184] Moreover, according to Collins, CFS-Curcao's own procedural manuals confirm that using a twenty percent discount is appropriate.[185] While I have reserved judgment on whether Collins may refer to these manuals when he testifies,[186] their usefulness in corroborating the reliability of Collins's approach does not depend on their admissibility.[187]

In light of this evidence, Collins's uncertainty as to whether the twenty percent discount was "overall industry practice," does not render his methodology unreliable. Industry standards do not have to be uniform for them to be helpful in educating the jury. Accordingly, Collins is entitled to testify as to his

---

[184]    *See id.* at 357:13-358:8 ("Q. . . . Where do you come up with the 20 percent, at least 20 percent discount approach? . . . A. My experience, what has been used in the past with other entities that I've seen commonly used. . . . Q. Other than your experience at RK, anything else as one of the basis of that 20 percent discount formula? . . . A. When we adopted some of these methodologies at Rothstein Kass, it was based on the experience that we had, that we had seen with a number of funds. It was through our own technical advisors that we had within the firm. We had all had conversations with other people about the – about what we felt like was appropriate. So we felt very comfortable with these methodologies, and we felt like it was proper under the circumstances.").

[185]    *See id.* at 358:13-19.

[186]    *See supra* note 171.

[187]    *See* Fed. R. Evid. 104 ("Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). *In making its determination it is not bound by the rules of evidence except those with respect to privileges.*" (emphasis added)).

-57-

recalculation of the monthly NAVs.[188]

## VI.    HEDGE FUND AUDITING EXPERTS

### A.    Regan

Plaintiffs request the exclusion of Regan's testimony in its entirety on the ground that he is unqualified to testify as an expert about PwC NA's audits of the Lancer Funds. Alternatively, they request the exclusion of portions of his proposed testimony on grounds discussed below.

### 1.    Regan Is Qualified to Testify

---

[188]    The Citco Defendants also argue that Collins's opinion is unreliable because he opined in his expert report that a fund's track record should be taken into consideration when valuing restricted securities, but at deposition he conceded that he did not factor the Lancer Funds' track record into his calculations. *See* Def. Collins Mem. at 18. However, Collins's expert report is not rendered unreliable by his deposition testimony. In his expert report, Collins stated that the use of a discount rate, rather than cost, "to price restricted shares is only appropriate where a hedge fund has a proven track record of both getting restricted securities registered (so they are no longer restricted) and then actually selling them at the full market price. When there is no such track record, it is my opinion that it is appropriate to price restricted shares at cost[.]" Collins Report at 31. Collins has provided two calculations in Exhibit Three – one that reflects the lower of cost and market value of the securities and one that reflects a discount rate of twenty percent. Thus, even if Collins had found a proven track record of registering and selling securities at full market price, the use of the discount rate would still be consistent with the methodology he asserted in his expert report. To the extent that the jury should rely on the discount rate calculation, rather than the cost calculation, or that this discount rate should have been different, the Citco Defendants should make this argument to the jury. Collins's expert report and deposition testimony are not so inconsistent that he should be precluded from testifying on this issue at trial.

Plaintiffs argue that "Regan should be precluded from testifying about PwC NA's audit of the Lancer Funds because he lacks sufficient experience with hedge funds to be able to offer a helpful or reliable opinion on how they should be audited."[189] However, the lack of *specific* experience with hedge fund audits is not necessarily determinative. To exclude Regan's testimony, I must find that Regan's *general* auditing expertise is insufficient to qualify him to testify about auditing standards as they apply to hedge funds.[190]

Regan has been a certified public accountant since 1970[191] and has performed approximately a hundred audits during his forty year career[192] –

---

[189]    Pl. Mem. at 12.

[190]    *See Santoro v. Donnelly*, 340 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) (Scheindlin, J.) ("The question is not whether the engineer is an expert on the exact issues presented in the case, but rather, whether his general engineering experience qualifies him to testify in an area in which he does not have extensive experience." (citations omitted)); *Valentin*, 1997 WL 33323099, at *25 ("The fact that a proposed expert may not have the exact qualifications to fit the case does not mean the expert's testimony is automatically inadmissible. If the court finds that the witness's qualifications are sufficiently similar to the issues in the case, the expert is qualified and opposing counsel can use cross-examination to attack any deficiencies in the expert's background." (citing *United States v. Ruffin*, 575 F.2d 346, 357 (2d Cir. 1978) and *Knight v. Otis Elevator Co.*, 596 F.2d 84, 88 (3d Cir. 1979))).

[191]    *See* Regan CV.

[192]    *See* Regan Dep. at 16:18-22.

-59-

including more than twenty audits under ISA.[193]  Given this substantial auditing

experience, the fact that Regan has performed only one audit of a hedge fund[194]

does not render him unqualified to testify as to the adequacy of PwC NA's audits

of the Lancer Funds.  Regan's report primarily discusses whether PwC NA met

ISA requirements, and there is no indication that these requirements substantially

differ when the audited entity is a hedge fund.[195]

      In addition, Plaintiffs' complaint that Regan's auditing experience is

"stale" because "[h]e has not signed an audit report since 1995, and he has not

performed an audit since 1996,"[196] is unavailing.  The fact that Regan's primary

occupation is now as a professional expert does not render him unqualified to

---

[193]    *See id.* at 17:20-25.

[194]    *See id.* at 21:13-19.

[195]    Plaintiffs argue that because Regan opines in his report that the PwC personnel performing the audit of Lancer Funds lacked the experience required by ISA 310 to audit a hedge fund, *see* Regan Report at 10, Regan (whose experience in the hedge fund industry is also limited) should likewise be precluded from testifying about PwC's audits of Lancer Funds, *see* Pl. Reply at 7-8.  This argument incorrectly assumes, however, that Regan must meet ISA requirements to testify.  To the contrary, the admissibility of Regan's testimony depends on the requirements of Rule 702 – which the Second Circuit has "liberally construed," *TC Sys.*, 213 F. Supp. 2d at 174, and which are presumably less stringent than ISA requirements.

[196]    Pl. Mem. at 13.

-60-

testify about auditing standards.[197]  Regan has remained familiar with the practice

of auditing and auditing standards through his role as a litigation consultant and

there is no reason to believe that his understanding of auditing is too "stale" to be

helpful to a jury.[198]

### 2.    Opinions About Roles of Hedge Fund Administrators, Directors and Investment Managers

Plaintiffs request that Regan be precluded from testifying "about the

roles, duties, and responsibilities of hedge fund administrators, directors and

investment managers in this case" because he lacks expertise about these

matters.[199]  The Citco Defendants respond by arguing that PwC NA had an

obligation "to gain . . . an understanding of the respective roles" of these entities

and that Regan will be testifying "as to the roles of the administrator and

investment manager *only as they relate to the planning and performance of the*

*audits by PwC.*"[200]

---

[197]    *See* Regan Dep. at 10:21-11:23.

[198]    *See id.* at 12:5-12 ("Q. About how many of your auditing opinions
have, sort of on a percentage basis, involved International Accounting Standards
on auditing? . . .  A. It depends on the year. Some years it's 100 percent, some
years it's zero percent. I recall a block of about three years where it was all
International Auditing Standards.").

[199]    Pl. Mem. at 14.

[200]    Def. Mem. at 18 (emphasis added).

With respect to Regan's proposed testimony about the investment

manager, it is apparent from his expert report and deposition testimony that the

role of the investment manager in providing valuations to the auditor is both an

important part of his analysis and an issue that is normally relevant to auditing a

hedge fund.[201]  For example, Regan's report asserts that "ISA 540 required PwC to

appropriately test the Investment Manager's significant accounting estimates" and

opines that "PwC failed to comply with ISA 540 in several respects."[202]

Accordingly, Regan may testify about the role of the investment manger to the

extent that the investment manager's performance affected, or should have

affected, PwC NA's auditing process.

Regan claims this his testimony about the role of CFS-Curacao as

administrator of the Lancer Funds is relevant because CFS-Curacao "participated

in gathering information that was used by PwC" and therefore played "a role which

---

[201]    *See, e.g.*, Regan Dep. at 96:20-24 (stating that the role of the
investment manager would be relevant to his testimony "[t]o the extent that the
investment manager has made valuations and those valuation are used as a starting
point in the work of the auditor[.]"); Regan Report at 13 ("[T]he Investment
Manager had poor internal controls related to its investment valuation process, a
factor that was not appropriately considered or addressed by PwC."); *id.* at 14
("[T]he Investment Manager appeared to employ a pattern of repeated delays in
providing PwC with necessary evidential matter.").

[202]    Regan Report at 17.

PwC considered in its planning and execution of its audit procedures."[203]

However, the expert report provides little meaningful analysis about how the role

of CFS-Curacao affected PwC NA's performance as auditor of the Lancer Funds.

In addition, Regan expressly disclaimed any expertise about the duties of hedge

fund administrators.[204] Accordingly, because such testimony would be largely

irrelevant[205] and would be on a subject about which Regan has expressly

disavowed any expertise,[206] Regan may not testify about the roles and duties of

CFS-Curacao as administrator of the Lancer Funds.

     As for any proposed testimony about the hedge funds' directors, the

Citco Defendants have not suggested why such testimony would be relevant,[207] and

Regan asserted during a deposition that he has not been retained to opine on the

---

[203]    Regan Dep. at 84:21-85:4.

[204]    *See id.* at 31:25-32:3 ("Q. You're not an expert on the duties of hedge
fun administrators? . . . A. Correct.").

[205]    *See* Fed. R. Evid. 401, 402.

[206]    *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 548-49
(stating that testimony by experts who "disavow any expertise" on subjects about
which they later opine is "inherently unreliable" and should be excluded).

[207]    *See* Def. Mem. at 18 (concluding their brief's section on this issue:
"Thus, Regan properly opines as to the roles of the *administrator* and *investment
manager* as they relate to the planning and performance of the audits by PwC"
(emphasis added)).

-63-

duties of hedge fund directors.[208]  Because neither Regan nor the Citco Defendants

have suggested why such testimony would be relevant to his analysis of PwC NA's

auditing process, Regan may not testify about the roles and duties of the hedge

funds' directors.[209]

### 3.    The Orbiter Fund Ltd. and The Viator Fund Ltd.

Regan's expert report examines PwC NA's audits of the original and

primary Lancer Fund – Lancer Offshore.  However, the report asserts that its

conclusions pertain not only to the audits of Lancer Offshore, but also to the audits

of two other Lancer Funds – The Orbiter Fund, Ltd. ("Orbiter") and The Viator

Fund, Ltd. ("Viator") – that were later merged into OmniFund.[210]  Plaintiffs object

to Regan testifying about these latter two funds on the ground that Regan "has not

disclosed any adequate basis for opining on those audits."[211]

---

[208]    *See* Regan Dep. at 58:7-9 ("Q. And you haven't been asked to opine
on the duties of a hedge fun director, correct? . . . A. Correct.").

[209]    *See* Fed. R. Evid. 401, 402.

[210]    *See* Regan Report at 3.

[211]    Pl. Mem. at 15.  During a deposition, Regan asserted that he did, in
fact, analyze the audits of funds other than Lancer Offshore. *See* Regan Dep. at
76:14-16.  However, "the court does not fulfill its gatekeeper function if it simply
accepts the *ipse dixit* of an expert." *Malletier*, 525 F. Supp. 2d at 643 (citing
*Joiner*, 522 U.S. at 146). *Accord Major League Baseball Props.*, 542 F.3d at 311;
*Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) ("Transposition of
data based on such conjecture and rough approximation lacks the 'intellectual

-64-

The only rationale Regan has provided for attributing his conclusions

about Lancer Offshore to the Orbiter and Viator funds is his claim that "many of

the investments [Lancer Offshore] held were also held by the other Funds in the

relative percentage that each investment comprise of the total NAV of each of the

funds."[212] However, the chart that Regan points to in support of that assertion

shows that these investment portfolios – while similar in some respects – had

substantial differences.[213] Moreover, as Regan's report itself demonstrates,

analyzing the sufficiency of PwC NA's audits is not solely dependent on the

makeup of the Lancer Funds' financial portfolios.[214] Given the complexity of

---

rigor' required by *Daubert*." (quoting *Kumho Tire*, 526 U.S. at 152)). An expert's bare assertion that he has performed the necessary analysis is insufficient to show that his analysis is reliable.

[212]     Regan Report at 3.

[213]     For example, while the chart reflects that Lancer Offshore and Orbiter had twenty-seven and twenty-five percent of their funds respectively invested in a particular stock (SMX), Viator only had one percent of its fund in that stock. *See id.* at 4. In addition, the chart only reflects the funds' investments in three stocks (comprising between twenty-one percent and fifty-six percent of each fund's total portfolio) at one specific time (the first year that all three funds existed). *See id.* at 3-4.

[214]     For example, Regan opines that "[i]n 2000, Lancer Offshore's unrealized gains on investment securities were driven substantially by the gains it reported from its warrant holdings [(*i.e.*, a security that entitles the holder to purchase stock at a specified price)]," *id.* at 27, and that "[d]ue to PwC's audit failures" the fact that Lancer Offshore had changed its valuation methodology with respect to the warrants "was not disclosed to shareholders," *id.* at 28. The same

-65-

Regan's analysis, this bare-bones chart is insufficient to demonstrate that Regan's conclusions about PwC NA's audits of Lancer Offshore can reliably be applied to the Orbiter and Viator funds.[215]  Accordingly, Regan may not testify that his conclusions are applicable to these funds.

### 4.    PricewaterhouseCoopers LLP and PricewaterhouseCoopers International Ltd.

The bulk of Regan's expert report analyzes the activities of PwC NA – which was the PwC entity contracted to audit the Lancer Funds.  However, Regan's expert report also mentions Pricewaterhouse Coopers LLP ("PwC US") and PricewaterhouseCoopers International Ltd. ("PwC IL").  Plaintiffs request that Regan be precluded from testifying about PwC US and PwC IL on the grounds that such testimony "would be purely speculative and conclusory."[216]  Regan briefly discusses these entities at the outset of his report, and notes his understanding that they played a role in auditing the Lancer Funds.[217]  However, the rest of his report

---

alleged failures may have occurred with respect to the other funds, but it is impossible to determine this without Regan articulating his analysis as it applies to these funds.

[215]    *See Daubert*, 509 U.S. at 595 (holding that an expert's opinions must be based upon a "reliable foundation").

[216]    Pl. Mem. at 17.

[217]    *See* Regan Report at 5-7.

-66-

solely analyzes the conduct of PwC (NA).[218]  Because this lack of analysis

regarding the conduct of PwC US and PwC IL would make any opinions regarding

their conduct conclusory, Regan may not offer his opinion about the roles of these

entities.[219]

### B.    Collins Rebuttal Report

Collins has also submitted a rebuttal report responding to Regan's

expert report.  The report essentially addresses two subjects.  The vast majority of

the Collins rebuttal report is devoted to rebutting Regan's asserted opinions on the

duties of hedge fund administrators and directors.[220]  Because I have already

excluded Regan's testimony regarding these duties,[221] Collins's rebuttal testimony

on these matters is also excluded.  The remaining section of the report addresses

"Regan's conclusion that PwC-NA did not place substantial reliance on the

representation letters it received from the Citco Directors and from CFS-Curacao

as administrator."[222]  The Citco Defendants argue that Collins's testimony on this

---

[218]    Regan uses the acronym "PwC" to refer to PricewaterhouseCoopers (Netherlands Antilles).  *See id.* at 5 n.8.

[219]    *See Major League Baseball Props.*, 542 F.3d at 311.

[220]    *See* Collins Rebuttal Report at 2-9.

[221]    *See supra* Part VI.A.2.

[222]    Collins Rebuttal Report at 9 (citing Regan Report at 32-33).

matter should be excluded because Collins testified at deposition that he found no

direct evidence in the record to support his assertion that PwC NA placed

substantial reliance on these representation letters.[223] However, while Collins may

not have found any direct evidence in the record, his opinion is not unsupported.

For example, Collins makes permissible inferences regarding whether, based on

Collins's understanding of industry standards, Regan's testimony is likely to be

accurate.[224] Accordingly, while the Citco Defendants are entitled to cross examine

Collins on his admissions, his conclusions regarding whether PwC-NA would have

---

[223]    *See* Def. Collins Mem. at 22. *See also* Collins Dep. 447:23-448:9
("Q. So you don't have any – you have not identified anything in the record that
would suggest that in the 1997 audit, '98 audit, '99 audit or 2000 audit preformed
by PwC, that they placed significant reliance on the management rep letter? . . . A.
I have no basis whatsoever. Nothing that I read that – this is the only evidence that
I had available to me to respond to that particular sentence in Mr. Regan's
report.").

[224]    *See, e.g.*, Collins Rebuttal Report at 9 ("Regan's conclusion that PwC-
NA did not place substantial reliance on the representation letters it received . . . is
baseless. He premises this conclusion on the fact that the representation letters
were dated later than the date of the audit reports. But a hedge fund's audit report
is dated on the date of completion, or substantial completion, of the auditor's
fieldwork. Representation letters are solicited and signed at or after the conclusion
of field work." (citations omitted)); Collins Dep. at 444:25-445:13 ("Q. But with
respect to the 1999 audit report, what information do you have or have you
reviewed that suggest that PwC did, in fact, place significant reliance on the
management representation letters prior to issuing its opinion?. . . A. I am
responding to the assertion that there was no significant reliance on those letters.
And I am responding by rebutting that statement saying that they are important,
they asked for it; that the auditor is – should not be issuing their opinion without it.
. . . That's what the literature says.").

substantially relied on the representation letters are not so unreliable as to warrant exclusion. The Clerk of Court is directed to close these motions.

## VII.  CONCLUSION

For the aforementioned reasons, the parties motions *in limine* to exclude and/or limit the proposed testimony of expert witnesses is granted in part and denied in part.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          February 22, 2010

-69-

## - Appearances -

**For the Plaintiffs:**

Scott M. Berman, Esq.
Anne E. Beaumont, Esq.
Amy C. Brown, Esq.
Philip A. Wellner, Esq.
Robert S. Landy, Esq.
Lili Zandpour, Esq.
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway
New York, New York 10019
(212) 833-1100

**For the Citco Defendants:**

Lewis N. Brown, Esq.
Dyanne E. Feinberg, Esq.
Terence M. Mullen, Esq.
Elizabeth A. Izquierdo, Esq.
Gilbride, Heller & Brown, P.A.
One Biscayne Tower, 15th Floor
2 South Biscayne Blvd.
Miami, Florida 33131
(305) 358-3580

Eliot Lauer, Esq.
Michael Moscato, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178
(212) 696-6000

**For Defendant Banc of America Securities LLC:**

Peter K. Vigeland, Esq.
Dawn M. Wilson, Esq.
Paul M. Winke, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800